**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-MJ-0092** |
| | : | |
| **COUY GRIFFIN,** | : | **Judge Zia M. Faruqui** |
| | : | |
| **Defendant** | : | |

**DEFENDANT GRIFFIN'S MOTION FOR IMMEDIATE RELEASE AND
RESPONSE IN OPPOSITION TO GOVERNMENT'S MEMORANDUM
<u>IN SUPPORT OF PRETRIAL DETENTION</u>**

Defendant Couy (pronounced "Koi") Griffin, by his attorney, David B. Smith,

respectfully requests that the Court order his release from custody pursuant to the Bail Reform

Act (BRA) and the Fifth Amendment's Due Process Clause.  On January 17, 2021, Mr. Griffin

was arrested on a criminal complaint charging him with a single count of violating 18 U.S.C. §

1752(a)(1), by knowingly entering or remaining in a restricted building or grounds without

lawful authority.  For this misdemeanor offense, the government requests his pretrial detention,

primarily contending that he poses a danger to the community.  Its argument rests on a

misleading and selective presentation of the evidence.  For the following reasons, it would be in

error to order pretrial detention of Mr. Griffin.  Mr. Griffin waives his right to be present at the

hearing so that it may be expedited.

Supreme Court precedent makes it unconstitutional for a court to detain a defendant

when, as here, there is no basis for detention under 18 U.S.C. § 3142(f). As all six courts of

appeals to address the question have recognized, the only permissible bases for detaining a

defendant are the enumerated factors set out in 18 U.S.C. § 3142(f). Under § 3142(f), ordinary

risk of flight is not a permissible basis for detention; rather, the statute only authorizes detention

if there is a "*serious risk* that [the defendant] will flee." § 3142(f)(2)(A) (emphasis added).
Further, data from the Administrative Office of the U.S. Courts show that there is an exaggerated
concern over risk of flight in our system and that the vast majority of released defendants do not
flee.  Here, the government has presented no evidence that Mr. Griffin poses a "serious risk" of
flight. § 3142(f)(2)(A).  Nor is there any evidence of "a serious risk that the defendant will
obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witness or
juror." § 3142(f)(2)(B).  The government cites three of Mr. Griffin's public statements
concerning firearms to insinuate he may have intended to commit acts of violence at the Capitol
on January 6 and during the inauguration.  Publicly available videos and FBI memoranda show
the government has selectively omitted contemporaneous statements in which Mr. Griffin
explained that he lawfully carried firearms solely to protect himself and his family from death
threats, as he had informed the FBI on multiple occasions.  He has no relevant criminal history.

Accordingly, Mr. Griffin must be released on bond with appropriate conditions of
release, particularly as other defendants involved in the January 6 incident have been so released
despite entering the Capitol Building, stealing government property and menacing public
officials.  The government does not contend Mr. Griffin did any of those things.  18 U.S.C. §§
3142(a)–(c).  In support of this motion, which is also an opposition to the government's motion
in support of pretrial detention, Mr. Griffin argues the following points.

## FACTUAL BACKGROUND

Cuoy Griffin, 47, is a county commissioner for Otero County, New Mexico.[1]  On January
6, 2021, he traveled to Washington, D.C., to participate in the rally near the Capitol.  On the

---

[1] In this misdemeanor trespassing case, the government's motion for pretrial detention dwells on
Mr. Griffin's political views and activities, describing them as "inflammatory, racist, and at least
borderline threatening advocacy." Gov't Mot., p. 2.  Besides being unfairly prejudicial and

same day, a joint session of Congress convened at the Capitol to certify the vote count of the Electoral College for the 2020 presidential election.  The session began at approximately 1:00 p.m.  Vice President Mike Pence was present and presiding.  According to the statement of facts attached to the criminal complaint, "temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol police were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside." Compl., p. 2.  Shortly after 2 p.m., the crowd "forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol police." *Id.*

 After receiving a tip that Mr. Griffin was present at the Capitol that day, Special Agents interviewed him on January 11.  According to their notes, Mr. Griffin told the agents that he "walked down to the Capitol building, where there was already a large crowd around the barricades." FD-302, 1/11/21, attached hereto as Exh. 1.  At that point, Mr. Griffin,

> got caught up in the crowd, which eventually pushed through the barricades. [He] saw many people scaling walls and scaffolding to get up to the Capitol's front patio.  In his area, there were people flying flags, but no one violent. . .Neither [he] nor [his acquaintance] entered the capitol building.  At one point, a man with a bullhorn gave it to [Griffin], who led a prayer on the steps. . .[Griffin] was never asked to leave the area by the police, and exited peacefully. He even encountered a former congressman on the way out and had a nice chat with him.

