**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:21-mj-92 |
| COUY GRIFFIN, | ) |
| | ) **District Judge Beryl A. Howell** |
| Defendant. | ) |
| | ) |

**DEFENDANT GRIFFIN'S MOTION TO REVOKE PRETRIAL DETENTION ORDER**

David B. Smith (D.C. Bar No. 403068)
DAVID B SMITH PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (Va. Bar. No. 79745)
7 East 20th Street
Suite 4R
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Couy Griffin*

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND…..…………………………………………………….2

THE MAGISTRATE JUDGE'S DECISION…..……………………..…..…………………….5

ARGUMENT…………………………………………………...……………………...……. 5

I.      The BRA authorizes detention at the initial appearance only when one of the §
        3142(f) factors is met…..................................................................................….6

        A.      Supreme Court precedent and the plain language of the BRA
                prohibit detention absent § 3142(f) factors………………....………………6

        B.      The courts of appeals agree that detention is prohibited when no § 3142(f)
                factor is present……………………………………………………....………8

        C.      The government's burden to show a "serious risk" of flight is heavy..…...…9

II.     The government has not met its burden of proving that Griffin poses a "serious"
        risk of flight under § 3142(f)(2)(A)…………………………………….…………...…..12

III.    There is no evidence showing a serious risk that Griffin will obstruct or attempt
        to obstruct justice or threaten, injure, or intimidate a prospective witness or juror…....14

IV.     Defendants who entered the Capitol Building and committed additional crimes,
        unlike Griffin, have been released on bail…………………….……………..……….....19

CONCLUSION……………………………………….……………...………20

Defendant Couy Griffin, by his attorneys, respectfully requests that the Court revoke the pretrial detention order entered in this matter on February 1, 2021, pursuant to 18 U.S.C. § 3145(b).  On January 17, 2021, Mr. Griffin was arrested on a criminal complaint charging him with a single count of violating 18 U.S.C. § 1752(a)(1), by knowingly entering or remaining in a restricted building or grounds without lawful authority, to wit, the west front of the Capitol Building steps on January 6.

This is a misdemeanor charge.  The government does not allege Mr. Griffin entered the Capitol Building or that he committed, intended to commit, or planned any other illegal act.  He has no relevant criminal history.  Pretrial Services recommended release on standard conditions.  However, the government moved for his pretrial detention, primarily on the ground that Mr. Griffin poses a "serious risk" of flight.  18 U.S.C. § 3142(f)(2)(A).  Its argument was that Mr. Griffin "lacked ties" to Washington, D.C.  That is frivolous.

In the event, the magistrate judge denied Mr. Griffin's bail motion for a reason not offered by the government.  The magistrate judge found that because the defendant had questioned the legitimacy of the 2020 presidential election, and had made three inflammatory political remarks, he must also doubt the legitimacy of the Court.  Therefore, he poses a "serious risk" of flight.  The government did not proffer this information.  It is not found in the charging instrument.  The magistrate judge did not articulate why Mr. Griffin's perceived political beliefs would defy all combinations of conditions to assure his appearance, or what Pretrial Services missed.  The magistrate judge did not address specific conditions.  In any case, there is no factual basis for this conclusion.  For that reason—and because detaining Mr. Griffin on this ground is barred by the First Amendment, *United States v. Lemon*, 723 F.2d 922, 938 n. 47 (D.C. Cir. 1983)—the Court should revoke the detention order.

1

Mr. Griffin will now remain incarcerated, on a misdemeanor charge, exposed to Covid-19, as he falls behind on mortgage payments and child support, based on no evidence of ordinary flight risk, much less serious risk. At present, he intends to exercise his right to a jury trial. Depending on the course of the pandemic, Mr. Griffin may not be able to have a trial within a year of his arrest. That means he occupies the extraordinary position of facing more incarcerated time in pretrial detention than the statutory maximum sentence on the charged misdemeanor offense.

## FACTUAL BACKGROUND

Couy Griffin, 47, is a county commissioner for Otero County, New Mexico.[1]  On January 6, 2021, he traveled to Washington, D.C., to participate in the rally near the Capitol. On the same day, a joint session of Congress convened at the Capitol to certify the vote count of the Electoral College for the 2020 presidential election. The session began at approximately 1:00 p.m. Vice President Mike Pence was present and presiding. According to the statement of facts attached to the criminal complaint, "temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol police were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside." Compl., p. 2. Shortly after 2 p.m., the crowd "forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol police." *Id.*

---

[1] In this misdemeanor trespassing case, the government's motion for pretrial detention dwells on Mr. Griffin's political views and activities, describing them as "inflammatory, racist, and at least borderline threatening advocacy." Gov't Mot., p. 2. Irrelevant though this information is to the detention factors in § 3142, candor requires admitting that it goes far in explaining the decision to charge Mr. Griffin and to detain him pretrial. Most of the protestors on the Capitol steps on January 6 were not federally charged—while many who entered the Capitol Building and committed offenses inside, unlike Mr. Griffin, have also not been charged or have been granted bail.

