```
                     UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. MJ 21-92
vs.                                )
                                   )
COUY GRIFFIN,                      )  February 5, 2021
                                   )  3:31 p.m.
              Defendant.           )  Washington, D.C.
                                   )
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE JUDGE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

_**(Counsel and defendant appearing via videoteleconference)**_


<u>**APPEARANCES**</u>:

FOR THE GOVERNMENT:  JANANI IYENGAR, ESQ.
                     United States Attorney's Office
                     for the District of Columbia
                     555 Fourth Street, NW
                     Washington, DC 20530
                     (202) 252-7760
                     Email: janani.iyengar@usdoj.gov


FOR THE DEFENDANT:   DAVID B. SMITH, ESQ.
                     NICHOLAS D. SMITH, ESQ.
                     108 North Alfred Street
                     Alexandria, Virginia 22314
                     (703) 548-8911
                     Email: dbs@davidbsmithpllc.com


ALSO PRESENT:        CHRISTINE SCHUCK, Pretrial Services
                     (Appearing telephonically)


Court Reporter:      Elizabeth SaintLoth, RPR, FCRR
                     Official Court Reporter


          Proceedings reported by machine shorthand, transcript
             produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2               THE DEPUTY:  Matter before the Court, Magistrate

3      Case No. 21-92, United States of America versus Couy

4      Griffin.

5               Your Honor, for the record, the pretrial agent,

6      Ms. Christine Schuck, is participating via telephone.

7               THE COURT:  Thank you.

8               THE DEPUTY:  Counsel, please state your names for

9      the record, starting with the Government.

10              MS. IYENGAR:  Yes, Your Honor.

11              Good afternoon.  Janani Iyengar for the

12     United States.

13              THE COURT:  Good afternoon.

14              For the defendant.

15              MR. D. SMITH:  Good afternoon, Your Honor.

16     David Smith and Nicholas Smith for the defendant,

17     Mr. Griffin.

18              THE COURT:  All right.

19              Mr. Griffin, do you have any difficulty hearing

20     what's going on?

21              THE DEFENDANT:  No, ma'am.  I can hear you fine.

22              THE COURT:  All right.  And do you agree to

23     participate in this teleconference via video teleconference

24     after consultation with your counsel rather than being

25     physically present in the courtroom?

1          You have to speak, Mr. Griffin.

2          THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

3          THE COURT:  All right.  So we're here on the

4     defendant's motion to revoke the pretrial detention order

5     that was entered by the magistrate judge.

6          Let me just begin by stating the documents that I

7     have reviewed in connection with this motion.  I have

8     reviewed the Government's oppos -- certainly the motion

9     itself, docketed at ECF 9; the Government's opposition

10    memorandum, and the defendant's reply.

11          I have reviewed the entire record in the case,

12    including the complaint; the magistrate judge's detention

13    order; the transcript of the detention hearing; and order.

14    And I have also reviewed the original motion filed by the

15    Government in support of its oral motion for pretrial

16    detention, and the defendant's opposition to that motion.

17          I do appreciate that it is -- the defendant's

18    motion is the one that's pending in front of me right now,

19    and usually we start with the moving party.  But given the

20    fact that it is the Government's burden to show the need for

21    pretrial detention, I am going to begin with my questions to

22    the Government.

23          So I will hear first from the Government, if there

24    is anything that you would like to highlight.  As I said, I

25    have already reviewed the papers in connection with the

1    case; but if there is something that you'd like to highlight

2    for me, please feel free to go ahead.

3              MS. IYENGAR:  Yes, Your Honor.

4              I think the, sort of, core of the Government's

5    position is just as Magistrate Judge Faruqui said in his

6    decision; that one of the issues that the Court has to look

7    at when determining if a defendant is going to abide by

8    conditions that the Court sets for him if he is released is,

9    you know, his willingness to trust in this process and to

10   trust in the Government and the Court, and the legitimacy of

11   the Government and the Court.

12             Mr. Griffin has made multiple statements that are

13   outlined in the papers that the Government submitted to the

14   Court illustrating that he does not trust in the legitimacy

15   of the Government.  And not only does he not trust in the

16   legitimacy of the Government, he has advocated a violent

17   overthrow of the Government on multiple occasions.

18             And so I think -- you know, the findings that

19   Magistrate Judge Faruqui made were based on issues that the

20   Court had, for the right to examine when determining if

21   Mr. Griffin would abide by what the Court says and,

22   therefore, I don't think that there is any reason to disturb

23   the ruling that he made.

24             THE COURT:  So let me just say at the outset,

25   Mr. Griffin is charged only with a misdemeanor case.  So he

1    is not charged with some of the more serious conspiracy or

2    felony charges that I have seen brought against people

3    involved or charged due to the events arising on

4    January 6th.

5            So isn't it fairly unusual in a misdemeanor case

6    of any type to have pretrial detention?

7            MS. IYENGAR:  Yes.  And I think if this was -- as

8    I am sure the Court is aware, the Government has not asked

9    for detention in the majority of the misdemeanor offenses

10   arising out of the incident at the Capitol Building.

11           The reason that Mr. Griffin's case, I think, is

12   set apart is not just because of the statements that he made

13   regarding, you know, there being blood running out of the

14   Capitol Building and holding a second rally at the Capitol;

15   but also the fact that he stated, you know, at this county

16   council meeting that he was going to return to the District

17   for inauguration and that he was going to bring firearms

18   with him when he returned to the District, and that he then

19   actually acted on that.  These were not just empty

20   statements that he was making.

21           When he was arrested on January 17th, he was

22   arrested in very close proximity to the Capitol Building,

23   and that was just three days before Inauguration Day --

24           THE COURT:  But at the time he did not have any

25   firearms; is that correct?

1          MS. IYENGAR:  He did not have any firearms in his

2     possession at that time.  What he told FBI agents was that

3     he had brought firearms with him on the trip and had left

4     them at a friend's home along the way --

5          THE COURT:  And has the FBI conducted any search

6     either of his home or any other location associated with

7     Mr. Griffin where they have recovered the firearms?

8          MS. IYENGAR:  No.  They have not conducted a

9     search that has recovered any firearms, no.

10          THE COURT:  All right.  And so -- I want to be

11     clear about the basis for the Government's seeking pretrial

12     detention here because, certainly, none of the factors set

13     out in 18 U.S.C. Section 3142(f)(1) apply; I think everybody

14     would agree with that.

15          So you are really just seeking detention based on

16     the factors in (f)(2), which is that the defendant presents

17     a serious risk of flight or is otherwise threatening to --

18     poses a serious risk of obstructing justice.

19          So it would -- if I'm understanding the

20     Government's position correctly, you think that Mr. Griffin

21     presents a serious risk of flight because of his statements

22     which the Government's interpreting as basically being

23     anarchist, not believing in the Government at all; do I have

24     that pretty much right?

25          MS. IYENGAR:  Yes.  That's pretty much correct,

1    yes.

2           THE COURT:  All right.  So is the Government -- I

3    mean, the Government has, in some of its papers, not just

4    referred to (f)(2)(A), serious risk of flight, but also

5    (f)(2)(B), which is a serious risk of obstructing justice by

6    threatening, injuring, or attempting to threaten or injure a

7    juror or a witness.  Are you really not relying on (f)(2)(B)

8    but only on (f)(2)(A), the serious risk of flight?

9           MS. IYENGAR:  Yes.  At this point I think we're

10    relying primarily on (f)(2)(A).

11           THE COURT:  Well, "primarily," or altogether?

12    Because I haven't seen anything in here about -- what has he

13    done to obstruct justice that you are relying on (f)(2)(B)?

14           MS. IYENGAR:  Yes.  I think we are relying solely

15    on (f)(2)(A), Your Honor.

16           THE COURT:  Okay.  I wanted to isolate what we're

17    talking about here, and it's not (f)(2)(B), the obstruction

18    of justice; just the serious risk of flight.

19           MS. IYENGAR:  That is correct.

20           THE COURT:  And one of the things that -- you

21    know, I appreciate the concern about the defendant's

22    comments about carrying a gun, I guess a rifle and various

23    other things -- guns, types of guns, to the inauguration --

24    very provocative -- very provocative statements; and in the

25    wake of the January 6th assault on the Capitol, clearly,

1    deeply disturbing to the citizens of the District of

2    Columbia, as well as everybody who works on Capitol Hill not

3    wanting to have another traumatic event as the one on

4    January 6th was.

5           But other than that statement, I take it -- given

6    the fact that no guns have been recovered from the

7    defendant, that not only did he not have a gun or weapon of

8    any kind, even a stun gun, a stun stick -- any kind of

9    weapon on him on January 6th, he didn't on the date of his

10   arrest either, just short of the inauguration; is that

11   correct?

12          MS. IYENGAR:  Yes.  That's correct.

13          THE COURT:  And there is also no allegation or

14   suspicion -- although I presume your investigation is

15   continuing.  But, right now, no proffer from the Government

16   that he damaged any federal property, that he injured or

17   risked injuring another person because of his conduct on

18   January 6th, and certainly didn't have a weapon to do so on

19   January 6th; is that right?

20          MS. IYENGAR:  Yes.  That's correct.

21          THE COURT:  And it's also the Government's proffer

22   that, when he was actually approached and interviewed by the

23   FBI on January 11th, he appeared to be cooperative; is that

24   correct?

25          Am I putting a word in the Government's mouth?  Or

