UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 1:21-cr-92 |
| | ) |
| COUY GRIFFIN, | ) **Judge Trevor N. McFadden** |
| | ) |
| Defendant. | ) |

**DEFENDANT GRIFFIN'S REPLY IN SUPPORT OF MOTION TO COMPEL THE PRODUCTION OF EVIDENCE, OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS**

Defendant Couy Griffin, through his attorneys, files this reply in response to the government's opposition to his motion to compel the production of documents and records or, alternatively, for a bill of particulars. ECF No. 23.

**A.     The government's equivocal response does not clarify whether Secret Service-related records need to be produced**

As explained in Griffin's motion, 18 U.S.C. § 1752 concerns the unlawful entry by defendants into areas restricted for the protection of Secret Service protectees. All three definitions of "restricted buildings or grounds" in the statute concern areas in which the Secret Service, and not some other federal agency, protects a narrowly defined class of individuals which does not include members of Congress. 18 U.S.C. § 1752(c)(1).

Once it is agreed that it is the Secret Service—and not some other federal agency—that is charged with providing the security and protection contemplated in § 1752, the only remaining question is whether the statute is reasonably interpreted to mean that agencies other than the agency specifically and repeatedly identified in the statute—the Secret Service—are entities that "post[], cordon[] off, or otherwise restrict[]" the "restricted buildings or grounds" at issue. The

1

government's opposition says, "There is no requirement in the statute for the government to prove that the restricted area was restricted at the direction of the Secret Service." Gov't Opp., pp. 2-3.  It offers one argument in support, based on statutory interpretation.  To contend, as Griffin does, that it is the Secret Service that restricts the area the Secret Service patrols for the protection of Secret Service protectees, "conflates two separate provisions in the statute.  The statute states in relevant part:

> [T]he term 'restricted buildings or grounds' means any posted, cordoned off, or otherwise restricted area—
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;"

Gov't Opp., p. 1 (quoting 18 U.S.C. § 1752(c)(1)(B)).

It is not clear what the government means by "conflat[ing] two separate provisions in the statute." The Court will notice the government has cited one indivisible definition of "restricted buildings or grounds" under § 1752(c)(1), and that definition says that the restricted area is one where the Secret Service is protecting a Secret Service protectee.  In any case, the question is why the statute would provide that some other federal agency, not charged with protecting the class of individuals protected by the Secret Service, may demarcate the "restricted buildings or grounds" even where it is *not* so restricted "at the direction of the Secret Service." Gov't Opp., p. 3.  The government's interpretation suggests a world where one law enforcement agency dictates and sets the scale and scope of another law enforcement agency's unique mission, even where the second agency has not directed it.  It cites no real-world example of such a dynamic and Griffin is unaware of any.

The statute itself shows why the government's interpretation lacks common sense. One of the "restricted buildings or grounds" is "any posted, cordoned off, or otherwise restricted area—(A) of the White House or its grounds, or the Vice President's official residence or its grounds;" 18 U.S.C. § 1752(c)(1)(A). Consider the following hypothetical world under the government's interpretation. The U.S. Postal Inspection Service determines that the Secret Service is not properly protecting the president. Because "there is no requirement in the statute for the government to prove that the restricted area was restricted at the direction of the Secret Service," Gov't Opp., pp. 2-3, the Postal Service determines, unilaterally, that the "restricted area" of the White House should extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse, to the east. Even though the Secret Service may disagree with the Postal Service's view of the appropriate size of the restricted area, for purposes of § 1752 liability that does not matter, and the reader of the brief is liable, and potentially detainable pretrial, unless some federal agency (the Postal Service? The Secret Service? Both?) gives him "lawful authority" to "knowingly" "remain" where he is. 18 U.S.C. § 1752(a)(1).

