**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-92** |
| | : | |
| **COUY GRIFFIN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INFORMATION

The United States of America respectfully files this response to Defendant Couy Griffin's motion to dimiss the information. ECF No. 32. That motion should be denied.

## FACTUAL BACKGROUND

On January 6, 2021, Vice President Pence and Vice President-Elect Harris, both under United States Secret Service (USSS) protection, were present at the United States Capitol building. The United States Capitol Police (USCP), with sole authority over security on the Capitol grounds, set up security barriers on the Capitol grounds. On the west side of the Capitol, USCP set up metal bike rack barriers along First Street. Within the West Front of the Capitol building, USCP set up additional temporary metal barriers, green snow fencing, and signage stating, "Area Closed By order of the United States Capitol Police Board." The Lower West Terrace on the West Front was closed to members of the public. Below is a map of the restricted area:




Below are two photographs of the line of USCP officers on the Lower West Terrace below the inauguration stage before rioters forced their way past the officers. The first photograph shows the full line of officers and the second photograph shows a close up of the officers with the metal barricades in the center and bottom right of the frame.





On January 6, 2021, the Defendant, along with his videographer, Matt Struck, attended President Trump's rally on the Mall. Following the rally, both the Defendant and Struck walked towards the Capitol. Struck videorecorded their walk towards the Capitol and their presence on the Capitol grounds. Struck provided law enforcement with a series of video clips from January 6. Struck's video footage shows that, at the time the Defendant approached the Capitol grounds, some of the metal barricades remained in place, but some had been moved out of line. Below is a screen capture of Struck's footage depicting the barricades:



In Struck's footage, the Defendant climbed over the stone wall in the picture above. The Defendant entered the lawn on the west front of the Capitol, which was within the restricted area. Based on the video footage, at the time the Defendant entered the lawn, the rioters had not entered the Lower West Terrace. As the Defendant walked up the lawn, chanting with the crowd, he turned to another individual and stated, "This is our house (audio unintelligible) we should all be armed." The Defendant then climbed over a metal barricade leaning against the stone wall surrounding Lower West Terrace, where rioters had pushed past the USCP officers and barricades. The below two images depict the metal barricades leaned against the stone wall and the second picture depicts the Defendant climbing over the barricades:






The Defendant then walked through the crowd, while chanting with the crowd, and climbed over what appears to be a wooden board to enter the area immediately beneath the

inauguration platform. Below is a screen capture of the Defendant entering the area directly beneath the inauguration platform:



The Defendant then asked Struck how they could access the "next tier" and used an exterior stairwell to access the inauguration platform. Once the Defendant was on the inauguration platform, he started speaking to the crowd on the plaza below through a bullhorn. The Defendant initially asked the crowd to pray with him. He then joined the crowd in a chant of "Free the people!" and turned towards Struck's camera and stated, "It's a great day for America. The people are showing that they have had enough. People are ready for fair and legal elections, or this is what you're gonna get and you're gonna get more of it." Another individual next to the Defendant stated, "It could have been a lot worse. We came peacefully." The Defendant then stated, "That's right, we came peacefully." The other individual then stated, "Believe me, we are well armed if we need to be." The Defendant then stated, "And we're not going anywhere, we

aren't taking no for an answer. We're not gonna get our election stolen from us from China. This is an America that's had enough right here. And like this gentleman said, we're not going anywhere."

On January 11, 2021, FBI agents contacted the Defendant by phone to interview him about the Capitol riot. The Defendant stated, after leaving President Trump's rally, he walked towards the Capitol. The Defendant admitted that he observed a large crowd around the barricades. He further admitted that he joined in the crowd, and admitted that the crowd pushed through barricades. FBI agents interviewed Struck, the Defendant's videographer, on the same day. Struck stated that, as he and the Defendant walked towards the Capitol, he observed people "where they shouldn't be," pushing past barriers onto the platform in front of the Capitol.

On January 14, 2021, the Defendant, who is a county commissioner in Otero County, New Mexico, attended a recorded county council meeting. During the meeting, the Defendant stated:

> We walked down the Mall and we were gonna leave. We were in debate to leave or not. I wasn't even going down to the Capitol. I knew that there was a lot of people that were going, but with the news that Mike Pence had just certified the election, that was kinda what the crowd was thinking about. But we thought, well, lets not leave too early, lets go ahead and see what they are doing. We walked down to the Capitol and on the inaugural side when all those people all those Trump people got down there that had just not gotten anything necessarily from the President that was new, and then heard that Mike Pence had certified a fraudulent election, the element in the crowd was pretty elevated, I would say. But when they got down to the inaugural side there was some fencing up. They were saying you couldn't go any further because this was being reserved for Joe Biden and his inauguration. You tell a million Trump supporters that are going down there, pretty soon that crowd just pushed through. I wasn't anywhere in the front of it, I was in the back.

