**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**COUY GRIFFIN**,<br><br>Defendant. | Case No. 21-cr-00092 (TNM) |

**MEMORANDUM OPINION AND ORDER**

Couy Griffin faces charges for entering a restricted area outside the U.S. Capitol on January 6, 2021. He now moves to dismiss the Information, arguing that because the Capitol Police—not the Secret Service—barricaded the area, the charged offenses do not cover his alleged conduct. *See* 18 U.S.C. § 1752. The Court does not read the statute to provide such tenuous security for Secret Service protectees. It will therefore deny his motion and permit the case to proceed.

**I.**

The Court treats the allegations in the Government's Complaint as true for now. *See United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009). According to it, a joint session of Congress gathered at the Capitol on January 6 to certify the Electoral College results of the 2020 Presidential Election. Compl. Ex. 1 ("Gov't Facts") at 1–2, ECF No. 1-1.[1] Vice President Mike Pence presided over, and Vice President-elect Kamala Harris attended, the joint session. Am. Information at 1, ECF No. 31. To protect the Capitol and the people and proceedings inside, the

_____

[1] All page citations refer to the page numbers generated by this Court's CM/ECF system, and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

U.S. Capitol Police ("USCP") erected a perimeter of barriers around the Capitol grounds. Gov't Facts at 1. USCP officers patrolled the barriers, and signage read "Area Closed by order of the United States Capitol Police Board." *Id.*

As the election certification proceedings began, a large crowd of protestors approached the Capitol. *Id.* at 2. In the crowd was Defendant Couy Griffin. *Id.* at 3. Griffin is the founder of an advocacy group, "Cowboys for Trump." *Id.* He and a videographer traveled to Washington, D.C., on January 6 to protest the results of the 2020 Presidential Election. *Id.* at 3. After attending a rally hosted by President Trump on the National Mall, Griffin headed toward the Capitol as the crowd formed around the barricades. *Id.* at 3–4. Griffin noticed that "there was some fencing up and they were saying that you could not go any further because this was being reserved for Joe Biden and his inauguration." *Id.* at 6.

Numerous protestors, including Griffin, breached the barricades and entered the area around the Capitol. *Id.* at 3. Griffin and his videographer climbed up a permanent wall and onto the Capitol's west-facing patio. *Id.* at 4. Griffin then took a temporary staircase to the outside deck of the Capitol, where the Presidential Inauguration was set to occur in a few weeks. *Id.* at 4, 6. There Griffin borrowed a bullhorn and led a group of protestors in prayer. *Id.* at 4. He remained on the deck for about an hour and a half before voluntarily leaving the Capitol grounds with his videographer. *Id.* at 3.

Three days later, the FBI received a tip that Griffin had entered the Capitol grounds on January 6. *Id.* The FBI also discovered Griffin's videographer had recorded much of his visit. *Id.* at 4.

The Government charged Griffin by Information with misdemeanor violations of 18 U.S.C. § 1752(a)(1) and (2). Information at 1–2, ECF No. 14. Section 1752(a)(1) criminalizes

"knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so."  18 U.S.C. § 1752(a)(1).  Section 1752(a)(2) further prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds . . . ."  18 U.S.C. § 1752(a)(2).

The Government moved to detain Griffin before trial.  It described Griffin's political views as "inflammatory, racist, and at least borderline threatening advocacy."  Gov't's Mem. in Supp. of Pretrial Detention at 2, ECF No. 3.  The Government also highlighted the gun rights advocacy of Cowboys for Trump, as well as allegedly violent statements made by Griffin.  *Id.* at 2–3.  A magistrate judge ordered Griffin detained.  Minute Entry (Feb. 1, 2021).  But Chief Judge Howell granted Griffin's motion to overturn the pretrial detention order, Minute Entry (Feb. 5, 2021), and he remains on pretrial release with conditions.

