## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-00092 (TNM)** |
| | : | |
| **COUY GRIFFIN,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' MOTION TO CONTINUE AND
### TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT

The United States of America hereby moves this Court for a 60-day continuance of the above-captioned proceeding, and further to exclude the time within which a trial must commence under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. (the "STA"), on the basis that the ends of justice served by taking such actions outweigh the best interest of the public and Defendant in a speedy trial pursuant to the factors described in 18 U.S.C. § 3161(h)(7)(A), (B)(i), (ii), and (iv). Further, for the same reasons that support and ends-of-justice continuance going forward, we request the Court exclude from the computation of time under the STA the time that has elapsed since June 30, 2021.

In support of its motion, the government states as follows:

### FACTUAL BACKGROUND

Defendant, a county commissioner for Otero County, New Mexico, is charged via information with violations of 18 U.S.C. §§ 1752(a)(1)(Entering and Remaining in a Restricted Building) and (a)(2) (Disorderly and Disruptive Conduct in a Restricted Building). These charges arise from his conduct on January 6, 2021, when he is alleged to have participated as part of a mob that attacked the U.S. Capitol (the "Capitol Breach"). Specifically, the defendant climbed the west steps of the Capitol (a restricted area), where he remained for approximately

one and one-half hours and used a bullhorn to address other rioters.

Defendant was arrested on January 19, 2021.   Although he was initially detained

pending trial, he was released on personal recognizance on February 5, 2021.

On March 18, 2021, the United States filed a motion for a 60-day continuance of this

proceeding, and further requested that the Court exclude the time within which a trial must

commence pursuant to the factors described in 18 U.S.C. § 3161(h)(7)(A), (B)(i), (ii), and (iv).

The government asserted that due to the number of individuals currently charged across the

Capitol Breach investigation and the nature of those interrelated charges, the on-going

investigation of many other individuals, the volume and nature of potentially discoverable

materials, and the reasonable time necessary for effective preparation by all parties taking into

account the exercise of due diligence, the failure to grant such a continuance in this proceeding

would be likely to make a continuation of this proceeding impossible, or result in a miscarriage

of justice.   (ECF No. 17 at 4.)

The same day, Defendant filed an opposition to the government's motion, objecting to

tolling of his constitutional and statutory rights to a speedy trial.   Defendant asserted that there

was nothing complex about his case, which "actually involves pictures of [him] with a bullhorn

on the Capitol steps," argued that the government had mischaracterized its own "logistical and

manpower burdens" as a complexity created by the case itself, and essentially accused the

government of weaponizing the STA "to strategically manage which trials and cases it wishes to

put forward to the public first."   (ECF No. 18 at 7-8.)   He also claimed that he was suffering

emotional distress from the charges, which were affecting his reputation as a public servant, and

observed that he could suffer further prejudice in the form of "dimming memories and loss of

exculpatory evidence."   (ECF No. 8-9.)

    At a hearing on April 7, 2021, the Court granted the government's motion, in part, by granting a 20-day continuance and tolling the time thereto.   (Minute Entry, 4/7/2021.)   At the April 27, 2021 status hearing, the government represented to the Court that it was still in the process of reviewing the discovery materials for the overall Capitol Breach investigation. The government represented that it expected to have a vendor to oversee the discovery process in place by June.   Based on a misunderstanding of information that had been made available to the assigned prosecutor, the government mistakenly represented that the vendor would actually be disseminating discovery materials in June.   The Court set a motions hearing on June 30, 2021. Following a motion by the government, the Court tolled the application of the STA between April 27, 2021, and June 30, 2021.

    At the motions hearing on June 30, the Court inquired of the government regarding the status of discovery and referenced the assigned prosecutor's prior representations that discovery would be disseminated in June.   The assigned prosecutor stated that we could not provide a specific date by which Defendant would receive these materials, inadvertently leaving the Court with the impression that we had no explanation for our failure to meet what the Court understood to be a June deadline for completing discovery.   The Court then scheduled another status date in this matter for August 9, 2021.   The Court, *sua sponte*, stated that it would not exclude time between June 30 and August 9, because the government did not produce discovery in June. Counsel for Defendant further stated that he opposed any motion to exclude time under the STA.

