# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-92-TNM |
| | ) | |
| COUY GRIFFIN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT GRIFFIN'S MOTION FOR DISCOVERY AND FOR AN EVIDENTIARY HEARING IN SUPPORT OF HIS CLAIM OF SELECTIVE ENFORCEMENT AND PROSECUTION

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Couy Griffin*

## <u>TABLE OF CONTENTS</u>

Introduction .................................................................................................. 1

Background .................................................................................................. 2

    A.    Hundreds to thousands of protesters similarly situated to Griffin but
        not similarly investigated or charged ......................................... 2

    B.    Government statements of discriminatory motive ........................ 5

Argument ..................................................................................................... 7

    I.    Standard for obtaining discovery on claims of selective enforcement
       and selective prosecution ............................................................. 7

    II.    Griffin has easily satisfied the lower standard for discovery on his
       selective enforcement claim ........................................................ 9

    III.    Griffin has satisfied the standard for discovery on his selective
       prosecution claim ........................................................................ 12

Conclusion ................................................................................................... 15

**Introduction**

The government estimates that over 2,000 protesters were present at the Capitol on January 6 in an area regarded by the government as "restricted" under 18 U.S.C. § 1752.  Of those, approximately 640 have been charged under that statute.  All, or virtually all, of them entered the Capitol Building and/or allegedly committed a felony offense outside it.  Except Couy Griffin.  Griffin is a Republican state official who founded an organization called Cowboys for Trump.  A quick internet search yields photographs of Griffin with the former president.

The Justice Department has announced that the January 6 investigation is one of the largest in its long history.  For that reason, it features likely the largest pattern in that history of selective enforcement and prosecution.  The equal protection component of the Fifth Amendment bars prosecution motivated by the defendant's exercise of a constitutional right, such as freedom of association, assembly and to petition the government.  To obtain discovery further demonstrating such an illicit charging decision, Griffin must merely offer some evidence that similarly situated defendants could have been charged as he has been but were not, and that the discrepancy is at least in part due to his exercise of a constitutional right.  His burden is lower for a claim of selective enforcement.

In the mine-run case, selective prosecution is challenging to establish.  Here, to state the standard is to show it has been satisfied.[1]  There are over 1,000 protesters who were not only similarly situated to Griffin and uncharged under § 1752 but identically situated.  The criminal

---

[1] Only two selective prosecution discovery motions have been resolved in the January 6 cases.  Because both turned on comparisons with the Portland courthouse riots, the decisions shed no light on selective enforcement and prosecution within the January 6 investigation itself.  *U.S. v. Judd*, 21-cr-40-TNM, ECF No. 203 (D.D.C. 2021); *U.S. v. Miller*, 21-cr-119-CJN, ECF No. 67 (D.D.C. 2021).  Neither decision addresses the selective enforcement doctrine.

complaint, arrest warrant and detention motion directed at Griffin are plastered with "allegations" regarding his political associations and beliefs.

The January 6 prosecutions are unprecedented in many ways. But in at least one sense they are retrograde. As in the 1950s and other politically perfervid eras, prosecutors make no secret of why protesters like Griffin have been charged with crimes unlike others who are similarly situated. The government targets the political beliefs and perceived ideologies of political and cultural groups. We know this because the former acting U.S. Attorney responsible for Griffin's charges announced that illicit enforcement motivation to a national audience. We know it thanks to publicly available charging statistics.

The Court is duty-bound to dismiss criminal charges motivated on those bases. Griffin can plainly make the minimal showing that discovery is warranted in connection with his selective enforcement and prosecution claims. The Court should therefore direct the government to produce relevant enforcement- and charging-decision documents and hold an evidentiary hearing in which officials overseeing this prosecution may corroborate or refute that they selectively prosecute Griffin.

