## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-92-TNM |
| | ) |
| COUY GRIFFIN, | ) |
| | ) |
| Defendant. | ) |

## GRIFFIN'S RESPONSE TO THE GOVERNMENT'S TRIAL BRIEF

On March 17, the government filed a brief that it says summarizes its evidence at Griffin's trial and the legal issues likely to be brought before the Court. ECF No. 90. However, the government's description of the evidence is not accurate. Its framing of the legal issues is as mistaken as it was over a year ago, when the government filed hundreds of charges under 18 U.S.C. § 1752 on the unexamined assumption that the statute would allow it to federalize common law trespass. That the government did not understand the offense of which it had accused hundreds was then underlined by its inaccurate claims, carelessly repeated a great many times in court, that the vice president and vice president-elect remained in the Capitol Building throughout the day of January 6.

For many reasons the government will fail to prove Griffin's guilt at trial. But its trial brief also gives grounds for immediate dismissal. One business day before trial, the government has indicated that its witness will not comply with the Court's order requiring testimony from a person with firsthand knowledge factually establishing that the vice president was present in the "restricted building or grounds" when Griffin allegedly entered or remained in those places.

1

Without such testimony, the government's case cannot be proven beyond a reasonable doubt and should therefore be dismissed.[1]

## I.      THE GOVERNMENT MISAPPREHENDS THE LEGAL ISSUES

### A.      The government's scienter argument conflicts with Supreme Court precedent; its citation to *Rehaif* is misleading

Because the government misuses § 1752, at each element of the offense it cannot stand up without the Court's assistance.  Although seemingly every case in the statute's fifty-year history had involved the U.S. Secret Service (USSS) designating the restricted area at issue, it argued that can be bypassed for January 6 defendants.  Now, having represented in hundreds of charging instruments that the vice president and vice president-elect were present in the Capitol Building on January 6, the government demands that the Court let that element slide too.  It similarly insists that it is immaterial whether Griffin knew that a USSS protectee was or would be temporarily visiting in the "restricted building or grounds" at issue; mere knowledge that he had entered some sort of restricted place suffices.  ECF No. 90, pp. 13-14.

The government does concede that the "knowingly" adverb in § 1752(a) modifies the actus reus in each count of the Third Amended Information.  ECF No. 90, p. 13.  Thus, the government acknowledges it must prove beyond a reasonable doubt that Griffin knowingly (a) "enter[ed] or remain[ed] in any restricted building or grounds" and (b) "without lawful authority to do so" (§ 1752(a)(1), Count 1); and that Griffin knowingly and "with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ed] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, imped[ed] or disrupt[ed] the orderly conduct of Government

---

[1] In this brief, Griffin responds to the government's trial brief arguments only.  He will offer different legal and factual arguments at trial, including through a Rule 29 motion.

business or official functions" (§ 1752(a)(2), Count 2).  But its claim that it need not prove that Griffin knew in what sense the area he entered was "restricted" is new special pleading in this thirteen-month-old case.  ECF No. 90, p. 13.

The government's argument is not supported by authority and has no merit.  Whether a criminal statute requires the government to prove that the defendant acted knowingly is a question of congressional intent.  *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994).  "In determining Congress' intent, [courts] start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'"  *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)).  This is known as the "presumption in favor of 'scienter.'" *Rehaif*, 139 S. Ct. at 2195.  The presumption is applied "even when Congress does not specify any scienter in the statutory text. . . But the presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself," such as the modifier "knowingly." *Id.*

The government's trial brief omits that the specific issue it raises——whether the presumption of scienter extends to statutory definitions defining the actus reus more narrowly than its dictionary definition—has been resolved against the government numerous times. *Staples* involved the question of whether a criminal statute that prohibited receipt or possession of an unregistered firearm should be construed so as to include a *mens rea* with respect to the facts that brought a particular weapon within the limited, statutory definition of "firearm." 511 U.S. at 603-04.  Not every firearm met the statutory definition.  The Court concluded that an individual could be convicted under the statute only if the factfinder determined that the

defendant knew of the factual characteristics that brought the weapon within the narrower statutory definition.  *Id*. at 619; *see also X-Citement Video*, 513 U.S. at 65-66 (similar).  In reaching this result, the Court rejected the government's argument that knowledge of any kind of firearm, whether or not it was as precise as the statutory definition, was dangerous and latently criminal enough to create a *mens rea* up to the level of congressional intent.  511 U.S. at 603-04.