Exh. 1, p. 2.

The complaint attaches a photograph of Mr. Griffin standing on the west front of the Capitol building steps.  Compl., p. 4.  The complaint describes this position as "well within the

---

irrelevant, the First Amendment bars the Court from considering protected speech and political advocacy of the type cited by the government in considering whether to detain Mr. Griffin and to what extent he should be punished at sentencing, should he be convicted.  *See, e.g.*, *United States v. Lemon*, 723 F.2d 922, 938 n. 47 (D.C. Cir. 1983) (collecting cases).

restricted area." *Id.*  The complaint does not allege that Mr. Griffin entered the Capitol Building.

The complaint does not define "restricted area." It alleges as follows:

> On January 6, 2021, permanent and temporary security barriers were in place to separate areas where lawful first amendment activity could be conducted from areas restricted both to prevent any adverse impact on the legislative process and to safeguard and prevent and [sic] property damage directed at the U.S. Capitol and West Front Inaugural Platform.

Compl., p. 2.

The Complaint cites two postings indicating to the public that the area Mr. Griffin

entered was "restricted": bike racks and green snow fencing; and signage stating, "Area Closed

By order of the United States Capitol Police Board." Compl., p. 2.

Mr. Griffin was charged under 18 U.S.C. § 1752(a)(1).  That section makes it a federal

misdemeanor to "knowingly enter[] or remain[] in any restricted building or grounds without

lawful authority to do so." 18 U.S.C. § 1752(a)(1).  Although it is not referenced in the

Complaint, "restricted buildings or grounds" is defined statutorily.  In Section 1752, that phrase

means "any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c)(1).

To establish a Section 1752(a)(1) offense, the government must show that Mr. Griffin

knew that the area in which he "enter[ed] or remain[ed]" was one of the areas described in

Section 1752(c)(1).  *United States v. Bursey*, 416 F.3d 301, 309 (4th Cir. 2005).  The Complaint

does not allege that either of subsections (A) or (C) in Section 1752(c)(1) is satisfied here.  It

does not allege that Mr. Griffin knew that the area in which he "enter[ed] or remain[ed]" was "of

a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

## ARGUMENT

### I.   The BRA Only Authorizes Detention at the Initial Appearance When One of the § 3142(f) Factors is Met

According to the plain language of § 3142(f), "the judicial officer shall hold a [detention] hearing" only "in a case that involves" one of the seven factors listed in § 3142(f)(1) & (f)(2). None of the § 3142(f) factors are actually present in this case.[2] Ordinary "risk of flight" is not among the § 3142(f) factors.

### A.   Supreme Court Precedent and the Plain Language of the BRA Prohibit This Court from Detaining Griffin

The Supreme Court's seminal opinion in *United States v. Salerno*, 481 U.S. 739 (1987), confirms that a detention hearing may only be held if one of the seven § 3142(f) factors is present. *See id*. at 747 ("Detention hearings [are] available if" and only if one of the seven § 3142(f) factors is present.).  Held the Court, "[t]he Act operates only on *individuals who have been arrested for a specific category of extremely serious offense*s. 18 U.S.C. § 3142(f)." *Id.* at 750 (emphasis added); *see also id.* at 747 ("The Bail Reform Act *carefully limits the circumstances under which detention may be sought* to the most serious of crimes," specifically the crimes enumerated in § 3142(f)) (emphasis added). *Salerno* thus stands for the proposition

---

[2] This case does not meet any of the five factors discussed in § 3142(f)(1), as it does not involve: (1) a crime of violence under (f)(1)(A); (2) an offense for which the maximum sentence is life imprisonment or death under (f)(1)(B); (3) a qualifying drug offense under (f)(1)(C); (4) a felony after conviction for two or more offenses under the very rare circumstances described in (f)(1)(D); or (5) a felony involving a minor victim or the possession/use of a firearm under (f)(1)(E). The government has also presented no evidence to establish that this case meets either of the two additional factors discussed in § 3142(f)(2): (1) a "serious risk that [the defendant] will flee" under (f)(2)(A); or (2) a "serious risk" that the defendant will engage in obstruction or juror/witness tampering under (f)(2)(B), as discussed *infra* in Sections II – VI.

that the factors listed in § 3142(f) serve as a gatekeeper, and only certain categories of defendants are eligible for detention in the first place.  As the D.C. Circuit has held, "First, a [judge] must find one of six circumstances triggering a detention hearing…. [under] § 3142(f). Absent one of these circumstances, detention is not an option." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