After receiving a tip that Mr. Griffin was present at the Capitol that day, Special Agents interviewed him on January 11.  According to their notes, Mr. Griffin told the agents that he "walked down to the Capitol building, where there was already a large crowd around the barricades." FD-302, 1/11/21, attached hereto as Exh. 1.  At that point, Mr. Griffin,

> got caught up in the crowd, which eventually pushed through the barricades. [He] saw many people scaling walls and scaffolding to get up to the Capitol's front patio.  In his area, there were people flying flags, but no one violent. . .Neither [he] nor [his acquaintance] entered the capitol building.  At one point, a man with a bullhorn gave it to [Griffin], who led a prayer on the steps. . .[Griffin] was never asked to leave the area by the police, and exited peacefully. He even encountered a former congressman on the way out and had a nice chat with him.

Exh. 1, p. 2.

The complaint attaches a photograph of Mr. Griffin standing on the west front of the Capitol building steps.  Compl., p. 4.  The complaint describes this position as "well within the restricted area." *Id.*  The complaint does not allege that Mr. Griffin entered the Capitol Building. The complaint does not define "restricted area." It alleges as follows:

> On January 6, 2021, permanent and temporary security barriers were in place to separate areas where lawful first amendment activity could be conducted from areas restricted both to prevent any adverse impact on the legislative process and to safeguard and prevent and [sic] property damage directed at the U.S. Capitol and West Front Inaugural Platform.

Compl., p. 2.

The Complaint cites two postings indicating to the public that the area Mr. Griffin entered was "restricted": bike racks and green snow fencing; and signage stating, "Area Closed By order of the United States Capitol Police Board." Compl., p. 2.

Mr. Griffin was charged under 18 U.S.C. § 1752(a)(1).  That section makes it a federal misdemeanor to "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).  Section 1752 is not a general, all-purpose

3

trespass statute for federal property.  Instead, "restricted buildings or grounds" is defined statutorily.[2]  In Section 1752, that phrase means "any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c)(1).

To establish a Section 1752(a)(1) offense, the government must show that Mr. Griffin knew that the area in which he "enter[ed] or remain[ed]" was one of the areas described in Section 1752(c)(1).  *United States v. Bursey*, 416 F.3d 301, 309 (4th Cir. 2005).  The Complaint does not allege that either of subsections (A) or (C) in Section 1752(c)(1) is satisfied here.[3]  It does not allege that Mr. Griffin knew that the area in which he "enter[ed] or remain[ed]" was "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).  As alleged, the area Mr. Griffin "enter[ed] or remain[ed]" was not the Capitol Building, where the Vice President then presided, but instead the west front of the Capitol steps.

---

[2] This statutory framework is omitted from the criminal complaint.

[3] The joint session of Congress on January 6 was not designated by the Secret Service as a "special event of national significance." National Special Security Events, CRS, Jan. 11, 2021, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.

Mr. Griffin was detained on January 17.  He was not given a shower, and held in solitary confinement, for over a week.  The toilet in his cell was broken, and when he requested a shower, was handed baby wipes.

### THE MAGISTRATE JUDGE'S DETENTION DECISION

On February 1, Magistrate Judge Zia M. Faruqi held Mr. Griffin's initial appearance detention hearing.  2/1/21 Hr'g Tr., Exh. 2.  Pretrial Services recommended release with standard conditions.  Exh. 2, pp. 15-16.  The government stated that the primary basis for its pretrial detention motion was 18 U.S.C. § 3142(f)(2)(A), i.e., that there is a "serious risk that [Mr. Griffin] will flee." *Id.*, p. 13:13. The government's evidence in support of this contention was that Mr. Griffin "lacks ties" to the Washington, D.C. area.  Gov't Mem., p. 7.  The argument that every defendant who is not a resident of this district is a serious risk of flight is frivolous, and the magistrate judge did not agree with that position.