```
 1    is that a generally -- is that a general description of how
 2    he was when he talked to the FBI?
 3              MS. IYENGAR:  Yes.  I think that's a fair
 4    description of how he was.
 5              THE COURT:  And he even told the FBI then about
 6    his plan to return to D.C. to protest again at the
 7    inauguration when he was interviewed by the FBI, which --
 8              MS. IYENGAR:  Yes.
 9              THE COURT:  -- which was very helpful to the FBI
10    because that's where he was arrested, right, when he came up
11    here?
12              MS. IYENGAR:  That's correct.
13              THE COURT:  Saving the Government and taxpayers
14    the cost of transporting him up here.  But he gave that
15    information to the FBI.
16              MS. IYENGAR:  Yes.  That's correct.
17              THE COURT:  And, in any way, has the defendant
18    engaged in any conduct that the Government's been aware of
19    about trying to evade law enforcement or being evasive in
20    his answers to law enforcement, having a safe house to go to
21    to hide his whereabouts from law enforcement?  Has he done
22    any of that?
23              MS. IYENGAR:  No, Your Honor.
24              THE COURT:  Has he engaged in any effort to cover
25    his tracks, like avoiding using his credit card, avoiding
```

1    using his cell phone, in an effort to frustrate law

2    enforcement from tracking him down which would be very

3    indicative of a risk of flight?  But has he engaged in any

4    of that conduct?

5           MS. IYENGAR:  No, Your Honor.  He has not engaged

6    in any of that conduct.

7           THE COURT:  All right.  And I think the Government

8    doesn't dispute that he does have strong ties to New Mexico;

9    is that right?

10          MS. IYENGAR:  Yes.

11          THE COURT:  I mean, because the Government does

12    mention that he lived in France for a while, but doesn't

13    give me dates of when he lived in France.  So I am just

14    trying to pin down the Government's position here.

15          MS. IYENGAR:  Yes, Your Honor.

16          Our understanding, anyway, is that he does have

17    strong ties to New Mexico; he is an elected official there.

18          THE COURT:  But despite his -- and he is an

19    elected official?  I have heard he has a position as

20    commissioner, something like that --

21          MS. IYENGAR:  Yes.

22          THE COURT:  But is that an elected position?

23          MS. IYENGAR:  I believe it is an elected position,

24    yes.

25          THE COURT:  All right.  Is it a paid elected

1      position?

2             I will just note, for the record, that Mr. Griffin

3      is shaking his head up and down to say yes, it is.  But if

4      the Government doesn't have any information about that, I

5      will ask his counsel later.

6             Does the Government have information about that?

7             MS. IYENGAR:  No.  We don't have any information

8      about that.

9             THE COURT:  Okay.  But given his ties to the New

10     Mexico community, it's, nonetheless, the Government's

11     position that there are no conditions or combination of

12     conditions that could assure or mitigate any risk of flight

13     he might present?

14            MS. IYENGAR:  Well, I think, you know -- I don't

15     think it's so much that there is no condition or combination

16     of conditions; it's that the rhetoric that he has engaged in

17     just leads us to believe that he just will not abide by any

18     conditions that the Court sets.

19            THE COURT:  Okay.  And, I mean, I have looked at

20     all of his comments.  I mean, he clearly views fellow

21     Americans who live here, who have grown up here and work

22     here, who vote here, who -- just because they may not share

23     his political views as some kind of "other," but I haven't

24     seen anything that actually talks about the federal

25     judiciary or judges, have you -- or lawful court orders, or

1    anything like that.

2              Am I missing anything on that?

3              MS. IYENGAR:  No.  I haven't seen anything with

4    respect to the judiciary.  I think all of his comments have

5    been that the President is not legitimately elected, and

6    things of that nature.

7              THE COURT:  So it's been focused more on

8    high-level executive branch officials?

9              MS. IYENGAR:  Yes.

10             THE COURT:  That's been my sense.  But, of course,

11   I haven't lived with this case like the Government has and

12   looked at all of the evidence the way the Government has;

13   but that's been my sense.

14             MS. IYENGAR:  Yes, Your Honor.  It's been mostly,

15   I think, executive branch, and some members of Congress as

16   well.

17             THE COURT:  Right.  All right.  He did make

18   comments about planting a flag on the Speaker of the House's

19   desk and minority or majority leader's desk.

20             Okay.  But, so to be clear, the Government is also

21   not arguing that there is clear and convincing evidence that

22   this defendant presents a danger to the safety of other

23   persons or the community; is that right?  You are not

24   arguing that?

25             MS. IYENGAR:  No.  Well, I think we are arguing it

1   to the extent that he has made the comments that he has made

2   that, you know, I think, sort of, are comments of a

3   threatening nature.

4           THE COURT:  But there are some statutes that you

5   can charge people for making threats; but he is not charged

6   with any of those, right?

7           MS. IYENGAR:  Yes, Your Honor.

8           And I don't think -- we did have a discussion

9   about this.  At this point I don't think that the statements

10  he made are threats under the statute.  But I think, you

11  know, they still are clearly statements that are of a

12  threatening nature; and I think the Court can still consider

13  them for that purpose --

14          THE COURT:  Of course.  And I will get to that.

15          But I do think it's an important distinction that

16  troubling statements, obnoxious statements, repugnant

17  statements of a deeply disturbing nature -- even if all of

18  those adjectives applied to Mr. Griffin's statements, it

19  would not amount to sufficiently disturbing statements or

20  threats to even constitute criminal conduct under

21  potentially available federal law; is that right?

22          MS. IYENGAR:  Yes.  That's our position at this

23  point, yes.

24          THE COURT:  All right.  Well, I mean -- when I

25  looked at the magistrate judge's order, he does not appear

1    to base his detention order regarding anything having to do

2    with dangerousness to the community because he said at the

3    hearing:  Although normally we look at dangerousness to the

4    community, here that's not something we're considering

5    because of the charges that have been brought.

6         His detention order is also quiet, as far as I

7    could read it, on danger, but rests on the defendant being a

8    serious risk of flight, such that no combination of

9    conditions can reasonably assure his appearance at a future

10   proceeding.

11        So I just wanted to make sure I understood the

12   role that dangerousness was playing in the Government's

13   position here.  And it's not -- the only dangerousness here

14   is posed by the troubling nature of some of Mr. Griffin's

15   comments publicly; is that right?

16        MS. IYENGAR:  Yes, Your Honor.  That's correct.

17        THE COURT:  Okay.  So now -- one of the arguments

18   that the defense makes is that, you know, the charge under

19   18 U.S.C. 1752(a)(1) with which Mr. Griffin is charged, you

20   know, does require more than simply having -- simply

21   presenting proof of the fact that Mr. Griffin jumped over

22   some fences or barriers, you know, to get onto the Capitol

23   grounds and, you know, that can be troubling in itself.  But

24   that fact alone doesn't constitute a crime under Section

25   1752(a)(1); and, instead, the Government has to prove, in

1    addition to breaching barriers of a restricted space, the

2    Government also has to prove that the defendant knowingly

3    entered this restricted building without lawful authority

4    knowing that in 1752(c)(1)(B) -- that the restricted space

5    was for the President or other person protected by the

6    Secret Service, is or will be temporarily visiting or, in

7    (C), the grounds were so restricted in conjunction with an

8    event designated as a special event of national

9    significance.

10           So is the Government relying on both (B) -- you

11   know, both of those provisions, (c)(1)(B) and (c)(1)(C)?

12           MS. IYENGAR:  Yes.  We are relying on both, I

13   guess, (B) and (C).

14           With respect to the first provision, the evidence

15   that we have is that Mr. Griffin attended the rally that

16   President Trump had held prior to when the Capitol riot took

17   place, and all the news reports have shown there was a

18   significant discussion at that rally that Vice President

19   Pence would be present at the U.S. Capitol on the stage

20   overseeing the Electoral College certification.

21           And I think, with respect to the second provision,

22   the whole purpose of people being at the Capitol that day

23   was because there was this Electoral College certification

24   going on; and I think, arguably, that is an event of

25   national significance per the statute.  And so I think those

1    two, taken in combination, we can make out a charge based on

2    that.

3              THE COURT:  Well, I haven't -- in all of the

4    public statements Mr. Griffin has made, I haven't seen

5    him -- and he certainly publicly announced that he was there

6    on January 6th.  He is fairly proud of the fact that he

7    marched on the Capitol.  Now, that, many people would view

8    as a very unpatriotic thing to do -- to stop a

9    constitutionally mandated process -- but he is very proud of

10   that.

11             But in the comments that I have seen in the record

12   so far, I haven't seen him also proudly talk about how he

13   was at this rally with the President.  Is that part of the

14   Government's proffer, that he was at the rally with the

15   President and therefore knew that Vice President Pence was

16   in the Capitol?

17             MS. IYENGAR:  Yes, Your Honor.

18             The evidence that we have is that Mr. Griffin had

19   attended the rally prior to when the riot at the Capitol

20   took place.  And President Trump made statements

21   regarding --

22             THE COURT:  I have seen those statements, right.

23             MS. IYENGAR:  -- his being at the Capitol.

24             THE COURT:  Okay.  So one of the points that the

25   defendant makes is he intends to exercise his right to a

1   jury trial and that, you know, due to the pandemic -- as

2   everybody -- all the prosecutors in town know, all of the

3   trials have been delayed.

4        You know, the defense papers make the point that

5   he may not be able to have a trial within a year of his

6   arrest, which means he would be sitting in pretrial

7   detention longer than the maximum period of time he could be

8   sentenced under this misdemeanor charge.

9        Does the Government countenance the possibility of

10  subjecting the defendant to pretrial detention longer than

11  the full period of the maximum term of imprisonment that he

12  could be subjected to were he convicted?

13       MS. IYENGAR:  Well, obviously, that's a situation

14  that we would like to avoid.  I understand that the

15  scheduling situation with COVID is sort of fluid at this

16  point --

17       THE COURT:  Well, it's not really fluid, I would

18  say.

19       I mean, I -- as the Chief Judge, I have issued a

20  standing order; we are not having trials before March 15th.

21  And given the situation, I think that March 15th date might

22  be postponed longer, depending on the vaccination rate, the

23  variant rate, the positivity rate, the number of people who

24  agree to wear their masks -- and Mr. Griffin, I understand,

25  has trouble with wearing masks; but that is -- those are all