The history of the protection of the White House belies the government's multi-agency interpretation. *See* Guarding the White House, The White House Historical Association, available at: https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house. The nature and size of the force protecting the Executive Mansion has changed many times since the early 1800s—but at no point did it entail overlapping agencies of *independent* security discretion of the kind contemplated by the government (for Capitol cases alone):

**1812-1814**: President Madison garrisoned a company of 100 militia on the grounds of the President's House.

3

**1823**: Commissioner for Public Buildings, Joseph Elgar, recommended to President Monroe that plainclothes officers protect the White House.

**1830**: D.C. Marshal Tench Ringgold ordered guards posted at the White House gates to maintain order at the president's "public levees."

**1837-1841**: President Van Burden ordered the White House grounds to be patrolled by day guards and night watchmen.

**1842**: Establishment of the first permanent security force for the White House: an auxiliary guard that consisted of a captain and his three men, who looked out for suspicious-looking people.

**1853-1857**: Franklin Pierce becomes the first president to have a full-time bodyguard, Thomas O'Neil.

**1861**: Metropolitan Police guarded the Executive Mansion but Lincoln "did not want the house to take on the characteristics of an armed camp. Guards inside the Executive Mansion dressed in civilian clothes and concealed their firearms."

**1901**: After the assassination of President McKinley, Congress informally requested Secret Service protection for the president.

**1901-1909**: During the Theodore Roosevelt administration, the Secret Service assumed full-time responsibility for protecting the president.

**1922**: At the request of President Warren G. Harding, a permanent White House Police Force was created.

**1930**: The White House Police Force placed under the administration of the Secret Service.

**1951**: Congress passed Public Law 82-79 which permanently authorized Secret Service protection of the president, his immediate family, the president-elect and the vice president.

**1962**: Congress passed Public Law 87-829, enlarging Secret Service coverage to include the vice president and the vice president-elect.

**1970**: Congress passed Public Law 91-217, renaming the White House Police Force the Executive Protective Service.

**1977**: The Executive Protective Service officially renamed the Secret Service Uniformed Division.

**2003**: Congress passed Public Law 107-296, under which the Secret Service was transferred from the Department of the Treasury to the Department of Homeland Security. Guarding the White House, The White House Historical Association, available at: https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house.

History aside, other federal statutes beyond Section 1752 demonstrate that the Secret Service is the sole federal agency involved in demarcating restricted areas under that statute. Section 3056 is entitled "Powers, authorities, and duties of United States Secret Service." 18 U.S.C. § 3056.  Subsection (d) criminalizes interfering with agents "engaged in the protective functions authorized by this section *or by section 1752 of this title*. . ." 18 U.S.C. § 3056(d) (emphasis added).  Because that crime is part of a statute directed to the "powers, authorities, and duties of United States Secret Service," it confirms the independent role of the Secret Service in setting and protecting the "restricted areas" of Section 1752.

Subsection (e) states, "When directed *by the President*, the United States Secret Service is authorized to participate, under *the direction of the Secretary of Homeland Security*, in the planning, coordination, and implementation of security operations at special events of national

5

significance, *as determined by the President*." 18 U.S.C. § 3056(e)(1) (emphasis added). This subsection makes clear with which authorities and agencies the Secret Service "coodinat[es]" in connection with "security operations"—and they do not include the U.S. Capitol Police.

Finally, subsection (g) stresses the *independence* of the Secret Service's mission. "The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function. No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department." 18 U.S.C. § 3056(g). This is not language indicative of a congressional intent that the Secret Service share its protective services with any federal agency that happens to "post[], cordon[] off, or otherwise restrict[] [any] area." 18 U.S.C. § 1752(c)(1).

Yet, although the government asserts that it does not have to "prove that the restricted area was restricted at the direction of the Secret Service," Gov't Opp., pp. 2-3, it does not commit that it will not attempt to offer such proof at trial, should the Court conclude that it is legally necessary. Moreover, in a footnote, the government writes, "There are standard procedures in place between USCP and the Secret Service to ensure that areas are appropriately restricted when the President or Vice President are visiting." Gov't Opp., p. 2. The government asserts that it cannot provide *any* timeline for when such records will be produced. It does not explain why the "standard procedures" cannot be produced on a "standard" timeline, why these would be burdensome to collect and produce, and whether the government has made any effort to do so.