The Defendant further stated that he led the crowd in a prayer when he got a bullhorn, "outside the Capitol, but up where the President is inaugurated at."

The government charged the Defendant by Amended Information with one count of violating 18 U.S.C. 1752(a)(1) and one count of violating 18 U.S.C. 1752(a)(2).

**ARGUMENT**

The Defendant principally contends that the Information is defective because it was required to—but did not—allege that the United States Secret Service designated the "restricted area" into which the Defendant is alleged to have unlawfully entered. That contention is incorrect because Section 1752's plain text includes no such requirement. That straightforward interpretation does not, as the Defendant suggests, render the statute vague, ambiguous, or an impermissible *ex post facto* law.

I. **Legal Standard**

A defendant may move to dismiss an information for failure to state a claim prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.* An information must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed." *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense

charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

## II. **18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.**

The Defendant first argues that the Information should be dismissed for failure to state an offense because the USSS did not designate the "restricted area" under 18 U.S.C. § 1752. ECF No. 32, p. 13-16. That argument misunderstands Section 1752's text.

Section 1752 provides in relevant part:

> (a) Whoever—
>
> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
>
> (c) In this section—
>
> (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020).

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *see Public Investors Arbitration Bar Association v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C., 2013) (Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question."). Where, as here, the statute in question's words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and the Defendant does not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in the Defendant's case. The Information alleges that, on January 6, 2021, a protected

person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or grounds" under § 1752(c)(1). The Information further alleges that the Defendant knowingly and without lawful authority entered and remained in that restricted buildings and grounds. It also alleges that the Defendant, knowingingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the Defendant urges (ECF 32, at 13-14) the Court to import an extra-textual requirement that the USSS be required to designate the restricted area. That is so, the Defendant claims, because Section 1752 is "directed to the USSS," and its "legislative history . . . is saturated with references to the USSS and to no other federal agency." *Id.* at 13. Those arguments fail on the merits. Section 1752 is directed not at the USSS, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). Second, the legislative history in fact undercuts the Defendant's argument. As he explains (ECF 32, at 2-3), an earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the USSS) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). But Congress's decision in 2006 to

"eliminate reference to regulations," ECF 32, at 3, indicates that the statute no longer depends on whether the USSS has defined an area as "restricted."

The Defendant's reliance on statutory purpose and legislative history suffers a bigger flaw: it focuses outside the text when the text itself is clear. Such an inquiry is permissible only where literal application of statutory language either results in an outcome that can truly be characterized as absurd, or produces an outcome that is demonstrably at odds with clearly expressed Congressional intent. *See United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940). The plain meaning of the statute does not result in an outcome that can be characterized as absurd. The example cited by the Defendant regarding the Postal Service extending the restricted area of the White House to the E. Barrett Prettyman U.S. Courthouse clearly falls outside the conduct criminalized by the statute. ECF No. 32, p. 18. Contrary to the Defendant's view that "the government claims that any federal or state agency may unilaterally set a 'restricted area,'" the statute sets clear limitations on where restricted areas may be established. *Id.* The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement. Therefore, reading the plain meaning of the statute does not result in the "absurd" outcome claimed by the Defendant.

Nor does the Defendant muster support for the claim that the literal application of the statute would be at odds with Congressional intent. The language of the statute is the

best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of USSS protectees. If Congress intended to give USSS sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent. In 1970, Congress enacted 18 U.S.C. § 1752 to include subsection (d), which gave authority to the Department of Treasury, which then oversaw USSS, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by USSS, but chose not to include that in the revised statute.

Neither of the cases on which the Defendant relies assists his argument. In *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005), the Fourth Circuit affirmed the defendant's conviction under 18 U.S.C. § 1752 for entering an airport hangar that was restricted by USSS working in tandem with local law enforcement. Responding to the defendant's claim that he was not advised the hangar was a federally restricted zone designated by USSS, the court simply asserted that the lower court's factual findings belie the defendant's claim, and he was aware that USSS coordinated security for the President at the hangar. *Bursey*, 416 F.3d at 309. The Defendant incorrectly claims that the Fourth Circuit's effort to correct the record from the defendant's misstatement is evidence that only USSS may designate a

restricted area. ECF No. 32, p. 19. The court did not address the issue of which law enforcement agencies may designate a restricted area, nor did it hold that only USSS is allowed to designate a restricted area.