Griffin now moves to dismiss the charges for failure to state an offense.  Def.'s Second Mot. to Dismiss the Am. Information ("Def.'s Mot.") at 5, ECF No. 32.[2]  He argues that the Capitol was not restricted by the U.S. Secret Service, a requisite for a § 1752 offense.  *Id.* at 13–16.  The Government opposes Griffin's motion but does not contest his allegation that the USCP was responsible for the restrictions.  *See* Gov't's Resp. to Def.'s Mot. ("Gov't Resp."), ECF No. 33.  The Court granted Def.'s Motion for a Hearing and heard arguments from both sides.  Griffin's motion to dismiss is ripe for disposition.

---

[2]  The Court denied as moot Defendant's initial Motion to Dismiss after the Government filed an Amended Complaint.  *See* Min. Order (May 18, 2021).

## II.

Before trial, a defendant in a criminal case may move to dismiss an information for failure to state an offense.  Fed. R. Crim. P. 12(b)(3)(B)(v).  A valid information must set out "the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet."  *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004).  The Government must state the essential elements of the crime and allegations of "overt acts [constituting the offense] with sufficient specificity."  *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995).

When ruling on a motion to dismiss, the Court "is limited to reviewing the face of" the Information and "the language used to charge the crimes."  *United States v. Payne*, 382 F. Supp. 3d 71, 73 (D.D.C. 2019) (cleaned up).  The Court must accept the allegations of the Information as true.  *Id.* at 74.  At this stage, "[t]he operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed."  *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

## III.

Griffin contends that he cannot be found guilty under 18 U.S.C. § 1752 as charged because the offense requires that the Secret Service—not another agency—restrict the area covered by the statute.  *See* Def.'s Mot. at 6–30.  The Government responds that the statute does not compel this narrow reading.[3]  Gov't Resp. at 9–17.  The Government is right.

---

[3]  At several points in these proceedings the Government implied that it had evidence that the Secret Service had conferred with the USCP about the barriers around the Capitol.  *See, e.g.*, Gov't's Resp. to Def.'s Mot. to Compel at 2 n.1, ECF No. 23.  The Court understands that for this motion the Government does not rely on any such evidence, if it exists, and it maintains that the USCP erected the barriers in accordance with its "sole authority over security on the Capitol grounds."  Gov't Resp. at 1.

## A.

The Court starts, as it must, with the text of the statute.  In relevant part, 18 U.S.C. § 1752

("Restricted building or grounds") criminalizes:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C ) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752.

To interpret the statute, the Court looks to its plain language.  *Jimenez v. Quarterman*,

555 U.S. 113, 118 (2009).  It is not complex.  The text prohibits certain conduct in and around

specified "restricted buildings or grounds."  18 U.S.C. § 1752.  The conduct includes, as relevant

here, knowingly and unlawfully "entering or remaining" in a restricted area, § 1752(a)(1), and

engaging in "disorderly or disruptive conduct" that "impedes or disrupts" government business in that area, § 1752(a)(2).  The statute gives three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B).  And Secret Service protectees include the Vice President and the Vice President-elect.  *See* 18 U.S.C. § 3056(a)(1).

In other words, someone can violate the statute by knowingly "entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020).  So too if someone intends to and does impede government business through disorderly or disruptive conduct while in the restricted area.

The statute focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting.  This flexible approach reflects the various temporary and permanent ways an area may be restricted—such as the White House fence, posted signs on a secure building, or police tape or barricades at an outdoor event— depending on where the protectee happens to be and the security threats he faces.  It also reflects the reality that while the Secret Service has primary responsibility for guarding its protectees, *see* 18 U.S.C. § 3056, it invariably relies on other law enforcement agencies for support.  These partners include the U.S. Park Police who share responsibility for the parklands surrounding the White House, *see* 36 C.F.R. § 7.96; state and local police who assist when protectees travel outside of the District, *see United States v. Bursey*, 416 F.3d 301, 304–05 (4th Cir. 2005); and

the USCP when, as here, the Vice President executes his duties as President of the Senate, 2 U.S.C. § 1961, *et seq.*