    On July 26, 2021, the government filed a memorandum regarding the status of discovery (ECF No. 42) (the "Discovery Status Memorandum"), incorporated herein by reference.

## ARGUMENT

As a preliminary matter, the government acknowledges that its prior misunderstanding of what a vendor was intended to accomplish as of June 2020 has led to confusion for both defense counsel and the Court as to when the production of discovery would be complete.   This motion is intended to clarify the record and explain the reasons that tolling is warranted.   In brief, as further explained below, it is the government's commitment to ensuring that all arguably exculpatory materials are produced in a comprehensive, accessible, and useable format that, in the main, underlies the government's request to toll the STA.

### I.    The Government's Approach to Discovery is Intended to Ensure that All Arguably Exculpatory Materials are Produced in a Comprehensive, Accessible, and Useable Format.

The government has always understood the magnitude and complexity of the discovery project presented by the January 6 attack on the Capitol.   We have taken a very expansive view of what may be exculpatory and thus discoverable in these Capitol Breach matters.   As set forth in our Discovery Status Memorandum (at 4-5 and Exhibit A), ostensibly in support of arguments that they believed they were authorized to enter the Capitol or restricted grounds, defense counsel in Capitol Breach cases have made requests including any and all information that captures an individual defendant's conduct or statements; shows people "peacefully walking around the Capitol"; or suggests that a member (or members) of law enforcement allowed people to enter or remain in the Capitol or on restricted grounds, acted friendly or sympathetic to the rioters, or otherwise failed to do their jobs.   Given the charges here, such information may also be relevant to Defendant's case.   Of course, there may be additional types of information Defendant may consider exculpatory in his case, but since the government does not know the

defense theory in this case, it is impossible to for the government to determine what other types of information Defendant believes to be material.

To the extent the type of information described above may exist, it may be interspersed among thousands of hours of video footage from multiple sources (e.g., Capitol surveillance footage, body-worn-camera footage, results of searches of devices and Stored Communications Act ("SCA") accounts, digital media tips, Parler video, and unpublished news footage), or referenced in multiple investigative documents describing the events of January 6 (e.g., interviews of tipsters, witnesses, investigation subjects, defendants, and members of law enforcement).   As the volume of material makes it impossible for the government to review every potentially discoverable item and determine its materiality to each specific defendant, and because "[d]efendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense,"[1]  it is our intent to provide the defense with all data that may contain such information, but in a manner that will facilitate search, retrieval, sorting, and management of that information.

The government's approach is consistent with the *Recommendations for Electronically Stored Information (ESI) Discovery Production* developed by the Department of Justice and

---

[1] *United States v. Meek,* No. 19-cr-00378-JMS-MJD, 2021 WL 1049773 *5 (S.D. Ind. 2021). *See also United States v. Ohle*, No. S3 08 CR 1109 (JSR), 2011 WL 651849 *4 (S.D.N.Y. 2011)(not reported in F.Supp.2d)("placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located.")

Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System.[2]   It is also the generally accepted approach in cases involving voluminous information.   Notably, every circuit to address the issue has concluded that, where the government has provided discovery in a useable format, and absent bad faith such as padding the file with extraneous materials or purposefully hiding exculpatory material within voluminous materials, the government has satisfied its *Brady*[3]obligations.   *See United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) ("We reject as without merit Yi's argument that fulfillment of the Government's obligation under *Brady* requires it to identify exculpatory material."); *United States v. Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (noting that the "government's duty to disclose generally does not include a duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence") (internal citations omitted); *United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) ("We have previously rejected such 'open file' *Brady* claims where the government provided the defense with an electronic and searchable database of records, absent some showing that the government acted in bad faith or used the file to obscure exculpatory material."); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("The government is not obliged to sift fastidiously through millions of pages (whether paper or electronic). . . [and] is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence.") (quotation marks and citations omitted); *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (rejecting *Brady* claim on the ground that the defendant "points to no authority requiring the prosecution to single

---

[2]  *See https://www.justice.gov/archives/dag/page/file/913236/download.*

[3]  *Brady v. Maryland*, 373 U.S. 83 (1963).