**Background**

### A.   Hundreds to thousands of protesters similarly situated to Griffin but not similarly investigated or charged

The government estimates that at least 2,000 protesters were present at the Capitol on January 6 in an area regarded by the government as "restricted" under 18 U.S.C. § 1752. FY 2022 President's Budget Request, Federal Bureau of Investigation, Section 5-5, available at: https://www.justice.gov/jmd/page/file/1399271/download. Of those, over 700 have been federally charged, as of December 15. Zoe Tillman, BuzzFeed News (@ZoeTillman), Twitter (Dec. 15, 2021), available at: https://twitter.com/ZoeTillman/status/1471182272862826504.

2

Of the over 700 charged protesters, 640 have been charged with entering or remaining in a "restricted area" under § 1752. *One Year Since the Jan. 6 Attack on the Capitol*, DOJ Press Release, Dec. 30, 2021, available at:  https://www.justice.gov/usao-dc/one-year-jan-6-attack-capitol.  The government had entered into plea agreements with slightly over 100 protesters by October 14.  *U.S. v. Nordean*, 21-cr-175, ECF No. 207-1 (D.D.C. 2021).  Approximately 90% of those agreements involved defendants who pled guilty to a misdemeanor offense and not to any felony offense.[2]  And among the misdemeanants, all but approximately 10 had been charged only with misdemeanor offenses, i.e., the government had not agreed to voluntarily dismiss felony charges as part of a plea bargain.  *Id.*, ECF No. 207-1.

The convicted defendants stipulated to their conduct in sworn statements of the offense attached to their plea agreements, so their conduct can be accurately measured against Griffin's.  *Nordean*, 21-cr-175, ECF No. 207-1.  The great majority of the misdemeanants who entered the Capitol building pled guilty—with government agreement— solely to the Title 40 misdemeanor of parading, demonstrating or picketing in the Capitol Building.  *Nordean*, 21-cr-175, ECF No. 207-1; 40 U.S.C. § 5104(e)(2)(G).  A conviction under § 5104(e)(2)(G) is a Class B misdemeanor, whereas a § 1752(a) conviction is a Class A misdemeanor.  18 U.S.C. § 3559.  All of the § 1752(a) misdemeanants entered the Capitol Building.  *Nordean*, 21-cr-175, ECF No. 207-1.

Examined at a granular level, the government's misdemeanor plea agreements do not just show dozens of protesters similarly situated to, but not charged like, Griffin.  They reveal dozens

---

[2] The misdemeanor offenses were (1) parading, demonstrating or picketing in the Capitol Building, 40 U.S.C. § 5104(e)(2)(G); (2) disorderly conduct in the Capitol Building, § 5104(e)(2)(D); and/or (3) entering a restricted area without lawful authorization. 18 U.S.C. § 1752(a).  *Nordean*, ECF No. 207-1.

of protesters whose conduct was more criminally serious than that alleged in this case.  Here, the government alleges that Griffin entered and remained in the "restricted area" covering the west front of the U.S. Capitol steps, picked up a bullhorn, and led a prayer.  Compl., ECF No. 1, pp. 3-4.  The government concedes he did not enter the Capitol Building.

By contrast, the government's misdemeanor plea agreements with dozens of defendants under Title 40 and § 1752(a) reveal the following illustrative stipulated conduct:

Derek Jancart brought a gas mask and two-way radios to D.C. on January 6.  He penetrated the Capitol Building to the Speaker's conference room.  He likely destroyed evidence by deleting videos and message threads from his phone.  He posted on Facebook that he "stormed the Capitol," explaining that the protesters "wanted to let the politicians know we can get this far any time we want." He pled guilty to a Title 40 offense.  *Nordean*, 21-cr-175, ECF No. 207-1.

Several Title 40 misdemeanants entered the Capitol and smoked and used controlled substances inside, including in senators' offices.  *Nordean*, 21-cr-175, ECF No. 207-1.  Simple possession of marijuana is a federal offense.  21 U.S.C. § 844.