The government quotes *Rehaif* for the proposition that facts having "'nothing to do with the wrongfulness of the defendant's conduct'" are "'not subject to the presumption in favor of scienter.'" ECF No. 90, p. 13 (quoting 139 S. Ct. at 2196).  That is doubly misleading.  First, the defendant's conviction in that case was reversed precisely because the lower court failed to apply the presumption of scienter to every element of 18 U.S.C. § 922(g), concerning unlawful possession of a firearm by a felon. 139 S. Ct. at 2194.  Relying on *Staples* and *X-Citement Video*, the Court held that "the word 'knowingly' applies both to the defendant's conduct [i.e., possessing a firearm] and to the defendant's status [as, e.g., a felon]" which was defined elsewhere in the statute.  *Id*.  Nothing about *Rehaif* aids the government's argument that Congress intended that § 1752's "knowingly" would conveniently skip over the statute's very own definition of "restricted buildings or grounds," the unlawful entry into which is the actus reus.

The government's citation to *Rehaif* is misleading for another reason.  Again, its quote from that case: facts having "nothing to do with the wrongfulness of the defendant's conduct" are "not subject to the presumption in favor of scienter." *Rehaif*, 139 S. Ct. at 2196.  What the government carefully omits: the Court was referring to "jurisdictional elements." *Id.* "Jurisdictional elements do not describe the 'evil Congress seeks to prevent,' but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's

conduct (normally, as here, through its Commerce Clause power)." *Id.* (quoting *Luna Torres v. Lynch*, 57 U.S. __, __-__,136 S. Ct. 1619 (2016)).

Section 1752's definition of "restricted buildings or grounds" is not a "jurisdictional element"—it describes where the crime must take place.  Section 1752 does not federally criminalize entry without lawful authority into any kind of "restricted area" whatsoever.  Rather, the statute states that "the term 'restricted buildings or grounds' means any posted, cordoned off, or otherwise restricted area. . . (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" because those protectees are the statute's focus, wherever *they* may be.  § 1752(c)(1)(B).  The presence of a USSS protectee does indeed have something "to do with the wrongfulness of the defendant's conduct" because the crime concerns the security of that protectee.  The defendant's proximity to the protectee is not incidental to the crime, like a jurisdictional element—it is the crime.  If a defendant enters "restricted buildings or grounds" without any thought or knowledge about a USSS protectee's presence, he poses a fundamentally different security question than the man who enters *knowing* the president, specifically, will be found there.  A range of security-related assumptions may be made about the second defendant which cannot be made about the former.  Section 1752 is not concerned with the man who rushes back into a cordoned building to grab his dissertation which is due in two hours—even if a protectee happens to be present unbeknownst to the man.  It is concerned with the man who enters the building because, for example, he intends to accost the president.

Critically, the mere act of entering into an area that is in *any* way restricted is not necessarily criminal, much less the specific evil Congress intended to forbid in § 1752.  If the presumption of scienter does not extend to the statute's own definition of "restricted buildings or

grounds," as the government proposes, the tools remaining for divining congressional intent are dictionary definitions that do not describe crimes.  In the context of physical space and presence, "restricted" may mean any of the following:

- "Limited, confined."

- "Limited to use by a certain group, *spec.* (a) non-Jews, (b) non-military personnel."

- "Of a person: not allowed freedom of movement, esp. for political reasons."

*Restricted*, Oxford English Dictionary (5th ed. 2002).

Given these noncriminal definitions, it is easy to see why declining to extend the presumption of scienter to the statute's definition of "restricted buildings or grounds" would deface congressional intent.  Suppose the president were paying a diplomatic visit to the King of Saudi Arabia.  The summit is held in Mecca.  Assume further that the defendant happens to be visiting the same country.  He is not even aware that the president is visiting the holy city.  As a non-Muslim, defendant is restricted from entering Mecca, as a matter of theological precept.  According to the government, the presumption of scienter only requires it to prove that defendant read in Baedeker that entering Mecca is haram.

Suppose the vice president is visiting Wing X of a hospital shelled by an enemy army.  Defendant is a family member of a patient in Wing Y in the same building.  Not knowing the vice president is present, he is nevertheless curious about what is happening in Wing X, whose entrance is adorned with the sign, "Only for patients in Wing X and their family members."  According to the government, the defendant had a § 1752 *mens rea* because he knew Wing X was restricted—for some reason or the other.