If no § 3142(f) factor is met, several conclusions follow: the government is prohibited from seeking detention and there is no legal basis to detain the defendant at the initial appearance, jail the defendant, or hold a detention hearing.  Instead, the court is required to release the defendant on personal recognizance under § 3142(b) or on conditions under § 3142(c).  The strict limitations § 3142(f) places on pretrial detention are part of what led the Supreme Court to uphold the BRA as constitutional.  It was the § 3142(f) limitations, among others, that led the Court to conclude that the Act was "regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause." *Salerno*, 481 U.S. at 748.[3]  Throughout its substantive Due Process ruling, the *Salerno* Court emphasized that the only defendants for whom the government can seek detention are those who are "already indicted or held to answer for a *serious* crime," meaning the "extremely serious offenses" listed in §

---

[3] The *Salerno* Court further relied on the limitations in § 3142(f) in another component of its substantive Due Process ruling, its conclusion that "the government's interest in preventing crime by arrestees is both legitimate and compelling." *Id*. at 749. To reach this conclusion, the Court contrasted the Bail Reform Act with a statute that "permitted pretrial detention of any juvenile arrested on any charge" by pointing to the gatekeeping function of § 3142(f): "The Bail Reform Act, in contrast, narrowly focuses on a particularly acute problem in which the Government interests are overwhelming. The Act operates *only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U.S.C. § 3142(f).*" *Id*. at 750 (emphasis added). The Court emphasized that Congress "specifically found that these individuals" arrested for offenses enumerated in § 3142(f) "are far more likely to be responsible for dangerous acts in the community after arrest." *Id*.

3142(f)(1).  *Id.* (emphasis added); *see also United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (discussing the BRA's legislative history).

### B.   The Courts of Appeals Agree That Detention is Prohibited When No § 3142(f) Factor is Present

Following the Supreme Court's guidance in *Salerno*, six courts of appeals agree that it is illegal to even hold a detention hearing unless the government invokes one of the factors listed in 18 U.S.C. § 3142(f). *See, e.g., United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *United States v. Friedman*, 837 F.2d 48, 48–49 (2d Cir. 1988); *Himler*, 797 F.2d at 160; *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992); *United States v. Twine*, 344 F.3d 987 (9th Cir. 2003); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).  For example, the First Circuit holds: "Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists." *Ploof*, 851 F.2d at 11. The Fifth Circuit agrees.  *See Byrd*, 969 F.2d at 109 ("A hearing can be held only if one of the . . . circumstances listed in (f)(1) and (2) is present," and "[d]etention can be ordered, therefore, only 'in a case that involves' one of the . . . circumstances listed in (f).") (quoting § 3142(f)).

Unfortunately, a practice has developed that results in defendants being detained in violation of the BRA, *Salerno*, and the Constitution.  Specifically, it is common for the government to seek detention at the initial appearance on the ground that the defendant is either "a danger to the community," "a risk of flight," or both.[4] Because neither "danger to the

---

[4] *See, e.g., The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. (Nov. 14, 2019), Written Statement of Alison Siegler at 8, https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf (presenting Congress with court-watching data demonstrating that federal prosecutors regularly violate the BRA by requesting detention at the initial appearance on the impermissible ground of ordinary—not serious—risk of flight and by failing to provide any evidence to support the request).

community" nor ordinary "risk of flight" is a factor listed in § 3142(f), it is illegal to hold a detention hearing on either of these grounds at the initial appearance.[5]

### C. Supreme Court Precedent and the Plain Language of the BRA Prohibit This Court from Detaining Griffin as an Ordinary "Risk of Flight"

Ordinary "risk of flight" is not a factor in § 3142(f). By its plain language, § 3142(f)(2)(A) permits detention and a hearing only when a defendant poses a "*serious* risk" of flight. There is some risk of flight in every criminal case; "serious risk" of flight means something more. According to a basic canon of statutory interpretation, the term "*serious* risk" means that the risk must be more significant than an ordinary risk. *See, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretative canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation omitted).