Contrary to Pretrial Service's recommendation, the magistrate judge instead determined that Mr. Griffin is a "serious risk" of flight through the following chain of inferences.  Exh. 2, p. 29:3-9.  The criminal complaint alleges that Mr. Griffin questions the legitimacy of the 2020 presidential election, asserting it was stolen.  Compl., p. 5.  The magistrate judge found that if, as alleged, the defendant believes that the presidential election was stolen, he must necessarily believe that the entire government is illegitimate.  The magistrate judge further reasoned that if Mr. Griffin believes the government is illegitimate, he poses a "serious risk" of flight under § 3142(f)(2)(A).  Exh. 2, p. 52:8-22.  Although the judiciary is not the same as the office of the president or other political offices, and although the government proffered no evidence concerning Mr. Griffin's opinions of the judiciary, the magistrate judge found that it was a reasonable inference to conflate the two for purposes of detention.  Exh. 2, p. 51:12-52:22.

5

Under this logic, no accused person who questioned the 2020 presidential election may be released on bail.

The magistrate judge also determined that three isolated inflammatory statements made by Mr. Griffin showed he was a serious risk of flight.  Exh. 2, p. 34:11-36:5.  As discussed *infra*, these political remarks had no bearing on the question of flight risk.  In addition, it is impermissible in this Circuit to denial bail on the basis of statements protected by the First Amendment to the Constitution.  The statements comfortably fall within Supreme Court precedent.

The magistrate judge did not articulate how Mr. Griffin's political beliefs would frustrate all conditions of release.  The judge did not address specific conditions of release, including those proposed by Pretrial Services.

## ARGUMENT

The Court reviews the magistrate judge's detention decision *de novo*.  *United States v. Sheffield*, 799 F. Supp. 2d 18, 20 (D.D.C. 2011).  "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *Id.* (internal quotation marks omitted).

Mr. Griffin's detention is contrary to the Bail Reform Act (BRA), the Fifth Amendment's due process clause, and the First Amendment's free speech clause.

**I.      The BRA authorizes detention at the initial appearance only when one of the § 3142(f) factors is met**

According to the plain language of § 3142(f), "the judicial officer shall hold a [detention] hearing" only "in a case that involves" one of the seven factors listed in § 3142(f)(1) & (f)(2).

6

None of the § 3142(f) factors are actually present in this case.[4]  Ordinary "risk of flight" is not among the § 3142(f) factors.

A.    **Supreme Court precedent and the plain language of the BRA prohibit detention absent § 3142(f) factors**

The Supreme Court's seminal opinion in *United States v. Salerno*, 481 U.S. 739 (1987), confirms that a detention hearing may only be held if one of the § 3142(f) factors is present.  *See id*. at 747 ("Detention hearings [are] available if" and only if one of the seven § 3142(f) factors is present.).  Held the Court, "[t]he Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U.S.C. § 3142(f)." *Id.* at 750; *see also id.* at 747 ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes," specifically the crimes enumerated in § 3142(f)).  *Salerno* thus stands for the proposition that the factors listed in § 3142(f) serve as a gatekeeper, and only certain categories of defendants are eligible for detention in the first place.  As the D.C. Circuit has held, "First, a [judge] must find one of [seven] circumstances triggering a detention hearing…. [under] § 3142(f).  Absent one of these circumstances, detention is not an option." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

If no § 3142(f) factor is met, several conclusions follow: the government is prohibited from seeking detention and there is no legal basis to detain the defendant at the initial

---

[4] This case does not meet any of the five factors discussed in § 3142(f)(1), as it does not involve: (1) a crime of violence under (f)(1)(A); (2) an offense for which the maximum sentence is life imprisonment or death under (f)(1)(B); (3) a qualifying drug offense under (f)(1)(C); (4) a felony after conviction for two or more offenses under the very rare circumstances described in (f)(1)(D); or (5) a felony involving a minor victim or the possession/use of a firearm under (f)(1)(E). The government has also presented no evidence to establish that this case meets either of the two additional factors discussed in § 3142(f)(2): (1) a "serious risk that [the defendant] will flee" under (f)(2)(A); or (2) a "serious risk" that the defendant will engage in obstruction or juror/witness tampering under (f)(2)(B), as shown *infra*.

appearance, jail the defendant, or hold a detention hearing.  Instead, the court is required to

release the defendant on personal recognizance under § 3142(b) or on conditions under §

3142(c).  The strict limitations § 3142(f) places on pretrial detention are part of what led the

Supreme Court to uphold the BRA as constitutional.  It was the § 3142(f) limitations, among

others, that led the Court to conclude that the Act was "regulatory in nature, and does not

constitute punishment before trial in violation of the Due Process Clause." *Salerno*, 481 U.S. at

748.[5] Throughout its substantive Due Process ruling, the *Salerno* Court emphasized that the only

defendants for whom the government can seek detention are those who are "already indicted or

held to answer for a *serious* crime." *Id*. (emphasis added); *see also United States v. Himler*, 797

F.2d 156, 160 (3d Cir. 1986) (discussing the BRA's legislative history).