```
 1    factors that will go into it.
 2              I mean, I guess you can say it's -- you know, it
 3    might be a form of rough justice for people who don't want
 4    to wear masks contributing to the spread of the virus
 5    sitting in jail on pretrial detention.  But, on the other
 6    hand, shouldn't the Court be concerned about the fairness of
 7    that kind of result?
 8              MS. IYENGAR:  Well, Your Honor, I mean -- like I
 9    said before, we -- one of the reasons we have not been
10    asking for detention in most of these misdemeanor cases is
11    partially for that reason.  We are not trying --
12              THE COURT:  Exactly.
13              MS. IYENGAR:  -- to increase the prison
14    population -- increase the jail population over misdemeanor
15    offenses.
16              But because this is, I think, a separate type of
17    case from, sort of, the run-of-the-mill misdemeanors we have
18    seen arising from the Capitol riot, that's the reason that
19    we're asking for the hold here.
20              I certainly understand the Court's concern
21    100 percent; we are not trying to expose anybody to COVID --
22              THE COURT:  Well, you can get exposed to COVID
23    within the jail or outside the jail.
24              MS. IYENGAR:  Yes.
25              THE COURT:  I mean, it's not a matter of exposure
```

1    to COVID that I am concerned about.

2            I am concerned about somebody in pretrial

3    detention for longer than the maximum term of imprisonment

4    if convicted; that's the point I am trying to make, and

5    that's part of the reason that the prosecutors --

6    particularly given the backlog and the delay in having

7    trials due to health and safety concerns -- have not asked

8    for pretrial detention in misdemeanor cases.

9            And, you know, I also look at this case and I see

10   that this is not one of the individuals who banged down

11   doors, sprayed with pepper spray or bear spray law

12   enforcement officials, injured law enforcement officials,

13   poked out the eyes of police in the building.

14           He was with all of those people; I guess he really

15   likes those people; he marched with those people.  He was

16   cheering them on with a bullhorn, but he wasn't actually one

17   of the people who did the banging on the doors, the poking

18   out of eyes of police officers, the spraying -- pepper

19   spraying of officers.  He wasn't one of the people who

20   entered the building, which is part of the reason he's

21   charged with a misdemeanor.

22           So I have been a little puzzled about the request

23   for detention, pretrial detention in this case and -- while

24   understanding the troubling nature of the comments this

25   defendant made.

1          Is there anything else you want to add?

2          MS. IYENGAR:  No, Your Honor.

3          There is nothing else from the Government.

4          THE COURT:  All right.  Let's turn to Mr. Smith.

5          Am I going to be speaking to -- which Smith?

6          MR. N. SMITH:  Nicholas.

7          THE COURT:  Nicholas.

8          Okay.  Mr. Nicholas Smith, how are you today?

9          MR. N. SMITH:  I am well.  Thank you, Your Honor.

10          THE COURT:  All right.

11          So the complaint in the case includes several --

12    maybe more than that -- screenshots of a person who appears

13    to be the defendant at the January 6th assault on the

14    Capitol; and he appears to be standing on the top of the

15    west steps of the Capitol.

16          Is there any dispute that it's the defendant in

17    those screenshots?

18          MR. N. SMITH:  No, Your Honor.

19          THE COURT:  All right.  And did he also attend

20    that rally by President Trump where the President did talk

21    about Vice President Pence?

22          MR. N. SMITH:  Your Honor, I think it was -- Your

23    Honor was right to point out that this is alleged in the

24    case, that he attended the rally, where he participated; if

25    he did attend the rally, what he heard, who he was with --

1    that's not in the charge, in the instrument.  I haven't seen

2    it in the discovery that's also been produced and, because

3    of that absence, it hasn't even come up as a subject in the

4    detention hearing so far --

5               THE COURT:  Okay.  I appreciate that.  I am not

6    going to put you on the spot.  Although, I might.  I am not

7    sure.  But I appreciate your response.

8               Okay.  So, I mean, I would say that given the

9    defendant's apparent appreciation, for want of a better

10   word, of President Trump, it would surprise me if he came

11   all the way to D.C. on January 6th and decided to skip a

12   rally that the President -- that the President was speaking

13   at just for people like him, like Mr. Griffin, who have

14   bought -- hook, line, and sinker -- the story that this is

15   not a fair election; but I appreciate that you're pointing

16   to the absence in the record to date that Mr. Griffin was

17   actually there.  Although, given the people that the FBI has

18   spoken to, they may have that information someplace in the

19   record already, it's just not in the record for this

20   detention hearing.

21               So it's clear from something that is in the record

22   that a person named Matt Struck [sic], who was Mr. Griffin's

23   companion on January 6th, did tell the FBI that both of them

24   had committed some minor trespassing at the Capitol.

25               Would the defendant dispute that characterization?

1          MR. N. SMITH:  Your Honor, we would say that the

2    characterization of "minor trespassing" is not -- is not

3    very informative, it doesn't move the needle very far

4    because the statute that the Government has charged

5    Mr. Griffin with is not an all-purpose, Swiss Army Knife,

6    type statute for federal property.  It's a much more narrow

7    statute about Secret Service protection for special people;

8    and there are mens rea requirements for this statute that

9    are, as Your Honor said, more involved than simply jumping

10   over a barricade.

11         The Government has to prove, among other things,

12   that Mr. Griffin knew that the area he entered, barricade or

13   not, was an area in which a Secret Service protectee will --

14   quote, Will be temporarily visiting or is visiting.  That's

15   1752(c)(1)(B) --

16         THE COURT:  Well, one of the things that the

17   defendant -- excuse me.

18         (Unintelligible, simultaneous speaking.)

19         THE COURT:  One of the things the defendant

20   proudly proclaimed at a public hearing, I guess, on

21   January 14th, is that when he and this mob of people got to

22   the U.S. Capitol, he stated, There was some fencing up; and

23   they were saying that you could not go any further because

24   this was being reserved for Joe Biden and his inauguration.

25         So this statement certainly suggests that

1    Mr. Griffin was fully aware that the places where he was

2    going he was not supposed to be; it was restricted because

3    of the impending inauguration.

4            Is there some other lens with which to interpret

5    that statement that Mr. Griffin made?

6            MR. N. SMITH:  So, Your Honor, on the 6th, the

7    Court knows that the Vice President was presiding in the

8    Capitol -- inside the Capitol at the time.

9            The statute, 1752, requires the Government to show

10   that a defendant crossed any posted, cordoned off, or

11   otherwise restricted area of a building or grounds where a

12   Secret Service protectee is -- is or will be temporarily

13   visiting.

14           The Government alleges that Mr. Griffin did not

15   enter the building where the Vice President was presiding;

16   that's the area under the statute where the Vice President

17   was presiding.

18           The Government alleges that he entered in the area

19   on the west steps of the front Capitol.  The Government does

20   not allege that the Vice President was or will be on the

21   west front steps of the Capitol when Mr. Griffin entered

22   that space.

23           THE COURT:  All right.  So the defendant

24   apparently founded this organization "Cowboys For Trump."

25           I am sort of curious.  What makes Mr. Griffin a

1    cowboy; do you know?

2             MR. N. SMITH:  Your Honor should direct that

3    question to Mr. Griffin.  I am sure he would be able to

4    answer it better than I would.

5             THE COURT:  All right.  Is there any other

6    information you want to bring to my attention?

7             MR. N. SMITH:  Yes.  There is, Your Honor.

8             Thank you for this opportunity.

9             There is not much we would add to what Your Honor

10   has already noted, except that there is no record evidence

11   about distrust in the Government or at large on

12   Mr. Griffin's part, although the Government keeps saying

13   there is in its papers.  The Government has represented many

14   times in its --

15            THE COURT:  You would characterize his comments,

16   Mr. Smith, as just hatred of anybody in the Democratic

17   Party, or dislike, disrespect, disregard -- I don't know

18   what you would call it; but certainly the language he has

19   used is just about people in the Democratic Party and

20   elected officials who happen to be members of the Democratic

21   Party.  Is that how you would characterize his animus or the

22   focus of his animus?

23            MR. N. SMITH:  Your Honor, I wouldn't go that far.

24            What I would say is that when the Government feels

25   the need to quote sound bytes from people's speeches taken

1    out of context that are five seconds long, and it doesn't

2    feel the need to even tell the Court that the next very

3    statement Mr. Griffin makes, which completely reverses your

4    reflection of that statement, I would say no, I don't feel

5    comfortable saying -- representing Mr. Griffin's political

6    opinions about the Government or at large because there is a