6

The Court should order the government either to provide a reasonable timeline for the production of such documents and records or confirmation of their non-existence, or else to commit that it will not attempt at trial to "prove that the restricted area was restricted at the direction of the Secret Service," Gov't Opp., pp. 2-3, because, according to the government, that is legally unnecessary under Section 1752.

The issue with respect to Section 1752(c)(1)(C) is similar. The government says it "is not seeking to argue in this case that the electoral college certification was an event designated as a special event of national significance." Gov't Opp., p. 3. The government should confirm this means that it *will* not make that argument at trial. If it does not make that commitment, the government should be ordered to timely produce documents and records supporting its contention that the joint session of Congress on January 6 was so designated by some federal agency. Similarly, if the government contends that the joint session was somehow a "special event of national significance" without any statutory designation and that that satisfies § 1752(c)(1)(C), it should say so and accordingly produce relevant documents and records in support.

### B. A bill of particulars is still warranted absent further clarification

Griffin requested a bill of particulars specifying "whether Griffin has allegedly violated § 1752(a)(1) because he crossed a U.S. Capitol Police barricade per se, or because that barricade was established to demarcate a restricted area set by the Secret Service." In response, the government states that it "is not making either of those allegations. The government is alleging that the Defendant violated 18 U.S.C. § 1752(a)(1) because he entered an area of the Capitol grounds that was restricted by the Capitol Police while two Secret Service protectees were inside the Capitol building." Gov't Opp., p. 3. Again, that the government is alleging a § 1752(a)

7

violation "because [Griffin] entered an area of the Capitol grounds that was restricted by the Capitol Police while two Secret Service protectees were inside the Capitol building" does not answer the question whether the government will *also* allege, if required, that the area Griffin allegedly entered was restricted by the Capitol Police *at the direction of the Secret Service*. The government should clarify its position in a bill of particulars or at least in writing.

As for the second bill of particulars request, again, the government should clarify whether it will contend that it may satisfy § 1752(c)(1)(C) by alleging that the joint session of Congress on January 6 was somehow "a special event of national significance" even though it was not so designated by DHS.[1]

Dated: April 20, 2021	Respectfully submitted,

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com
*Appointed by the Court*

Nicholas D. Smith, VA Bar No. 79745
David B. Smith, PLLC
7 East 20th Street, Suite 4R
New York, NY 10003
(917) 722-1096
nds@davidbsmithpllc.com

---

[1] In the last hearing, Griffin mentioned that he may file a motion to suppress evidence collected from his cell phone, which had been searched without a warrant and likely after Griffin withdrew his consent to search the device. However, he said he was waiting for the government to indicate when the search of the phone was performed. Initially, the government indicated it was searched "prior to February 5." On April 8, however, the government subsequently informed Griffin that the search was performed on February 8 and 9. Griffin replied that the search was therefore improper, as he withdrew his consent on February 6, the day after he was released from pretrial detention. The government later indicated it would not use the evidence collected from Griffin's phone in its case-in-chief, but only for impeachment should Griffin testify at trial.

**Certificate of Service**

I hereby certify that on the 20th day of April, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

>JANANI IYENGAR
>Assistant United States Attorney
>555 4th Street, N.W., Room 4408
>Washington, D.C. 20530
>(202) 252-7846

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

>/s/ David B. Smith
>David B. Smith, VA Bar No. 25930
>David B. Smith, PLLC
>108 North Alfred Street, 1st FL
>Alexandria, Virginia 22314
>(703) 548-8911 / Fax (703) 548-8935
>dbs@davidbsmithpllc.com
>*Appointed by the Court*