This Court's decision in *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86 (D.D.C. 2019) is similarly inapposite to the Defendant's case. That case concerned efforts by Dr. Wilson, a presidential candidate, to gain access to a political event in South Carolina—the Jim Clyburn World Famous Fish Fry. *Id.* at 95-96. The Defendant highlights the Court's determination that Wilson did not offer any "evidence that [he] had a right to enter the restricted area" and lacked authorization from USSS to enter. *Id.* at 98. The Defendant's suggestion (ECF 32, at 20) that this determination would be "in error if there were some reasonable possibility that an entity other than USSS restricts, and admits access to, areas under § 1752" fails to account for the fact that the USSS was the *only* agency in charge of security at the Fish Fry. This Court therefore had no reason to consider whether USSS has the sole authority to designate a restricted area under § 1752, and did not do so.

## III. **18 U.S.C. § 1752 is not unconstitutionally vague.**

The Defendant contends (ECF 32, at 16-23) that the straightforward interpretation described above is unconstitionally vague. A statute is vague where it (1) fails to give ordinary people fair notice of the conduct it punishes or (2) is so standardless that it invites arbitrary enforcement. *Johnson v. United States* 576 U.S. 591 (2015). Neither applies to Section 1752.

As described above, Section 1752 prohibits the defendant from knowingly engaging in certain conduct in "any posted, cordoned off, or otherwise restricted area,

of…grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." § 1752(a), (c)(1)(B). Because the area on the Capitol grounds was cordoned off by metal barricades as well as a row of USCP officers, the Defendant was on notice that the area on the west front of the Capitol was restricted. Moreover, the Defendant admitted that he was aware of the barricades and that law enforcement instructed the crowd that the area was restricted. Therefore, he had fair notice that his entry into the west front of the Capitol was unlawful. There is no evidence that the law is being arbitrarily enforced. Contrary to the Defendant's contention that there were other individuals in the restricted area and "most of those people have not been charged under § 1752 like Griffin," (ECF No. 32, at 24) the government has charged hundreds of people with violating § 1752 for entering the grounds and the Capitol building.[1]

The Defendant relatedly contends (ECF 32, at 21-23) that the government is relying on an ambiguous phrase—"within such proximity to"—in Section 1752(a)(2). That contention misunderstands the charged crime. The Defendant is not alleged to have engaged in unlawful disruption because he was within proximity to the Capitol building. Instead, the Defendant was squarely within the restricted area. Contrary to the Defendant's contention that he, "merely picked up a bullhorn and led a prayer," (ECF No. 32, at 15) the Defendant moved through the crowd in the restricted area, chanted along with them, sought out the inauguration platform, and recorded a message about election theft. The charges

1 The Defendant argues that he was targeted by the government due to his political speech as outlined in the government's Motion for Pre-Trial Detention. The statements cited by the government were directly related to his respect for the government's authority and his ability and willingness to abide by any conditions of release set by a judicial officer. The government charged the Defendant because he violated the law, and for no other reason.

against the Defendant do not include criminalizing "pure political speech, assembly and Griffin's right to petition the government." ECF No. 32, p. 27. Instead, the government charged the Defendant with entering an area he knew was restricted and engaging in disruptive conduct that in fact disrupted government business, namely, the certification of the Electoral College vote.

## IV. The rule of lenity is inapplicable.

The Defendant invokes (ECF 32, at 23-24) the rule lenity. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). There is no grievious ambiguity here. As noted above, Section 1752 prohibits certain knowing conduct within restricted zone established to ensure the protection of certain individuals such as the Vice President and Vice President-elect. No guess work is required.

## V. The novel construction principle does not apply.

Finally, the Defendant asserts (ECF 32, at 24-25) that the "novel construction principle" requires dismissal of the Information. "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). As with the Defendant's other arguments, this claim is rooted in the faulty premise that the statute requires that the USSS designate the restricted area. Because Section 1752's plain language includes no such requirement—and

encompasses the precise conduct that the Defendant is alleged to have committed—the novel construction principle has no application here.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By: /s/
Janani Iyengar
Assistant United States Attorney
Bar No. 5225990
555 Fourth Street, N.W., Room 9413
Washington, DC 20530
Janani.iyengar@usdoj.gov
(202) 252-7760