Griffin contends that the Secret Service must "establish" the restricted area under § 1752(c)(1).  Def.'s Mot. at 17–20.  But that requirement is not in the text.  Indeed, the only reference in the statute to the Secret Service is to its protectees.  Section 1752 says nothing about who must do the restricting.  To be sure, the relevant phrase appears in the passive voice, implying that someone must do the physical posting, cordoning off, or restricting.  Just because Congress left this part of the statute open-ended does not mean any word or phrase is ambiguous or that the statute is inoperable unless the Court fills in the blank.  When, as here, "the words of a statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (cleaned up).

Griffin urges that his proffered limitation is lurking beneath the text because the statute is "directed to the [Secret Service]" and its "legislative history . . . is saturated with references to the [Secret Service] and to no other federal agency."  Def.'s Mot. at 17.  These extratextual arguments are unavailing.  If this criminal statute in Title 18 is "directed to" anyone—a dubious claim—it would seem directed at prosecutors, would-be violators, and courts; it is not a regulatory statute.  More importantly, the Court will not invoke the statute's supposed purpose or legislative history to create ambiguity where none exists.  *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).  "Given [a] straightforward statutory command, there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997).[4]

---

[4]  Even if the Court was to consider legislative history, Griffin offers "scattered floor statements by individual lawmakers,"—i.e., "the sort of stuff" the Supreme Court has called "among the least illuminating forms of legislative history." *Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1661 (2017).

Unlike legislative history, the Court will consider the *statutory* history.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 352 (2012) (defining the latter as the "enacted lineage of a statute, including prior laws, amendments, codifications, and repeals"); *id.* at 220 (contrasting legislative history and statutory history).  Griffin urges the Court to examine superseded versions of the statute to unearth the meaning of the current text. This inquiry does not help him.

From its enactment in 1970 until 2006, Section 1752 contained a provision that authorized the Treasury Department (of which, until 2003, the Secret Service was a component) to "designate by regulations the buildings and grounds which constitute the" protected residences or offices of Secret Service protectees and "prescribe regulations governing ingress or egress to . . . posted, cordoned off, or otherwise restricted areas where" protectees were present.  18 U.S.C. § 1752(d) (1970).  As with the current statute, this old version did not say *who* must restrict an area of a building or grounds.  Suggestions to the contrary by Griffin appear to conflate this power with the Treasury Department's then-authority to designate the "buildings and grounds" themselves and the "ingress and egress to" restricted areas.  *See* Def's Mot. at 7; Def's Reply in Supp. of Mot. to Dismiss at 10 & n.3 ("Def.'s Reply"), ECF No. 34.

While Griffin clings to this statutory history, it ends up being more cement shoes than life preserver.  By 2006 Congress rewrote the statute, in the process eliminating reference to the Treasury Department and to any "regulations" from any executive branch agency.[5]  18 U.S.C. § 1752 (2006).  More, the new statute criminalized merely entering or remaining in a restricted area; the old statute required further action, such as impeding government business, obstructing

---

[5]  The statute did not, for example, merely swap out the Treasury Department—the old home of the Secret Service—for the Department of Homeland Security—its current home.

ingress or egress, or physical violence.  *Compare* 18 U.S.C. § 1752(a)(1) (2006) *with* 18 U.S.C. §

1752(a) (1970).  But Congress did not stop there.  In 2012 it reconfigured the statute, adding the

term "restricted buildings or grounds" and then defining it under subsection (c), as it appears

today.  18 U.S.C. § 1752(a) (2012).  Congress did not take that opportunity to clarify *who* can or

must do the restricting, leaving it open-ended.  But Congress did lower the mens rea requirement,

striking the requirement that a defendant act "willfully."[6]

So what should the Court gather from this foray into § 1752's statutory history?  "Not

much" would be a fair answer.  Perhaps better would be to recognize the direction of Congress's

legislative march, where at every turn it has *broadened* the scope the statute and the potential for

liability.  Even if Griffin were correct that earlier versions required Secret Service authorizations

of restrictions, the Court cannot reconstitute provisions that Congress has jettisoned.  And the

Court cannot agree with Griffin that woven through these increasingly broad versions of the

statute was a latent limitation that only the Secret Service could effectively post, cordon off, or

restrict an area.