out a particular segment of a videotape, and we decline to impose one"); *United States v. Warshak,* 631 F.3d 266, 297 (6th Cir. 2010) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."), aff'd in part, vacated in part, remanded, 561 U.S. 358 (2010); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny . . . impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Jordan,* 316 F.3d 1215, 1253-54 (11th Cir. 2003) (concluding that the defendant's demand that the government "identify all of the *Brady* and *Giglio* material in its possession," "went far beyond" what the law requires).[4]

Having recognized from the beginning the unprecedented discovery obligations that would inevitably be associated with the collection of voluminous materials relevant to many, if not all, defendants (including Defendant), and the need to provide such information in the most comprehensive and useable format to the defense, a Capitol Breach Discovery Coordinator was appointed on or about January 27, 2021, to manage and organize this project.   The coordinator

---

[4] Even in the unusual cases where courts have required the government to identify *Brady* within previously produced discovery, no court found that this was a substantive right held by the defendant in every case.   For example, in *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020), in which the court ordered the government to identify any known *Brady* material within its prior productions because the production involved over a million records and defense counsel was working "*pro bono* with time constraints and limited financial resources," the Court acknowledged that "persuasive authority has articulated a 'general rule' that 'the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence.'"   *Id.* at 84 n.15, quoting *Skilling*, 554 F.3d at 576.

began to quickly assemble the core Discovery Team as described in the Discovery Status

Memorandum (ECF No. 26 at 5-6).   The Discovery Team has augmented its staff as needed

using full-time employees, contractors, and agents to perform a wide variety of functions, e.g.,

receiving, tracking, processing, redacting, and producing discovery in individual cases; drafting

and implementing protocols and procedures that will allow for the same with respect to

voluminous data; managing filter reviews; training agents and attorneys; collecting potentially

discoverable materials from a wide variety of sources including multiple law enforcement

agencies; reviewing those materials for discoverability; responding to discovery-related

litigation; and taking the steps necessary to retain a vendor who could provide litigation

technology support services to include highly technical and specialized data and document

processing and review capabilities.   It continues to add staff as required, e.g., to conduct *Brady*

reviews of voluminous documents.

The government moved expeditiously to retain a vendor to provide litigation technology

support services.   The initial draft of a Statement of Work that would be used to solicit bids was

completed no later than February 1, 2021.   As this investigation is unprecedented in size and

scope, and as more information was been learned about the scope of the evidence as drafting was

occurring, the Statement of Work necessarily was revised.   It was also reviewed multiple times

at various levels of the Department of Justice before it was approved for publication on April 19,

2021.   Final bids were received on or about May 10, 2021, and after careful consideration,

Deloitte Financial Advisory Services, LLP ("Deloitte") was retained on or about May 28, 2021.

The government *began* transferring data to Deloitte the week of June 8, 2021.

Processing materials in a manner that will facilitate review by the defense is particularly

complex because of diversity of potentially relevant materials and the varied formats in which

they are stored.   Each category of video footage must be analyzed separately.   For example,

Capitol surveillance footage comprising thousands of hours is stored in a proprietary format that

would be extremely burdensome for defense counsel to search and review.   The solution for

processing such footage, however, will not be the same as the solution for processing body-

worn-camera footage, which is stored in a different proprietary format; or for processing the

results of searches accounts and devices seized in Capitol Breach cases, for which the processing

solution may differ based on the type of device or account, and/or the tool that was used by law

enforcement to search it.   Accordingly, we are working with the Federal Bureau of Investigation

("FBI"), Deloitte, the Federal Public Defender for the District of Columbia ("FPD"), and other

parties as necessary (e.g., the developers of the proprietary formats at issue), to ensure that all of

these materials are transferred to Deloitte and processed in a manner that will optimize the

defense's use of them.

Determining the optimal manner of processing, and processing itself, takes time, but the

government is taking all appropriate measures to expedite this task.   Notably, taking the time to

do this now will significantly benefit the defense in terms of its ability to review the information

ultimately produced by saving the defense countless hours it would otherwise expend performing

burdensome and time-consuming searches of such information once it receives it, given the

nature and volume of the materials involved.

As each category of data may present a unique challenge, the government cannot state

with certainty when the transfer of the bulk of material to Deloitte will be complete.   However,

as described above, the government is prioritizing the materials that are likely to be most relevant

to the Capitol Breach defendants.   The government's *goal* is to populate its discovery

production database with at least Capitol surveillance footage, body-worn-camera footage, and

other materials from responding law enforcement agencies, in approximately the next four to six

weeks.