A Title 40 misdemeanant, Frank Scavo recorded himself on video inside the Capitol saying, "Stormed the f**king Capitol" and "We f**king took it back" and "Treason." Title 40 misdemeanants penetrated all the way to senators' offices and the Speaker's conference rooms. Title 40 misdemeanants stole objects from the Capitol.  One such misdemeanant recorded herself inside the Capitol saying, "We were looking for Nancy to shoot her in the frickin' brain, but we didn't find her." *Nordean*, 21-cr-175, ECF No. 207-1.

As explained above, every single § 1752(a) misdemeanant entered the building. *Nordean*, 21-cr-175, ECF No. 207-1.  Dozens of additional, similarly situated defendant examples are publicly available.  *Id.*

Among the 640 defendants charged under § 1752 who have not pleaded guilty, all or nearly all are alleged to have entered the Capitol Building and/or to have committed a felony offense outside the building.  Except Griffin.

## B.  Government statements of discriminatory motive

In March, the then-U.S. Attorney who presided over the January 6 probe conducted a nationally televised interview about the investigation.  *Inside the prosecution of the Capitol rioters*, CBS News, Mar. 22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.  His uncommonly candid remarks are significant in the selective prosecution context in a number of respects.[3]

First, the former acting U.S. Attorney stated he was still employed by the Department of Justice when he sat down for the interview and that he had possessed decision-making powers over the January 6 investigation.  *Id.*[4]

Second, the former acting U.S. Attorney then described how his office's charging decisions were made.  He began by saying his office divided the protesters into roughly two camps.  In the first were "the internet stars," which included "the 'zip-tie guy,' the 'rebel flag

---

[3] For purposes of this motion, Griffin does not draw the Court's attention to the acting U.S. Attorney's interview on account of its impropriety.  Far more significant than the prosecutor's indisputably unwise decision to appear on television is the forthcoming content of his remarks. Griffin proposes that it was the unscripted nature of these comments more than the violation of Department policy they embodied which prompted DOJ to investigate his TV interview.

[4] Whether the former U.S. Attorney received "approval" from the Department is immaterial in this motion.  The government has never indicated that the prosecutor's televised remarks were not truthful.  As shown *infra*, if they are truthful they satisfy the discriminatory intent standard.

guy,' the 'Camp Auschwitz guy.'" *Inside the prosecution of the Capitol rioters*, CBS News, Mar.

22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-

charges-60-minutes-2021-03-21/.  These were charged differently from the other camp on the

charging criterion that they "were thumbing their noses at the public. . ." *Id.*

 The former acting U.S. Attorney then described the second camp of protesters.  These

were "the great majority of the people" who were "protesters" and not "rioters." *Id.*  He

explained when a person crossed from this second camp to the cohort of "internet stars": "You

cross the line when you cross a police line aggressively.  You throw something at a cop.  You hit

a cop.  You go into a restricted area, knowing you're not supposed to be there."  *Id.*

The chief prosecutor provided another reason why certain protesters, like Griffin, were

charged before January 20th:

> Michael Sherwin: After the 6th, we had an inauguration on the 20th.  So, I wanted to
> ensure, and our office wanted to ensure, that there was shock and awe that we could
> charge as many people as possible before the 20th.  And it worked because we saw
> through media posts that people were afraid to come back to D.C. because they're like,
> "If we go there, we're gonna get charged."

The criminal complaint on which Griffin was arrested, and the government's motion for

detention, contain the following "allegations":

- Griffin "is the founder of an organization called 'Cowboys for Trump'" (CFT). ECF No.