Or suppose the vice president is touring the reactor room of a nuclear power plant.  A janitor who has long been curious about the mysterious noises in the room decides to defy

company policy that only technicians may enter.  He did not know anything about the vice president's visit.  According to the government, the janitor still possessed a § 1752 *mens rea* as he knew the area he entered was "restricted."

The government cites to *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005)—but that case perfectly illustrates its mistake.  The Fourth Circuit could not have been more clear that the defendant's § 1752 conviction was affirmed precisely because the evidence showed that he knew *the president* was present in the restricted area and not merely that Bursey knew about some nonspecific "restricted area." These are the *mens rea* facts the court of appeals found determinative:

- Bursey "concede[d] that he knew that the President was visiting the area";

- "the district court found that he understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement)";

- "there was ample evidence that Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone";

- "Bursey also acknowledged that, in protesting at two earlier visits to South Carolina by the incumbent President, he was advised in both instances that 'the Secret Service had basically preempted the security arrangements' of local police";

- "A Secret Service Agent . . .approached Bursey and informed him that he could not remain in the restricted area."

*Bursey*, 416 F.3d at 305-09.

Notice that the government's incorrect interpretation of a § 1752 *mens rea* is in no way dictated by the Court's rejection of Griffin's motion to dismiss.  Even if any law enforcement agency may set the statute's restricted area (in conjunction with the USSS), that need not imply

that a defendant's *mens rea* under the statute may lack any knowledge that a USSS protectee "is or will be temporarily visiting" the area restricted by law enforcement for the protectee's benefit. § 1752(c)(1)(B).[2]

For all these reasons, and others that will be raised at trial, the Court should reject the government's invitation not to apply the presumption of scienter to the statute's requirement that a USSS protectee be or will be temporarily visiting the restricted area when the defendant enters it or remains there.

**B.    The government's last-minute argument that the vice president "would be" visiting the Capitol when Griffin allegedly entered the area is nonsensical**

On January 4, 2022, Griffin filed a motion displaying a still image depicting the earliest possible moment when he allegedly entered a "restricted area" on January 6.  ECF No. 66, p. 2. Publicly available evidence had indicated that the vice president had already departed the Capitol Building before that moment in time and exited through underground tunnels.  *Id.*

Griffin will show at trial that immediately after he publicized that photograph the FBI began analyzing the metadata from dozens of video clips of Griffin filmed at the Capitol.  The metadata reveal when the clips were originally filmed and thus when Griffin allegedly entered the "restricted area." He will show that when the government later produced those videos to the defense, they included creation time metadata for nearly all the clips—except the one showing Griffin's alleged entrance into the restricted area.

---

[2] It may still be recognized that the government's *mens rea* argument is an outgrowth of the unusual circumstance where some agency other than the USSS sets a § 1752 restricted area.  (By "sets" Griffin does not refer to physically placing barriers and posts.  He refers to the process whereby an entity designates the scope and size of the restricted perimeter.  He refers to the entity that decides.)  Where the USSS sets a physically demarcated restricted area, patrols its perimeter, and distributes USSS pins for lawful entry, as in *Bursey* and other reported § 1752 cases but unlike here, few defendants could plausibly claim ignorance of a protectee's presence, particularly when they are directly informed of it by the USSS.  *Bursey*, 416 F.3d at 305-09.

Around the same time, the government changed its § 1752 argument. Now it began claiming that even if the vice president was no longer "temporarily visiting" the restricted area when Griffin allegedly entered or remained there—notwithstanding its many sworn representations to the contrary—the protectee returned to the Capitol hours after Griffin had departed the area and the statute defines "restricted buildings or grounds" to mean "a building or grounds where the President or other person protected by the Secret Service is or *will be* temporarily visiting" § 1752(c)(1)(B) (emphasis added).

The government has not even preserved this argument for trial and even if it had, it is chronologically nonsensical. Griffin has argued in multiple motions that under the concurrence principle, the defendant's guilty act and guilty mind must temporally coincide. *E.g.*, *Morissette v. U.S.*, 242 U.S. 246, 251-52 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil meaning mind with an evil-doing hand. . ."); ECF No. 73, p. 4; ECF No. 82, p. 2. The government has not offered any argument or evidence showing how Griffin, when he allegedly entered the "restricted area," had knowledge that the vice president "would be" returning hours afterward. The vice president himself in all likelihood did not then know. The government's argument is a *mens rea* anachronism. By never responding to this argument it is plainly forfeited. *E.g.*, *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016).