### D. It is Improper to Detain Griffin Because the Government Has Provided *No Evidence* to Support its Claim that He is a Serious Risk of Flight

Where the government's only legitimate § 3142(f) ground for detention is "serious risk" of flight, the government bears the burden of presenting some *evidence* to support its allegation that a defendant poses a "serious risk" of flight rather than the ordinary risk attendant in any criminal case. A defendant "may be detained *only if the record supports a finding* that he presents a serious risk of flight." *Himler*, 797 F.2d at 160 (emphasis added); *see also United States v. Robinson*, 710 F. Supp. 2d 1065, 1088 (D. Neb. 2010) (criticizing the government for failing to present evidence of "serious risk" of flight at the initial appearance and saying "no

---

[5] *See id*. at 7 ("Yet judges regularly detain people under [§ 3142(f)(2)(A)] in non-extreme, ordinary cases without expecting the government to substantiate its request or demonstrate that there is a 'serious risk' the person will flee.").

information was offered to support [the] allegation").  After all, the statute only authorizes

detention "*in a case that involves*" a "serious risk" that the person will flee. § 3142(f)(2)(A)

(emphasis added). This contemplates a judicial finding about whether the case in fact involves a

serious risk of flight.[6]

The BRA's legislative history makes clear that detention based on serious risk of flight is

only appropriate under "extreme and unusual circumstances."[7] For example, the case relied on in

the legislative history as extreme and unusual enough to justify detention on the grounds of

serious risk of flight involved a defendant who was a fugitive and serial impersonator, had failed

to appear in the past, and had recently transferred over a million dollars to Bermuda. *See*

*Abrahams*, 575 F.2d at 4. The government must demonstrate that the risk of flight in a particular

case rises to the level of extreme or unusual, and no such showing has been made here.

---

[6] Had Congress intended to authorize detention hearings based on a mere certification by the
government, Congress could have enacted such a regime, just as they have done in other
contexts. *See, e.g.,* 18 U.S.C. § 5032 (creating exception to general rule regarding delinquency
proceedings if "the Attorney General, after investigation, certifies to the appropriate district court
of the United States" the existence of certain circumstances); 18 U.S.C. § 3731 (authorizing
interlocutory appeals by the government "if the United States attorney certifies to the district
court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof
of a fact material in the proceeding").

[7] *See Bail Reform Act of 1983: Rep. of the Comm. on the Judiciary*, 98th Cong. 48 (1983)
("Under subsection f(2), a pretrial Detention Hearing may be held upon motion of the attorney
for the government or upon the judicial officer's own motion in three types of cases….T]hose
[types] involving…a serious risk that the defendant will flee…*reflect the scope of current case
law that recognizes the appropriateness of denial of release in such cases*.") (emphasis added)
(citing *United States v. Abrahams*, 575 F.2d 3, 8 (1st Cir. 1978)—which held that only a "*rare
case of extreme and unusual circumstances*…justifies pretrial detention"—as representing the
"current case law"); *see also Gavino v. McMahon*, 499 F.2d 1191, 1995 (2d Cir. 1974) (holding
that in a noncapital case the defendant is guaranteed the right to pretrial release except in
"extreme and unusual circumstances"); *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir.
1976) (holding that bail can only be denied "in the exceptional case").

In addition, a defendant should not be detained as a "serious risk" of flight when the risk of non-appearance can be mitigated by conditions of release. The only defendants who qualify for detention under § 3142(f)(2)(A) are those who are "[t]rue flight risks"—defendants the government can prove are likely to willfully flee the jurisdiction with the intention of thwarting the judicial process.[8]

## II.   The Government Has Not Met Its Burden of Proving that Griffin Poses a *"Serious"* Risk of Flight Under § 3142(f)(2)(A)

Mr. Griffin must be released immediately on conditions because the government did not present any evidence to establish that "there is a serious risk that the [defendant] will flee" the jurisdiction under § 3142(f)(2)(A).  Although the defense bears no burden of proof, it is clear from Mr. Griffin's history and characteristics that he does not pose a serious risk of flight.

Mr. Griffin is a publicly elected official for Otero County, New Mexico.  He has been gainfully employed continuously since the 1990s.  The only conviction in his criminal history is *a DUI almost 25 year ago*.   He is a part of a large and loving family, including a sister and brothers and seven-year-old son, who are deeply concerned for his welfare, familiar with his case, and steeped in respect for law enforcement.  As further discussed below, in the same public statements cited by the government to insinuate he is a threat to the public, Mr. Griffin praises at length the law enforcement efforts of the FBI and local D.C. police.

---

[8] *See, e.g.,* Lauryn Gouldyn*, Defining Flight Risk*, 85 U. Chi. L. Rev. 677, 724 (2017). This rule is sound policy, as the risk of a defendant becoming either a "local absconder" (who intentionally fails to appear but remains in the jurisdiction), or a "low-cost non-appearance" (who unintentionally fails to appear), can be addressed by imposing conditions of release like electronic monitoring, GPS monitoring, and support from pretrial services. *See* Gouldyn, 85 U. Chi. L. Rev. at 724.