### B.    The courts of appeals agree that detention is prohibited when no § 3142(f) factor is present

Following the Supreme Court's guidance in *Salerno*, six courts of appeals agree that it is

illegal to even hold a detention hearing unless the government invokes one of the factors listed in

18 U.S.C. § 3142(f). *See, e.g., United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *United*

*States v. Friedman*, 837 F.2d 48, 48–49 (2d Cir. 1988); *Himler*, 797 F.2d at 160; *United States v.*

*Byrd*, 969 F.2d 106, 109 (5th Cir. 1992); *United States v. Twine*, 344 F.3d 987 (9th Cir. 2003);

---

[5] The *Salerno* Court further relied on the limitations in § 3142(f) in another component of its substantive Due Process ruling, its conclusion that "the government's interest in preventing crime by arrestees is both legitimate and compelling." *Id*. at 749. To reach this conclusion, the Court contrasted the Bail Reform Act with a statute that "permitted pretrial detention of any juvenile arrested on any charge" by pointing to the gatekeeping function of § 3142(f): "The Bail Reform Act, in contrast, narrowly focuses on a particularly acute problem in which the Government interests are overwhelming. The Act operates . . . *on individuals who have been arrested for a specific category of extremely serious offenses. 18 U.S.C. § 3142(f)*." *Id*. at 750 (emphasis added). The Court emphasized that Congress "specifically found that these individuals" arrested for offenses enumerated in § 3142(f) "are far more likely to be responsible for dangerous acts in the community after arrest." *Id*.

*United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). For example, the First Circuit holds:

"Congress did not intend to authorize preventive detention unless the judicial officer first finds

that one of the § 3142(f) conditions for holding a detention hearing exists." *Ploof*, 851 F.2d at 11.

The Fifth Circuit agrees. *See Byrd*, 969 F.2d at 109 ("A hearing can be held only if one of the . .

. circumstances listed in (f)(1) and (2) is present," and "[d]etention can be ordered, therefore,

only 'in a case that involves' one of the . . . circumstances listed in (f).") (quoting § 3142(f)).

Unfortunately, a practice has developed that results in defendants being detained in

violation of the BRA, *Salerno*, and the Constitution. Specifically, it is common for the

government to seek detention at the initial appearance on the ground that the defendant is either

"a danger to the community," "a risk of flight," or both.[6] Because neither "danger to the

community" nor ordinary "risk of flight" is a factor listed in § 3142(f), it is illegal to hold a

detention hearing on either of these grounds at the initial appearance.

### C.    The government's burden to show a "serious risk" of flight is heavy

Where the government's only legitimate § 3142(f) ground for detention is "serious risk"

of flight, the government bears the burden of presenting some evidence to support its allegation

that a defendant poses a "serious risk" of flight rather than the ordinary risk attendant in any

criminal case. A defendant "may be detained only if the record supports a finding that he

presents a serious risk of flight." *Himler*, 797 F.2d at 160 (emphasis added); *see also United*

---

[6] *See, e.g., The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. (Nov. 14, 2019), Written Statement of Alison Siegler at 8, https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf (presenting Congress with court-watching data demonstrating that federal prosecutors regularly violate the BRA by requesting detention at the initial appearance on the impermissible ground of ordinary—not serious—risk of flight and by failing to provide any evidence to support the request).

*States v. Robinson*, 710 F. Supp. 2d 1065, 1088 (D. Neb. 2010) (criticizing the government for failing to present evidence of "serious risk" of flight at the initial appearance and saying "no information was offered to support [the] allegation").  After all, the statute only authorizes detention "in a case that involves" a "serious risk" that the person will flee. § 3142(f)(2)(A) (emphasis added). This contemplates a judicial finding about whether the case in fact involves a serious risk of flight.[7]

The BRA's legislative history makes clear that detention based on serious risk of flight is only appropriate under "extreme and unusual circumstances."[8]  For example, the case relied on in the legislative history as extreme and unusual enough to justify detention on the grounds of serious risk of flight involved a defendant who was a fugitive and serial impersonator, had failed to appear in the past, and had recently transferred over a million dollars to Bermuda. *See*

---

[7] Had Congress intended to authorize detention hearings based on a mere certification by the government, Congress could have enacted such a regime, just as they have done in other contexts. *See, e.g.,* 18 U.S.C. § 5032 (creating exception to general rule regarding delinquency proceedings if "the Attorney General, after investigation, certifies to the appropriate district court of the United States" the existence of certain circumstances); 18 U.S.C. § 3731 (authorizing interlocutory appeals by the government "if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding").