7    five-second sound byte on Facebook that the Government

8    doesn't even do the liberty of quoting for Your Honor.

9            Let me give Your Honor another example of this.

10           So in many of its papers to date, the Government

11   has said that, at a January 14th meeting of the Otero County

12   Commission that Mr. Griffin is a part of, he said that he

13   would bring firearms to the Capitol; they quote the types of

14   firearms.  They say Mr. Griffin says it's going to be in my

15   car, I am going to bring it to the Capitol; and then the

16   Government's quote ends there, Your Honor.

17           When the Government put this paper in front of

18   Your Honor, there is a publicly available video that shows

19   Mr. Griffin making this comment.  And one second in the

20   video, after the Government ends its quote, Mr. Griffin

21   explains why he said he would have firearms.  It has nothing

22   to do with threatening people in Washington, D.C., with

23   threatening to kill people -- although that's the

24   insinuation the Government is trying to place in the Court's

25   mind.

1          Mr. Griffin says:  I have been subject to death

2     threats repeatedly as a public official in New Mexico.

3     People have taken pictures of my son, my young child, and

4     put crosshairs over my family's -- over their heads; these

5     are real threats.  So Mr. Griffin takes the threats, goes to

6     the FBI, reports them.  Says:  If you want any more

7     information about these threats, please go to my office in

8     New Mexico.  Ask me for my emails, I will make all of this

9     available to you.

10         So why is -- Your Honor asked the question.  Your

11    Honor is going in the right direction with some of the

12    questions you ask.

13         But, further, why is the Government insinuating

14    that Mr. Griffin is trying to harm people, which is what

15    it's doing, when there is no evidence of that?

16         Why was it selectively quoting these comments he's

17    made to make it look like he's going after people and

18    harming them when the very next comment in a publicly

19    available statement shows that's not true?  Why is it doing

20    this?

21         THE COURT:  All right.  Does the Government want

22    to respond?  And then I will issue my ruling.

23         MS. IYENGAR:  So, I guess, just with respect to

24    the argument about the statements, Your Honor, I believe we

25    did quote what he said accurately in the papers that we

27

1    submitted to the Court, including -- I think there is a

2    statement he made about:  The only good Democrat is a dead

3    Democrat.  We did state in the papers that we submitted

4    that, after he made that statement, he said:  I didn't mean

5    that physically, I meant that politically.  So I don't think

6    there is any inaccuracy in anything that was submitted to

7    the Court.

8              THE COURT:  All right.  I am prepared to rule.

9              At the outset, I am just going to review the

10   applicable law.  The Bail Reform Act requires release of a

11   defendant prior to trial unless a judicial officer

12   determines after a hearing that, quote:  No condition or

13   combination of conditions will reasonably assure the

14   appearance of the person as required and the safety of any

15   other person in the community.  See 18 U.S.C. Section

16   3142(e)(1).

17             The Government bears the burden to establish by a

18   preponderance of the evidence that the defendant poses a

19   serious risk of flight to -- really, in order to trigger a

20   detention hearing and ultimately detention; and that is what

21   the Government is alleging here.

22             To order detention after a hearing, the Court must

23   determine that no condition or combination of conditions

24   will mitigate those risks of flight.

25             And in determining whether any conditions of

1   release will reasonably assure the appearance of a person as

2   required, the Court must take into account the available

3   information concerning four factors that are set out in

4   18 U.S.C. Section 3142(g).

5           Those factors are:  One, nature and circumstances

6   of the offense charged; two, the weight of the evidence

7   against the person; three, the history and characteristics

8   of the person including the person's character, physical,

9   and mental condition, family ties, employment, financial

10  resorts, length of residence in the community, community

11  ties, past conduct, history relating to drug or alcohol

12  abuse, criminal history, and record concerning appearance at

13  court proceedings.  And then, finally, four:  The nature and

14  seriousness to the danger to any person or the community

15  that would be posed by the person's release.

16          On an appeal from a magistrate judge's order of

17  pretrial release, the District Court must conduct a *de novo*

18  review.  In conducting this review, the Court examines the

19  available information that touches upon the four statutory

20  factors just listed.

21          Before addressing those statutory factors, I will

22  address a threshold procedural argument raised by the

23  defendant that there was no lawful basis for the magistrate

24  judge to actually conduct a pretrial detention hearing in

25  the first place; this argument is wrong.  The magistrate

1    judge made no error in holding a detention hearing.

2         The law requires that a judicial officer hold a

3    hearing to determine whether any condition or combination of

4    conditions will reasonably assure the appearance of the

5    defendant in 18 U.S.C. Section 3142(f); and that must be

6    done upon motion of the attorney for the Government in a

7    case that involves one of the seven factors listed in

8    18 U.S.C. Section 3142(f).

9         The Government doesn't argue that any of the five

10   factors in 3142(f)(1) apply here and, plainly, none of them

11   does; that leaves the two factors outlined in the next

12   statutory paragraph, 3142(f)(2), as possible bases for a

13   detention hearing.

14        Under that section, a judicial officer may hold a

15   detention hearing if there is a serious risk that the

16   defendant will flee, that is, 3142(f)(2)(A), or if there is

17   a serious risk the defendant will obstruct or attempt to

18   obstruct justice in various ways in Section 3142(f)(2)(B).

19        If one of these factors is not met, a pretrial

20   detention hearing may not be conducted and the defendant

21   must be released.

22        The defendant criticizes the Government and the

23   magistrate judge for conducting the hearing on the basis

24   that the defendant presents a serious risk of flight because

25   the Government did not meet its burden to present any

1   evidence about those factors.  The defendant conflates,

2   however, the burden that the Government bears to show a

3   serious risk of flight in order to detain a defendant with

4   the burden the Government bears to obtain a hearing pursuant

5   to 3142(f)(2).

6         Certainly, the defendant is correct that a

7   defendant may be detained only if the record supports a

8   finding by a preponderance of the evidence that he presents

9   a serious risk of flight.  See *U.S. v Himler,* a Third

10  Circuit case from 1986 which is part of the defendant's

11  motion at 8.

12        The defendant errs in claiming that 3142(f)(2)

13  requires a judicial finding about whether the case involves,

14  in fact, a serious risk of flight before even conducting a

15  detention hearing.  To the contrary, the language of 3142

16  directs that a judicial officer -- and I quote, Shall hold a

17  detention hearing upon motion of the attorney for the

18  Government or upon the judicial officer's own motion in a

19  case that involves the 3142(f)(2) factors, and such a

20  hearing must be held immediately upon the person's first

21  appearance before the judicial officer unless a continuance

22  is sought.

23        The Government's burden to prove by a

24  preponderance of the evidence that the defendant presents a

25  risk of flight and no combination of conditions will suffice

1      to ensure his appearance concerns the merits of whether he

2      may be detained, not the preliminary issue of whether the

3      judicial officer must hold a detention hearing.

4              The magistrate judge here fully complied with the

5      procedural requirement of Section 3142.  Before the

6      magistrate judge, the Government moved that the defendant be

7      detained pending trial pursuant to Section 3142(f)(2)(A) and

8      (f)(2)(B) of the federal bail statute -- see the

9      defendant's -- the Government's motion at 1 -- and urged the

10     Court to hold a hearing to determine whether the defendant

11     should be detained because of the serious risk the defendant

12     will flee and because there is a serious risk the defendant

13     will obstruct or attempt to obstruct justice, et cetera.

14             The Government has since then dropped the

15     (f)(2)(B) basis for detention, and it is relying now solely

16     on the serious risk of flight.

17             Citing the fact that the defendant lacks ties to

18     the Washington, D.C. metropolitan area, the Government posed

19     that -- and his other lack -- his disregard for the law, the

20     Government posited he posed a serious risk of flight and

21     moved for the hearing.  The magistrate judge then acted as

22     required by the mandatory language of 3142(f), and promptly

23     held such a hearing.  Thus, both the Government and the

24     magistrate judge acted entirely properly in moving for and

25     promptly conducting a detention hearing.

1          So having established the detention hearing

2     pursuant to Section 3142(f) is proper and, indeed, required

3     in this case on the part of the magistrate judge, given the

4     Government's motion and basis for it, I will now proceed to

5     consider the four 3142(g) factors.

6          Although the magistrate judge properly determined