Nor does the only appellate-level authority interpreting § 1752 save Griffin.  In *United

States v. Bursey*, the Fourth Circuit affirmed a defendant's conviction under § 1752 for entering

an airport hangar that was restricted by the Secret Service ahead of a rally involving the

President.  416 F.3d at 309.  Griffin makes much of the court's statements that Bursey

"contend[ed] that he was never advised that the area was a federally restricted zone, so

designated by the Secret Service," *id.* at 308, and that "the district court found that he understood

the restriction to have been created by the Secret Service (as opposed to state or local law

---

[6]  Congress last modified the statute in 2018, adding a provision that criminalizes operating "an
unmanned aircraft system" that enters into or above a restricted buildings or grounds.  18 U.S.C.
§ 1752(a)(5).  Neither party makes anything of this amendment, and nor does the Court.

enforcement)," *id.* at 309.  But recall that the then-operative version of § 1752 required that a violator act "willfully" and that the Secretary of Treasury promulgate regulations to which restricted areas must adhere.  18 U.S.C. § 1752 (1970).  On appeal Bursey challenged the District Court's finding that he acted willfully, so the Fourth Circuit quoted facts showing that Bursey must have known he was violating the law by remaining in the restricted area.  These details prompted the court's conclusion that "there was ample evidence that Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone."  *Id.* at 309.

It is also possible that the Fourth Circuit assumed that the Secret Service must restrict an area for it to invoke § 1752.  This would support Griffin's reading, at least as to that superseded statutory language.  But even if true, the Fourth Circuit had no reason to analyze the issue because all parties agreed that the Secret Service secured the hangar.  There is no holding— binding or persuasive—on this question.

At bottom, Griffin provides no reason to depart from the plain meaning of the text. While broad in its scope, the statute criminalizes defined conduct, and Griffin's proposed limitation is not required by the text.  The Court will not read it in.

## B.

Griffin offers several other reasons the Court should dismiss the Information.  *See* Def.'s Mot. at 25–30.  None are availing.

*First*, despite not making a facial challenge to the statute, Griffin offers a farfetched hypothetical supposedly showcasing the absurdity of the Government's reading.  He posits that U.S. Postal Inspectors could "resolve[], unilaterally, that the 'restricted area' of the White House should extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse, to the east" thereby covering much of the city.  Def.'s Mot. at 18.  Then, even

though "the Secret Service may disagree with the Postal Service's view of the appropriate size of the restricted area," anyone inside could be liable under § 1752(c)(1)(a). *Id.* Not only does Griffin cite a provision that he was not charged under, his hypothetical is flawed. It ignores a critical limitation. The USPS could not extend the "restricted area" to indefinite bounds because then it would no longer be an area "of the White House *or its grounds*." 18 U.S.C. § 1752(c)(1)(a) (emphasis added). The White House and its grounds are fixed locations, even if the "restricted area" within it can balloon or retract in size. Similarly, under § 1752(c)(1)(B), the restricted area could never encompass an area wider than the building or grounds where the Secret Service protectee was present. And the barricades Griffin allegedly breached were indisputably on the Capitol grounds.

Griffin's preferred reading suffers from other, more pressing absurdities. Consider when the President visits Camp David, situated on a military base. Griffin's reading of the statute would not permit reliance on the preexisting fortifications of a heavily guarded military installation. For § 1752 to apply, the Secret Service would have to "post, cordon off, or otherwise restrict" an area in or around the military base. So too if a Secret Service protectee visited a private residence—no matter how secure the location or how imposing the preexisting walls or barriers around the property. If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the principal, surely it would have said so.