Notably, at the same time we are addressing the complex processing issues described

above, we are: (1) providing tens of thousands of investigative documents to the vendor for

ingestion into the database, so that we may review them for any potentially exculpatory

information and produce them in a manner that adequately protects the identities of tipsters,

confidential sources, witnesses and victims and preserves the future security of the U.S. Capitol;

(2) working with the FBI to ensure that all devices and SCA accounts searched in this

investigation are promptly scoped and provided to Deloitte for processing; and (3) leveraging the

FBI's internal capabilities to identify and provide information that may be relevant in individual

cases when possible.   For example, the FBI is able to search defendants' known identifiers

against (a) cell tower data for thousands of devices that connected to the Capitol's interior

Distributed Antenna System (DAS) during the Capitol Breach (obtained from the three major

telephone companies); and (b) location history data for thousands of devices present inside the

Capitol (obtained from a variety of sources including two geofence search warrants and searches

of ten data aggregation companies).   The FBI is also using internally developed software to

perform recurring automated searches of faces across a wide variety of digital multimedia

evidence, in the effort to identify video footage that may depict a particular defendant and

creating reports of those search results that are being provided in individual cases.

While it is correct the government has not yet projected a time for completing discovery,

the government is committed to completing this task as quickly as possible – which is why we have already provided the discovery most relevant to the charges here (*see* Discovery Status Memorandum at 8), filed the Discovery Status Memorandum regarding our progress with respect to voluminous data, and proposed setting an interim status hearing to inform the Court as to our continued progress.

Notably, even if all the voluminous materials were available for production today, we do not believe Defendant is prepared to receive them in a manner that provides for searches across broad swaths of data using sophisticated software tools (e.g., keyword searches, facial recognition, object recognition, or audio recognition) that make such review meaningful and efficient.   The government, however, is working closely with FPD to ensure they have the information they need to establish a receiving database that could be made available to Federal Public Defender offices nationwide that are working on Capitol Breach cases, counsel that are appointed under the Criminal Justice Act (such as counsel for Defendant), and retained counsel for people who are financially unable to obtain these services.

We understand Defendant believes he has received all of the information he needs to proceed to a trial in this case, as "[i]mages and video, already produced by the government, depict Griffin standing on the steps outside the west front of the Capitol," and that the only "question for trial is whether that conduct amounts to a violation of 18 U.S.C. § 1752(a)(1) and (a)(2), the two misdemeanor charges in the Information." (ECF No. 18 at 1-2.)   *Brady v. Maryland*, 373 U.S. 83 (1963), however, imposes a constitutional obligation on the government to disclose information favorable to Defendant where it is material to either guilt or punishment. *Id.* at 87.   *Brady* applies in any case where the defendant proceeds to trial.   *See* 373 U.S. at 87

(underpinning of right to disclosure is "avoidance of an unfair *trial* to the accused")(emphasis added); *see also United States v. Ruiz*, 536 U.S. 622, 631 (2002) (explaining that exculpatory and impeachment information trigger "*trial*-related rights") (emphasis added).   Regardless of the defendant's current position regarding discovery, the government maintains an obligation to provide potentially exculpatory materials.   *Cf. Price v. U.S. Department of Justice*, 865 F. 3d 676, 682-83 (D.C. Cir. 2017) (holding unenforceable a defendant's *guilty plea waiver* of his Freedom of Information Act rights on the basis that such waivers deny criminal defendants the opportunity to discover potentially exculpatory information or material supporting ineffective-assistance-of-counsel claims).

For all the reasons described above, despite our diligent efforts, we are not currently in a position to identify all information that may be material to the defense in this case.   We do not know the theory of defense, and to the extent that we can surmise what it might be, relevant evidence may be interspersed among voluminous data that we cannot possibly review in its entirety.   Further, we are not in a position to turn over the universe of information we possess for Defendant to review.   Although we are aware that we possess some information that the defense may view as supportive of arguments that law enforcement authorized defendants (including Defendant) to enter the restricted grounds, e.g., images of officers hugging or fist-bumping rioters, posing for photos with rioters, and moving bike racks, we are not in a position to state whether we have identified all such information.   Pursuant to *Brady* and its progeny, we are required to make available the voluminous data that may contain any similar information for Defendant to review.