  1-1, p. 3;

- On behalf of CFT, Griffin "has engaged in inflammatory, racist and at least borderline

  threatening advocacy." ECF No. 3, p. 2;

- At one gathering of CFT, Griffin stated, "'the only good democrat is a dead democrat,'

  before saying he did not intend that physically, only politically." ECF No. 3, p. 2;

- Griffin "posted a video titled 'Cowboys and Indians' on his Facebook page in which the defendant participates in a traditional Apache blessing where he is seen laughing while an individual off-camera says, 'You better go jump on (an expletive) Democrat now . . . You're protected now.' As a result of this incident, the nearby Mescalero Apache Tribe banned the defendant from entering its tribal lands." ECF No. 3, p. 2;

- "[R]eferencing certain football players, [Griffin] stated, 'They want to destroy our country. They want to talk about playing a Black national anthem before football games? I got a better idea, why don't you go back to Africa and form your little football teams over in Africa and you can play on an old beat-out dirt lot and you can play your Black national anthem there. How about that?'" ECF No. 3, p. 2;

- CFT "was fined for flouting financial reporting requirements and ignoring a binding arbitration agreement that found it was a political committee, subject to state regulation." ECF No. 3, p. 2;

- CFT "has plans to stage a protest at the New Mexico State Capitol on January 20, 2021." ECF No. 3, p. 2;

- CFT "advocates for gun rights." ECF No. 3, p. 3.

None of the aforementioned "allegations" concerns a factor relevant to the charged § 1752(a) offense or to the detention criteria under 18 U.S.C. § 3142. All of them are openly focused on Griffin's perceived political beliefs and political associations.

**Argument**

**I.     Standard for obtaining discovery on claims of selective enforcement and prosecution**

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by"

7

the equal protection component of the Fifth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). While a prosecutor has "broad discretion to enforce the Nation's criminal laws," the decision to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal citation omitted). Such "arbitrary classifications" include "a suspect's exercise of constitutional rights through participation in political activity." *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997); *United States v. Cyprian*, 23 F.3d 1189, 1195 n. 10 (3d Cir. 1994), *cert denied*, 513 U.S. 879 (1994) (same); *United States v. Berrios*, 510 F.2d 1207, 1211 (2d Cir. 1974) (same).

  To prevail on the claim, the defendant must demonstrate that the "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465. As to discriminatory effect, the defendant must show that "similarly situated defendants . . .could have been prosecuted but were not." *Id.* at 469. As for improper prosecutorial motive, the defendant must demonstrate that the government chose to prosecute "at least in part because of, not merely in spite of," his protected characteristic. *Wayte v. United States*, 470 U.S. 598, 610 (1985). Discriminatory intent can be shown "by either direct or circumstantial evidence." *United States v. Miller*, 21-cr-119-CJN, ECF No. 67, p. 4 (D.D.C. 2021). Dismissal of the selectively prosecuted charge is the appropriate remedy. *In re Aiken County*, 725 F.3d 255, 264 n. 7 (D.C. Cir. 2013).

  Producing evidence of these elements often requires discovery. *Miller*, 21-cr-119-CJN, ECF No. 67, p. 1. "If discovery is ordered, the government must assemble from its own files documents which might corroborate or refute the defendant's claim." *Armstrong*, 517 U.S. at 648. To obtain such discovery, the defendant must identify "some evidence tending to show the

existence of" the discriminatory effect and improper prosecutorial motive. *Id.*; *Miller*, 21-cr-119-CJN, ECF No. 67, p. 2.

A selective enforcement claim is different in key respects from selective prosecution. Just as the prosecutor may not constitutionally charge a defendant based on arbitrary classifications, so law enforcement agents may not constitutionally base target selection or prosecution referrals on such classifications. *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc) (Easterbrook, J.). Unlike prosecutors, however,

> agents . . .are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They may also have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. . . . In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI . . . engaged in [arbitrary classifications] when selecting targets . . .or when deciding which suspects to refer for prosecution.