C.      **The government pretends this Court's *Jabr* decision does not exist**

According to the Third Amended Information and under § 1752(c)(1)(B), the restricted area at issue encompasses two places: the U.S. Capitol Building and its grounds. Third Am. Information, Counts 1, 2. The Capitol Building and the Capitol Grounds are defined statutorily. 40 U.S.C. §§ 5101, 5102. Neither definition encompasses underground garages or tunnels.

The government offers one response to Griffin's interpretation: "the definition of the United States Capitol Building in Title 40 is inapplicable to Section 1752." ECF No. 90, p. 12. That is not an argument about text; it is ipse dixit.  The government ignores *United States v. Jabr*, 2019 U.S. Dist. LEXIS 238718, 18-cr105-PLF (D.D.C. May 16, 2019), where the government recently made the same argument before a different judge in this Court and it was rejected.

Jabr was prosecuted for entering "'any posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds.'" 2019 U.S. Dist. LEXIS 238718, *15 (quoting § 1752(c)(1)(A)). Specifically, she was arrested on the steps of the U.S. Treasury Building, adjacent to the White House. The question was whether the Treasury steps constituted "the White House or its grounds." For its part, the government contended that the Treasury steps were part of the White House "grounds," as they were encompassed within—"White House Complex." 2019 U.S. Dist. LEXIS 238718, *18.

Jabr, on the other hand, cited a statute designating the White House to be administered by the National Park Service (NPS). *Id.*  Just like 40 U.S.C. § 5102 does with respect to the Capitol Grounds, the NPS statute gave a metes and bounds definition of the White House Grounds that did not include the Treasury steps.  *Id.*, *19. The White House Grounds were coterminous with the § 1752 "grounds," Jabr argued.  She also noted that the 1997 Omnibus Consolidated Appropriations Act provided that "'the White House Security Complex'" included "'the White House, the White House grounds, the Old Executive Office Building, the New Executive Office Building, the Blair House, the Treasury Building. . .'" *Id.*, *20 (quoting Pub. L. No. 104-208, § 8100, 110 Stat. 3009 (1996)).  Congress, the *Jabr* Court observed, purposefully "differentiated" in the Act's list between "the 'White House,' the 'White House grounds,' and the 'Treasury

Building.'" *Id.*  Identically, Congress has here "differentiated" between the "United States Capitol," the "Capitol Visitor Center," underground "subways," and "real property underlying" the Capitol building. 40 U.S.C. § 5101.

In *Jabr* the government countered that § 1752's "grounds" should be informed by the broadest dictionary definition.  2019 U.S. Dist. LEXIS 238718, *21. This Court rejected that argument and granted the defendant's Rule 29 motion.  "'Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts.'" *Id*., *19 (quoting *New Hampshire v. Ramsey*, 366 F.3d 1, 26 (1st Cir. 2004) (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)). Continued the Court:

> [T]he White House and its grounds refers to a defined area—specifically, eighteen acres. The "restricted area" of the White House or its grounds could refer to all eighteen acres, surrounded by a fence, or to a subsection of the White House grounds, further restricted. What is significant for the current discussion is that the "White House and its grounds" refers to a finite part of the "White House complex," and Congress deliberately referred to the "White House grounds," not the "White House Complex," in Section 1752. To read the surrounding text as referring to a larger geographic area would be contrary to that legislative choice and the statutory language.

*Jabr*, 2019 U.S. Dist. LEXIS 238718, *21.

Here, the government filed a declaration from a U.S. Capitol Police Officer, Sergeant Stephen T. James, distinguishing between the Capitol Building and the "Capitol Complex" and stating that by 2:28 p.m. on January 6, Vice President Pence had relocated to the latter.  ECF No. 81, p. 3.  The government's position here rehashes its losing argument in *Jabr*.  Section 1752 refers to restricted "buildings" and "grounds," not a restricted "complex." *Jabr*, 2019 U.S. Dist. LEXIS 238718, *21. Congress's differentiating in Title 40 between (a) the "United States Capitol," the "Capitol Visitor Center," underground "subways," "real property underlying" the Capitol building (§ 5101), and (b) the Capitol Grounds (§ 5102) informs the correct

interpretation of "building" and "grounds" in § 1752 because "'where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts.'" *Id*. (quoting *Ramsey*, 366 F.3d at 26).