In multiple conversations with the FBI, Mr. Griffin has abjured violence, lawbreaking, and disrespect to law enforcement.  In the aforementioned January 11 interview, he told agents "he expected the [January 6] rally to be peaceful and it largely was [based on what he witnessed]." Exh. 1, p. 1.  Mr. Griffin "stated he would inform the FBI if he encountered any individuals attempting to organize violence at the [inauguration] protest. . ." *Id.*  He "asked the FBI to contact him if they believed his comments may be a violation of law so he can avoid jail." *Id.*  Matt Struck, an associate of Mr. Griffin's who traveled to the January 6 rally with him, explained that he and Mr. Griffin "stay away from Proud Boys and militia-types, preferring to support law enforcement." FD-302, 1/11/21, Exh. 2, p. 2.

On January 16, Special Agents called Mr. Griffin as he traveled back to Washington, D.C., for the inauguration.  FD-302, 1/16/21, Exh. 3, p. 1.  Mr. Griffin candidly informed the agents of his plan to attend the inauguration and even gave the agents permission to enter his office in New Mexico and gather information about threats made against him and his family.  *Id.*

These are not the actions of someone who is a serious risk of flight—in the face of a misdemeanor offense carrying less potential prison time than a sentence for skipping bail. The only argument offered by the government is Mr. Griffin's "lack of ties . . . to Washington, D.C." Gov't Mem., p. 7.  It cites no authority, and there is none for the frivolous and unconstitutional proposition that every non-D.C. resident must be detained pretrial.

## III.   Statistics Showing that It is Extraordinarily Rare for Defendants on Bond to Flee Further Demonstrate that Mr. Griffin Does Not Pose a Serious Risk of Flight.

The government's own data show that when release increases, crime and flight do not.  In this case, the Court should be guided by AO statistics showing that nearly everyone released pending trial appears in court and doesn't reoffend. In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and 98% did not commit new crimes on

bond.[9] Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[10] Even in districts that release two-thirds of all federal defendants on bond, fewer than 1% fail to appear in court.[11] The below chart reflects this data:



[9] Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[10] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. *See* AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42. The failure-to-appear and rearrest rates for these districts were calculated using AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 26.00%) have an average failure-to-appear rate of 1.37%, while the ten districts with the highest release rates (average 65.58%) have an *even lower* failure-to-appear rate of 0.87%. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 1.19%, while the ten districts with the highest release rates have an average rearrest rate of 2.29%. The districts with the lowest release rates are, from lowest to highest, S.D. California, W.D. Arkansas, E.D. Tennessee, S.D. Texas, E.D. Missouri, N.D. Indiana, E.D. Oklahoma, W.D. Texas, W.D. North Carolina, C.D. Illinois; the districts with the highest release rates are, from lowest to highest, E.D. Michigan, E.D. Arkansas, D. New Jersey, E.D. New York, D. Maine, D. Connecticut, W.D. New York, W.D. Washington, D. Guam, D. Northern Mariana Islands.

[11] *See* AO Tables H-14A and H-15.

Yet despite the statistically low risk of flight that defendants like Mr. Griffin pose, the government recommends detention in 77% of cases nationwide. *See* AO Table H-3. Clearly, the government's detention requests are not tailored to the low risk of flight and recidivism that defendants pose.  Mr. Griffin must be released because the government has not presented evidence that shows that he would be among the approximately 1% of defendants who fail to appear in court.  Detaining Mr. Griffin without evidence that he poses a "serious risk" of flight violates his constitutionally protected liberty interest.

**IV.     There Is No Other Basis to Detain Mr. Griffin as a Serious Risk of Flight in this Case**

The potential maximum penalty in this *misdemeanor* case is only one year in prison and a fine. That unusual fact cuts strongly against the government's detention request. There is no evidence Congress intended courts to detain even a client facing a long prison sentence. Indeed, many federal defendants face long sentences—being a defendant in a run-of-the-mill federal case cannot possibly be an "extreme and unusual circumstance." Even at the detention hearing, where the standard for finding a serious risk of flight is lower than at the initial appearance, Congress did not authorize courts to evaluate potential penalty when considering risk of flight. *See* § 3142(g) (listing as relevant factors (1) the nature and seriousness of the charge, (2) the weight of the evidence against the defendant, and (3) the history and characteristics of the defendant); *Friedman*, 837 F.2d at 50 (in "cases concerning risk of flight, we have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support finding risk of flight") (emphasis added).