[8] *See Bail Reform Act of 1983: Rep. of the Comm. on the Judiciary*, 98th Cong. 48 (1983) ("Under subsection f(2), a pretrial Detention Hearing may be held upon motion of the attorney for the government or upon the judicial officer's own motion in three types of cases….T]hose [types] involving…a serious risk that the defendant will flee…*reflect the scope of current case law that recognizes the appropriateness of denial of release in such cases*.") (emphasis added) (citing *United States v. Abrahams*, 575 F.2d 3, 8 (1st Cir. 1978)—which held that only a "*rare case of extreme and unusual circumstances*…justifies pretrial detention"—as representing the "current case law"); *see also Gavino v. McMahon*, 499 F.2d 1191, 1995 (2d Cir. 1974) (holding that in a noncapital case the defendant is guaranteed the right to pretrial release except in "extreme and unusual circumstances"); *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir. 1976) (holding that bail can only be denied "in the exceptional case").

*Abrahams*, 575 F.2d at 4. The government must demonstrate that the risk of flight in a particular case rises to the level of extreme or unusual.

In addition, a defendant should not be detained as a "serious risk" of flight when the risk of non-appearance can be mitigated by conditions of release. The only defendants who qualify for detention under § 3142(f)(2)(A) are those who are "[t]rue flight risks"—defendants the government can prove are likely to willfully flee the jurisdiction with the intention of thwarting the judicial process.[9]

The government's own data show that when release increases, crime and flight do not.  In this case, the Court should be guided by AO statistics showing that nearly everyone released pending trial appears in court and does not reoffend.  In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and 98% did not commit new crimes on bond.[10]  Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[11]  Even in districts that release two-

---

[9] *See, e.g.,* Lauryn Gouldyn*, Defining Flight Risk*, 85 U. Chi. L. Rev. 677, 724 (2017). This rule is sound policy, as the risk of a defendant becoming either a "local absconder" (who intentionally fails to appear but remains in the jurisdiction), or a "low-cost non-appearance" (who unintentionally fails to appear), can be addressed by imposing conditions of release like electronic monitoring, GPS monitoring, and support from pretrial services.  Gouldyn, 85 U. Chi. L. Rev. at 724.

[10] Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[11] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. *See* AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42.

11

thirds of all federal defendants on bond, fewer than 1% fail to appear in court.[12]  The below chart reflects this data:



Yet despite the statistically low risk of flight that defendants like Mr. Griffin pose, the government recommends detention in 77% of cases nationwide.  *See* AO Table H-3. The government's detention requests are not tailored to the low risk of flight and recidivism that defendants pose.

## II.     The government has not met its burden of proving that Griffin poses a *"serious"* risk of flight under § 3142(f)(2)(A)

Mr. Griffin is a publicly elected official for Otero County, New Mexico.  He has been gainfully employed continuously since the 1990s.  The only conviction in his criminal history is a DUI almost 25 year ago.   He is part of a large and loving family, including a sister and brothers and seven-year-old son, who are deeply concerned for his welfare, familiar with his case, and steeped in respect for law enforcement.  As further discussed below, in the same public statements cited by the government to insinuate he is a threat to the public, Mr. Griffin praises at length the law enforcement efforts of the FBI and local D.C. police.

---

[12] *See* AO Tables H-14A and H-15.

In multiple conversations with the FBI, Mr. Griffin has abjured violence, lawbreaking, and disrespect to law enforcement.  In the aforementioned January 11 interview, he told agents "he expected the [January 6] rally to be peaceful and it largely was [based on what he witnessed]." Exh. 1, p. 1.  Mr. Griffin "stated he would inform the FBI if he encountered any individuals attempting to organize violence at the [inauguration] protest. . ." *Id.*  He "asked the FBI to contact him if they believed his comments may be a violation of law so he can avoid jail." *Id.*  Matt Struck, an associate of Mr. Griffin's who traveled to the January 6 rally with him, explained that he and Mr. Griffin "stay away from Proud Boys and militia-types, preferring to support law enforcement." FD-302, 1/11/21, Exh. 3, p. 2.