7     that he was required to hold a hearing and consider those

8     factors, I do respectfully disagree with the magistrate

9     judge's application of the factors here.

10          I will start with the nature and circumstances of

11     the offenses charged -- or the offense charged because it is

12     a single misdemeanor charge.

13          Based upon the Government's investigation to date,

14     the defendant's conduct in this case amounted to marching to

15     the Capitol Building with hundreds or even thousands of

16     other people, many of whom then assaulted the Capitol by

17     breaking windows, violently pushing past police, injuring

18     police officers in the course of that conduct, and damaging

19     the Capitol Building in the course of that; and, then, those

20     mobsters marauded through the hallways, into private

21     offices, even onto the floor of the Senate Chamber, right

22     outside the House of Representatives Chamber.  But the

23     defendant was not one of those people who broke into the

24     Capitol; he stayed outside, albeit in areas cordoned off and

25     restricted where he was not supposed to be.

1               The Government has proffered no evidence that this

2     defendant used a weapon, brandished a weapon, carried a

3     weapon on January 6th, or used any violence that day either

4     against the police or the Capitol Building.

5               Consequently, the defendant has been charged with

6     a misdemeanor offense of knowingly entering or remaining in

7     any restricted building or grounds without lawful authority,

8     in violation of 18 U.S.C. Section 1752(a)(1), for entering

9     the Capitol grounds, an offense that carries a penalty of up

10    to one-year imprisonment, rather than more serious felony

11    charges even under that statute of ten years if there is

12    property damage or bodily injury that results.

13              If proven, there is no question that the

14    defendant's conduct was criminal.  And for many Americans,

15    his conduct in marching on the Capitol to protest the

16    democratic and constitutionally mandated process of counting

17    the Electoral College certificates was grossly unpatriotic;

18    but, nonetheless, the nature and circumstances of this

19    defendant's particular conduct on January 6th, 2021, weigh

20    in favor of release.

21              As I have said before, what happened on January 6,

22    2021, was not a peaceful protest but, in fact, did result in

23    the disruption, as intended, for hours of the Congress being

24    able to perform its constitutionally mandated task, as well

25    as resulting in the death of five people, and so many more

1    both injured and traumatized.

2            But by contrast to those who entered the building

3    and committed those acts inside the building, the defendant

4    was charged with entering the restricted area of the steps

5    of the west front of the Capitol, and the patio at the top

6    of these steps that was cordoned off with temporary barriers

7    on January 6th.

8            While there, the defendant allegedly borrowed a

9    bullhorn to address a group of protesters and rioters and

10   remained on the steps approximately an hour and a half,

11   according to one of his companions that day; and they left

12   once they smelled the pepper spray.

13           But in contrast to most of the brazen rioters, he

14   was not armed, and he left the Capitol grounds peacefully,

15   although it doesn't diminish the seriousness of the assault

16   or the seriousness of the offense with which the defendant

17   is charged here.  He was not a participant in the violent

18   break-in of the Capitol or the marauding mobs roaming the

19   hallways of our legislative branch of government on

20   January 6th, and the charge he now faces reflects that fact.

21           The Government does point to the defendant's

22   public statements as cause for concern, and they are.  In a

23   video the defendant filmed himself and apparently posted

24   himself, he referenced that:  There is going to be blood

25   running out of that building.  But at the end of the day,

1    you mark my word, we will plant our flag on the desk of

2    Nancy Pelosi and Chuck Schumer, and Donald J. Trump if it

3    boils down to it.

4         On January 6, he was filmed on the west Capitol

5    steps threatening:  We are not going anywhere.  We are not

6    going to take no for an answer.  We are not going to get our

7    election stolen from us by China.  We are not going to allow

8    it.  There will never be a Biden presidency.

9         Later, when he was back in New Mexico, he spoke

10   publicly of his participation in the January 6th riot, and

11   further his plan to return to Washington, D.C. for the

12   inauguration of then President-Elect Biden with guns in the

13   trunk of his car, a revolver, a rifle, et cetera.

14        He has also said:  The only good Democrat is a

15   dead Democrat and, shortly after that, saying he did not

16   intend that physically, only politically; that his -- the

17   briefing papers acknowledge that caveat might fall short

18   ethically.

19        He also told the FBI, on January 11th, he hoped

20   the demonstration at the inauguration would be peaceful,

21   that a change in leadership can be accomplished without a

22   single shot being fired; but he also seemingly threatened:

23   No option is off the table for the sake of freedom.  These

24   are all words that are deeply disturbing, especially when

25   considered in conjunction with the defendant's decision to

1    return with firearms to D.C. shortly before the President's

2    inauguration on January 20th.

3              His words certainly reflect strong convictions

4    that many in this country would consider unpatriotic,

5    obnoxious, repugnant to the democratic process, certainly

6    harmful to the American body politic when he's talking about

7    fellow Americans.

8              The defendant has argued these words are simply an

9    exercise of the defendant's First Amendment rights, and that

10   the Government erred and the magistrate judge erred in using

11   them to analyze whether pretrial detention is appropriate.

12   He contends that inflammatory though defendant's statements

13   may be, they are patently within the bounds of

14   constitutionally protected speech and, as such, the Court

15   may not deny the defendant pretrial release on account of it.

16             And he suggests that reliance on his statements is

17   appropriate only if they do not comprise constitutionally

18   protected speech, namely, if they are directed to inciting

19   imminent lawless action within the meaning of *Brandenburg v*

20   *Ohio*, which is the Supreme Court case from 1969; not so.

21             The defendant is correct that a criminal defendant

22   may not be punished, for instance, through a greater

23   sentence or even through pretrial detention solely because

24   of his abstract beliefs.  See *Wisconsin v Mitchell*, a 1993

25   Supreme Court case citing *Dawson v Delaware*, a Supreme Court

1    case from 1992, and *United States v Lemon*, the D.C. Circuit

2    case from 1983.

3            But, at the same time, the Constitution does not

4    erect a per se barrier to the admission of evidence

5    concerning one's beliefs and associations at sentencing

6    simply because those beliefs and associations are protected

7    by the First Amendment; that's a quote from *Mitchell,* the

8    Supreme Court case from 1993.

9            Crucially, *Mitchell* again says:  The First

10   Amendment does not prohibit the evidentiary use of speech to

11   establish the elements of a crime or to prove motive or

12   intent.

13           Likewise, in the pretrial detention context, it is

14   entirely proper to examine and rely upon a defendant's

15   statements if those statements shed any light on the four

16   factors the courts are directed to consider under Section

17   3142(g).  See, for example, *U.S. v Daniels*, Northern

18   District of Texas case from January 30th, 2018, which was

19   collecting cases in which courts relied upon defendants'

20   statements in assessing risk of flight for pretrial

21   detention purposes.  This is so long as the Court does not

22   seek merely to punish the defendant for his beliefs or

23   statements about his beliefs.  See, also, *U.S. v Ervin,* 818

24   F. Supp. 2d 1314, a Middle District of Alabama case from 2011.

25           Also, when a defendant has made specific

1    statements that call into question whether he will abide by

2    a Court's order to appear at trial, it is his conduct and

3    possible conduct that is ultimately an issue, and his

4    statements are relevant only to the extent they reflect on

5    that conduct; that was the use that the Government and the

6    magistrate judge were considering in these statements here.

7              The defendant relies heavily on *U.S. v Lemon,* a

8    1983 D.C. Circuit case, for the proposition that it is

9    improper to consider a defendant's statements in evaluating

10   pretrial detention, and this is a misreading of that D.C.

11   Circuit case.

12             *Lemon* was a case concerning a sentencing, not

13   pretrial detention, of a defendant who was allegedly a

14   member of the Black Hebrew group; and the sentencing judge

15   assumed the defendant had intended to further the illegal

16   aims of the Black Hebrews on the basis of the defendant's

17   association with some Black Hebrew members.

18             The Government had urged the sentencing judge to

19   impose a harsher sentence for the check fraud conviction on

20   the ground that the defendant's alleged membership in the

21   Black Hebrews, and that group's criminal activities,

22   together suggested that the defendant had committed the

23   check fraud as part of a criminal conspiracy.

24             The sentencing judge didn't explain whether he

25   adopted this theory; but the D.C. Circuit concluded that he

1    appeared to have relied on the information about the