*Second*, Griffin asserts that the statute is unconstitutionally vague. Def.'s Mot. at 25–27. His arguments on this front mainly rehash his complaints about the Government's reading of the statute, which the Court finds to be reasonable. More, the statute does not invite arbitrary enforcement by criminalizing common activities or giving law enforcement undue discretion; as

applied here, the Government alleges Griffin breached clearly posted security barriers manned by uniformed federal officers. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 47 (1999) (striking down as vague ordinance that, in part, criminalized "loitering" defined as "remain[ing] in any one place with no apparent purpose."). This law is no trap awaiting the unwary.

*Third*, Griffin invokes the doctrine of lenity and the "novel construction principle." Def.'s Mot. at 27–30. Neither applies. Lenity is "a sort of junior version of the vagueness doctrine." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (cleaned up). It comes into frame only when a court has exhausted all canons of statutory construction and is left with only a coin flip to resolve "grievous ambiguity." *Barber v. Thomas*, 560 U.S. 474, 488 (2010).

As the Court has explained, Section 1752 is capacious, not ambiguous. Griffin's "ability to articulat[e] a narrower construction" of the statute does not trigger lenity. *Smith v. United States*, 508 U.S. 223, 239 (1993). Nor has there been an "unforeseen judicial enlargement" of a longstanding criminal statute so that it operates like an ex post facto law. Def.'s Mot. at 29 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)). Griffin has allegedly violated a rarely charged statute, but that does not mean the *construction* of the statute unfairly blindsided him. There was no prevailing practice of courts forgoing or rejecting the interpretation that the Government now advances.

*Finally*, Griffin complains of discriminatory prosecution. He contends that he was targeted and "selectively charged . . . because the government loathed him and his politics." Def.'s Reply at 3. "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up). So "the

presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *Id.*

Griffin comes up short on providing the "clear evidence" required for this Court to surmount the presumption of regularity—and the separation of powers.  He points to "hundreds or perhaps thousands of other individuals 'remaining' in the same area" as him on January 6 who have not faced charges under 18 U.S.C. § 1752.  Def.'s Mot. at 24.  The Court hesitates to credit these unsupported numbers, especially as the Government continues to charge new individuals with offenses related to January 6.  Nor is the Court concerned by the Government's statements about Griffin when seeking to detain him pretrial; detention hearings require the Court to consider the defendant's history and personal characteristics, as well as his potential dangerousness.

Griffin highlights the Government's dismissal of charges under 18 U.S.C. § 1752 in "the interests of justice" in *United States v. Christopher Kelly*, 21-mj-128 (D.D.C. 2021).  According to news reports, the Government moved to drop the charges after determining Kelly did not enter the Capitol building.  *See Feds move to drop charges for Capitol riot defendant*, Politico, June 1, 2021, https://www.politico.com/news/2021/06/01/feds-capitol-riot-defendant-491514 ("'Since he was not inside, in the interest of consistency in the investigation, the charges were dropped,' the official said.").  Even so, the Government could rationally forgo federal prosecution as to most trespassers while deciding that Griffin's leadership role in the crowd, position as an elected official, and more blatant conduct at the scene merited him different treatment.  Not all differences amount to discrimination.  In any event, presumably Kelly and the other uncharged

protestors surrounding Griffin on the Capitol steps share his "politics," Def.'s Reply at 3, complicating his complaint of bias here.

Griffin also points to the numerous uncharged protestors who broke through USCP barricades to occupy the Capitol steps on the eve of Justice Kavanaugh's Senate confirmation vote.  *See* Def.'s Notice at 2, ECF No. 39; *see also Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote*, Roll Call, Oct. 6, 2019, https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/.  Disparate charging decisions in similar circumstances may be relevant at sentencing.  *Cf.* 18 U.S.C. 3553(a)(c) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  But this is not a basis to dismiss the charges.

## IV.

 For these reasons, the Court DENIES Defendant's [32] Second Motion to Dismiss.


Dated:  July 2, 2021

_____
TREVOR N. McFADDEN, U.S.D.J.