The fact that Defendant may not plan to contest a particular element of the crimes

charged does nothing to change this analysis.   At a trial, it is the government's burden to prove each and every element of the charged offenses, regardless of any tactical decision by Defendant not to contest a particular element.   *See Estelle v. McGuire*, 502 U.S. 62, 69–70, (1991) ("But the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."); *Mathews v. United States*, 485 U.S. 58, 64-65 (1988)("A simple plea of not guilty, Fed. Rule Crim. Proc. 11, puts the prosecution to its proof as to all elements of the crime charged. . . .").   "At trial, a defendant may thus choose to contest the Government's proof on every element; or he may concede some elements and contest others; or he may do nothing at all. Whatever his choice, the Government still carries the burden of proof beyond a reasonable doubt on each element."   *Old Chief v. United States*, 519 U.S. 172, 199 (1997) (O'Connor, J., dissenting).

In sum, contrary to Defendant's assertions that delay is being contrived by the United States as part of a strategy to determine which cases are tried first (which is untrue), or because the United States purportedly lacks the resources to try such cases (which it does not), the entire basis for the continuance being sought here is to honor Defendant's constitutional rights.

Further, it is not the government's purported "self-imposed burden of prosecuting hundreds of cases simultaneously," (ECF No. 18 at 1), that has created the discovery challenges presented by the Capitol Breach.   Instead, the challenges are the product of hundreds attacking the Capitol on January 6.   The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government

and the orderly administration of the democratic process."[5]  Accordingly, the government appropriately immediately began to investigate and charge those responsible for the attack.   And when thousands of individuals, including Defendant, collectively participate in such an attack at a heavily surveilled location, further choose to record their actions on their own digital devices, and subsequently post evidence of their criminal conduct on social media, those individuals and not the government are responsible for the volume of relevant discovery in each case.

It is important to note that a large portion of the most relevant voluminous materials (surveillance footage, body-worn-camera footage, radio transmissions, location history data, cell tower data, and social media posts) were created on the day of the attack, and *not* as the result of subsequent investigations into individual rioters.   Moreover, given the overt nature of this investigation, had we failed to move quickly to accumulate data from individual SCA accounts and devices that we intend to turn over, we would surely have risked the loss or destruction of such evidence.

## II.    An Ends-of-Justice Tolling of the Speedy Trial Act is Warranted.

Given the due diligence the United States continues to apply to meet its discovery obligations, as described in the Discovery Status Memorandum and further elaborated above, the government has established that an ends-of-justice continuance under the STA is warranted.

As the Supreme Court has observed, the STA "recognizes that criminal cases vary widely and that there are valid reasons for greater delay in particular cases."   *Zedner v. United States,*

---

[5]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

547 U.S. 489, 497 (2006).   "Much of the Act's flexibility is furnished by § 3161(h)([7]), which

governs ends-of-justice continuances."   *Id.* at 498.   "Congress clearly meant to give district

judges a measure of flexibility in accommodating unusual, complex, and difficult cases."   *Id.* at

508.   And it knew "that the many sound grounds for granting ends-of-justice continuances could

not be rigidly structured."   *Id.*

    The need for reasonable time to address discovery obligations is among multiple pretrial

preparation grounds that Courts of Appeals, including our circuit, have routinely held sufficient

to grant continuances and exclude time under the STA – and in cases involving far less

complexity in terms of the volume and nature of data, and the number of defendants entitled to

discoverable materials.   *See, e.g., United States v. Bikundi*, 926 F.3d 761, 777-78 (D.C. Cir.