793 F.3d at 721. Accordingly, at least three federal circuits have recognized that selective enforcement claims are open to discovery on a lesser showing than the one under *Armstrong*. *Davis*, 793 F.3d at 721; *United States v. Sellers*, 906 F.3d 848, 850-51 (9th Cir. 2018); *United States v. Washington*, 869 F.3d 192, 219 (3d Cir. 2017). One district court has described the lower standard as merely requiring the defendant to show that his protected characteristic "has been singled out [for enforcement targeting] to a statistically significant extent in comparison with other [potential defendants]." *United States v. Lopez*, 415 F. Supp. 3d 422, 427 (S.D.N.Y. 2019) (Rakoff, J.).

## II.   Griffin has easily satisfied the lower standard for discovery on a selective enforcement claim

As shown above, selective enforcement claims are open to discovery on a showing considerably more relaxed than that set forth in *Armstrong*. *Davis*, 793 F.3d at 721; *Sellers*, 906

F.3d at 850-51; *Washington*, 869 F.3d at 219; *Lopez*, 415 F. Supp. 3d at 427.  But even if the *Armstrong* standard were to apply to law enforcement agents and not just to prosecutors, Griffin has satisfied it.

Agents of the FBI and Metropolitan Police Department filed a criminal complaint against, and sought a warrant for the arrest of, Griffin on the basis of the same § 1752 offense he faces today.  ECF No. 1.  According to the government, at least 2,000 protesters outside the Capitol Building could have been charged under that statute.  Of those, 640 were so charged— and all or nearly all of them entered the building or were additionally alleged to have committed a felony offense outside it, unlike Griffin.

One protester had been charged under § 1752 though he had not entered the Capitol Building or committed a felony offense outside it.  *U.S. v. Christopher Kelly*, 21-mj-128 (D.D.C. 2021).  Yet the government then voluntarily dismissed the charge.  *Id.*, ECF No. 14.  A law enforcement official subsequently informed the news media of the reason.  "Since [Kelly] was not inside [the Capitol Building], in the interest of consistency in the investigation, the charges were dropped," the law enforcement official said.  *Feds move to drop charges for Capitol riot defendant*, Politico, June 1, 2021, available at: https://www.politico.com/news/2021/06/01/feds-capitol-riot-defendant-491514 (emphasis added).  Of course, the fact that Griffin's identical charge was not similarly dismissed despite "the interest of consistency in the investigation" implies the existence of some consideration at work outside the ordinary, objective investigatory criteria.

Thus, there are plainly "similarly situated defendants . . .[who] could have been [investigated and criminally referred under § 1752] but were not." *Armstrong*, 517 U.S. at 469.

As for targeting and prosecution referral on the basis of arbitrary classifications, it is lying on the face of the criminal complaint and detention motion.  "[I]t is axiomatic that the first amendment guarantees freedom of association with religious and political organizations, however unpopular.  Thus, the government cannot [target] an individual for mere membership in a religious or political organization. . ." *United States v. Lemon*, 723 F.2d 922, 940 (D.C. Cir. 1983); *see also NAACP v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963) (holding that the First Amendment protects the right of an individual to advocate through an association).  As Justice Harlan described the right of association:

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. . . . It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause . . . . which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 499, 460-61 (1958).

As to time and place, "courts have long recognized that the Capitol Grounds as a whole meet the definition of a traditional public forum: They have traditionally been open to the public, and their intended use is consistent with public expression." *Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002) (citing *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) (three-judge panel) *sum. aff'd* 409 U.S. 972 (1972)).  In *Lederman*, the government argued that the Capitol's East Front sidewalk was not a public forum for protest because it "abuts the Capitol Building, is well within the Capitol Grounds, and does not run parallel to any city street." 291 F.3d at 42.  The D.C. Circuit rejected that limitation on speech.

11

Thus, the government's "ability to permissibly restrict expressive conduct there is very limited. . ." *Id.* at 44.