If anything, Title 40's goals are far more closely related to § 1752's than were the comparator statutes' goals in *Jabr*. Just like § 1752, Title 40 delimits areas that will be patrolled by law enforcement to enforce criminal offenses defined in the same statutory scheme. Section 5102 defines "Capitol Grounds" and § 5104 in turn defines crimes that may not be committed on the Capitol Grounds. Logically, there is no sense in presuming that Congress intended a meaning of "grounds" and "building" in 1752 different from the definitions of those terms in 40 U.S.C. §§ 5101, 5102 when, for example, it contemplated a Secret Service protectee's quadrennial "visits" to the U.S. Capitol and its Grounds.

Griffin's interpretation is consistent with common sense. The purpose of § 1752 is to keep unauthorized people from coming too close to the physical space of a Secret Service protectee. When the protectee is present in the Capitol Grounds, § 5102, or the Capitol Building, § 5101, undesired proximity is always a risk, for all the places in those definitions lie above ground in public. By contrast, if the protectee has repaired to an underground bunker north of Constitution Avenue through a network of subterranean tunnels inaccessible to the public, it makes little if any practical sense to enforce a § 1752 claim against a defendant who, as a matter of basic chronology, necessarily cannot be causally responsible for the protectee's departure from the "building and grounds," even assuming the legal arguments worked, which they do not.

The government has given the Court no reason to cast aside "basic canons of statutory construction" which "suggest a presumption that Congress intended the term[s] to have the same meaning in both contexts." *Jabr*, 2019 U.S. Dist. LEXIS 238718, *21.

**D.   The government's definitions of "disorderly" and "disruptive" conduct will trigger an as-applied First Amendment challenge if they are deemed to reach Griffin's leading of public prayer at the Capitol**

The government defines "disorderly conduct" to mean when a person is "unreasonably loud and disruptive under the circumstances. . ."  ECF No. 90, p. 3.  It defines "disruptive conduct" as a "disturbance that interrupts an event, activity, or the normal course of a process." *Id.*

The government's definitions are incorrect because they lack a *mens rea* element.  The Court should look to the D.C. Code's definitions of disorderly and disruptive conduct which properly require a guilty mind.  In this district, disorderly conduct occurs where, "(a) in any place open to the general public" a person, "(1) Intentionally or recklessly act[s] in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken. (2) Incite[s] or provoke[s] violence where there is a likelihood that such violence will ensue; or (3) direct[s] abusive or offensive language or gestures at another person . . . in a manner likely to provoke immediate physical retaliation or violence by that person or another person." D.C. Code § 22-1321.  The Court should also apply this definition because in passing § 1752, Congress did not express an intent to preempt the field of local laws and ordinances defining "disorderly conduct." Thus, because Griffin's conduct occurred in the District of Columbia, § 22-1321 controls.

At trial, the government will not prove that Griffin satisfied any of these definitions of disorderly or disruptive conduct.  To the contrary, it will see that Griffin peacefully led a prayer

on the Capitol steps, reciting 2 Chronicles 7:14.  It will see that the members of the crowd listening to Griffin were calmed and pacified compared to protesters around them.

To the extent the government's definitions are applied and the Court finds they somehow reach Griffin's conduct, he will raise an as-applied First Amendment challenge.  *See Hess v. Indiana*, 414 U.S. 105 (1973) (Indiana's disorderly conduct statute unconstitutional as applied to protester's remarks to crowd about "taking the fucking streets later" after being ordered off public property by sheriff); *see also Lederman v. United States*, 89 F. Supp. 2d 29, 36 (D.C. Cir. 2000) (steps at East Front of Capitol a public forum); *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1973) (Title 40 parading on the grounds offense facially unconstitutional).

## II.     THE GOVERNMENT'S CONTINUED ATTEMPTS TO RESTRICT CROSS-EXAMINATION ARE INAPPROPRIATE

The Court has already ruled that "If the government wishes to proceed on Count One of the Third Amended Information, it is hereby ORDERED to have a witness present at trial who can speak based on first-hand knowledge as to the whereabouts of former Vice President Pence during the alleged offense conduct." 3/09/22 Minute Order.