Additionally, a criminal record also does not by itself render a client a serious risk of flight. To the contrary, evidence that a defendant has complied with court orders in the past supports a finding that he is not a serious risk of flight.  *See, e.g., United States v. Williams*, 1988

WL 23780, at *1 (N.D. Ill. Mar. 8, 1988) (defendant who made regular state court appearances in the past deemed not a serious flight risk). Here, *Mr. Griffin has one DUI conviction alone from nearly 25 years ago.*

## V.   Detaining Griffin as a Serious Risk of Flight Is Not Only Legally Unsupported, But Also Harmful and Unnecessary

### A.   A Few Days of Detention Can Have Disastrous Consequences on Someone's Life

Congress was correct to cabin pretrial detention to "extreme and unusual circumstances," because even very short periods of detention have been shown to seriously harm defendants. For example, according to a recent study published by the Administrative Office of the U.S. Courts, 37.9% of federal defendants detained fewer than three days reported having a negative outcome at work (such as losing their job).[12] Likewise, 29.9% of people detained fewer than three days reported that their housing became less stable.[13] In other words, a substantial minority of people held for only one or two days in federal cases still lose their jobs or their housing as a result of the brief detention.

The first few days of detention can also be dangerous. According to the Bureau of Justice Statistics, between 38% and 45% of all jailhouse rapes perpetrated on a male victim happen within three days of admission.[14] Over 40% of people who die in jail die within their first

---

[12] Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) Federal Probation 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83.

[13] *Id.*

[14] Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2008–09, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK.

week.[15] Despite the trauma and danger inherent in the first few days of a jail stay, jails' physical and mental health screenings and treatment offerings are often inadequate.[16]

In sum, detaining Mr. Griffin for even one or two days in this case is not just illegal—it could also jeopardize [his/her] physical, financial, and mental wellbeing.  These risks are not merely hypothetical.  For the first seven days of his confinement, Mr. Griffin represents that he did not receive a shower.  He represents that the only toilet available to him has been clogged for his entire detention and that when he complains, he is given baby wipes.

### B.   Many Conditions of Release Have Been Proven to Effectively Manage Ordinary Risk of Flight or Nonappearance

Any concerns the Court may have about nonappearance can be allayed by imposing any number of conditions of release that have been shown empirically to reduce the risk of nonappearance.  For example, a study conducted in New York state courts found that text message reminders were able to reduce failures to appear by up to 26%, translating to 3,700 fewer arrest warrants per year.[17] Holistic pre-trial services focused on providing social services and support to clients also reduce the risk of non-appearance across all risk levels in state

---

[15] Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[16] *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman, et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 Journal of Substance Abuse Treatment 239, 247–49 (2007), archived at https://perma.cc/G55Z-4KQH.

[17] *See* Brice Cooke et al, *Text Message Reminders Decreased Failure to Appear in Court in New York City*, Abdul Latif Poverty Action Lab (2017), archived at https://perma.cc/JCW7-JVZW.

systems.[18] Moreover, scholars and courts agree that electronic monitoring is especially effective

at reducing risk of flight.[19] Mr. Griffin has already driven across the U.S. twice; is able to do so

again, or to pay for a plane ticket to Washington, D.C.

## VI.     There is No Evidence Showing a Serious Risk Griffin Will Obstruct or Attempt to Obstruct Justice or Threaten, Injure, or Intimidate a Prospective Witness or Juror (§ 3142(f)(2)(B))

Mr. Griffin is not a mafia member.  He is an elected official on the governing body of

Otero County, New Mexico and a pastor.  He is a well-known figure in his home state, where he

was born and lived his entire life.  He has never been charged with an attempt to obstruct justice

or threaten, injure or intimidate a witness or juror. He is charged with a misdemeanor and there

appears to be some doubt that the government even intends to go through with his prosecution

for that charge. *See* Devlin Barrett and Spencer S. Hsu, *Justice Department, FBI debate not*

*charging some of the Capitol rioters*, Wash. Post, Jan. 23, 2021. The *Post* reports that "some in

federal law enforcement are concerned that charging people solely with unlawful entry, when

they are not known to have committed any other bad acts, could lead to losses if they go to trial.

'If an old man says all he did was walk in and no one tried to stop him, and he walked out and no

---

[18] *See generally* Christopher Lowenkamp and Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes*, John and Laura Arnold Foundation, Special Report (2013), archived at https://perma.cc/R3F3-KZ76.