On January 16, Special Agents called Mr. Griffin as he traveled back to Washington, D.C., for the inauguration.  FD-302, 1/16/21, Exh. 4, p. 1.  Mr. Griffin candidly informed the agents of his plan to attend the inauguration and even gave the agents permission to enter his office in New Mexico and gather information about threats made against him and his family.  *Id.*

These are not the actions of someone who is a serious risk of flight—in the face of a misdemeanor offense carrying less potential prison time than a sentence for skipping bail. The only argument offered by the government is Mr. Griffin's "lack of ties . . . to Washington, D.C." Gov't Mem., p. 7.  It cites no authority, and there is none for the frivolous and unconstitutional proposition that every non-D.C. resident must be detained pretrial.

The magistrate judge's determination that Mr. Griffin must be a "serious risk" of flight because of his statements about the 2020 presidential election being stolen is erroneous.  The government neither alleged in the charging instrument nor proffered to the magistrate judge that the judiciary—to which Mr. Griffin would be held accountable for skipping bail—is illegitimate in the eyes of Mr. Griffin.  Exh. 2, p. 47.  The magistrate judge assumed this was the case.  But a

detention decision must be made on the basis of evidence in the record.  *Himler*, 797 F.2d at 160.

If the magistrate judge's logic were correct, every accused person who has quarreled with the

2020 presidential election outcome is subject to automatic pretrial detention, no matter their

individual characteristics.  That is not consistent with the plain language of the BRA.

Similarly, the magistrate judge predicated his decision on "the government's proffer . . .

that this was an organized attempt to stop the lawful administration of the democratic process."

Exh. 2, p. 32:2.  But the government has not alleged or proffered that about Mr. Griffin himself

and the court cannot make a detention decision about the defendant based on public speculation

about the mindset of other individuals who could be charged with other crimes not at issue here.

*Id.*, pp. 47-48.

Equally, the magistrate judge did not articulate how or why Mr. Griffin's political beliefs

would frustrate any combination of conditions to assure his appearance.  Indeed, the magistrate

judge did not address any specific conditions, including those recommended by Pretrial Services.

This was in error, and there is no factual basis for a finding that the defendant's political beliefs

would somehow frustrate any and all of the traditional conditions—such as the standard ones

recommended by Pretrial Services.  The incident at the Capitol on January 6 involved individuals

who committed significant crimes, including ones much more serious than Mr. Griffin's

misdemeanor trespassing charge, but it is no reason to abandon regular procedure.

### III.    There is no evidence showing a serious risk Griffin will obstruct or attempt to obstruct justice or threaten, injure, or intimidate a prospective witness or juror

It is not clear whether the government also contends that Mr. Griffin should be detained

pretrial on the basis of "a serious risk that such person will obstruct or attempt to obstruct justice,

or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective

14

witness or juror." 18 U.S.C. § 3142(f)(2)(B).  In any case, the government has offered no evidence in support of this argument.

Mr. Griffin is not a mafia member.  He is an elected official on the governing body of Otero County, New Mexico and a former pastor.  He is a well-known figure in his home state, where he was born and lived his entire life.  Again, he has no relevant criminal history.

The government cites in support of its position three isolated, inflammatory statements of Mr. Griffin's.  First, the government states that, "at one gathering involving [Mr. Griffin's political] group, the defendant stated, "the only good democrat is a dead democrat." Gov't Br., p. 2.  In the following sentence, the government itself acknowledges why this statement has no bearing on detention.  Mr. Griffin added "he did not intend that physically, only politically." *Id.* Although that caveat might fall short ethically or politically, the government does not contend Mr. Griffin, who has no criminal history, has ever planned or intended to commit an act of violence in his life, which is what counts under § 3142(f)(2)(B).

Second, the government cites a January 14 meeting of the Otero County Commission, on which Mr. Griffin sits, in which he spoke for approximately 17 minutes.  The government writes:

> [T]he defendant  spoke at the commission  meeting about his plans to return to Washington, D.C. to protest President-Elect Biden's inauguration on January 20, 2021. The defendant stated that he intended to bring his firearms with him when he traveled to Washington, D.C. Specifically, the defendant stated: "I am going to leave either tonight or tomorrow. I've got a .357 Henry big boy rifle . . . that I got in the trunk of my car, and I've got a .357 single action revolver . . . that I will have underneath the front seat on my right side. And I will embrace my Second Amendment, I will keep my right to bear arms, my vehicle is an extension of my home in regard to the constitution law, and I have a right to have those firearms in my car."

Gov't Mem., p. 5.