2    defendant's alleged associations with the Black Hebrews in

3    imposing an unusually severe sentence for a first-time

4    offender.

5            After holding that a sentence based to any degree

6    on activity or beliefs protected by the First Amendment is

7    constitutionally invalid, the Circuit went on to determine

8    that the Black Hebrew group is protected by the First

9    Amendment and that mere membership would be an impermissible

10   factor at sentencing.

11           The Court further explained that there must be:

12   Sufficiently reliable evidence of the defendant's connection

13   to illegal activity within the Black Hebrews to insure that

14   he was not being given a harsher sentence for mere

15   association with the group and its illegitimate aims and

16   activities, noting that his membership in the Black Hebrews

17   may be evidence of his knowledge of the group's illegal

18   activities and, thus, may be considered for that limited

19   purpose.

20           In a footnote, the Circuit observed, by way of

21   analogy, that similar principles govern the determination of

22   bail status; appellate courts have seriously limited the

23   extent to which protected political speech and association

24   may be the basis for revoking or denying bail, which is the

25   language on this footnote that the defendant relies on.

1              But *Lemon* is wholly consistent with and, in fact,

2    reenforces the principle that a defendant may not be

3    punished, whether through a greater sentence or pretrial

4    detention, solely because of his opinions, beliefs,

5    statements, or associations; but that certainly those views,

6    statements, and associations may be relied upon for purposes

7    of proving, for example, intent or motive.

8              Similarly, with *Williamson v United States*, a

9    Second Circuit case from 1950 on which the defendant relies,

10   you know, also demonstrates this position.  *Williamson*

11   stands for the proposition that political speech that is

12   protected by the First Amendment cannot, standing alone,

13   suffice to show danger to the community warranting pretrial

14   or preappeal detention; but *Williamson* does not conflict at

15   all with the holding of *Mitchell*, a Supreme Court case

16   decided 40 years later, that a defendant's speech may be

17   considered to establish the elements of a crime or to prove

18   intent or motive.

19             Here, questions of motive and intent are clearly

20   central to the analysis of the 3142(g) factors.  The

21   Government moved for the defendant to be detained pending

22   trial on the grounds that he is a flight risk; and, in

23   evaluating that issue, his intent and state of mind is

24   paramount to determining whether he is a flight risk.  The

25   Government -- the Court must decide essentially whether the

1    defendant intends to flee if he is released pretrial.

2          This is precisely the category of situation in

3    which reliance upon a defendant's statement is countenanced

4    by *Mitchell*.  As the magistrate judge rightly noted, for

5    instance, during the defendant's initial appearance:  Speech

6    here motivates my understanding of what his intent was; see

7    hearing transcript.

8          In short, the magistrate judge acted entirely

9    appropriately in reviewing the defendant's statements for

10   appropriate inferences in evaluating the necessary factors

11   under Section 3142(g).  There is absolutely nothing

12   unconstitutional, as the defendant suggests, about the

13   magistrate judge's analysis and reliance on his statements.

14         I do part ways with the magistrate judge, however,

15   in finding that the defendant's statements considered in

16   conjunction with his conduct do not -- because I find that

17   they do not suggest that he intends to flee, or that

18   detaining him pending trial is the only way to ensure his

19   appearance at trial.

20         I agree with the magistrate judge and the

21   Government's interpretation that the defendant's statements

22   are highly inflammatory, deeply disconcerting --

23   particularly for a person who is an elected repre -- elected

24   person in a community and feels comfortable publicly

25   suggesting that the blood of elected officials will be

1    spilled because he is unhappy with the outcome of a

2    presidential election, and also that he would subsequently

3    return to Washington, D.C., with firearms with the intention

4    of, again, being present and armed at the Capitol on

5    January 20th -- I mean, those are sort of outrageous

6    comments; but he proudly said them at a public meeting.

7         But other parts of the defendant's comments and

8    his behavior suggest a more law-abiding view on his part.

9    He did prove, after the January 6th assault on the Capitol,

10   largely cooperative with the FBI.  He was forthright with

11   the FBI about his plans to return to D.C. for the

12   inauguration.  He cooperated with the FBI in investigating

13   threats that the defendant and his family received once his

14   presence and his role at the January 6 riot were made

15   public.

16        But taken together, his conduct and his statements

17   do not suggest that he presents a serious risk of flight or

18   that because -- in part because his statements reflect a

19   dislike, to put it mildly, of some duly elected federal

20   officials; but he hasn't expressed such a disdain for the

21   judiciary or for court orders, and he does present some

22   respect for law enforcement and some rules.

23        I appreciate that the charge here is that he

24   disregarded signage about restricted areas at the Capitol on

25   January 6th; but his subsequent cooperation with law

1    enforcement shows that he is not a person who has a

2    categorical disdain and disregard for any and every

3    government actor or authority figure and rule, or it doesn't

4    suggest that he has a similar disregard for the Court and

5    can't be trusted to respect release conditions imposed by

6    the Court when so directed.

7         In sum, notwithstanding his inflammatory remarks,

8    the troubling circumstances of his return to D.C., the

9    defendant's charged conduct was largely peaceful; his

10   contemporaneous and subsequent statements, while

11   provocative, do not suggest that there are no combination of

12   release conditions that can assure his appearance in court.

13        As to the second factor, the weight of the

14   evidence against the defendant, the evidence consists of

15   videos, screenshots, his own statements about him being

16   where he wasn't supposed to be on January 6th, and then his

17   subsequent discussions about that; and putting aside some

18   dissection of the statute, the weight of the evidence

19   against this defendant does appear strong, but that evidence

20   has to be calibrated against the charge itself which is,

21   here, a misdemeanor carrying no more than one-year

22   imprisonment.

23        Given the fact that we're in the midst of a global

24   pandemic, and that trials have been delayed due to health

25   and safety concerns, pretrial detention may put the

1   defendant in a position of waiting for a trial as long as he

2   may be required to serve a prison term if he is convicted;

3   this strongly counsels against pretrial detention here.

4          As to the third factor, the history and

5   characteristics of the defendant, those clearly weigh in

6   favor of release.  He is employed; apparently, he has been

7   for 30 years.  He's also engaged with his community,

8   involved in local government, apparently is an elected

9   county commissioner.  He also has other political

10  activities, such as his Cowboys For Trump.  He has a limited

11  criminal history, with only one conviction for a DUI that

12  occurred nearly 25 years ago.

13         And although the Government is correct that he

14  apparently has no ties to the D.C. area, he certainly has

15  strong ties to where he lives in New Mexico.  He has lived

16  there almost most of his life; he has got his family there;

17  he works there, including as a public servant.  He has child

18  support obligations in New Mexico.  So all of these factors

19  weigh heavily in favor of release.

20         As to the last factor, about the nature and

21  seriousness of the danger to any person or the community,

22  because of the nature of the crime he's charged with and the

23  fact that the Government asked that he be detained basically

24  only because he presents a flight risk, this factor doesn't

25  appear to play much of a role at all, and really needn't be

1    considered to the extent that some of his comments are

2    targeted at the top federal officials and were made about

3    things that are occurring in Washington, D.C.  There doesn't

4    seem to be any evidence that he poses a risk of danger to

5    the community in New Mexico where he lives and will reside

6    if released pending trial.

7         To the extent that he presents a danger in

8    Washington, D.C., I think that can be effectively mitigated

9    by a release condition prohibiting him from entering this

10   city except when required to do so for court hearings.

11        So, accordingly, to the extent this factor -- this

12   last factor of the danger to any person or the community is

13   considered at all, it weighs in favor of release with that

14   condition of release.

15        So my order is:  Upon consideration of the

16   proffered evidence presented, the factors set forth in

17   18 U.S.C. Section 3142(g), the possible release conditions

18   set forth in Section 3142(c), the Court finds that the

19   statutory factors weigh in favor of pretrial release and

20   that the Government has not met its burden of establishing

21   by a preponderance of the evidence that no condition or

22   combination of conditions will reasonably assure the

23   appearance of the defendant.

24        The defendant's motion is, therefore, granted.

25   The magistrate judge's pretrial detention ruling is