2019) (upholding ends-of-justice continuances totaling 18 months in two co-defendant health

care fraud and money laundering conspiracy case, in part because the District Court found a need

to "permit defense counsel and the government time to both produce discovery and review

discovery"); *United States v. Bell*, 925 F.3d 362, 374 (7th Cir. 2019) (upholding two-month ends-

of-justice continuance in firearm possession case, over defendant's objection, where five days

before trial a superseding indictment with four new counts was returned, "1,000 pages of new

discovery materials and eight hours of recordings" were provided, and the government stated that

"it needed more than five days to prepare to try [the defendant] on the new counts"); *United

States v. Vernon*, 593 F. App'x 883, 886 (11th Cir. 2014) (District court did not abuse its broad

discretion in case involving conspiracy to commit wire and mail fraud by granting two ends-of-

justice continuances due to voluminous discovery); *United States v. Gordon*, 710 F.3d 1124,

1157-58 (10th Cir. 2013) (upholding ends-of-justice continuance of ten months and twenty-four

days in case involving violation of federal securities laws, where discovery included "documents

detailing the hundreds financial transactions that formed the basis for the charges" and "hundreds

and thousands of documents that needs to be catalogued and separated, so that the parties could

identify the relevant ones")(internal quotation marks omitted); *United States v. Lewis*, 611 F.3d

1172, 1177-78 (9th Cir. 2010) (upholding ninety-day ends-of-justice continuance in case

involving international conspiracy to smuggle protected wildlife into the United States, where

defendant's case was joined with several co-defendants, and there were on-going investigations,

voluminous discovery, a large number of counts, and potential witnesses from other countries);

*United States v. O'Connor*, 656 F.3d 630, 640 (7th Cir. 2011) (upholding ends-of-justice

continuances totaling five months and twenty days in wire fraud case that began with eight

charged defendants and ended with a single defendant exercising the right to trial, based on "the

complexity of the case, the magnitude of the discovery, and the attorneys' schedules").

Notably, Defendant's lack of consent to the United States' request for an ends-of-justice

continuance is irrelevant.   There is no requirement that a defendant personally consent to an

ends-of-justice continuance; the only question is whether the district court has complied with the

procedural requirements of section 3161(h)(7).   *See United States v. Sobh*, 571 F.3d 600, 603

(6th Cir. 2009) ("By its terms, § 3161(h)([7])(A) does not require a defendant's consent to the

continuance 'if the judge granted such continuance on the basis of his findings that the ends of

justice served by taking such action outweigh the best interest of the public and the defendant in

a speedy trial.'"); *accord United States v. Jones*, 795 F.3d 791, 798 (8th Cir. 2015); *United States

v. Williams*, 753 F.3d 626, 635 (6th Cir. 2014); *United States v. Lynch*, 726 F.3d 346, 355 (2d

Cir. 2013); *United States v. Gates*, 709 F.3d 58, 65-66 (1st Cir. 2013) ("We hold   .   .   .   that in

16

the ordinary course and within the confines of the STA exclusion provisions, defense counsel has

the power to seek an STA continuance without first informing his client or obtaining his client's

personal consent."); *United States v. Herbst*, 666 F.3d 504, 510 (8th Cir. 2012) ("Herbst's

opposition to his counsel's request for a continuance does not prevent that time from being

excluded from the speedy trial calculation."); *United States v. Stewart*, 628 F.3d 246, 254 (6th

Cir. 2010) ("[W]here an attorney seeks a continuance without the client's approval, this court has

held that the Speedy Trial Act 'does not require a defendant's consent to the continuance' in

order for a judge to be able to grant a motion in furtherance of the ends of justice.").  *See also*

*United States v. Stoddard*, 74 F. Supp. 3d 332, 341–42 (D.D.C. 2014) ("Even assuming

*arguendo* that Stoddard was not advised of his statutory Speedy Trial rights by his counsel and

that his counsel consented to the tolling of the time without Stoddard's consent, Stoddard was

not prejudiced by this error. The Court tolled the time under the Speedy Trial Act pursuant to 18

U.S.C. §§ 3161(h)(8)(A), (B)(i), (B)(ii) & B(iv)(2004). None of those provisions require the

consent of the defendant."); *cf. Zedner*, 547 U.S. at 500-01 (holding the STA cannot be tolled by

virtue of a defendant's waiver of its application).

###     III.     <u>Defendant's Constitutional Speedy Trial Claims Also Fail.</u>

There is also no basis for the Court to consider an allegation that Defendant's

constitutional speedy trial rights have been violated.   "The absence of a Speedy Trial Act

violation does not *ipso facto* defeat a Sixth Amendment speedy trial claim.   *See* 18 U.S.C. §

3173.   But as a number of courts have noted, it will be an 'unusual case' in which the Act is

followed but the Constitution violated."   *United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir.