As indicated above, agents' criminal complaint "alleges" Griffin "is the founder of an organization called 'Cowboys for Trump.'" ECF No. 1-1, p. 3.   It alleges that, unlike hundreds of other protesters standing in the same "restricted area" as the defendant, Griffin "was able to borrow a bullhorn to lead the group in a prayer." *Id.*, p. 4.   The complaint "alleges" that, unlike other similarly situated defendants, Griffin's political speech was broadcast in the news. *Id.*, p. 5.   A news segment, the complaint "alleges," contained video footage of Griffin stating, "'We are not going anywhere.   We are not going to take no for an answer.   We are not going to get our election stolen from us from China.'" *Id.*[5]   The complaint contains photographs depicting hundreds or perhaps thousands of protesters in the same "restricted area" as Griffin.   Many or most of these protesters—whose political views were not broadcast on the TV news like Griffin's—remain uncharged under § 1752.   *Id.*

A simple numerical comparison shows that Griffin "has been singled out [for enforcement targeting] to a statistically significant extent in comparison with other [potential defendants.]" *Lopez*, 415 F. Supp. 3d at 427.   To repeat, Griffin must merely show, by direct or circumstantial evidence, that law enforcement targeting or prosecution referral was based "at least *in part*" on an arbitrary classification.   *Wayte*, 470 U.S. at 610 (emphasis added).   Among the at least 2,000 protesters found outside the Capitol Building in the § 1752 "restricted area," only those who entered the building or allegedly committed felony offenses outside it have been investigated and referred for prosecution under that statute—except Griffin.   And what visually

_____

[5] Of course, the constitutional protection afforded to speech on a matter of public concern is not dependent on its truth value as determined by a court and/or its popularity in the marketplace of ideas.   *E.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011).

distinguished Griffin from the uncharged and similarly situated protesters, according to the complaint itself, was his protected political (and religious) speech.

That easily satisfies the applicable selective enforcement discovery standard. *Lopez*, 415 F. Supp. 3d at 427; *Davis*, 793 F.3d at 721; *Sellers*, 906 F.3d at 850-51; *Washington*, 869 F.3d at 219.

**III.    Griffin has satisfied the standard for discovery on his selective prosecution claim**

As explained above, Griffin's burden to obtain discovery on selective prosecution is to identify "some evidence tending to show the existence of" the discriminatory effect of and improper prosecutorial motive behind the charge he faces. *Armstrong*, 517 U.S. at 469.  Thanks to the former acting U.S. Attorney's decision to announce his office's discriminatory charging logic publicly and the nakedly political statements made by the prosecution here, Griffin has cleared even the *Armstrong* standard.

As he has already indicated, Griffin has shown over 1,000 "similarly situated" protesters who were not charged like him under § 1752 (all the protesters in the "restricted area" who did not enter the Capitol Building or commit a felony offense outside it).  Thus, he has satisfied the "discriminatory effect" burden to obtain discovery. *Armstrong*, 517 U.S. at 469.  It is critical to appreciate that this consideration distinguishes Griffin's request from the selective prosecution discovery motions rejected in *U.S. v. Judd*, 21-cr-40-TNM, ECF No. 203 (D.D.C. 2021) and *U.S. v. Miller*, 21-cr-119-CJN, ECF No. 67 (D.D.C. 2021).  In those cases, the Court rejected the discovery motions on the ground that Portland riot defendants were not "similarly situated" to January 6 defendants for reasons mostly having to do with distinctions between the overarching fact patterns in Portland and the District of Columbia (e.g., the Portland courthouse was attacked at night when no one was present, unlike the Capitol).

As for improper prosecutorial motive, Griffin has offered both direct and circumstantial evidence. *Miller*, 21-cr-119-CJN, ECF No. 67, p. 4. As shown above, the former acting U.S. Attorney explicitly announced in an interview that his office had charged "internet star" defendants like Griffin in a manner different from other protesters, on the ground that they had "thumbed their nose at the public." By "the public" the chief prosecutor referred to the elite media, academic and professional class to which he and his interviewer belong.[6] And by "thumbed their nose" the prosecutor meant that the "internet stars" expressed political views the same class finds contemptible, embarrassing and ignorant.