Griffin had previously explained why prohibiting him from cross-examining a witness on facts going to an element of the offenses with which he is charged would violate his Confrontation Clause right under the Sixth Amendment.  *United States v. Foster*, 986 F.2d 541 (D.C. Cir. 1993); ECF No. 75, p. 3.

However, the government's trial brief states that its USSS witness will not comply with that order.  The witness "will not answer any questions about the precise location of the emergency relocation site to which the Vice President was taken on January 6, 2021." ECF No. 90, p. 10.

This is misleading.  As Griffin will show at trial, images of where the vice president was relocated are now public information.  As he will show at trial, the place to which the vice president was relocated is not a special permanent location where protectees are typically relocated according to planning.  Rather, as he will show at trial, the place to which the vice president was taken was a security expedient.  As Griffin will show at trial, the place is not located in the § 1752 "restricted area." As Griffin will show at trial, the government's many representations that the vice president "remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed," ECF No. 1-1, p. 3 (criminal complaint), are no less misleading than its representations that the vice-president elect was in the Capitol Building that day. ECF No. 31.

But even if all of that were not true, restricting Griffin's cross-examination rights on the government's terms would be in error.  Even if the "secure location" were not just a one-time expedient and actually implicated "future security of a Head of State," ECF No. 90, p. 10, the proper remedy would not be to permit the witness to refuse *all* questions about the vice president's presence, as the government suggests.  The witness could answer questions such as whether the vice president left the Capitol Building itself by 2:28 p.m., as another government witness has already stated in a sworn declaration based on a review of CCV footage.  The vice president's absence from the Capitol Building does not reveal the "precise secure location" and does not implicate "future security of a Head of State." That the government refuses even to address this simple expedient creates the impression that the language of national security is being exploited in an attempt to cloak a great many misrepresentations that have been filed in court about the vice president's presence in the Capitol Building.

As shown above and elsewhere, the USSS witness's testimony is plainly required to establish Griffin's guilt or innocence.  The government has stated that the witness will not provide this testimony and the government has given no indication that it is even willing to compromise on how questions are asked in order to accommodate both parties. The Court should therefore dismiss the charges.  If it does not, it should at least give Griffin the opportunity to conduct relevant cross-examination and, if the witness does not answer questions, address the parties' motions at that time.

## III.    THE GOVERNMENT'S DESCRIPTION OF THE EVIDENCE IS INACCURATE

The government represents that Griffin's "own statements show that he was well aware that Vice President Pence was present at the Capitol on January 6." ECF No. 90, p. 14.  Notice that the government does not say that the evidence will show that Griffin was aware that the vice president was present when Griffin was on the Capitol Grounds.

That is because, as the government knows, the evidence will show that Griffin had virtually no knowledge of how the joint session's count of electoral certificates proceeded, no knowledge of who was there, and no knowledge of when the process began and completed.  The evidence will show that Griffin believed that the process had been completed long before he arrived at the Capitol Grounds.  It will show in several ways that Griffin did not "know" something that was not in fact true: that Vice President Pence was in the Capitol Building when Griffin stood outside it.

The government represents that Griffin walked "over several barriers." ECF No. 90, p. 1. The evidence will show that is flatly untrue. The government will not present evidence that Griffin saw a single "Do No Enter" sign anywhere.  It will not present evidence that a single law enforcement officer advised Griffin not to enter the "restricted area."

16

The government will present evidence showing that hundreds or thousands of similarly situated protesters did exactly what Griffin did on January 6 and have not been charged with any crime, much less Griffin's. The evidence will show that the government selected Griffin for prosecution based on the fact that he gave a speech and led a prayer at the Capitol, that is, selected him based on protected expression.

Dated: March 18, 2022                    Respectfully submitted,


                                         /s/ David B. Smith
                                         David B. Smith (D.C. Bar No. 403068)
                                         108 N. Alfred St.
                                         Alexandria, VA 22314
                                         Phone:(703)548-8911
                                         Fax:(703)548-8935
                                         dbs@davidbsmithpllc.com

                                         Nicholas D. Smith (D.C. Bar No. 1029802)
                                         7 East 20th Street
                                         New York, NY 10003
                                         Phone: (917) 902-3869
                                         nds@davidbsmithpllc.com

                                         *Attorneys for Couy Griffin*

### Certificate of Service

I hereby certify that on the third day of March 18, 2022, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

        Janani Iyengar
        Assistant United States Attorney
        555 4th Street, N.W., Room 4408
        Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Couy Griffin*