[19] *See, e.g.,* Samuel R. Wiseman, *Pretrial Detention and the Right to the Monitored*, 123 Yale L. J. 1344, 1347–48 (2014) ("Increasingly sophisticated remote monitoring devices have the potential to sharply reduce the need for flight-based pretrial detention….[T]he question of finding other ways of ensuring a non-dangerous defendant's presence at trial is one not of ability, but of will...."); *id.* at 1368–74 (citing studies in both European and American contexts to demonstrate that electronic monitoring is at least as effective as secured bonds at deterring flight, and that it comes at far reduced cost to both the defendant and the government); *United States v. O'Brien*, 895 F.2d 810, 814–16 (1st Cir 1990) (describing reduction in flight rate from monitoring program and concluding that "evidence concerning the effectiveness of the bracelet alone [] arguably rebuts the presumption of flight").

one tried to stop him, and that's all we know about what he did, that's a case we may not win,'

one official said."

The article reports that "federal officials estimate that roughly 800 people surged into the

[Capitol] building." Mr. Griffin was clearly not one of them. He did not even try to enter the

Capitol building and no one claims he did anything besides giving a five-minute religious

sermon to the crowd around him on the Capitol grounds. If the government is not going to

prosecute most of the 800 people who surged into the building, why should they continue to

pursue Mr. Griffin, who didn't even approach the entrance to the Capitol building? By the time

the Court reads this, Mr. Griffin will have already spent over a week in solitary detention at the

D.C. jail, which ought to be enough to punish him for his actions on January 6, assuming

*arguendo* they were illegal.

The government relies on two of Mr. Griffin's public statements concerning firearms.  Its

characterization of his comments is misleading and selective.  It cites a January 14 meeting of the

Otero County Commission in which Mr. Griffin spoke for approximately 17 minutes.   The

government writes:

> [T]he defendant  spoke at the commission  meeting about his plans to return to
> Washington, D.C. to protest President-Elect Biden's inauguration on January 20, 2021.
> The defendant stated that he intended to bring his firearms with him when he traveled to
> Washington, D.C. Specifically, the defendant stated: "I am going to leave either tonight
> or tomorrow. I've got a .357 Henry big boy rifle . . . that I got in the trunk of my car, and
> I've got a .357 single action revolver . . . that I will have underneath the front seat on my
> right side. And I will embrace my Second Amendment, I will keep my right to bear arms,
> my vehicle is an extension of my home in regard to the constitution law, and I have a
> right to have those firearms in my car."

Gov't Mem., p. 5.

This passage is intended to lead the Court to believe that Mr. Griffin may have planned

violence in this district during the inauguration.  However, the government omits Mr. Griffin's

very next words which refute that impression.  After stating, "I have a right to have those

firearms in my car," Mr. Griffin then immediately adds the following explanation:

> As everybody here that works in the County [knows], I can see it on your faces and it breaks my heart how tired you are from the harassment.  Whenever I walk through the front door, I see the sweetest lady that works in this building, Diane, sitting there and she can't even hardly look up at me because she's been getting the threats all day long. It infuriates me.  But what am I to do? . . .

> It is unfortunate that there are so many hateful people on the left that treat people so horribly as to just attack somebody that they don't know.  But I appreciate those people too . . . because they have been calling the FBI repeatedly.

> Which I am thankful for, because the FBI contacted me about two days ago, and I was able to have a fantastic conversation with them. Great agents: they still understand what the Constitution is about, they still understand what freedom of speech is about, they still understand what rights are about.  And I believe those men I talked to out of that FBI office in Las Cruces are true patriots. So, I believe that the FBI is going to defend my rights to be able to carry firearms in my car.  What else was beautiful about it is I was able to speak about the threats I was receiving and they were aware of them. . . The threats since I started this have been horrible and the FBI should have been contacted by somebody.

> When I received pictures of me and my family all with crosshairs on our heads, and my baby's about five months old in the picture and he's got a crosshair on his head, and I've got to read the most vile stuff and the death threats that are sent to an elected official in county email. . . Now the FBI is going to start investigating all of these threats that have been made to me personally as well as made to others in the county.  And that's the only way we're going to be able to stop this going forward.  . . I am turning all of my access to all of my county emails over to the FBI, I am turning all of my Facebook page and all my Facebook inbox messages over to the FBI, and I am also going to turn all the hate mail I have received over to the FBI.



Screenshot from Otero County Commission Meeting of Jan. 14, 2021, available at: https://youtu.be/dyOklmYmvr4?t=4411.