This passage is intended to lead the Court to believe that Mr. Griffin may have planned violence in this district during the inauguration.  However, the government omits Mr. Griffin's

15

very next words which refute that impression.  After stating, "I have a right to have those

firearms in my car," Mr. Griffin then immediately adds the following explanation:

> As everybody here that works in the County [knows], I can see it on your faces and it
> breaks my heart how tired you are from the harassment.  Whenever I walk through the
> front door, I see the sweetest lady that works in this building, Diane, sitting there and she
> can't even hardly look up at me because she's been getting the threats all day long. It
> infuriates me.  But what am I to do? . . . It is unfortunate that there are so many hateful
> people on the left that treat people so horribly as to just attack somebody that they don't
> know.  But I appreciate those people too . . . because they have been calling the FBI
> repeatedly.
>
> Which I am thankful for, because the FBI contacted me about two days ago, and I was
> able to have a fantastic conversation with them. Great agents: they still understand what
> the Constitution is about, they still understand what freedom of speech is about, they still
> understand what rights are about.  And I believe those men I talked to out of that FBI
> office in Las Cruces are true patriots. So, I believe that the FBI is going to defend my
> rights to be able to carry firearms in my car.  What else was beautiful about it is I was
> able to speak about the threats I was receiving and they were aware of them. . . The
> threats since I started this have been horrible and the FBI should have been contacted by
> somebody.
>
> When I received pictures of me and my family all with crosshairs on our heads, and my
> baby's about five months old in the picture and he's got a crosshair on his head, and I've
> got to read the most vile stuff and the death threats that are sent to an elected official in
> county email. . . Now the FBI is going to start investigating all of these threats that have
> been made to me personally as well as made to others in the county.  And that's the only
> way we're going to be able to stop this going forward.  . . I am turning all of my access to
> all of my county emails over to the FBI, I am turning all of my Facebook page and all my
> Facebook inbox messages over to the FBI, and I am also going to turn all the hate mail I
> have received over to the FBI.



Screenshot from Otero County Commission Meeting of Jan. 14, 2021, available at: https://youtu.be/dyOklmYmvr4?t=4411.

Mr. Griffin's remarks on January 14 show that he believed he needed to carry firearms to protect himself and his family—not to harm people in Washington, D.C.  This explanation was publicly available on the internet when the government selectively quoted his January 14 statement to detain Mr. Griffin pretrial.  Also omitted from the government's motion are similar mitigating statements made by Mr. Griffin to Special Agents during interviews before the inauguration.  Exh. 1,3,4.

Third, the government quotes from a video posted on Facebook in which Mr. Griffin apparently said the following concerning the January 6 incident at the Capitol:

> You want to say that that was a mob? You want to say that was violence? No sir. No Ma'am. No, we *could* have a 2nd Amendment rally on those same steps that we had that rally yesterday. You know, and *if we do*, then it's gonna be a sad day, because there's gonna be blood running out of that building. But at the end of the day, you mark my word, we will plant our flag on the desk of Nancy Pelosi and Chuck Schumer and Donald J. Trump if it boils down to it.

Gov't Mem., pp. 3-4 (emphasis added).

This statement yields no support for pretrial detention, for several reasons.  First, although it suggests Mr. Griffin intended to bring firearms to Washington, D.C., during the inauguration, the government neglected to inform the magistrate judge that Mr. Griffin decided not to bring them, as it would be unwise, a fact corroborated by the FBI.  FD-302, 1/17/21, p. 4. Second, inflammatory though this isolated statement may be, it is patently within the bounds of constitutionally protected speech.  As such, the Court may not deny the defendant pretrial release on account of it.  *Lemon*, 723 F.2d at 938 n. 47.  To repeat, there is no evidence Mr. Griffin has ever planned or intended to commit an act of violence in his life.

Saying "*If* we had a 2nd Amendment rally, there's gonna be blood running"—when there was no such firearms rally planned as of January 6— is constitutionally protected speech because (1) it is not speech directed to or inciting "imminent lawless action" and (2) the government has not offered any evidence it was likely to produce such action. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (applying *Brandenburg*, finding First Amendment protected protestor's statement, "We'll take the fucking street again, later," as the speech "amounted to nothing more than advocacy of illegal action at some indefinite future time").

The magistrate judge rejected this argument, finding that the reason Mr. Griffin's Second Amendment rally did not take place is that National Guard troops were stationed around the city. Exh. 2, p. 59:1-11.  That misses the point.  The government offered no evidence that the "rally" hypothesized by the defendant in the quoted sound bite was *planned* or *intended in the first place*.  This evidence does not exist.  Accordingly, there is simply no basis for finding that Mr. Griffin's comment is not protected under *Brandenburg* and its progeny, which the magistrate judge did not address.