```
 1    reversed.
 2              The defendant will be released pending trial
 3    subject to the following conditions:
 4              He must report to pretrial services by telephone
 5    today -- if that's possible, given the lateness of the hour;
 6    and, thereafter, report to pretrial services weekly by
 7    telephone.  He must verify his address with pretrial
 8    services.  He must notify pretrial services in advance of
 9    all travel within the continental United States; any other
10    travel must be approved in advance by the Court.
11              The defendant must not possess a firearm,
12    destructive device, or other weapon.  The defendant must
13    report to pretrial services by phone about any contact he
14    has with law enforcement within 24 hours of such contact,
15    including arrests, questioning, and traffic stops.
16              The defendant must surrender any passports to
17    pretrial services agency for the District of Columbia and
18    not obtain another passport or other international travel
19    document.
20              The defendant must stay out of the District of
21    Columbia except for court or pretrial business, or meetings
22    with his attorney.
23              The defendant must not possess or use a narcotic
24    drug or other controlled substance, unless prescribed by a
25    licensed medical practitioner.
```

1          The Court is to be notified of any violations of

2    this order.

3          Mr. Griffin, I want to remind you that your

4    presence is required in court, at least remotely for the

5    time being, and that you will be advised when next to

6    appear.  So you should stay in close touch with your counsel

7    to make sure you know when that is.

8          I am also required to caution you about your

9    conduct during your release pending trial and of certain

10   penalties that could apply to you.

11         Failing to appear in court as required is a crime

12   for which you can be sentenced to imprisonment.

13         If you violate any condition of release, a warrant

14   for your arrest may be issued, and you may be jailed until

15   trial, and you may also be prosecuted for contempt of Court.

16         Committing a crime while on release may lead to

17   more severe punishment than you would receive for committing

18   that same crime at any other time.

19         It is also a crime to try to influence a juror, to

20   threaten or attempt to bribe a witness or other person who

21   may have information about this case, to retaliate against

22   anyone for providing information about the case, or to

23   otherwise obstruct the administration of justice.

24         Do you understand those cautions, Mr. Griffin?

25         THE DEFENDANT:  I do.

1              THE COURT:  All right.  Is there anything further

2       today from the Government?

3              MS. IYENGAR:  No, Your Honor.  Nothing further

4       from us.

5              THE COURT:  Anything further from defense counsel?

6              MR. N. SMITH:  No, Your Honor.  Thank you.

7              THE COURT:  I can't hear you.  Speak up, please.

8              MR. D. SMITH:  This is David Smith.

9              Can you hear me?

10             THE COURT:  Yes.

11             MR. D. SMITH:  When he was arrested, Your Honor,

12      the FBI took his car into custody -- not to forfeit it or

13      anything, but just because there was -- they have to take

14      the car into custody if he's arrested, and he is not with

15      someone who can remove the car.

16             Could the Court direct the Government to see to it

17      that his car is given back to him so he can drive home to

18      New Mexico in it?

19             THE COURT:  I will so direct the Government.

20             I expect, Ms. Iyengar, that you will talk to the

21      FBI agents on the case and get that car back to the

22      defendant.  I am sure capable counsel can make those

23      arrangements without the Court's intervention.

24             MS. IYENGAR:  Yes, Your Honor.

25             THE COURT:  All right.  If there is nothing