2014).

17

In order to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated, the Court must consider four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530 (1972).   Under the first factor, Defendant must make a threshold showing that the delay between the accusation and the trial was presumptively prejudicial in order for the claim to proceed. *Id.*   If that threshold requirement is met, then the Court must consider the length of the delay "as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."   *Doggett v. United States*, 505 U.S. 647, 652 (1992).

First, there is no presumption of prejudice here and so Defendant cannot even make a threshold showing that his claim should proceed.   The determination as to whether a delay is presumptively prejudicial is dependent upon the peculiar circumstances of the case.   *Barker*, 407 U.S. at 530-31; *United States v. Marshall*, 669 F.3d 288, 295–96 (D.C. Cir. 2011) (requiring the district court to make factual findings regarding defendant's allegation that the government did not overcome the presumption of prejudice for delays over one year); *United States v. Taylor*, 497 F.3d 673, 677 (D.C. Cir. 2007) (assuming without deciding that a delay barely over one year between the indictment and trial was presumptively prejudicial).

Even assuming a *Doggett* inquiry were appropriate, a presumption of prejudice is rebuttable.   The delay experienced in this case, which involves unprecedented complex discovery issues that affect hundreds of defendants, easily passes constitutional muster.   *See, e.g., Bikundi,* 926 F.3d at 780 (Although the delay of approximately 18 months in defendant's prosecution for health care fraud, conspiracy to commit health care fraud, money laundering, and

18

conspiracy to commit money laundering triggered inquiry into whether she was deprived of her constitutional speedy trial right, factors of the length of the delay and the reason for the delay weighed in favor of government; defendant's case involved complex conspiracy charges with complicated evidence and multiple defendants, requiring voluminous discovery, defendant had herself filed multiple pretrial motions which contributed to the length of the proceedings, as well as an interlocutory appeal, and she consented to two of the continuances that were granted); *United States v. Lopesierra–Gutierrez*, 708 F.3d 193, 202–03 (D.C. Cir) (2013) (42-month delay not prejudicial because complex conspiracy charge involved executing 15 extraditions, fairly treating 15 codefendants, collecting and deciphering foreign evidence, and coordinating with foreign witnesses); *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006) (no violation despite eleven-year delay between indictment and arrest).

      Defendant's complaint that he is suffering emotional distress from the charges, which are affecting his reputation as a public servant, are irrelevant to whether there has been a violation of his constitutional speedy trial rights. *Cf. United States v. Rice*, 746 F.3d 1074, 1082 (D.C. Cir. 2014) ("although Rice suffered lengthy [twenty-six month] 'pretrial incarceration' and 'anxiety and concern,' he does not even attempt to argue that he suffered 'the most serious' form of prejudice: the impairment of his defense. [*Barker*, 407 U.S. at 532]."). His assertion that he will also suffer prejudice in the form of "dimming memories and loss of exculpatory evidence," (ECF No. 8-9), rings completely hollow in view of his concurrent assertion that the entirety of his crime is already preserved in video footage and that the only issue left for trial is whether his conduct "amounts to a violation of 18 U.S.C. § 1752(a)(1) and (a)(2)." (ECF No. 18 at 2.)

**CONCLUSION**

For the reasons described above, and any others that may be offered at a hearing on this matter, the government requests the Court grant its motion for a continuance of the above-captioned proceeding for sixty days in order to provide discovery in this case, and further to exclude the time within which a trial must commence under the STA on the basis that the ends of justice served by taking such actions outweigh the best interest of the public and Defendant in a speedy trial.   Further, for the same reasons that support and ends-of-justice continuance going forward, we request the Court exclude from the computation of time under the STA the time that has elapsed since June 30, 2021.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:    /s/ *Emily A. Miller*
EMILY A. MILLER
Capitol Breach Discovery Coordinator
DC Bar No. 462077
555 Fourth Street, N.W., Room 5826
Washington, DC 20530
Emily.Miller2@usdoj.gov
(202) 252-6988

By:    /s/ *Janani Iyengar*
JANANI IYENGAR
Assistant United States Attorney
NY Bar No. 5225990
555 Fourth Street, N.W., Room 4237
Washington, DC 20530
Janani.Iyengar@usdoj.gov
(202) 252-7760