The former acting U.S. Attorney added that such charges were filed "to ensure that there was shock and awe, that we could charge as many people as possible before the" presidential inauguration and to make Griffin and others "afraid to come back to D.C." *Inside the prosecution of the Capitol rioters*, CBS News, Mar. 22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/. Whether or not one agrees with the chief prosecutor's candid sentiments as a personal matter, it is indisputable that they do not constitute constitutionally defensible grounds for a charging decision. The prosecutor likened his office's charging decisions against citizens of his own country to a military tactic involving the flamboyant display of force to overwhelm enemy combatants in war. The Attorney General and United States Attorneys enjoy discretion "to enforce the Nation's criminal laws," *Armstrong*, 517 U.S. at 469—not to frighten citizens from

---

[6] In this connection it is critical to acknowledge that political discrimination need not be expressed neatly along a two-party divide. The former acting U.S. Attorney may have been appointed by a Republican administration, but that does not mean that his office may base charging decisions on the political viewpoints of defendants—so long as the latter are not perceived to be Democrats. For example, a Republican-appointed official's discrimination against Republican defendants' political viewpoints in order to signal to the right people that the official is not "one of them" is merely a more insidious equal protection violation.

14

petitioning their government in the nation's capital and otherwise exercising their constitutional rights. Griffin and other Americans have a constitutional right to travel to D.C., to assemble there, and to nonviolently petition their government—even if their political beliefs are odious to a prosecutor. *Lederman*, 291 F.3d at 44.

On their own, the former acting U.S. Attorney's remarks amount to "some evidence tending to show the existence of" an improper prosecutorial motive "at least in part" explaining the decision to charge Griffin, *Wayte*, 470 U.S. at 610, sufficient to warrant discovery. But Griffin has shown much more than that. The above-mentioned charging statistics showing that Griffin has been singled out to an extraordinary degree also circumstantially demonstrate an improper prosecutorial motive. *Lopez*, 415 F. Supp. 3d at 427. The prosecution's filings in this case themselves have repeatedly cited Griffin's political beliefs and associations even where they have no bearing on the elements of the offense or the Bail Reform Act detention factors. And the government voluntarily dismissed apparently the only other § 1752 charge against a protester who, like Griffin, neither entered the Capitol Building nor committed a felony offense outside it, informing the media that this was done "in the interest of consistency in the investigation." Therefore, Griffin's identical charge proceeds for reasons inconsistent with those marking the rest of the investigation, according to a January 6 law enforcement agent himself.

**Conclusion**

For the foregoing reasons, the Court should direct the government to provide documents sufficient to show how charging decisions were made with respect to Griffin, demonstrating why the government decided to charge him differently from similarly situated January 6 protesters. The Court should also hold an evidentiary hearing in which the officials overseeing this

15

prosecution may corroborate or refute that Griffin has been subject to selective enforcement and prosecution.

Dated: January 4, 2022                      Respectfully submitted.


                                            */s/ David B. Smith*
                                            David B. Smith (D.C. Bar No. 403068)
                                            108 N. Alfred St.
                                            Alexandria, VA 22314
                                            Phone:(703)548-8911
                                            Fax:(703)548-8935
                                            dbs@davidbsmithpllc.com

                                            Nicholas D. Smith (D.C. Bar No. 1029802)
                                            7 East 20th Street
                                            New York, NY 10003
                                            Phone: (917) 722-1096
                                            nds@davidbsmithpllc.com

                                            *Attorneys for Couy Griffin*


## Certificate of Service

I hereby certify that on the third day of January 4, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

        Janani Iyengar
        Assistant United States Attorney
        555 4th Street, N.W., Room 4408
        Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].


                                            /s/ David B. Smith
                                            David B. Smith, VA Bar No. 25930

16

David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Couy Griffin*