Mr. Griffin's remarks on January 14 show that he believed he needed to carry firearms to protect himself and his family—not to harm people in Washington, D.C. This explanation was publicly available on the internet when the government selectively quoted his January 14 statement to detain Mr. Griffin pretrial. Also omitted from the government's motion are similar mitigating statements made by Mr. Griffin to Special Agents during interviews before the inauguration. Exh. 1-3.

The government also quotes from a video posted on Facebook in which Mr. Griffin apparently said the following concerning the January 6 incident at the Capitol:

> You want to say that that was a mob? You want to say that was violence? No sir. No Ma'am. No, we *could* have a 2nd Amendment rally on those same steps that we had that rally yesterday. You know, and *if we do*, then it's gonna be a sad day, because there's gonna be blood running out of that building. But at the end of the day, you mark my word, we will plant our flag on the desk of Nancy Pelosi and Chuck Schumer and Donald J. Trump if it boils down to it.

Gov't Mem., pp. 3-4 (emphasis added).

This statement yields no support for pretrial detention, for several reasons. First, although it suggests Mr. Griffin intended to bring firearms to Washington, D.C., during the

inauguration, the government neglects to inform the Court that Mr. Griffin decided not to bring

them, as it would be unwise, a fact corroborated by the FBI.  FD-302, 1/17/21, Exh. 4, p. 4.

Second, inflammatory though this isolated statement may be, it is patently within the bounds of

constitutionally protected speech.  As such, the Court may not deny the defendant bail on

account of it.  *Lemon*, 723 F.2d at 938 n. 47.

Saying "*If* we had a 2nd Amendment rally, there's gonna be blood running"—when there

was no such firearms rally planned as of January 6— is constitutionally protected speech because

(1) it is not speech directed to or inciting "imminent lawless action" and (2) the government has

not offered any evidence it was likely to produce such action. *Brandenburg v. Ohio*, 395 U.S.

444, 447 (1969); *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (applying *Brandenburg*, finding

First Amendment protected protestor's statement, "We'll take the fucking street again, later," as

the speech "amounted to nothing more than advocacy of illegal action at some indefinite future

time.").

In sum, the government has offered no evidence whatsoever that Mr. Griffin, who has no

relevant criminal history at age 47, will injure, threaten or intimidate potential witnesses or

jurors.

## VII.   Mr. Griffin Requests Immediate Release on His Own Recognizance or with the Least Restrictive Conditions that Would "Reasonably Assure" His Appearance

As this Court is aware, other defendants charged with offenses relating to the January 6

incident at the Capitol have been granted bail.  And in cases far more serious than Mr. Griffin's.

Recently, Riley June Williams was not detained pretrial.  *See Speaker at Jan. 5 pro-Trump rally*

*charged with encouraging mob*, *impeding police during Capitol breach*, Wash. Post, Jan. 25,

2021, available at: https://www.washingtonpost.com/local/legal-issues/brandon-straka-arrested-

capitol-riot/2021/01/25/e359ec3a-5f45-11eb-9430-e7c77b5b0297_story.html.  Not only did

Williams allegedly enter the Capitol Building, unlike Mr. Griffin, she may have stolen a laptop from the office of the Speaker of the House and attempted to sell it to Russians.  In addition, the government contended that Ms. Williams may have attempted to destroy evidence.  *Id.*

Other defendants who secured bail include a man who entered the Capitol Building carrying a Confederate battle flag (as well as his co-defendant son), a woman who entered the legislative chamber with zip ties, and the son of a judge who appeared in the Capitol wearing a fur pelt costume, to name a few.  *NYC man arrested on Capitol riot charges freed on $100,000 bond*, AP News, Jan. 12, 2021, available at: https://apnews.com/article/aaron-mostofsky-100k-bond-capitol-riots-be62a48e605c8916c5183e70bd6e3a25. All of these defendants face charges more serious than Mr. Giffin's.

Because there is no basis to detain Mr. Griffin, he respectfully requests that he be released immediately on his own recognizance or under the least restrictive conditions that the Court believes will "reasonably assure" his appearance and the safety of the community. § 3142(c).

Respectfully submitted,

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com
*Appointed by the Court*

Nicholas D. Smith, VA Bar No. 79745
David B. Smith, PLLC
7 East 20th Street, Suite 4R
New York, NY 10003
(917) 722-1096
nds@davidbsmithpllc.com

**<u>Certificate of Service</u>**

I hereby certify that on the 27th day of January, 2021, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

> JANANI IYENGAR
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-7846

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, VA Bar No. 25930
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com
> *Appointed by the Court*