In *Lemon*, the D.C. Court of Appeals observed that "appellate courts have seriously limited the extent to which protected political speech and association may be the basis for revoking or denying bail." 723 F.3d at 938 n. 47.  Among other cases, the *Lemon* court relied on *Williamson v. United States*, 184 F.2d 280 (2d Cir. 1950).

*Williamson* concerned Communist Party leaders convicted under the Smith Act.  Before it was deemed unconstitutional, the Act was used to prosecute members of the Communist Party for "conspiring to advocate and teach the violent overthrow of the United States Government." 184 F.2d at 280.  Sitting as a judge on the Second Circuit, Justice Jackson addressed the

18

defendants' appeal for bail pending the Supreme Court's decision on their petition for certiorari. The Communist Party members had already been convicted and the government wanted bail revoked on account of the defendants' speeches, which were "crudely intemperate, contain[ed] falsehoods obvious to the informed, and all are plainly designed to embroil different elements of our society and embarrass those who are presently conducting the Government." *Id.* at 283.

Nevertheless, Justice Jackson affirmed bail.  He reasoned as follows:

It is not contended that these utterances, in themselves, are criminal. . . If the Government cannot get at these utterances by direct prosecution, it is hard to see how courts can justifiably reach and stop them by indirection.  I think courts should not utilize their discretionary powers to coerce men to forgo conduct as to which the Bill of Rights leaves them free . . .

If the courts embark upon the practice of granting or withholding discretionary privileges or procedural advantages because of expressions or attitudes of a political nature, it is not difficult to see that within the limits of its logic the precedent could be carried to extremities to suppress or disadvantage political opposition . . .

*Id.* at 284.

If Justice Jackson's logic covers bail-seeking defendants already convicted of conspiring to advocate and teach the violent overthrow of the United States Government, it is not clear why Mr. Griffin's isolated, protected statement about a hypothetical Second Amendment rally at some indefinite date would serve as the basis for his detention *before he has even been tried for a misdemeanor offense unrelated to the statement.*

## IV.    Defendants who entered the Capitol Building and committed additional crimes have been released on bail

At least one of the reasons Pretrial Services recommended release on standard conditions is that other defendants charged with offenses relating to the January 6 incident at the Capitol have been granted bail—in cases far more serious than Mr. Griffin's.  Recently, Riley June Williams was not detained pretrial.  *See Speaker at Jan. 5 pro-Trump rally charged with*

*encouraging mob*, *impeding police during Capitol breach*, Wash. Post, Jan. 25, 2021, available at: https://www.washingtonpost.com/local/legal-issues/brandon-straka-arrested-capitol-riot/2021/01/25/e359ec3a-5f45-11eb-9430-e7c77b5b0297_story.html.  Not only did Williams allegedly enter the Capitol Building, unlike Mr. Griffin, she may have stolen a laptop from the office of the Speaker of the House and attempted to sell it to Russians.  In addition, the government contended that Ms. Williams may have attempted to destroy evidence.  *Id.*

Other defendants who secured bail include a man who entered the Capitol Building carrying a Confederate battle flag (as well as his co-defendant son), a woman who entered the legislative chamber with zip ties, and the son of a judge who appeared in the Capitol wearing a fur pelt costume, to name a few.  *NYC man arrested on Capitol riot charges freed on $100,000 bond*, AP News, Jan. 12, 2021, available at: https://apnews.com/article/aaron-mostofsky-100k-bond-capitol-riots-be62a48e605c8916c5183e70bd6e3a25.

All of these defendants face charges more serious than Mr. Griffin's.

## **CONCLUSION**

For all of the foregoing reasons, Mr. Griffin respectfully requests that his detention order be revoked and that he be released on the standard conditions recommended by Pretrial Services, or such other conditions as the Court deems necessary to assure his appearance, so that he does not remain incarcerated pretrial for a period of time longer than the statutory maximum sentence should he be convicted.

Dated: February 3, 2021                          Respectfully submitted.

                                                 */s/ David B. Smith*
                                                 David B. Smith (D.C. Bar No. 403068)
                                                 108 N. Alfred St.
                                                 Alexandria, VA 22314

Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (Va. Bar No. 79745)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869

### **Certificate of Service**

I hereby certify that on the 3rd day of February, 2021, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

> JANANI IYENGAR
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-7846

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com
*Appointed by the Court*