```
 1      further, you are all excused.

 2                MS. SCHUCK:  Your Honor.

 3                THE COURT:  Who is talking?

 4                THE DEPUTY:  Pretrial.

 5                THE COURT:  Pretrial.  Yes?

 6                MS. SCHUCK:  Christine Schuck with pretrial

 7      services.

 8                THE COURT:  Yes.  Ms. Schuck, how are you?

 9                MS. SCHUCK:  Good.  How are you, Your Honor?

10                THE COURT:  I am good.

11                MS. SCHUCK:  Pretrial would just respectfully

12      request an additional condition that he contact pretrial

13      services by -- on Tuesday, February 9th to have an interview

14      conducted because -- so we can gather some information

15      regarding his residence, his employment, et cetera, because

16      we did not have that information at the time our report was

17      prepared.

18                THE COURT:  Yes, Ms. Schuck.  I will so direct.

19                Is there a specific time on Tuesday that you would

20      like?

21                MS. SCHUCK:  Just between normal business hours

22      which, for us, is 8:30 a.m. to 4:30 p.m., eastern time.

23                THE COURT:  All right.  Mr. Smith.  One of the

24      Mr. Smiths -- excuse me.

25                Do you need the phone number to call?
```

```
 1              MR. N. SMITH:  Yes, please.
 2              THE COURT:  Ms. Schuck, what is the telephone
 3    number that should be called by Tuesday, February 9th by
 4    Mr. Griffin?
 5              MS. SCHUCK:  Sure.
 6              The main number is 202-442-1000.  And at that time
 7    he would be advised who his case manager is and be directed
 8    to the case manager who will conduct the interview.
 9              THE COURT:  All right.  Okay.  Don't miss that
10    call, Mr. Griffin, because if there is any violation of your
11    release conditions I will be immediately informed.
12              Do you understand that?
13              THE DEFENDANT:  I understand.
14              THE COURT:  All right.
15              Okay.  If there is nothing further, you all are
16    excused.  Thank you.
17              MR. D. SMITH:  Thank you so much, Your Honor.
18              It was really a pleasure to hear your opinion
19    which I hope you will publish.  It sounds like a publishable
20    decision to me.
21              THE COURT:  I am probably not going to publish it,
22    but thank you.
23              You are all excused.
24              MR. D. SMITH:  Thank you.
25              (Whereupon, the proceeding concludes, 4:43 p.m.)
```

1                              **<u>CERTIFICATE</u>**

2

3           I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings to the best of my

7     ability.

8

9           PLEASE NOTE:  This hearing was held telephonically

10    in compliance with the COVID-19 pandemic stay-safer-at-home

11    orders and is therefore subject to the limitations

12    associated with the use of technology, including but not

13    limited to telephone signal interference, static, signal

14    interruptions, and other restrictions and limitations

15    associated with remote court reporting via telephone,

16    speakerphone, and/or videoconferencing capabilities.

17

18           This certificate shall be considered null and void

19    if the transcript is disassembled in any manner by any party

20    without authorization of the signatory below.

21

22      Dated this 6th day of February, 2021.

23

        <u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
24      Official Court Reporter

25