```
1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-92
4              Plaintiff,               .
                                        .
5         vs.                           .
                                        .  Washington, D.C.
6    COUY GRIFFIN,                      .  March 21, 2022
                                        .  9:33 a.m.
7              Defendant.               .
     - - - - - - - - - - - - - - - - -

8

9                       TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE TREVOR N. MCFADDEN
10                    UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:        JANANI IYENGAR, AUSA
                                   KIMBERLY PASCHALL, AUSA
14                                 United States Attorney's Office
                                   555 Fourth Street Northwest
15                                 Washington, D.C. 20530

16   For the Defendant:           NICHOLAS D. SMITH, ESQ.
                                   David B. Smith, PLLC
17                                 7 East 20th Street
                                   New York, New York 10003

18

19

20   Official Court Reporter:      SARA A. WICK, RPR, CRR
                                   United States District Court
21                                    for the District of Columbia
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

C O N T E N T S

OPENINGS

Opening Statement by Defense ......................... 37

TESTIMONY

MATTHEW STRUCK      Direct Examination .................. 45
                    Cross-Examination .................. 61
                    Redirect Examination ............... 64
                    Recross-Examination ................ 83
                    Further Redirect Examination ........ 123

JOHN ERICKSON       Direct Examination .................. 133
                    Cross-Examination .................. 169
                    Redirect Examination ............... 203

LANELLE HAWA        Direct Examination .................. 211
                    Cross-Examination .................. 226
                    Redirect Examination ............... 255

EXHIBITS RECEIVED

Government 70, 71, 100, 101 .......................... 44
Government 10 through 62 ............................. 51
Government 64 ........................................ 53
Government 63 ........................................ 58
Government 67 and 68 ................................. 83
Defendant 1-A ........................................ 90
Government 10-1 through 62-1 ......................... 123
Defendant 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 17, and 28... 130
Government 1 through 5 ............................... 144
Government 73 ........................................ 150
Government 74 and 75 ................................. 163
Government 72 ........................................ 208
Government 102 and 103 .............................. 209
Government 6 ......................................... 214
Government 16 ........................................ 264
Defendant 13 ......................................... 265

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  This is Criminal Case 21-92, United

 4     States of America versus Couy Griffin.

 5          Counsel, please come forward to identify yourselves for the

 6     record, starting with the government.

 7              MS. IYENGAR:  Good morning, Your Honor.  Janani

 8     Iyengar for the United States, and I'm here with my colleague,

 9     Kim Paschall.

10              THE COURT:  Good morning, ladies.

11              MR. SMITH:  Good morning, Your Honor.  You have

12     Nicholas Smith here for defendant Couy Griffin.

13              THE COURT:  Good morning, Mr. Smith.  Good morning,

14     Mr. Griffin.

15              THE DEFENDANT:  Good morning, Your Honor.

16              THE COURT:  All right.  I believe we need to arraign

17     the defendant.  Ms. Chaclan.

18              COURTROOM DEPUTY:  Mr. Griffin, if you could come

19     forward with your attorney, Mr. Smith.

20          Couy Griffin, in Criminal Case 21-92 in which you are

21     charged by an information on Count 1, entering and remaining in

22     a restricted building, and Count 2, disorderly and disruptive

23     conduct in a restricted building, do you waive the formal

24     reading of the information, and how do you wish to plead?

25              MR. SMITH:  I will answer for Mr. Griffin.
```

1        We waive formal reading of the information and enter pleas

2   of not guilty.

3             THE COURT:  Thank you, Mr. Smith.

4        Ms. Iyengar, is the government ready for trial?

5             MS. IYENGAR:  Yes, Your Honor, we are.

6             THE COURT:  Mr. Smith, is defense ready for trial?

7             MR. SMITH:  Your Honor, we will be proceeding with

8   trial today, but we filed a couple of motions over the weekend

9   indicating that the government has made productions, somewhat

10  substantial productions of discovery to the defense a couple of

11  days before trial, you know, as late as -- I think one came this

12  weekend.  There was a production of about 60 video files on

13  Thursday of last week.

14       Judge, so the situation that we are in, as we tried to

15  outline in the motions, is that Mr. Griffin can either agree to

16  continue his trial more after it's been continued and continued

17  for over a year, or he is in a situation where there's a

18  possibility that something the government has given us might

19  assist him at trial.

20       And I think we've pointed out in our briefs before that we

21  don't think that the government is in a position to place that

22  Sophie's choice, so to speak, on Mr. Griffin, especially at this

23  point.

24       So one of the motions we filed pretrial was seeking relief

25  of striking the government's witness -- exhibits, to the extent

1    they are based on videos that were produced after March 11th,

2    which is when the government first gave us what it identified as

3    a final exhibit list.

4         THE COURT:  Those are the videos from the -- I think

5    your client's videographer; is that correct?

6         MR. SMITH:  Yes, Your Honor.  So there's -- one of the

7    confusing aspects about discovery here is that the government

8    received a batch of videos from the witness, Matt Struck, the

9    videographer, long ago, around January in 2021, but then a

10   second batch of about, I guess, 60 to 80 videos just came in

11   this week.

12        So when we say we're moving to exclude the government's

13   videos based on the Struck videos, we're only referring to

14   videos that were produced on Thursday, a couple of days before

15   trial, to the extent the government is using them.  It's not

16   clear to the defense at this point because there have been so

17   many e-mails back and forth and exhibit numbering changes and

18   the like.  So I'm not really sure what their position is.

19        THE COURT:  Okay.  I will hear from the government on

20   that in a moment.

21        By the way, folks, I should have mentioned, in light of the

22   fact that the CDC has found D.C. to be a low danger area, I do

23   not require people to wear masks in my courtroom.  Obviously,

24   you're welcome to do so if you would like.

25        UNIDENTIFIED SPEAKER:  Thank you.

1          THE COURT:  I understand the parties believe we've

2    done a Waiver of Jury Trial.  I don't recall going through my

3    formal colloquy.  So I think I would like to do that.

4          MR. SMITH:  And Your Honor, after that's complete,

5    there's a couple more matters we would like to address.

6          THE COURT:  I understand.

7       Mr. Griffin, could you approach the podium, sir.

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Sir, I'm informed that you desire to waive

10   your right to a jury trial.  Is that correct?

11         THE DEFENDANT:  Yes, Your Honor, that's correct.

12         THE COURT:  Before accepting your waiver to a jury

13   trial, there are a number of questions I will ask you to ensure

14   that it is a valid waiver.

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  If you do not understand any of the

17   questions or at any time wish to interrupt the proceeding to

18   consult with your attorney, please do so since it's essential to

19   a valid waiver that you understand each question before you

20   answer.

21      Do you understand all that, sir?

22         THE DEFENDANT:  Yes, sir; yes, Your Honor.

23         THE COURT:  What is your full name, sir?

24         THE DEFENDANT:  Couy Dale Griffin.

25         THE COURT:  And how old are you, sir?

```
1              THE DEFENDANT:  I'm 48 years old.

2              THE COURT:  And how far did you go in school?

3              THE DEFENDANT:  Some college.

4              THE COURT:  All right.  Probably a silly question, but

5    are you able to speak and understand English?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  What is your employment background, sir?

8              THE DEFENDANT:  Employment, I'm currently an elected

9    official.  I'm a county commissioner.  And I'm also a stone

10   mason.  I lay rock.

11             THE COURT:  Say that last part again, sir.

12             THE DEFENDANT:  I'm a stone mason.

13             THE COURT:  I see.

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Okay.  And have you taken any drugs,

16   medicines, or pills or consumed any alcoholic beverage in the

17   last 24 hours?

18             THE DEFENDANT:  No, sir.

19             THE COURT:  Do you understand that you're entitled to

20   a trial by jury on the charges filed against you?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Do you understand that a jury trial means

23   you will be tried by a jury consisting of 12 people and that all

24   of the jurors must agree on the verdict?

25             THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  Do you understand that you have a right to
2     participate in the selection of the jury?
3          THE DEFENDANT:  Yes, sir.
4          THE COURT:  Do you understand that if I approve your
5     waiver of a jury trial the Court will try the case and determine
6     your innocence or guilt?
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  Have you discussed with your attorney your
9     right to a jury trial?
10          THE DEFENDANT:  Yes, Your Honor.
11          THE COURT:  Have you discussed with your attorney the
12     advantages and disadvantages of a jury trial?
13          THE DEFENDANT:  Yes, Your Honor.
14          THE COURT:  Do you want to discuss this issue further
15     with your attorney?
16          THE DEFENDANT:  No, Your Honor.
17          THE COURT:  Mr. Smith, have you discussed with your
18     client the advantages and disadvantages of a jury trial?
19          MR. SMITH:  Yes, Your Honor.
20          THE COURT:  Do you have any doubt that the defendant
21     is making a knowing and voluntary waiver of the right to a jury
22     trial?
23          MR. SMITH:  I have no doubt, Your Honor.
24          THE COURT:  Has anything come to your attention
25     suggesting the defendant may not be competent to waive a jury

1    trial?

2           MR. SMITH:  No, Your Honor.

3           THE COURT:  Ms. Iyengar, has anything come to your

4    attention suggesting that the defendant may not be competent to

5    waive a jury trial?

6           MS. IYENGAR:  No, Your Honor.

7           THE COURT:  I have here a written Waiver of Trial by

8    Jury form.  Sir, is that your signature there?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Okay.  I do find that the defendant has

11   knowingly and voluntarily waived his right to a jury trial and

12   approve that waiver.

13       Sir, you may have a seat.

14          THE DEFENDANT:  Thank you, Your Honor.

15       Your Honor, if I could correct the record on one question

16   that you asked me.  I had a couple beers last night at the hotel

17   before we -- when we went out.  So inside 24 hours, you know, so

18   just to make sure that's clear.

19          THE COURT:  Fair enough.  There's nothing illegal

20   about that.

21          THE DEFENDANT:  Okay.

22          THE COURT:  You feel clear headed now?

23          THE DEFENDANT:  Yes, sir, absolutely.  Thank you, Your

24   Honor.

25          THE COURT:  You may have a seat, sir.

1    Before the Court is the defense motion to compel, ECF

2    Number 66.  This relates to what the defense has described as

3    photographic *Brady* evidence.  Specifically, the defense seeks

4    production of certain photographs allegedly depicting Vice

5    President Pence in an underground garage while the defendant was

6    in the Capitol.

7    The Court finds that even if the photographs are

8    exculpatory, the government has no duty to disclose them here.

9    It's well-established in this circuit that the government's

10   *Brady* and Rule 16 obligations require it to search for and

11   disclose evidence beyond its own files.  Of course, Rule 16 and

12   *Brady* address related but different disclosure obligations, but

13   they both concern material within the possession or control of

14   the government.  So for purposes of this motion, I consider the

15   standard for possession under either rule as comparable.

16   The D.C. Circuit has framed this rule in *United States v.*

17   *Brooks*, saying that the government must search for and disclose

18   exculpatory materials maintained by branches of government,

19   quote unquote, closely aligned with the prosecution, that is,

20   agencies whose, quote, bureaucratic boundary from the

21   prosecution is too weak to limit that duty, closed quote.  And

22   this is from 966 F.2d 1500, page 1503, from the D.C. Circuit in

23   1992.

24   *Brooks* itself involved files held by the Washington, D.C.

25   Metropolitan Police Homicide and Internal Affairs Division.  The

panel found that there was a close working relationship between the department and the United States Attorney's Office.  And thus, the prosecution's *Brady* obligations extended to files held by the department.

Here, the defense says the sought-after photographs are held by the National Archives and Records Administration.  If that's correct, I don't believe the government possesses the photographs within the meaning of *Brady* or Rule 16.  I see this as a common sense application of *Brooks*.  It would strain credulity to say that NARA is closely aligned with the prosecution here in the same way that the Metropolitan Police Department is closely aligned with the D.C. U.S. Attorney's Office.

That's all to say that even if the pictures are exculpatory, I don't believe the government has an obligation to disclose them.

I do acknowledge that at least one judge in this district has extended the government's *Brady* and Rule 16 obligations broadly enough to support the defense's arguments here.  In *United States v. Safavian*, the district held -- or a district court held that the government had to disclose exculpatory materials held by, quote, any and all agencies and departments of the executive branch, closed quote.  And that's from 233 F.R.D. 12, page 14, out of D.D.C. in 2005.

I think that's an expansive reading, frankly an overly

expansive reading.  As another of my colleagues has recognized, *Safavian* went beyond the Ninth Circuit cases it relied on for support, and it certainly went beyond the analytical limits of *Brooks.*  And for that, I'm looking to *United States v. Libby*, 429 F.Supp.2d 1 at page 6, Note 10, out of this district in 2006, where the *Libby* Court said that the Court in *Safavian* indicated that the government's search was to be limited only by the, quote, rule of reason.

This Court need not, nor does it believe it could, adopt such a broad reading of the applicable case law in this circuit.

I also think *Safavian* contradicts a number of courts of appeal.  Numerous circuits have held that prosecutors' discovery obligations are not violated by failing to produce documents possessed by agencies which had no part in the criminal investigation and over which the prosecution has no control.

*Brooks* itself relied on cases from the Seventh Circuit, the Fifth Circuit, and the Ninth Circuit.  *Libby* added to -- the following list of cases supporting the *Brooks* rule.  It looked to *United States v. Pelullo*, 399 F.3d 197, page 218, out of the Third Circuit in 2005; *United States v. Casas*, 356 F.3d 104, page 116, from the First Circuit in 2004; *United States v. Velte*, 331 F.3d 673 at page 680, from the Ninth Circuit in 2003; and *United States v. Morris*, 80 F.3d 1151, page 1169, from the Seventh Circuit in 1996.

The Eleventh Circuit has also framed the government's Rule

16 obligations more narrowly than the defense asks us to do here.  In *United States v. Jordan*, 316 F.3d 1215, page 1249, from 2003, the Eleventh Circuit said courts have found that the possession, custody, or control of the government requirement includes materials in the hands of a government investigatory agency closely connected to the prosecutor.

All in all, I think the *Brooks* line of cases and indeed the overwhelming wealth of the case law suggests that NARA is not -- photographs that may be held by NARA are not within the government's control.  And therefore, I deny the defense motion in ECF 66.

I turn now to the government's motion for clarification in ECF 97.  I thought I had been pretty clear about this.  I don't think the government is entitled to some sort of Secret Service exception or sensitive material exception for proving its case beyond a reasonable doubt.  I think to the extent the government is concerned about sensitive information being disclosed at trial, that's an issue for it to consider whether or not it should bring charges.  I don't think that is a concern of mine as to whether or not to prohibit the defense from ensuring that the government and testing the government's allegations about where the vice president was.

I don't think it's terribly relevant what the defense -- or what the Secret Service protocols are or other issues about what types of agents were there or what have you.  That's why I

1    agreed with the government as to the second two categories of

2    information.

3         And I certainly would consider any objections the

4    government may make on relevance grounds.  But I'm not going to

5    sustain objections from the government to the defense going into

6    where the vice president might have been while Mr. Griffin was

7    in the area.  Unless -- I mean, the government did raise

8    something later on suggesting that maybe it doesn't even matter

9    where the government -- or where the vice president was if he

10   intended to be back there later in the evening.  If the

11   government wishes to concede that the vice president wasn't in

12   the restricted area while the defense was -- while the defendant

13   was in the restricted area, I think that changes the calculus.

14        But otherwise, I think where the vice president was is

15   relevant, and I'm not going to allow the government to shield

16   his whereabouts by some sort of Secret Service sensitivity

17   concerns.  And I think that result is compelled by the *Foster*

18   case that I discussed in my order.

19        I will hear from the government now on -- there's several

20   motions pending from the defense, motions for *Jencks* material,

21   motions for discovery sanctions, motions to -- a motion to

22   exclude video montage, and motion to compel CCV footage.

23             MS. PASCHALL:  Good morning, Your Honor.

24             THE COURT:  Good morning, Ms. Paschall.

25             MS. PASCHALL:  Something that we need to address, now

that Your Honor has ruled on that motion to clarify, at some
point in time -- and I apologize that I do not have the ECF
number -- defense moved to compel video that was mentioned in
the U.S. Capitol Police affidavit by Inspector James that went
to the location of the Vice President of the United States.  The
government has consistently taken the position that that video
is highly sensitive information that we cannot disclose under
2 U.S.C. 1979.  So we have not done so.

However, given Your Honor's present ruling, we may be at an
impasse, because that information is in the possession, custody,
and control of the U.S. Capitol Police.  It was, in fact, at one
time in the USAO's possession, custody, and control.  It has
since been clawed back for those security purposes.  It has not
been disclosed to defense in this matter.

The government is not really in a position to argue that
that isn't potentially relevant information for their
preparation, now that Your Honor has permitted them to probe
that information.  We do have the general counsel from the
U.S. Capitol Police who can address the 2 U.S.C. 1979 issue.

But I think it's important for Your Honor to be aware that
the government is understanding its Rule 16 obligations,
understanding it may extend to these materials, and these
materials have not been disclosed and cannot be disclosed today
because of 2 U.S.C. 1979.

So I'm happy to have U.S. Capitol Police general counsel

1    address that a little further.  I'm also happy to take Your

2    Honor's questions and try to mete out exactly what we need to do

3    here.

4            THE COURT:  So this is your trial date.  Do you want

5    to go forward with trial or not, Ms. Paschall?

6            MS. PASCHALL:  We do want to go forward, Your Honor.

7            THE COURT:  Do you want to show Mr. Smith the video

8    over lunch?

9            MS. PASCHALL:  So I don't think that's going to be a

10   possibility, and I think, perhaps, Capitol Police would be able

11   to better elucidate why that is.  It's not something that I am

12   an expert in.  But Tad DiBiase would be better able to explain

13   that to the Court.

14           THE COURT:  Okay.

15           MR. DIBIASE:  Good morning, Your Honor.

16           THE COURT:  Good morning, sir.  What's your name?

17           MR. DIBIASE:  Thomas DiBiase, and I'm general counsel

18   for the Capitol Police.

19           MR. SMITH:  Your Honor, we're objecting to the extent

20   this isn't a witness and we won't have an opportunity to

21   cross-examine what the Court is hearing.

22           THE COURT:  I don't think he's a witness.  He's making

23   argument.  You will have an opportunity to respond.  Thank you.

24      Go ahead, sir.

25           MR. DIBIASE:  So we learned over the weekend that the

prosecution in this case wanted to turn over the video in this case that's related to the position of where VPOTUS was.  That video, as Ms. Paschall mentioned, was at one point given to the government, but we clawed it back because we believe it is covered under 2 U.S.C. 1979.

THE COURT:  That's the provision that also, I call it, the video cameras -- I mean, there's a lot of things that you say is covered by this that the government normally would not be able to have but you provided the government anyway; correct?

MR. DIBIASE:  Yes.  To be clear, if we're just talking about the video, we have designated other video as 2 U.S.C. 1979 as well.  Evacuation of the members is the other one that's the most clear.

So in order for us, the USCP, to turn over that video to the government and then have it turned over to the defense, we have to get the board approval.  I don't know -- the Court probably knows this, but the Capitol Police Board consists of the Senate and House Sergeant at Arms, the Architect of the Capitol, and then the Chief of the Capitol Police, who is a non-voting member.

So I would have to go ask them if they want to, you know, turn it over.  That is something that I think I could probably get done today or tomorrow, but I literally would have to speak to them and their counsel and say do you want to allow this to be turned over to, you know, a third party at this point.

1          And of course, I'm willing to do that and tell the Court --

2     obviously, if they say no, the Court has to make a decision.  I

3     suspect they probably will allow it to be turned over, but it is

4     something that I have to jump through -- it's not exactly a

5     bureaucracy, but I have to jump through some hoops to get their

6     permission to do that.

7          THE COURT:  Okay.  Thank you, sir.

8          So you don't need to respond.

9          Ms. Paschall, your options are to dismiss the case, or we

10     start and go forward and we will deal with it then.  This is

11     your trial date.  I've been clear about this, I think, for quite

12     a while.

13          MS. PASCHALL:  I think the government would like to

14     proceed.  And to the extent that Your Honor does find some sort

15     of Rule 16 violation based on these materials, we can address

16     arguments about, if any, sanctions would be appropriate at that

17     point in time.

18          THE COURT:  Okay.  I will hear you on the remaining

19     motions, then.

20          MS. PASCHALL:  Yes.  I have some, and Ms. Iyengar has

21     some.  I will address the *Jencks* with respect to the Secret

22     Service witness.

23          Again, now that Your Honor has clarified and we understand

24     the ruling, we have an unredacted version of the e-mails that

25     were disclosed in redacted form.  I still believe some of it

1    could be redacted that is not going to be relevant to the

2    location of the Vice President of the United States.  Some of it

3    is preplanning that would have nothing to do with when this

4    defendant would have been on the grounds.  But some of it is.

5         I can have that ready to go in very short order.  I have an

6    unredacted copy.  I think I would just want to confer with

7    Secret Service general counsel, who is also present, to make

8    sure there's nothing else --

9              THE COURT:  I think he might have just left.

10             MS. PASCHALL:  No, Secret Service general counsel.  I

11   have a full bench today, Your Honor.

12             THE COURT:  How many of these people here work with

13   you, Ms. Paschall?

14             MS. PASCHALL:  All of them, Your Honor.

15        Patrick Glaze with the Secret Service is present.  I would

16   just want to confer with him to make sure that any other

17   information that would not constitute *Jencks* for the witness

18   specific to the vice president's location is appropriately

19   redacted and turned over.  But I think we can address that

20   pretty quickly.  She's not going to be our first witness.  So it

21   wouldn't take long.  I have an unredacted copy here.  It's

22   something I think we can address quickly.

23             THE COURT:  Okay.  So you're going to take care of --

24   that's ECF 94?

25             MS. PASCHALL:  That is ECF 94.

```
 1              THE COURT:  Okay.

 2              MS. PASCHALL:  I think Ms. Iyengar is going to deal

 3   with the Rule 16.  And I'm sorry.  I think there's a third one

 4   as well.

 5              THE COURT:  I think there's the --

 6              MR. SMITH:  Motion in limine.

 7              THE COURT:  Yes, regarding the montage.

 8              MS. PASCHALL:  I believe we addressed this pretty

 9   thoroughly in our trial brief, Your Honor.  We preemptively gave

10   Your Honor a discussion about Federal Rules 401 and 403.  We

11   think --

12              THE COURT:  How long is the video going to be?

13              MS. PASCHALL:  The montage from the Capitol Police is

14   about 20 minutes.  The montage about the official proceeding is

15   closer to ten.

16              THE COURT:  Okay.

17              MS. PASCHALL:  So I don't know if Your Honor needs to

18   hear any more from us on 401 and 403.

19              THE COURT:  I don't think so.

20              MS. PASCHALL:  Okay.

21              MS. IYENGAR:  Your Honor, I just wanted to address the

22   Rule 16 motion that defense had filed.

23        So I guess just to give the Court a better background of

24   how we came into possession of these videos, the FBI had gotten

25   a set of 53 videos back in January of 2021 from the witness that
```

1   we will be calling today, Matthew Struck.  That was turned over

2   voluntarily by him.  The agent had asked basically for, you

3   know, the footage that he had taken on January 6.  It sounds

4   like there was some sort of time limit placed on that.  It was

5   everything after the president's rally at The Ellipse ended up

6   through, you know, the whole time that they were at the Capitol

7   grounds through that evening.

8       We -- as I think the Court is aware, we had to extend

9   immunity to Mr. Struck in order to -- in order to testify today.

10  Once we got through that process, he retained an attorney to

11  represent him.  We met with him to prepare him for his

12  testimony.

13      After meeting with him, we asked through his attorney

14  whether there were any additional videos, basically just to

15  confirm that there wasn't anything we were missing.  His

16  attorney indicated that there were basically double the number

17  of videos.  So there were 78 videos that we did not have that

18  were in Mr. Struck's possession from January 6.  He asked if we

19  wanted those.  We said that we would like to have those turned

20  over to us.  We provided a subpoena to Mr. Woodward, who is

21  Mr. Struck's attorney, and he provided us with those videos.

22  And that all took place on Wednesday of last week.

23      Mr. Struck's attorney sent those videos over to us

24  basically through a Dropbox-type account.  I downloaded them

25  Wednesday night and turned them over Thursday morning sight

1    unseen to the defense because I wanted to get them out as

2    quickly as possible to avoid any, you know, potential delays.

3            THE COURT:  And so the 53 videos you got in January,

4    when did you turn those over, Ms. Iyengar?

5            MS. IYENGAR:  Those were turned over, I believe,

6    shortly after the defendant's arrest in this matter.  It was --

7            THE COURT:  Oh, that was January 2021.

8            MS. IYENGAR:  2021, yes.

9            THE COURT:  Okay.  So those were turned over a long

10   time ago?

11           MS. IYENGAR:  Correct.

12           THE COURT:  I see.

13           MS. IYENGAR:  So in any event, I actually watched the

14   videos Thursday night.  The video that I believe was referenced

15   in the defendant's motion that he refers to as a *Brady* video is

16   a video of the defendant himself speaking to the camera, I

17   believe, on the night of January 6.  He made several statements

18   about his beliefs about Vice President Trump's whereabouts that

19   day and things of that nature, basically what had taken place on

20   January 6.

21       I notified Mr. Smith about that video just to flag it for

22   him on Saturday because I knew this was an issue that he had

23   raised in several prior briefings for the Court.  So I didn't

24   want it to be an issue where he hadn't watched the video and

25   then watched it, you know, at lunchtime or after the trial was

1    over and realized this was something that he wanted to, you

2    know, bring into evidence somehow during trial.

3         Our position is that is not *Brady* material.  I know that he

4    had referenced that this was *Brady* material.  That does not

5    exculpate him from --

6         THE COURT:  These 78 videos you're saying you don't

7    believe are *Brady*?

8         MS. IYENGAR:  Correct.

9         THE COURT:  In any event, you turned them over within

10   hours --

11        MS. IYENGAR:  Exactly.  Right.  And they only came

12   into our possession Wednesday.  We disclosed them as soon as it

13   was practically possible for us to do so.  So there is not

14   really any basis to find any sort of discovery violation under

15   *Brady* or Rule 16.

16        THE COURT:  I understand.  Okay.  Do you think that's

17   all of the -- oh, there was a motion to compel CCV footage back

18   from ECF 86.  Was that resolved?

19        MS. IYENGAR:  So my understanding of that motion was

20   it was filed sort of as a best evidence motion if the government

21   was not calling a witness who had firsthand knowledge of the

22   vice president's whereabouts.  We are calling a witness who has

23   firsthand knowledge.  So I don't believe that should be an issue

24   anymore.

25        THE COURT:  Okay.  Thank you, ma'am.

1          Mr. Smith?

2             MR. SMITH:  Thank you, Your Honor.

3          So picking up just where the government left off, the

4     government is incorrect.  We've moved to compel the CCV footage,

5     and that kind of dovetails with what Your Honor just heard the

6     government say, that they believe it's relevant footage.  I

7     think they called it the basis for withholding the material is

8     that it's designated highly sensitive under 2 U.S.C. 1979.

9          Your Honor probably knows that --

10            THE COURT:  So, Mr. Smith, you say if the government

11    does not produce the videos any testimony based on the CCV

12    footage must be struck.  There's not going to be any testimony

13    based on that footage.

14            MR. SMITH:  If Your Honor would like to see what we've

15    sent the government, we've sent perhaps six e-mails or maybe

16    more requesting this footage.

17            THE COURT:  Okay.  I'm dealing with the motions in

18    front of me, sir.

19            MR. SMITH:  Okay.  So I think given that the

20    government just indicated this is relevant information and that

21    we've asked them to produce it but they haven't, we could

22    reformulate this as a failure to produce rather than addressing

23    it through the best evidence motion Your Honor is looking at.

24    But either way, we've asked the government to produce the

25    footage, and they have not, and they've just called it relevant.

          So that's the framework I'm trying to analyze, what was

just -- the Court was just informed about, if that makes sense.

So the Court was just informed that the footage cannot be

produced because it's highly sensitive.  That is not an evidence

privilege.  The government has not identified any privilege that

would allow merely sensitive information to be withheld.  There

are rules that the Court knows about, classification and the

Classified Information Procedures Act.  This is not within that

realm.  This is just the government's characterization of

something as sensitive, which is not a privilege.

          And I think the illustrative comparison here is to the case

the Court cited earlier, *Foster*.  In *Foster*, the government had

argued in the D.C. Circuit that there was a privilege called the

observation tower privilege, which is a privilege recognized by

law.  Even in that case the privilege was not -- did not

overcome the defendant's right to the information that he

sought.

          Here, the government has not identified any privilege, and

there's no basis for not producing the information.

          As for the delay, Your Honor, we do not believe that the

trial should be delayed.  Your Honor heard that if the Capitol

Police Board were -- a government witness or agent could go to

the Capitol Police Board and seek approval.  But Your Honor,

this case is over a year old.  That could have been done long

ago when we asked the government many times to produce this CCV

1    footage that it's called relevant.

2         So Your Honor, we think that there's a breach of its

3    discovery obligations there.

4         On the *Jencks* information, Your Honor, the government

5    indicated that unredacted e-mails are available to the defense.

6    Well, Your Honor knows that the defense has to review them.

7    There are over 30 pages of the records.  And we don't understand

8    how we can make effective use of this information immediately

9    while we're in the midst of a trial.  There would need to be

10   some sort of a delay.

11        THE COURT:  That is kind of a problem with the *Jencks*

12   law itself; right?

13        MR. SMITH:  Yes, Your Honor.  So technically, the

14   government may, although it's contrary to DOJ policy, they may

15   withhold the information until after the witness testifies.

16        But Your Honor, as Your Honor knows, it's normally not done

17   that way, particularly in the case where there's only one day

18   for trial and we're already over a year after the time in which

19   the defendant has been charged, because what that effectively

20   means is it creates total dysfunction in a trial.  The defendant

21   has to focus on the witnesses that are presented by the

22   government.  If the government comes back and provides

23   unredacted *Jencks* at the last minute, how can one possibly

24   consider that effective preparation for cross-examination?

25        Let me give Your Honor an example.  If there's a piece of

information in the e-mails that the defense could use to then determine that the vice president was not in the restricted area or the place that he was relocated was not in the restricted area, that would be not just relevant, but *Brady* information for reasons we will make clear later in briefing and orally.  But we won't have that opportunity.

And Your Honor, there really isn't any excuse for this, because Your Honor ruled twice, on March 9th and 18th, that this information is, quote, the subject matter of the witness's testimony under 3500, Section 3500.  That was clear.

Immediately after the Court ruled that way, the government produced this information with 3500 material redacted, knowing the Court had ruled that way.

So Your Honor, I guess the government's response was technically they can withhold this information until the witness testifies.  But in the circumstances of this case, that's leaving us no time to investigate the information.

So we will seek -- we indicate in our motion that we're going to seek sanctions at the appropriate time, Your Honor, and we will.

And on the montage, Your Honor, there's just -- there is no way to call this Capitol Police montage relevant.  What it is, frankly, Your Honor, is a piece of propaganda that stitches together videos that have nothing to do with --

THE COURT:  I'm going to need to watch this to rule on

1    it; right?  This feels a little like --

2         MR. SMITH:  Your Honor, it's 20 minutes long.  So this

3    is going to take up a substantial amount of the government's

4    time.  And I don't think the government would contest that what

5    this is is stitching together videos that do not involve the

6    defendant.  So you're imagining a scenario where the defendant

7    is on trial for X, and the government wants to show a violence

8    montage for defendants 1, 2, 3, through 100.

9         THE COURT:  Okay.  Well, it strikes me that that will

10   just make your client look good in comparison.  This is a bench

11   trial.  I don't --

12        MR. SMITH:  Another way of looking at it, Your Honor,

13   is that it's cumulative, that it's a waste of time because it

14   doesn't concern the defendant.  I'm also struggling to

15   understand what the relevance argument is.  If they don't

16   concern the defendant, what is the relevance of showing other

17   people committing acts of violence and pillaging and destroying

18   things if there was no evidence the defendant even saw these

19   things, much less participated in them.

20        THE COURT:  Okay.  Did you want to speak to the Struck

21   videos?  I think that's --

22        MR. SMITH:  Yes, Your Honor.  I think the government's

23   last comment on this point was that they were -- the latest

24   batch, which is, I guess, between 70 or 80 Struck video files

25   that was produced on Thursday of last week, was produced, quote,

as soon as possible.  Your Honor, that is simply not correct.

We understand that the government neglected to ask the witness for this time period of evidence.  It asked the witness for this evidence last week and then served a subpoena on him last week.

We've submitted some case law on Rule 16 control.  There's a decision called -- there's a decision from Judge Lamberth, I think, from 2008 in which control is defined to include when the government reasonably could have obtained the information.

And Your Honor, if we're talking about a witness who is the government's witness and who was first interviewed in January of 2021 and was asked for video clips back in January 2021, I don't think there's any argument that it was reasonable not to ask the next question for the second batch of videos until the week of trial, Your Honor.  I don't see how that could be considered reasonable.

And if it's not, Your Honor, and if this information could have been obtained with a question --

THE COURT:  I guess I will learn about Mr. Struck.  But my impression was your client hired him to go and do all this videoing at the Capitol.  If anything --

MR. SMITH:  Your Honor, I believe --

THE COURT:  Sorry.  It doesn't work when we both talk.

If anything, I would have assumed that all of this was in your client's custody and control and that only recently the

1    government got it.

2           MR. SMITH:  Your Honor, I believe that Mr. Struck, and

3    my client can correct me if I'm wrong, was hired for purposes of

4    Mr. Griffin's organization called Cowboys for Trump.  But

5    Mr. Struck was not hired for the purpose of travelling --

6           THE DEFENDANT:  No, he was not.

7           MR. SMITH:  Was never hired for the purpose of

8    traveling to Washington, D.C.  So these films would be personal

9    to the witness, Your Honor.  So I don't -- it's not like

10   Mr. Struck intended them to create kind of a cinematic

11   experience of Mr. Griffin only and, you know, that that would be

12   delivered to Mr. Griffin.  That's not the case for these video

13   files.

14      So -- and I think, Your Honor, the focus of Rule 16 is on

15   the government's control.

16           THE COURT:  Yeah, but the government didn't have

17   control.  I mean, they literally didn't even know about them

18   until a couple days ago; right?

19           MR. SMITH:  Your Honor, there's a decision called

20   *Archbold*, the Judge Lamberth decision that I just referenced,

21   which says that control includes when the government reasonably

22   could obtain evidence and that the test is really more focused

23   on fairness to the defendant.

24      So if you're talking about a witness that was first

25   interviewed in January of last year and was asked for

information in January of last year and then the follow-up

question wasn't asked until March, the week of trial, March in

2022, Judge, that really doesn't seem like reasonable diligence.

And then think of the outcome for Mr. Griffin.  He's got to

review 60 video files the weekend before trial as he's driving

from New Mexico to Washington, D.C., and the government can just

put on evidence that it produces at the last minute?

I think, Your Honor, we also asked the Court on, I think it

was, March 8th for a scheduling order because we were afraid

something like this might happen.  And Your Honor indicated that

if we couldn't reach a reasonable accommodation with the

government, we could file a Rule 16(d) motion.

The reason we didn't file it earlier is because on March 11

the government produced a file of exhibits called "Final Exhibit

List."  And the defense followed up with the government over a

couple of days saying can you please confirm these are the final

exhibits.  The answer was yes.

And then we got 70-odd files the weekend before trial,

including the next issue I'm going to touch on, Your Honor,

which is *Brady*.  I think Ms. Iyengar just indicated that a video

was produced in which Mr. Griffin indicates he did not believe

the vice president was in the Capitol when he was in the area.

And the reason you know that this isn't a statement of

truth or fact, Your Honor, it's just his mistaken belief, and we

know this, Your Honor, because he says in the video he's

1    surprised that Pence is back in the building when the vice

2    president returned later on in the evening.

3        So Judge, producing *Brady* to the defense that was within

4    the control, technical control of the government the weekend

5    before trial is pretty rough for the defendant.

6        So we think -- our motion asks for a remedy of striking the

7    government's exhibits that are based on videos that were

8    produced not even in time for the defendant to review them as

9    he's driving up to the district where his trial is held.

10           THE COURT:  Okay.  Thank you, sir.

11       Ms. Iyengar, are you planning to present any of these 70

12   videos that you just got?

13           MS. IYENGAR:  Yes, Your Honor.  And we indicated this

14   to Mr. Smith.  We're only planning on using five of those

15   videos, and we identified those videos for Mr. Smith.

16           THE COURT:  So, I mean, that does feel a little bit

17   like sandbagging here, isn't it?  I mean, you told them ten days

18   ago that you had your final list, and then you've --

19           MS. IYENGAR:  So my recollection is we never indicated

20   that that was the final -- like the final list in the sense that

21   nothing was going to be added or subtracted from that list.  He

22   had been asking repeatedly for a list of exhibits, and so we

23   provided a list of exhibits that, I think, we at least had

24   perceived was sort of an initial exhibit list that we obviously

25   were adding and subtracting from as we were meeting with

```
 1    witnesses and finalizing the questions that we wanted to ask of

 2    those witnesses.

 3              THE COURT:  Is your impression that the defendant

 4    was -- I mean, what was the relationship between the defendant

 5    and Mr. Struck?

 6              MS. IYENGAR:  So my understanding from speaking with

 7    him is that Mr. Struck took videos for the defendant's

 8    organization, Cowboys for Trump.  He basically took these videos

 9    in order to put together montages for him and things of that

10    nature.  There was also, I believe, a Facebook page.  I'm not

11    sure who was running the Facebook page for the organization.

12    But there were Facebook videos that Mr. Struck would post from

13    videos that he had taken.

14        My understanding is that they remained in some sort of

15    communication in the months after January 6.  I'm not -- I don't

16    believe that the videos that were produced in discovery in this

17    case had been turned over to the defendant, but that's just

18    going off of what Mr. Struck's attorney has told me.

19        So that's my understanding of their relationship.

20              THE COURT:  Okay.  Thank you.

21              MR. SMITH:  Your Honor, there's one more thing that I

22    neglected to mention.

23              THE COURT:  Okay, quickly.

24              MR. SMITH:  Very briefly.

25        Your Honor, if Your Honor would like, we have the e-mails
```

1    showing where the government indicated this -- there was a final

2    exhibit list produced on March 11.

3        Your Honor, there's also a 50-minute video montage that the

4    government produced on Saturday which takes all of the

5    previously produced Struck video clips and puts them together

6    into a montage.  But that's the government's representation to

7    us on the Saturday before trial.  We have a right to examine

8    whether this montage that they're saying is merely stitched

9    together from other evidence we've received is what the

10   government says it is.

11       But if Your Honor thinks about how that would work out, the

12   defense would have to compare this montage clip minute by minute

13   with dozens of separate video files that are arranged with

14   different exhibit numbers.  To produce this to the defense on

15   Saturday and then say figure this out in the limited number of

16   hours you have before is unreasonable, Your Honor.

17       So we've moved to strike at the very least this 50-minute

18   montage which we have not even had the opportunity to determine

19   if it's authentic or not.

20             THE COURT:  Okay.  Thank you.

21       So going down these different motions, motion to compel CCV

22   footage, ECF 86, as I said, as I read this, it's stated in the

23   alternative.  If the government does not produce the videos, any

24   testimony based on the CCV footage must be struck.  My

25   understanding is no video footage is being based -- or no

testimony is being provided based on the CCV video footage.
Therefore, I'm denying ECF 86 as moot.

I think the issue Mr. Smith is raising, just wanting to see
CCV footage as kind of Rule 16, is kind of wrapped in, as he
suggests, with this video footage of the vice president that the
Capitol Police is currently refusing to turn over.  I will deal
with that separately.  We'll see if they decide to, in fact,
turn it over in time for the defense to use it.  So I'm denying
as moot ECF 86.

On ECF 94, the motion for *Jencks* material, my understanding
is the government is providing unredacted e-mails here, and I'm
going to order the government to completely fulfill its *Jencks*
obligations by the end of lunch today.

I understand Mr. Smith's frustration with just receiving
these things now.  But, A, I think *Jencks* allows this.  B, we're
talking about a relatively small amount of material here; 30
pages of pretty scattered e-mails is not actually a lot of
material.  And C, I do understand the government's concerns in
this case about sensitivity of the *Jencks* material it's
disclosing.

While this is different from many other criminal cases
where you have concerns about turning over witness information
and what have you too early in a way that would raise danger for
the witnesses, I think there is a similar motivating concern
here from the government about prematurely disclosing very

1    sensitive information.

2          And so I don't think -- provided that the government does

3    provide this information by the end of the lunch hour, I think

4    there's no violation there.  And so I will deny the motion for

5    *Jencks* material under ECF 94, with the caveat of that order.

6          I'm also denying ECF 96, the motion in limine to exclude

7    the montage.  I am happy to consider the relevance after I see

8    it.  But this is a bench trial.  It's not going to be very long.

9    And I think the easier way is to just deal with that during

10   trial.

11         The ECF 95 motion for discovery sanctions, I think that

12   relates to Mr. Struck.  I'm going to reserve ruling on that.

13         Ms. Iyengar, I want to understand from the witness his

14   relationship with the defendant and the defendant's access to

15   those videos.  I will consider barring the playing of those five

16   videos you mentioned.  So before you play those, let's talk

17   about this.

18         It sounds to me like this is an unusual situation where, if

19   anything, the defendant had greater access to the videos than

20   the government did, and certainly, it sounds like the government

21   was surprised to get this download of an additional nearly 80

22   videos very late in the day.  It sounds like it turned them over

23   right away.  But this is hardly your kind of normal witness that

24   is more available to the government than it is to the defense.

25   If anything, it sounds like it was the other way around.

1       I think I've resolved everything.  I think we're ready for

2  trial.

3       Ms. Iyengar, am I missing anything?

4            MS. IYENGAR:  No, Your Honor.

5            THE COURT:  All right.  Mr. Smith, am I missing

6  anything?

7            MR. SMITH:  I don't believe so, Your Honor.

8            THE COURT:  All right.  I've read the attorney's trial

9  briefs.  Ms. Iyengar, please call your first witness.

10            MR. SMITH:  Your Honor, there is one thing.  We would

11  like -- we're concerned that without at least brief opening

12  remarks the issues are not going to be properly framed for the

13  Court.  So we would ask for just a few minutes, I mean, maybe

14  three minutes of opening statement.

15            THE COURT:  All right.  Do you want to do that now or

16  after --

17            MR. SMITH:  Yes, Your Honor.

18            THE COURT:  Okay.  Go ahead.

19            MR. SMITH:  Okay.  Thank you, Your Honor.

20       Over a year ago, Mr. Griffin was arrested as he walked

21  along a D.C. street in late January.  He was visiting from New

22  Mexico.  He was brought to an FBI office where he asked, "Why am

23  I here?  What am I here for?"  "Entering the Capitol building on

24  January 6," they said.  That was strange.  There was no evidence

25  Griffin entered the Capitol building because he didn't.  That

was the first mistake in this case -- on which the case is built.

The government then decided Griffin needed to be detained pretrial.  "Judge, Griffin entered the Capitol building; he's a threat.  Judge, Griffin said he was going to bring his guns to D.C. for the Biden inauguration."

Well, the government knew that wasn't true either.  The government knew that Griffin secured his firearms outside of D.C., that he was carrying them there because he had been receiving death threats, he told them.  So we're now at two falsehoods, Judge.

Griffin was incarcerated.  He was put in solitary for weeks.  The COs had a little fun with him by snapping pictures of him in his cell like he was a monkey.

The false allegation, by the way, that Griffin entered the Capitol building remains on the docket sheet to this day.  It's just a criminal allegation in federal court, no big deal.

Back in the first few months of Griffin's case, it wasn't just the facts the government had got wrong.  It thought it would charge Griffin with trespass.  We know that because if you look at the first information in this case it says nothing about Secret Service protectees or the vice president.  It says Griffin entered the Capitol; it was restricted; now he should be arrested.

About three months after he's charged, the government

realizes there might be more elements.  So comes the amended
information.  Griffin entered the Capitol building and grounds
where vice president and vice president-elect were temporarily
visiting.

Now we've got a proper 1752 offense; right?  No, Judge.  We
have more false allegations.  It turned out the vice
president-elect was not in the Capitol building at all.  That
remained on the docket for half a year.  That's the third
falsehood.

But what about Vice President Pence?  He saw it.  To quote
the sworn complaint, Pence, quote, remained in the U.S. Capitol
from the time he was evacuated from the Senate chamber until the
session resumed, end quote, in the evening.  This turned out to
be the fourth falsehood.

Later in a sworn declaration, the government admitted that
the vice president left the building around 2:26 p.m. and
entered a place it calls the Capitol complex.  That's not a very
helpful term because there's a dozen or so buildings or places
there.

Well, sure, maybe Vice President Pence left the building,
but that doesn't matter because Griffin got on the wrong side of
a Capitol Police barricade before that; right?  We're now at the
fifth falsehood.  Griffin produces a time-stamped photograph
showing he could not have entered what the government calls a
restricted area at any point before 2:31 p.m.

1       What does the government do?  It examines the metadata on

2  the videos of Griffin at the Capitol.  It pulls the creation

3  times out.  It produces all of it to Griffin's defense, except

4  one or two films, one of them showing when Griffin allegedly

5  crossed into the restricted area.  That's not very nice, Judge.

6       So the statute says a Section 1752 crime is entering a

7  restricted area where a protectee is or will be temporarily

8  visiting.  Well, so what if Vice President Pence wasn't visiting

9  when Griffin entered the Capitol grounds?  Pence would be

10  visiting.  That's the government's next theory.

11       Wait a second.  How could Griffin have known that Pence

12  would return to the Capitol when the vice president himself

13  likely did not know?

14       So a couple of days before trial, the government rolls out

15  a new argument.  The defendant does not need to know anything

16  about his Secret Service protectee's presence.  So the Secret

17  Service does not have to set the restricted area, and the

18  defendant does not have to know anything about a Secret Service

19  protectee.

20       So we've come full circle, Judge.  We are now back at

21  trespass.

22       To sum it up, after hearing the evidence, we believe the

23  Court will not find Griffin's guilt beyond a reasonable doubt

24  for about six reasons, which we'll briefly summarize.

25       The first is the Section 1752 restricted area's boundaries

must be physically marked.  The statutory area is, quote, any posted, cordoned off, or otherwise restricted area, end quote. Under the canons of noscitur a sociis and ejusdem generis, quote, otherwise restricted, end quote, refers to the same type of restriction as the first two examples in the phrase "any posted, cordoned off" area.  So this would be signs and officers forming a perimeter.

Contrary to the government's representations, the evidence will not show that the place Griffin entered was so marked.

Second, the vice president was not present in the Capitol building when Griffin entered.  He was not in the Capitol grounds.  Because he was actually in an underground place, Griffin was not just in the restricted area with the vice president; he was in a different spatial dimension.  No one has ever been convicted of a 1752 offense in these circumstances.

Third, even if the vice president were visiting the Capitol building and grounds at the same time as Griffin, the evidence will show that he thought throughout the day of January 6 that the vice president had certified the election long before Griffin approached the Capitol grounds.

As Your Honor just heard, a video taken the night of January 6 indicates Griffin was startled to learn Pence had returned to the Capitol.  He thought the election had already been certified.  The evidence will show that Griffin believed that even if there were restrictions on movement near where he

entered, it was for Joe Biden's inauguration, he repeatedly
said, not a USSS protectee.

That's a mistake of fact, Your Honor, which is a complete
defense the government will not be able to overcome beyond a
reasonable doubt.

Fourth, the evidence will show that Griffin did not engage
in disorderly or disruptive conduct with the intent to disrupt
government business.  And Griffin's own actions, the evidence
will show, in no way themselves disrupted government business in
fact.

The government claims -- appears to claim that Griffin's
leading of a prayer at the Capitol constitutes disorderly
conduct.  That is offensive and wrong.  Visibly, the evidence
will show, Griffin's words calmed the crowd down.  They did not
incite anyone.

Last, Your Honor, any definition of disorderly conduct that
reaches Griffin's speech in prayer would fail an as-applied
First Amendment challenge.  His words did not come close to the
line for incitement, said in the *Brandenburg* decision and
*Hess v. Indiana*.

There's a few more arguments that may come up at trial,
Judge, but after all the evidence is presented, we will ask the
Court to enter a judgment of not guilty on both counts.
Thank you.

        THE COURT:  Thank you.

1        Ms. Iyengar, please call your first witness.

2            MS. IYENGAR:  Your Honor, just before we bring

3    Mr. Struck in, we do have a binder with our paper exhibits for

4    the Court and for defense counsel, if that's something the Court

5    would like.

6        And just given that there's some question about the video

7    exhibits, we will provide the flash drive with those at the end

8    of trial.

9            THE COURT:  Thank you.  You're planning to show the

10   videos?

11           MS. IYENGAR:  Yes, we are.

12           THE COURT:  So Mr. Struck is your first witness?

13           MS. IYENGAR:  Yes.

14           THE COURT:  So why don't you get to a convenient spot

15   where you believe you've established his relationship with the

16   defendant and the defendant's access to the videos, and then I

17   will give Mr. Smith a brief opportunity to cross him on that,

18   and then I will deal with this issue.

19           MS. IYENGAR:  Sure.

20       Your Honor, since we have some downtime, I did just want to

21   move what I believe are some uncontested exhibits into evidence,

22   just some certifications and things like that.

23       So Exhibits 70 and 71, which are certifications of video

24   footage from the House and Senate.

25           THE COURT:  Any objection to those, Mr. Smith?

1              MR. SMITH:  Your Honor, I'm not familiar with the

2    exhibits the government's referring to.

3              MS. IYENGAR:  These were provided back on March 11th

4    to defense counsel.  These are certifications of the video

5    footage from --

6              MR. SMITH:  Certifications from which witness?

7              MS. IYENGAR:  They're certifications of the House and

8    Senate video footage, of the authenticity of those.

9              MR. SMITH:  Your Honor, I thought the first witness

10   was Matt Struck.

11             THE COURT:  Yes.  She's just dealing with trying to

12   use the time wisely.

13             MR. SMITH:  Oh, okay, Your Honor.  So no objection.

14        (Government Exhibits 70 and 71 received into evidence.)

15             MS. IYENGAR:  So I also wanted to move in Exhibit 100

16   and 101, which are stipulations regarding the Otero County

17   Commissioner video -- Otero County Commission meeting video and

18   the Electoral College process.

19             THE COURT:  Any objection?

20             MR. SMITH:  We have an objection to the video itself

21   but not the certification.

22             THE COURT:  Okay.  So 100 and 101 are admitted.

23        And it looks like your witness is here.

24        (Government Exhibits 100 and 101 received into evidence.)

25             MS. IYENGAR:  The government calls Matthew Struck to

1    the stand.

2              MATTHEW STRUCK, WITNESS FOR THE GOVERNMENT, SWORN

3              THE COURT:  Ms. Iyengar, do you believe we need to do

4    any colloquy on Fifth Amendment?

5              MS. IYENGAR:  I guess I'm fine proceeding however the

6    Court would like to proceed.  I'm not sure if the witness would

7    feel more comfortable with that.

8              THE COURT:  Well, his attorney is here.  Sir, if you

9    could just introduce yourself for the record.

10             MR. WOODWARD:  Good morning, Your Honor.  Stanley

11   Woodward on behalf of Mr. Struck.

12        We have had a discussion about Fifth Amendment.  I've

13   provided the Court's order to Mr. Struck, and I believe he

14   understands the boundaries of what that provides.  But we don't

15   object to the Court conducting a colloquy if the Court is more

16   comfortable doing that.

17             THE COURT:  I'm not.  I wanted to look to you.  If you

18   think we can proceed now, that's fine.

19             MR. WOODWARD:  Yes.  Thank you, Your Honor.

20             THE COURT:  Thank you.

21        Ms. Iyengar.

22             MS. IYENGAR:  Yes, Your Honor.  Thank you.

23                         DIRECT EXAMINATION

24             BY MS. IYENGAR:

25   Q.   All right.  Mr. Struck, if you can just state your name and

1    spell it for the court reporter, please.

2    A.    Matt Struck, M-a-t-t S-t-r-u-c-k.

3    Q.    Okay.  And what part of the country do you live in,

4    Mr. Struck?

5    A.    Colorado.

6    Q.    Okay.  What do you do for a living?

7    A.    I'm a video editor.

8    Q.    I'm sorry.  Can you say that again?

9    A.    I'm a video editor.

10   Q.    Okay.  And do you work for yourself or for a company?

11   A.    I work for myself.

12   Q.    Okay.  Do you know an individual named Couy Griffin?

13   A.    I do.

14   Q.    Do you see that person in the courtroom today?

15   A.    I do.

16   Q.    Can you, please, point to that person and identify them by

17   a piece of clothing that they're wearing?

18   A.    They're there with a white shirt and a dark jacket.

19   Q.    Okay.  And I think you're just feeding off of me because

20   I'm a fast talker.  But if you can just slow down a little bit,

21   I think that makes things easier for our court reporter here.

22   Okay?

23   A.    Okay.

24   Q.    All right.  How long have you known Mr. Griffin for?

25   A.    We met around July 4, 2019.

1   Q.   Okay.  And after you met him July 4th of 2019, how did your

2   relationship with him progress after that?

3   A.   We became friends.

4   Q.   And when you say you became friends, what was the nature of

5   your friendship?  Like what kinds of things did you have in

6   common?  What did you do together?

7   A.   We travelled together.

8   Q.   Okay.  And did you ever do -- are you aware of whether

9   Mr. Griffin was a member of any organizations?

10  A.   Yes.

11  Q.   And can you tell me about that?

12  A.   He was the founder of Cowboys for Trump.

13  Q.   Okay.  And did you ever do any work associated with Cowboys

14  for Trump?

15  A.   Voluntarily.

16  Q.   Okay.  And explain what you mean by that.

17  A.   I just recorded -- I went around and filmed people, and

18  Couy and Cowboys for Trump was someone that I did that with.

19  Q.   Okay.  And when you would do that, when you would film -- I

20  guess what you mean by that is film events and things of that

21  nature; is that right?

22  A.   I film a lot of stuff.

23  Q.   Okay.  And when you would do that for Cowboys for Trump,

24  did you provide the video footage to Mr. Griffin, or how did

25  that work?

```
 1    A.    No.
 2    Q.    Okay.  So tell me about what you would do with the video
 3    footage.
 4    A.    I would create videos and make videos.
 5    Q.    Okay.  And did you put them on social media or --
 6    A.    Yes.
 7    Q.    Okay.  And which social media sites would you use?
 8    A.    My Twitter account before it was shut down.
 9    Q.    Okay.  All right.  So I want to just move on now to January
10    of 2021.  Okay?
11    A.    Okay.
12    Q.    Did you travel to Washington, D.C., in January of 2021?
13    A.    Yes.
14    Q.    And who did you travel with?
15    A.    Couy.
16    Q.    Okay.  And when you say Couy, you're talking about
17    Mr. Griffin?
18    A.    Couy Griffin.
19    Q.    Okay.  And where did you travel from?
20    A.    I traveled from Denver.
21    Q.    Okay.  And did you meet Mr. Griffin somewhere along the
22    way?
23    A.    I met Mr. Griffin in New Mexico.
24    Q.    Okay.  And then you both traveled from New Mexico to
25    Washington, D.C.; is that right?
```

1    A.   Correct.

2    Q.   Okay.  What date did you arrive in Washington, D.C.?

3    A.   I believe July 5th -- I mean January 5th.

4    Q.   Okay.  Did you take video footage while you were in

5    Washington, D.C.?

6    A.   Yes.

7    Q.   And what did you use to take that video footage?

8    A.   My iPhone.

9    Q.   Okay.  So Mr. Struck, I'm going to first show this to

10   defense, and then I'm going to come up and show you something.

11   Okay?

12   A.   Okay.

13   Q.   All right.  So Mr. Struck, you can see that I just handed

14   you Government Exhibits 10 through 69 on that sticker that's on

15   that envelope?

16   A.   Yes.

17   Q.   Okay.  If you can just open up that envelope and see what's

18   inside.  Do you see that that's a flash drive inside that

19   envelope?

20   A.   Correct.

21   Q.   Okay.  And does that have any initials written on it?

22   A.   Yeah, my initials are on this.

23   Q.   Okay.  And when did you put your initials on there?

24   A.   Yesterday.

25   Q.   Okay.  Did you review the video footage that was on there

1   with me yesterday?

2   A.   Yes, I reviewed the footage that was on here yesterday.

3   Q.   Okay.  And the -- well, let me -- I'm actually going to

4   take that from you and put it in my computer.

5        Mr. Struck, you have a screen in front of you there?

6   A.   Yes.

7   Q.   So can you see what's on my screen --

8   A.   Yes.

9   Q.   -- starting at Exhibit 10?

10  A.   Yes.

11  Q.   Okay.  And are these -- do these appear to be the same

12  videos that we reviewed in my office yesterday?

13  A.   They appear to be, yes.

14  Q.   Okay.  So I'm going to take these in a few different chunks

15  with you.  All right?  So Exhibits 10 through 62, do you see

16  down here where it says 62?

17  A.   Yes.

18  Q.   So all of those exhibits that have the exhibit number and

19  then it says IMG underscore and has a number after that, were

20  those all videos that you provided to the government?

21  A.   Yeah, they're copies of the videos that I provided.

22  Q.   Okay.  And when you met with me in my office yesterday, did

23  we watch all of these videos that were on this flash drive?

24  A.   Yes, we watched the video.

25  Q.   And did you compare those with the videos that you had on

1    your phone?

2    A.    Yeah, we compared the video, and the video looked the same.

3    Q.    And for Exhibits 10 through 62, they were all the same?

4    A.    Yeah, all the video was the same.

5    Q.    Okay.  And so those videos were all a fair and accurate

6    depiction of the events that you filmed on January 6 --

7    A.    Yes.

8    Q.    -- 2021?

9    A.    Yeah, what I filmed on January 6, yes.

10            MS. IYENGAR:  So, Your Honor, at this time I just move

11   into evidence Exhibits 10 through 62.

12            MR. SMITH:  No objection.

13            THE COURT:  Without objection, 10 through 62 are in.

14        (Government Exhibits 10 through 62 received into evidence.)

15            BY MS. IYENGAR:

16   Q.    Okay.  Then I want to just move on to Exhibit 63.  That's

17   the one that says video from January 5th.

18        Do you see that there?

19   A.    Yes.

20   Q.    Okay.  So just to be clear, that was not a video that you

21   had provided to the government; correct?

22   A.    Yes; correct.

23   Q.    Okay.  But when you were in my office yesterday, you -- did

24   you review that exhibit --

25   A.    Yes.

1    Q.   -- and compare it with a video that was on your phone?

2    A.   Yes.

3    Q.   And did they appear to be the same video?

4    A.   That video seemed to be the same.

5    Q.   Okay.  And is that video a fair and accurate depiction of

6    the events that you filmed on January 5th?

7    A.   Of that moment, yes.

8              MS. IYENGAR:  Your Honor, I ask to move in Exhibit 63.

9              THE COURT:  Mr. Smith?

10             MR. SMITH:  Your Honor, because the exhibit numbers

11   have changed and the government has not described what is

12   contained in the film, we do not know what exhibit the

13   government is referring to.  So that should be elicited from the

14   witness.

15             THE COURT:  Okay.

16             MS. IYENGAR:  Well, I can get -- we did provide this

17   back on March 11th.

18             THE COURT:  I understand.  But he's saying he

19   doesn't --

20             MR. SMITH:  The exhibit numbers change, Your Honor.

21             THE COURT:  Why don't we just deal with this when you

22   play it.

23             MS. IYENGAR:  Sure.  Okay.  Absolutely.  There's just

24   one more that I want to admit, and then I'm not going to deal

25   with the additional exhibits until we can take a break.

1          BY MS. IYENGAR:

2    Q.   So for Exhibit 64, do you see that down here where it

3    says "January 7 video"?

4    A.   Yes.

5    Q.   I'm sorry.  Something keeps popping up on my screen there.

6          Did you review that video in my office with me yesterday?

7    A.   Yes.

8    Q.   Okay.  And when you reviewed that video, was that a fair

9    and accurate depiction of the events that you filmed on

10   January 7?

11   A.   Yes, the video that I filmed.

12          MS. IYENGAR:  Your Honor, we would move Exhibit 64

13   into evidence as well.

14          THE COURT:  Mr. Smith?

15          MR. SMITH:  We would ask the government whether this

16   is the interview of Mr. Griffin filmed in Roanoke, Virginia.

17          MS. IYENGAR:  Yes.

18          MR. SMITH:  Okay.  Then we have no objection.

19          THE COURT:  Without objection, 64 is admitted.

20       (Government Exhibit 64 received into evidence.)

21          BY MS. IYENGAR:

22   Q.   Now, Mr. Struck, I just want to play just a handful of

23   these videos for you.  Okay?

24   A.   Sure.

25   Q.   So I'm going to start actually with -- and I think -- I'm

1    going to play these from a different folder that are the exact

2    same videos.  Just with -- I just think it's going to make it

3    easier for us to watch them, or I will just play them from here

4    directly.  Okay.

5              THE COURT:  Ms. Iyengar, these are not the five that

6    there's the dispute over?

7              MS. IYENGAR:  No.

8              THE COURT:  Okay.

9              BY MS. IYENGAR:

10   Q.   So I'm going to start with Government Exhibit 18, and this

11   is -- the file number is IMG_9637.  And if it gets too loud,

12   just let me know.  And I'm starting this from time stamp 00:00

13   in the player.

14        (Video played.)

15   Q.   I'm going to pause the video at time stamp 1:38 in the

16   player.

17        Do you see the person in this frame who is wearing a cowboy

18   hat?

19   A.   Yes.

20   Q.   Do you recognize that person?

21   A.   Yes.

22   Q.   And who is that person?

23   A.   Couy Griffin.

24   Q.   I'm sorry?

25   A.   Couy Griffin.

1    Q.    Okay.  All right.  So I'm going to move on to Exhibit 30.

2    And this is -- the file name for it is IMG_9649.  I'm going to

3    start playing this from time stamp 00.

4    A.    Okay.

5          (Video played.)

6    Q.    Okay.  And going on to Exhibit 33, which is IMG_9652.

7          And Your Honor, I think there should be a transcript in the

8    trial binder, which is Exhibit 33-A, for this video.

9          I'm going to actually start it at about 35 seconds into the

10   video, and that's the time stamp on the player.

11         (Video played.)

12   Q.    I'm going to stop it at 1:26 in the player.

13         Do you see a person in a cowboy hat in this frame?

14   A.    Yes.

15   Q.    And who is that person?

16   A.    That's Couy trying to pray.

17   Q.    I'm sorry?

18   A.    That's Couy trying to get to pray.

19   Q.    Okay.  So moving on to Exhibit 37 --

20         THE COURT:  Ms. Iyengar, I take it that's not the

21   barrier you think was relevant here, is it?

22         MS. IYENGAR:  That is the barrier.

23         THE COURT:  That is the barrier?

24         MS. IYENGAR:  Well, I think that's the barrier when he

25   first makes entry into the restricted area.

```
 1              THE COURT:  Okay.  That wall there?
 2              MS. IYENGAR:  Yes, that's correct.
 3              THE COURT:  Okay.  Could you play that one more time?
 4              MS. IYENGAR:  Sure.  I'm happy to play the full clip
 5    for the Court, or if the Court just wants to see the
 6    portion that I just played.
 7              THE COURT:  This is fine.
 8         (Video played.)
 9              BY MS. IYENGAR:
10    Q.   Then I'm going to move on to Exhibit 37, and this is
11    IMG_9656.  Just for the record, I'm starting the video from time
12    stamp 00:00.
13         (Video played.)
14    Q.   I'm just going to stop it at 1:26 on the player.
15         Do you see a person wearing a cowboy hat in this frame?
16    A.   Yes.
17    Q.   And who is that person?
18    A.   That's Couy Griffin.
19    Q.   Okay.  And I'm going to push us ahead to 5:58, and I'll
20    start it from there.
21         (Video played.)
22    Q.   And I will move forward to Exhibit 40, and this is file
23    name IMG_9658.
24         And, Your Honor, this video does have a transcript.  In the
25    trial binder, it should be Exhibit 40-A.
```

 1          THE COURT:  Thank you.

 2          BY MS. IYENGAR:

 3   Q.   Okay.  I'm going to start this at time stamp 00:00 in the

 4   player.

 5          (Video played.)

 6   Q.   And then moving on to Exhibit 43, and this is IMG_9661.

 7          And, Your Honor, this also has a transcript in the trial

 8   binder.  It should be Exhibit 43-A.

 9          I'm starting this at time stamp 00:00.

10          (Video played.)

11   Q.   And I just wanted to -- and I can pull it back if you

12   didn't hear it.  Did you just hear someone say, "I love the

13   smell of napalm in the air"?

14   A.   No.

15   Q.   Okay.  Let me just pull it back.  We can listen to it

16   again.

17          (Video played.)

18   Q.   Did you hear it that time?

19   A.   I can't hear it.

20   Q.   Okay.  All right.  No worries.  We can just move on.

21   A.   Okay.

22   Q.   But I did just want to-- in this frame at 35 seconds, do

23   you see somebody with a cowboy hat there?

24   A.   Yes.

25   Q.   And who is that person?

1    A.    That's Couy Griffin.

2    Q.    Okay.  So moving on to Exhibit 57, this is IMG_9676.

3          (Video played.)

4    Q.    Okay.  So I wanted to just go back now and play Exhibit 63

5    from January 5th, and I know this was a video that the defense

6    had a question about.  So I will just show the first shot of it

7    before I play the full video.

8                MR. SMITH:  No objection.

9                THE COURT:  Okay.  Without objection, 63 is in.

10         (Government Exhibit 63 received into evidence.)

11               BY MS. IYENGAR:

12   Q.    This is a video from January 5th, and I will start it at

13   00:00.

14         (Video played.)

15   Q.    I just pulled it back to 00:00.

16         Just for the record, who is the person speaking in this

17   video?

18   A.    That's Couy Griffin.

19   Q.    Okay.  And then I just wanted to go to Exhibit 64 from

20   January 7th, and I will start this at 3:17.

21         (Video played.)

22   Q.    Okay.  And I'm just going to pause it at --

23               THE COURT:  Can you play that again actually?  Just go

24   back to the beginning.

25               MS. IYENGAR:  Okay.  The beginning of when I played

```
 1    it?
 2              THE COURT:  Yeah.
 3              MS. IYENGAR:  Okay.
 4         (Video played.)
 5    Q.   Okay.  And I'm just going to pause it at 4:10.  Who is the
 6    person speaking in this video?
 7    A.   Couy Griffin.
 8              MS. IYENGAR:  I'm sorry, Your Honor.  If I could have
 9    just one brief moment.
10              BY MS. IYENGAR:
11    Q.   Okay.  Mr. Struck, I just wanted to ask just a few
12    follow-up questions, and I think we will need to take just a
13    quick break to address an issue.
14    A.   Okay.
15    Q.   So yesterday when I met with you in my office, when you
16    were reviewing the videos off of your phone, were you also
17    confirming the date and time stamp that was on the video on your
18    phone?
19    A.   Yes.
20    Q.   Okay.  And were you confirming that with us to make sure it
21    was the correct date and time stamp that we had?
22    A.   Correct.
23    Q.   Okay.  Did you ever provide these videos -- the set of
24    videos that we just watched and that you reviewed yesterday, did
25    you ever provide those videos to Mr. Griffin at any point?
```

1    A.   I don't believe so.

2    Q.   Okay.  And Your Honor, I think this was just an oversight

3    on -- and did the defendant ever ask for those videos?

4    A.   What's that?

5    Q.   Did the defendant ever ask you --

6    A.   Yes.

7    Q.   -- for those videos?

8    A.   Yes.

9    Q.   And tell me about that conversation.

10   A.   He wanted to give them to the press, and I didn't want them

11   to be -- to go to the press.

12   Q.   He wanted to give the videos to the press?

13   A.   He wanted all the videos to be released to the press.

14   Q.   Okay.  And do you know about what time frame that you had

15   that conversation with him?

16   A.   It was after he got out of jail.

17   Q.   Okay.  So this would have been last year some time, then?

18   A.   Yeah, shortly after he got out of jail, I think.

19        MS. IYENGAR:  Okay.  And Your Honor, I did just -- I

20   think I asked the witness for an identification of the

21   defendant, but I didn't ask the record to reflect an in-court

22   identification.  So I'm asking now.

23        THE COURT:  It will so reflect.

24        MS. IYENGAR:  And Your Honor, I think we should

25   probably take a break now to discuss those additional videos.

1          THE COURT:  So I think -- Mr. Smith, did you want to

2     inquire of the witness specifically on this issue about the --

3          MR. SMITH:  Yes, reserving the rest of our questions.

4          THE COURT:  Yes.  Let's just focus in on the videos,

5     the five videos.

6          MR. SMITH:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8          BY MR. SMITH:

9     Q.   So good afternoon, Mr. Struck.

10    A.   Hello.

11    Q.   I'm Nick Smith.  I'm Mr. Griffin's counsel.

12    A.   Great.  Nice to meet you.

13    Q.   I want to just clarify something at first.  We've never had

14    a conversation before?

15    A.   Correct.

16    Q.   And we've never met each other?

17    A.   Correct.

18    Q.   Okay.  When you filmed these clips for Mr. Griffin on

19    January 6, he wasn't paying you, was he?

20    A.   No, and I wouldn't say I was filming them for Couy.

21    Q.   Oh, okay.

22         THE COURT:  Can you say that again?

23         THE WITNESS:  I was not filming these for Couy.

24         BY MR. SMITH:

25    Q.   So rather, Mr. Struck, it was that you and Mr. Griffin made

1  a decision, planned to go to the Capitol together; right?

2  A.   Correct.

3  Q.   And this was kind of, you know, a personal visit rather

4  than something for Cowboys for Trump?

5  A.   Yeah, it was.  It was -- yes.

6  Q.   Okay.  And I actually -- do you recall a time when the

7  defense, specifically the counsel, did reach out to you and, I

8  think, maybe left a voicemail message for you?

9  A.   No.

10  Q.   Okay.  Well, you don't recall a voicemail message in which

11  the defense was inquiring if they could obtain some video

12  evidence from you?

13  A.   No.  I don't have a voicemail set up.

14  Q.   Maybe it was a text.  Do you recall that?

15  A.   I don't.  I'm sorry.  I don't recall.

16  Q.   So Mr. Struck, the reason that you ended up producing a

17  second batch of videos to the government this week was because

18  the government had not asked for videos in that time frame; is

19  that right?

20  A.   That is correct.

21  Q.   And when the government initially asked you to send you

22  video clips of Mr. Griffin on January 6, that was back in

23  January of 2021?

24  A.   That's correct.

25  Q.   And between January 2021 and last week, did the government

1    follow up with any questions about producing more videos?

2    A.   Yeah, they asked for more videos last week.

3    Q.   Right, last week.

4    A.   Yes.

5    Q.   But between January 2021 and last week --

6    A.   No.

7    Q.   -- were there any other requests?

8    A.   No, I never heard from them as far as that goes, yeah.

9    Q.   And the reason that the second batch of videos that was

10   produced last week was not given to the government until last

11   week was because they asked -- they had originally asked only

12   for videos filmed between the Trump rally and your departure

13   from the Capitol; correct?

14   A.   That is correct.

15   Q.   They specifically asked for that time frame, and they

16   carved out earlier periods or other periods?

17   A.   They just said send the video from after the Trump rally to

18   when you left the Capitol.

19   Q.   Okay.  So if you're not with Mr. Griffin in your capacity

20   as a videographer for Cowboys for Trump and you're just hanging

21   out with him, is it your practice to just give him videos you

22   make without him --

23   A.   I put them on my social media -- well, actually, I ran the

24   Cowboys for Trump Twitter page, too, but, you know, I did that

25   voluntarily.

1          MR. SMITH:  I think that's all on this point, Your

2     Honor.

3          THE COURT:  Okay.  Ms. Iyengar, did you want to

4     redirect on this?

5          MS. IYENGAR:  Yes, I just had a couple follow-up

6     questions.

7                      REDIRECT EXAMINATION

8          BY MS. IYENGAR:

9     Q.   So I think you said, when Mr. Smith was asking you

10    questions, that you were asked to provide videos back in January

11    2021 from the end of the president's rally to when you left the

12    Capitol; is that correct?

13    A.   Correct.

14    Q.   Did you actually provide all of those videos for up until

15    the time that you left the Capitol grounds?

16    A.   Yes.

17    Q.   Okay.  So it's your testimony today that you provided the

18    full set of videos up through --

19    A.   Everything they asked for; I felt like I was providing what

20    they asked for, yes.  When they asked for it, I had no reason to

21    not give them what they asked for, so I did.

22    Q.   All right.  And I can bring up the exhibit again, Exhibit

23    63, that video from January 5th, the day before this incident.

24    A.   Yes.

25    Q.   I could see in the background that there was a -- there was

1    kind of a big SUV that said "C for Trump" on the side of it.

2         Do you remember that?

3    A.   Yes, "C 4 T."

4    Q.   What does that stand for?

5    A.   Cowboys for Trump.

6    Q.   Okay.  Did you arrive in Washington, D.C., in that car?

7    A.   Yes.

8    Q.   So that car is a part of the defendant's organization,

9    Cowboys for Trump; is that right?

10   A.   No.

11   Q.   Okay.  Tell me about that.

12   A.   It was a rental car.

13   Q.   It was a rental car?

14   A.   Yes.

15   Q.   Okay.  Explain that to me.

16   A.   We rented it.

17   Q.   Okay.  The car itself was rented, but it had --

18   A.   Or Couy rented it, yeah.

19   Q.   But it had the Cowboys for Trump logo on the side of it; is

20   that correct?

21   A.   Yes.

22        MS. IYENGAR:  I don't have anything further on this

23   issue, Your Honor.

24        THE COURT:  Sir, I'm just trying to understand.  I

25   guess back last year you gave the government a number of videos

1    from the rally.

2          THE WITNESS:  Yeah, from after Trump's speech until we

3    left the Capitol is what they asked for.  So that's what I

4    provided.

5          THE COURT:  And then what are the videos you provided

6    last week?

7          THE WITNESS:  They asked for every single thing that I

8    filmed on January 6th.  So it was early morning and late night.

9          THE COURT:  I see.  Okay.

10          THE WITNESS:  And the Trump rally.

11          MS. IYENGAR:  And Your Honor, I'm not sure if we

12    should do this in the presence of the witness, but there is some

13    information I should proffer to the Court about this.

14          THE COURT:  And did you say you would not have

15    provided these to Mr. Griffin if he had asked you?

16          THE WITNESS:  At the time I did not.

17          THE COURT:  But what did he ask you for?

18          THE WITNESS:  He asked me to give him -- he wanted the

19    videos to be released to the press.

20          THE COURT:  Okay.  So he asked you to release all of

21    the videos?

22          THE WITNESS:  Not specifically.  I mean, he just

23    wanted -- yeah, he wanted the videos for the press, and I didn't

24    want to give it to them.

25          THE COURT:  Okay.  All right, sir.  You can step down.

```
1    Why don't you just step outside the courtroom.  I'm going to

2    take a break anyway, probably five to ten minutes.  Don't talk

3    about the contents of your testimony with anyone until you're

4    back on the stand.

5              THE WITNESS:  Okay.

6        (Witness exited courtroom.)

7              THE COURT:  All right, Ms. Iyengar.

8              MS. IYENGAR:  Yes, Your Honor.

9        I had asked Mr. Struck whether he actually provided all of

10   the videos up until the time that he and Mr. Griffin left the

11   Capitol grounds, and that is just not factually correct.  There

12   were videos that we received in this new set that included

13   videos where they were still on the Capitol grounds.  So I just

14   wanted to make that clear.

15             THE COURT:  Sure.  So -- yeah, I guess, Ms. Iyengar, I

16   haven't dealt with a situation like this before.  I mean, it

17   sounds like while they're certainly friends, in my mind, the

18   fact that he had been asked for the videos from the defendant

19   and refused to give them does kind of cut against you, and it's

20   kind of a different situation than I thought initially.

21       I certainly don't think you did anything wrong or anything

22   like that, but I am trying to figure out how to deal with this

23   situation where I take the defense point that they're kind of

24   being prejudiced by this late dump of videos.

25             MS. IYENGAR:  Yes, Your Honor, and I hear what the
```

1    Court is saying.  I think, you know, from the government's

2    standpoint, we are only using five of the videos.  It's not as

3    if we're using the full set of 78 and asking the defense to go

4    through each one to determine if it's admissible or not.  I

5    think because we identified just the five on Friday -- and these

6    are relatively short video clips.  We're not talking about five

7    two-hour-long videos or something like that.  The defense could

8    pretty quickly review them, determine if they were objecting to

9    them, and make whatever objection they wanted to make.

10        Obviously, it's not ideal for us to be making these

11    disclosures this close to trial, but, you know, this is

12    unfortunately the way that it played out.  But I don't think we

13    should be -- that they should be excluded, given the small

14    number of exhibits.

15            THE COURT:  So is your position that there's no Rule

16    16 violation here at all, or are you saying that -- admitting

17    there was a violation but --

18            MS. IYENGAR:  No, I don't believe there was a

19    violation.  Obviously, these were not in our possession until

20    Wednesday.  And we were under the impression that we had --

21    because the FBI had specifically asked for videos between the

22    end of the rally to when they left the Capitol grounds, we were

23    under the impression that we had everything, you know, up until

24    leaving the Capitol grounds, and we did not.  We didn't have any

25    reason at that point to believe that he had not provided

everything.

This was more just a question we asked his counsel to make sure that we did -- to just sort of confirm that we had everything, and then this is how it ended up playing out.  So because these materials were not in our possession until Wednesday, I don't believe that there was any -- there is any basis for the Court to find a Rule 16 violation here.

THE COURT:  Okay.  Thank you.

Mr. Smith?

MR. SMITH:  Thank you, Your Honor.

So the government just referenced that it's only attempting to use five of the videos of the close to 80 it produced last Thursday, but Your Honor, I think all or most of these videos do not actually fall within the exception Ms. Iyengar just said, that these are videos that were not originally produced to the government by Mr. Struck because the government had not asked for those videos.  It specifically asked him for videos between the rally and when Mr. Griffin left the Capitol.  But the government is now attempting to use at least some of the videos that are not from the period Mr. Struck allegedly failed to produce the first time.  They're from the period that the government specifically did not ask for.

THE COURT:  I'm looking at Rule 16 now.  Tell me specifically what you think the -- where is the violation in Rule 16.

1        MR. SMITH:  Your Honor, I believe yesterday or on

2   Saturday we filed a Rule 16 motion, and we cited a case called

3   *Archbold-Manor*, which is a D.C. -- a District Court case from

4   2008 where Judge Lamberth held that the control element of

5   Rule 16's possession, custody, and control is not over-duly

6   concerned with the semantics of the word "control" but focuses

7   on prejudice to the defendant.  And the judge held that if

8   information was readily available to the government and could

9   have easily been obtained, the government -- the prosecutors

10  have control over it.

11      That's the *Archbold-Manor* case, and the circumstance in

12  that case is virtually identical to here.  The defendants moved

13  to exclude evidence under Rule 16 because the government could

14  have obtained the information earlier but didn't.

15      So when you consider that this was a witness of the

16  government they've been speaking to for over a year and at no

17  point between January 2021 and the week before trial they make a

18  request for the particular types of video time period that

19  they're now trying to introduce, Judge, we think that's control.

20          THE COURT:  So again, where in the rule -- what is the

21  violation?

22          MR. SMITH:  So Judge, so the first step is, there's

23  control, because it's their witness, and they could ask the

24  question of them any time they want.  That's control.  Then they

25  have a duty to promptly produce defense statements.  We've

requested defense statements in a discovery letter back in
February of 2021, all defense statements.  That's 16(a),
recorded defense statements and also, you know, recordings that
the government intends to use in its case-in-chief.  That's
16(a)(1)(E).  Those -- all recordings of the defendant and
recordings that the government intends to use in its
case-in-chief were demanded by the defense long ago.  That
triggers the government's duty to promptly produce that
information.  Under the *Archbold-Manor* case, the government had
control over its own witness because it could have asked for the
documents or the records at any time.

And they were not promptly produced, Your Honor.  They were
produced with virtually no business days left before trial.

And then I think, Judge, this is a little bit tricky,
because the witness is gone, but I asked the witness about a
voicemail message.  So I did -- my recollection is that I left a
voicemail message for him to get all of the records he has.  And
he didn't return my call, Your Honor.  Maybe it's my memory
that's bad.

But another thing that he did testify is that Mr. Griffin
attempted to get the videos and could not get them.  So, I mean,
at that point how could the defense -- the defense had no
opportunity to review the evidence.  It was just given to us
this weekend.  The government says well, these are only five.
Well, some or all of them are the five the government could have

requested a long time ago but did not.  And while it's only five

videos, okay, they produced 60 to us, and I didn't identify the

videos until the weekend.

I mean, Judge, we think that under Rule 16(d)(2), the

provision that says that evidence that's not -- that has not

been produced according to the rule can be stricken is --

applies here.

THE COURT:  Okay.  Thanks.

This is a good time for our morning break anyway.

MR. WOODWARD:  Your Honor, I'm sorry.  May I just make

one representation for the record on this point?

THE COURT:  Sure.

MR. WOODWARD:  I just want to object to the

characterization of Capitol grounds.  I don't think that it was

clear to Mr. Griffin what the Capitol grounds were at the time.

And so --

THE COURT:  I don't think anybody is suggesting --

MR. WOODWARD:  Well, it's under oath, and we talked

about Fifth Amendment.  And so I just want to --

MS. PASCHALL:  I'm sorry.  You mean your client,

Mr. Struck, as opposed to the defendant?

MR. WOODWARD:  Excuse me.  Mr. Struck.  I object to

Mr. Struck's answer, about whether that was a

mischaracterization or not.  Thanks, Your Honor.

THE COURT:  All right.  Let's take a break.  I'll be

1   back in about ten minutes.

2          (Recess taken from 11:24 a.m. to 11:39 a.m.)

3          (Call to order of the court.)

4          THE COURT:  Ms. Iyengar, are any of these five films

5   you're looking to play films that you think would have fit in

6   the original request?

7          MS. IYENGAR:  Yes.  There are -- three of the videos

8   would fit into -- well, I should say, two of the videos fit into

9   the original request, up until the time that they left the

10  Capitol grounds.  One is past that time, when they're driving

11  back to their hotel, and then two of the videos are before the

12  rally at The Ellipse takes place.

13      And I do just want to make it clear to the Court that these

14  videos in totality are only five minutes and 30 seconds long to

15  watch.

16          THE COURT:  Say that again.  Which are the ones you

17  think fit within your original request?

18          MS. IYENGAR:  So let me -- sorry.  I don't remember

19  off the top of my head.  Let me just make sure.

20      So Exhibit 67 and 68 would have fit within our original

21  request.  65, 66, and 69 would not.

22          THE COURT:  Okay.  Mr. Smith, do you agree?

23          MR. SMITH:  So I think there's a film at night that I

24  think that's before January 6, before the event, that's filmed

25  in the evening near the Washington Monument.

1          MS. IYENGAR:  That was 65, which is outside the range.

2          MR. SMITH:  Then we agree with that distinction.

3          MS. IYENGAR:  I'm sorry if the Court is done hearing

4    legal argument on this, but I did want to make a few points

5    based on what Mr. Smith had argued before we took our break.

6          I know that Mr. Smith was relying on the *Archbold-Manor*

7    case.  We do believe that that is distinguishable from the

8    situation that we have here.

9          First of all, that was a District Court decision.  So it's

10   not binding on this Court, as the Court knows.  That was a case

11   where 10,000 pages roughly of documents were dumped on the

12   defense very shortly before trial began.  Those were documents

13   that were in Spanish that needed to be translated.  They had not

14   been translated by the government before their disclosure.  So

15   the defense had to go through the translation process and then

16   make whatever use of them that they could.  Those were also

17   exhibits that the government had created.

18         And that was all based on an investigation that was done

19   with a government partner.  This was an investigation done in

20   concert with the Colombian government.  And that was -- the

21   Colombian government had created basically this material, and

22   the disclosure of them had been delayed.

23         So we're, obviously, very differently situated here.

24         THE COURT:  So I read the case.  Why -- are you

25   arguing that these were not in your control?

         MS. IYENGAR:  Yes, we are arguing that they were not

in our control.

         THE COURT:  And give me your best argument on that.

         MS. IYENGAR:  Sure.  Yes.  I mean, this was a witness

that we had spoken -- that the FBI had spoken to back in

January, but he was also friendly with the defendant throughout

this -- throughout the period of time since the defendant's

arrest up to today's court date.  So it's not like a government

partner like what we saw in *Archbold-Manor*.

     We had also, you know, made a request that we believe had

been complied with by this witness in terms of the set of videos

that he had disclosed to us.  That was a mistaken understanding.

     When we asked his attorney for any videos that we were

missing, we didn't put any parameters on that request because we

didn't know, you know, essentially what even would be contained

in the videos that had been provided to his attorney.

     So these were just not videos that we, I think, had any

sort of custody over.  This is a civilian witness, not a

government partner.  So they were just not in our custody before

Wednesday of last week.

     We thought that we had made the correct efforts to obtain

these videos back in January of 2021, and we had no reason to

believe that the witness had not produced the videos within the

range that we had asked for.

         THE COURT:  Okay.  Thank you.  Is that it,

Ms. Iyengar?

          MS. IYENGAR:  Yes.

          THE COURT:  All right.  So I'm going to grant in part
the defense motion to strike these videos.  And specifically, I
will allow the government to play the videos that are 67 and 68
that I think the parties agree did fall within the government's
original request, but I'm going to disallow the government to
play the other videos that they just received.

     I'm looking to Rule 16(a)(1)(B), which says, "Upon a
defendant's request, the government must disclose to the
defendant and make available for inspection, copying, or
photographing all of the following:  One, any relevant written
or recorded statement by the defendant if the statement is
within the government's possession, custody, or control, and the
attorney for the government knows, or through due diligence
could know, that the statement exists."

     I think the parties agree that the defendant made the
request, that these videos are relevant, they are written or
recorded statement.  The government's primary argument is that
the videos were not within their custody, but of course, this
also speaks to control.  And at least according to Judge
Lamberth from *Archbold-Manor*, 581 F.Supp.2d 22, from this court
in 2008, the control prong of the Rule 16 test generally focuses
on the fairness to the defendants rather than the semantics of
whether or not the prosecutors actually held the evidence at the

time it should be produced.

I think this is a close call.  I don't think there was anything inappropriate that the government did here.  But I think they had a unduly limited initial request to the witness only for videos from the time of the rally until the defendant left the Capitol, and for them to only ask a few days before the trial for all relevant videos, when they suddenly get this new dump of videos is -- you know, puts the defense in a bind, as Mr. Smith points out.

I think -- I originally thought this witness was not somebody who was really in the government's control, but I think hearing from the witness on the stand, he said that he had been asked by the defendant for the videos, but he refused to give those to him.

So in other words, contrary to my original impression, this witness is somebody who was working with the government and really was -- refused to work with the defendant.  And so I think this is someone who was kind of more within the government's -- was within the government's control and really was not within the defense control.

And I think the government could have known about this through the exercise of due diligence, could have known about these other films well before this last week.

And I think allowing the government to play these films does provide prejudice to the defense, not only given these

specific films that they weren't aware of, but then as Mr. Smith
points out, it's very difficult for the defense to take into
account all of the other videos that also were just dumped on
them that the government doesn't intend to use but that may put
these statements in a different light.

So the Rule 16 does give the Court great discretion for
failures to comply and says the Court may order that a party --
to permit the discovery or inspection and specify its time,
place, and manner and prescribe other just terms and conditions,
grant a continuance, prohibit that party from introducing the
undisclosed evidence, or enter any other order that is just
under the circumstances.

Here, we're in trial.  The defense has been pushing for
trial for a long time.  I don't think it's appropriate to delay
this misdemeanor trial any longer.  I think the appropriate
sanction is to prohibit the government from introducing the
undisclosed evidence, except for 67 and 68, which I think they
couldn't have known about since they did ask for it and hadn't
been given it the first time.

And I think here the government followed -- appropriately
followed its duty under subpart (c), which says it has a
continuing duty to disclose.  And so I don't think there was any
violation as to those.

MS. PASCHALL:  I just wanted to clarify one thing,
Your Honor.  I take Your Honor's ruling to be based primarily on

1    fairness and the defense's ability to review the information.

2        But with respect to statements, I think this is actually

3    not a Rule 16 statement.  My understanding in reading the rule

4    is that upon the defendant's request the government must

5    disclose to the defendant the substance of any relevant oral

6    statement made by the defense before or after arrest in response

7    to interrogation.

8            THE COURT:  I'm looking at (b).

9            MS. PASCHALL:  I'm sorry?

10           THE COURT:  Subpart (b), which says defendant's

11   written or recorded statement.

12           MS. PASCHALL:  But doesn't that carry the same

13   modifier about in response to interrogation?

14           THE COURT:  No.

15           MS. PASCHALL:  Okay.

16           THE COURT:  All right.  Let's put the witness back on

17   the stand, and you can proceed, Ms. Iyengar.

18       (Witness resumed stand.)

19           THE COURT:  I remind you, sir, you're still under

20   oath.

21       Ms. Iyengar.

22                    CONTINUED REDIRECT EXAMINATION

23           BY MS. IYENGAR:

24   Q.   All right.  Mr. Struck, thank you for being patient with

25   us.  I just wanted to play three more videos with you while

1    you're on the stand.  Okay?

2    A.    Yes.

3    Q.    Okay.  So I'm going to actually -- I think I tried to play

4    Exhibit 40 before the break, and I played the incorrect exhibit.

5    So I'm going to play what we have as Exhibit 40 now.

6              THE COURT:  Oh, I thought that was 40.  Do you know

7    what that was?

8              MS. IYENGAR:  I'm not sure.  I think I played 41 by

9    mistake.  So this hopefully should be the correct one.

10             THE COURT:  Okay.

11        (Video played.)

12             MS. IYENGAR:  Let me play this one more time, because

13   I think it froze up there.  We do have a transcript for this in

14   the binder as well.

15        (Video played.)

16             MS. IYENGAR:  Then let me move on to Exhibit 67.

17             THE COURT:  Sorry.  So you have in your transcript,

18   "We will wait until they get this door broken down."

19             MS. IYENGAR:  Yes.

20             THE COURT:  I did hear that on the video.  Are you

21   going to show that that was the defendant?

22             MS. IYENGAR:  I can ask if that was the defendant.

23             BY MS. IYENGAR:

24   Q.    Did you hear that in the video?

25   A.    (Shook head.)

1    Q.   Okay.  Let me play it for you just one more time.

2         (Video played.)

3    Q.   Did you just hear a voice just then speaking?

4    A.   No.

5    Q.   Let me try this one more time.

6              MR. SMITH:  Objection.  This has been asked and

7    answered, I think, three times now.

8              THE COURT:  Denied.

9         (Video played.)

10   Q.   Okay.  Did you hear a voice just then?

11   A.   Yeah.

12   Q.   I'm not asking you what he said, but can you tell whose

13   voice that was?

14   A.   Can you play it again?

15   Q.   Yeah, sure.

16        (Video played.)

17   Q.   Did you hear it that time?

18   A.   Yeah.

19   Q.   Okay.  Could you tell whose voice that was?

20   A.   Not 100 percent.

21   Q.   Okay.  Who do you believe was that voice?

22   A.   I'm not sure.  It may have been -- yeah, I don't know.

23   Q.   All right.  And just for the record, I played it from 24

24   seconds to 31 seconds.

25        And I will move on to Exhibit 67, and I will play Exhibit

1    67 from 00:00.

2         (Video played.)

3    Q.   I'm just going to pause it at 00:18.  Who is the person in

4    this frame?

5    A.   That's Couy Griffin.

6    Q.   Okay.  I'm going to just keep playing it from there.

7         (Video played.)

8              THE COURT:  Can you play that one more time?

9              MS. IYENGAR:  Sure.

10        (Video played.)

11             BY MS. IYENGAR:

12   Q.   Let me play Government's Exhibit 68.  I'm starting this

13   from 00:00.

14        Just in the frame we're looking at here, who is this person

15   that's in the frame?

16   A.   That's Couy.

17        (Video played.)

18             THE COURT:  All right.  Were you looking to move in 67

19   and 68?

20             MS. IYENGAR:  Yes, Your Honor.

21             THE COURT:  Mr. Smith?

22             MR. SMITH:  Judge, while we don't think these videos

23   are particularly troubling, we don't understand the relevance

24   for a 1752 case.  We don't think the government is alleging this

25   is the obstructive conduct that they're charging, and these

```
 1    statements have nothing to do with Mr. Griffin's intent to enter

 2    a restricted area.  They're just being played to target the

 3    defendant.

 4         But we didn't object earlier because we don't think it's

 5    particularly troubling anyway, but we don't think it's relevant.

 6              THE COURT:  Okay.  Over objection, 67 and 68 are

 7    entered.

 8         (Government Exhibits 67 and 68 admitted into evidence.)

 9              THE COURT:  Okay.  Ms. Iyengar?

10              MS. IYENGAR:  I don't have any further questions, Your

11    Honor.

12              THE COURT:  Thank you.

13         Mr. Smith?

14                        RECROSS-EXAMINATION

15         BY MR. SMITH:

16    Q.   Good afternoon again.

17    A.   Hello.

18    Q.   So before, we discussed when we spoke earlier that you and

19    Couy decided to travel to D.C. as kind of a personal trip to the

20    Trump rally, right, on January 6?

21    A.   Yeah.  We were invited.

22    Q.   And so the plan that you and Griffin had was to attend the

23    rally rather than to go towards the Capitol building; is that

24    right?

25    A.   That's correct.
```

Q.   So the plan that you had with Couy was that Couy wanted to

kind of speak at the Trump rally, didn't he?

A.   That's correct.

Q.   And do you know what Couy was going to try to speak about

there?

        MS. IYENGAR:  Objection, Your Honor.  This all calls

for hearsay.

        MR. SMITH:  No, Your Honor, these are not statements

offered for their truth but rather for state of mind, as many of

the following statements will be offered, to show what

Mr. Griffin knew and what his plan was, which is not offered for

its truth.  I mean, I could cite 100 cases for that.

        THE COURT:  All right.  Let me deal with it in a

minute.

    Do you know the answer to the question?

        THE WITNESS:  Can you repeat the question, please.

        BY MR. SMITH:

Q.   You just testified that Mr. Griffin had a plan to speak at

the Trump rally; is that right?

A.   Right.

Q.   Do you know what subject matter that would be about?

A.   I know part of it he wanted to give a prayer.

Q.   Okay.  Thank you.

        THE COURT:  And I will overrule the objection.

        BY MR. SMITH:

1  Q.   So you and Couy ended up leaving the rally early; is that

2  right?

3  A.   Yeah; yep.

4  Q.   And then is it fair to say that at that point you saw

5  people drifting towards the -- heading in the direction of the

6  Capitol, walking in the --

7  A.   Yes.

8  Q.   Okay.  Now, on your walk with Mr. Griffin towards the

9  Capitol, could you observe what he was doing carefully?

10 A.   Somewhat.  I got -- yeah, somewhat, yeah.

11 Q.   But you were close to him; right?

12 A.   Yes.

13 Q.   Because you had a camera, and you were --

14 A.   Right.

15 Q.   Okay.  So as you begin walking towards the Capitol, did

16 your plan become at that point to go onto the Capitol lawn?

17 A.   No.

18 Q.   So is it fair to say the plan was to wander towards the

19 Capitol and, what, check out the scene?  Is that fair?

20 A.   No.  We were looking for a -- we were specifically looking

21 for a place to pray, because -- yeah.

22 Q.   So on the way -- on your walk toward the Capitol, did you

23 see Griffin interact with law enforcement officers before you

24 reached the Capitol lawn?

25 A.   No.

1  Q.   At any point on your way towards the Capitol, did you

2  interact with police who told you you can't be in a certain

3  place?

4  A.   No.

5  Q.   Did you see any law enforcement officer direct Griffin not

6  to be in any particular place?

7  A.   No.

8  Q.   So let's think about the time when you're walking towards

9  the Capitol.  There's lots of people around you; right?

10  A.   Yes.

11  Q.   And they're talking about the certification process and the

12  election that's going on; right?

13  A.   Yeah.  I wasn't -- I didn't necessarily hear that at the

14  time, but yeah.  I mean, there were people talking about it, but

15  I wasn't necessarily focusing on what everyone else was saying

16  around me.

17  Q.   Sure.  But there's people around you who were talking about

18  the election naturally?

19  A.   Sure.

20  Q.   Okay.  And the government might have played a clip about,

21  you know, there were some people chanting "certify" or

22  "decertify."

23  A.   Right.

24  Q.   And there might have been some chatter about will Pence

25  certify; right?

```
1    A.    Yes.

2    Q.    Okay.  Now, you're aware that -- you're now aware that

3    Congress, after the hubbub on January 6, reconvened later that

4    day, and they came back to the Capitol; right?

5    A.    Right.

6    Q.    But as you're walking towards the Capitol that day, did it

7    appear to you that Griffin may not have had a very strong grasp

8    of what was going on inside?

9              MS. IYENGAR:  Objection.

10             THE WITNESS:  Yeah, I don't know.

11             THE COURT:  Hold on a second.

12             BY MR. SMITH:

13   Q.    Did --

14             THE COURT:  Hold on a second.  What's the objection?

15             MS. IYENGAR:  I don't think any foundation has been

16   laid as to how this --

17             COURT REPORTER:  Counsel, you need to speak into your

18   microphone.

19             MR. SMITH:  Your Honor, I can just put it a different

20   way.

21             THE COURT:  Okay.  So sustained.

22             BY MR. SMITH:

23   Q.    Did Mr. Griffin indicate to you at some point that he

24   believed that the vice president, Vice President Pence, had

25   certified the election before you even got close to the Capitol?
```

```
 1              MS. IYENGAR:  Objection, Your Honor.  This calls for

 2    hearsay.

 3              MR. SMITH:  It's --

 4              THE COURT:  Sustained.

 5              MR. SMITH:  Your Honor, we're going to be offering

 6    some statements from Mr. Griffin that are not offered for the

 7    truth.  So if Mr. Griffin, for example, were to say that "I

 8    believe the sky is green," we would not be offering it to prove

 9    that the sky is green.  It's offered to show that Mr. Griffin's

10    belief or state of mind is a certain way.

11        And Your Honor, we can provide Your Honor with some

12    citations for that point if you would like to litigate -- or

13    deal with that issue right now.

14              THE COURT:  So did he talk about the certification?

15              THE WITNESS:  No, not beforehand, no.

16              THE COURT:  Okay.

17              THE WITNESS:  Not that I remember.

18              BY MR. SMITH:

19    Q.   I'm going to bring up what's been marked Griffin Exhibit 1,

20    but this i -- you've actually already authenticated this as

21    Government Exhibit Number 16.  So it is within the list that you

22    authenticated.

23    A.   Sure.

24    Q.   So can you see that image?

25    A.   Yes.
```

1    Q.   Do you remember this moment?

2    A.   Yes.

3    Q.   All right.  I'm going to play this conversation.

4         And, Judge, this is a faint conversation.  We have a

5    transcription of it, which we're going to move into evidence

6    next.  It's digital evidence.  So we will be providing it to the

7    Court on a thumb drive rather than a folder.  But I'm going to

8    play the file first, and then we can move to the transcription.

9         (Video played.)

10   Q.   Okay.  Now, this is faint, but I'm going to bring you back

11   a couple of seconds, and I'm going to ask you whether you can

12   hear Mr. Griffin saying "he certified it."  Okay?

13   A.   Okay.

14        (Video played.)

15   Q.   Did you hear that?

16   A.   No, not really.

17             MR. SMITH:  So, Judge, I think before we go further on

18   this exhibit I'm going to move what's marked as Griffin Exhibit

19   1-A into evidence, which is on a thumb drive we are providing to

20   the Court.  It's a transcription of the conversation that we

21   just listened to where the woman in blue referred to Mike Pence

22   and Mr. Griffin responded "yeah, he certified it."

23             THE COURT:  All right.  Any objection to 1-A?

24             MS. IYENGAR:  No, Your Honor.

25             THE COURT:  Without objection, 1-A is in.

1          (Defendant Exhibit 1-A received into evidence.)

2               THE COURT:  Did you provide us with a -- yes.  This is

3     yours?

4               MR. SMITH:  Yeah.

5               BY MR. SMITH:

6     Q.   So, Mr. Struck, do you recall -- you said you recalled this

7     moment on January 6 where you're next to this body of water

8     right here.

9          Do you know what that is?

10    A.   Yeah, in front of the Capitol, the water in front of the

11    Capitol.

12    Q.   Reflecting Pool?

13    A.   Okay.

14    Q.   And so is it fair to say that -- so you ultimately do end

15    up near -- closer to the Capitol that day; correct?

16    A.   Correct.

17    Q.   So would you say you're maybe about 45 minutes away from

18    the Capitol at this point?

19    A.   As far as how long -- I don't know how long it took us to

20    get to the Capitol from there.

21               MR. SMITH:  Okay.  With the Court's indulgence, I'm

22    going to be bringing up an exhibit that Mr. Struck already

23    certified, which is Government Exhibit 16 -- excuse me,

24    Government Exhibit 17-1.

25               MS. IYENGAR:  I'm sorry, Your Honor.  I believe this

1   is an exhibit that did not get entered into evidence.  We only

2   admitted Government Exhibit 17.

3          MR. SMITH:  I should correct myself.  This was an

4   exhibit that Mr. Struck authenticated.

5          MS. IYENGAR:  I'm sorry.  No, he did not authenticate

6   this exhibit.

7          THE COURT:  I had that you had done through 62.

8          MS. IYENGAR:  No.  This is 17-1.  We admitted just 17

9   with no dash 1.  This exhibit is time-stamped, and we did not

10  admit a time-stamped exhibit.

11         BY MR. SMITH:

12  Q.   Mr. Struck, do you recall when you authenticated the time

13  stamps from the metadata on the videos that you provided to the

14  government?

15  A.   Yesterday.

16  Q.   Does this image look like an image you filmed?

17  A.   I'm sorry.  I don't have a picture up.

18  Q.   Excuse me.  I apologize for that.  This was a video we were

19  just watching next to the Reflecting Pool that you recognized.

20  A.   Yeah, all the time stamps that -- we confirmed them

21  yesterday.

22  Q.   Okay.  So can you see the time stamp that's on this video

23  that was marked Government Exhibit 17-1?

24  A.   Yes.

25  Q.   And what time is that?

A.   1:45.

THE COURT:  All right.  So are you objecting to 17-1?

MS. IYENGAR:  No.  I was just saying it hasn't been admitted yet.

THE COURT:  Okay.  I was definitely under a misimpression.  I thought you were doing all of them.  But you were just doing the --

MS. IYENGAR:  The regular exhibits without the time stamp, correct.

BY MR. SMITH:

Q.   Mr. Struck, do you recall approximately when you arrived near the Capitol grass lawn?

A.   No.

Q.   Okay.  Was it about approximately 2:30?

A.   Yeah, it's hard for me to remember.  I'd have to look and see.  I don't know.

Q.   Okay.  We'll get to that.  That's fine.

A.   Okay.

Q.   So Mr. Struck, wasn't there another time when Mr. Griffin indicated he believed that Pence had certified the election before you reached the Capitol?

A.   I don't --

MS. IYENGAR:  Your Honor, I'm objecting to this if this is something outside of what's in the video footage.

MR. SMITH:  Your Honor, this is not -- if the

```
 1    government would allow the exhibit to be raised before it starts

 2    objecting, that would streamline the process.

 3                THE COURT:  Okay.  Well --

 4                MR. SMITH:  So, Your Honor, again, the next exhibit is

 5    not being offered for the truth but for state of mind.  This is

 6    Government Exhibit 64, which has also been marked Griffin

 7    Exhibit Number 2.

 8                THE COURT:  All right.  I think his answer was,

 9    though, he doesn't remember this.  Is that correct?

10                MR. SMITH:  I'm now refreshing the witness's

11    recollection.

12                THE COURT:  Okay.

13                BY MR. SMITH:

14    Q.   So, Mr. Struck, do you recall the image that's on the

15    screen?

16    A.   Yes.

17    Q.   Okay.  Is this the film that you made of Mr. Griffin in

18    Roanoke, Virginia, on January 7th?

19    A.   Yes, it appears to be.

20    Q.   Okay.  Now I'm going to bring us to 3:16 and play this.

21         (Video played.)

22    Q.   So now do you recall Mr. Griffin saying to you at some

23    point on this day that he believed that Pence had certified the

24    election about three quarters of the way on your walk towards

25    the Capitol?
```

1    A.   Yeah, it looks like he did.

2    Q.   Thank you.  And Mr. Struck, was there another time when

3    Griffin said the same day that he believes Pence had already

4    certified the election before you reached the Capitol?

5    A.   I just don't remember.

6    Q.   That's okay.

7              MS. IYENGAR:  Your Honor, we are objecting to this

8    video.

9              MR. SMITH:  Your Honor, the government hasn't said

10   what the basis for its objection is.

11             THE COURT:  Which video are you showing?

12             MR. SMITH:  This has been marked Griffin Exhibit

13   Number 3.  And so we will let the government explain the basis

14   for its objection first.

15             MS. IYENGAR:  Your Honor, these are hearsay

16   statements.  They were not admitted by the government.  The

17   defense is seeking admission of them, and there's no -- there's

18   no hearsay exception to the statements that are in this video.

19             THE COURT:  I understand.

20             MR. SMITH:  So for the exact same reason --

21             THE COURT:  I heard you.  Let's play it, and I will

22   rule.

23             BY MR. SMITH:

24   Q.   Mr. Struck, you said that -- do you recognize this video?

25   A.   It's not up there.

1   Q.   Oh, there you go.

2   A.   Yes.

3   Q.   Okay.  Is this a video you made of Mr. Griffin the night of

4   January 6th?

5   A.   Yes.

6   Q.   Okay.  I will take this to 4:21 and see if you recall what

7   Mr. Griffin said.

8        (Video played.)

9   Q.   Did you hear in that clip that Mr. Griffin indicated he

10  believed that at some point on the way towards the Capitol that

11  Mike Pence --

12  A.   Yes.

13  Q.   -- had certified?  And did he say where he heard that?

14  A.   Did he say three quarters of the way?  I don't remember.

15  Q.   He said near -- I think he said near the reflecting pool --

16  A.   Oh, okay.

17  Q.   -- but I will play it again.

18        THE COURT:  Can you replay it, sir.

19        MR. SMITH:  Yes.

20        (Video played.)

21        BY MR. SMITH:

22  Q.   Okay.  Did you hear Mr. Griffin refer to a fountain there?

23  A.   Yeah, he said by the reflecting pond.

24  Q.   Now, I'm going to bring us to 8:44 in the same clip and

25  play this.

1          (Video played.)

2     Q.   Were you able to hear Mr. Griffin there?

3     A.   Yes.

4     Q.   Did you -- did he -- does it appear to you at this moment

5     that Mr. Griffin believed that Mike Pence had left the building?

6     A.   Correct, yes.

7     Q.   And did it appear to you that Mr. Griffin believed that --

8     Mr. Griffin was surprised to learn that Mr. Pence was back in

9     the building?

10    A.   Yes, it sounds like it.

11         MS. IYENGAR:  Your Honor, I'm objecting to this.  This

12    witness's impressions of whatever the defendant was saying are

13    not relevant to any of the facts at issue in this case.  He can,

14    obviously, watch the video, and the video speaks for itself.

15         THE COURT:  Okay.  So let's go back to the first one.

16    "We began to hear that Mike Pence had already certified the

17    election."  I mean, that does feel like a hearsay statement.

18         MR. SMITH:  Your Honor, if it was offered for the

19    truth of the matter asserted, which is that Mike Pence had

20    certified the election at that point --

21         THE COURT:  No, no, it's being admitted for the truth

22    that you began to hear it that it had happened; right?

23         MR. SMITH:  We're not admitting that -- we're not

24    admitting this for any truth.  We're admitting it to show state

25    of mind, which is nonhearsay under 801, F.R.E. 801.

1          So, Your Honor, the defense position is it is quite common

2     in cases involving scienter to play defense statements that are

3     not offered to prove the truth of what the defendant is saying.

4     If the defendant says, "I own $100 in my bank account" and you

5     play a defense statement out of court to prove that there's $100

6     in the defendant's bank account, that is hearsay.

7          If you're introducing the statement to show that the

8     defendant was thinking something that is not necessarily true

9     and is in fact a mistake of fact, there is no other way to

10    establish a mistake-of-fact defense.

11         THE COURT:  I understand what hearsay is.

12         I think what Ms. Iyengar is saying, though, is you are

13    pointing to a specific time.  "We began to hear that this had

14    happened when we were down at the fountain," that "when we were

15    down at the fountain is when we heard about it."

16         Why is that not a hearsay statement?

17         MR. SMITH:  Oh, if Your Honor is only discussing that

18    aspect of the statement, we would just point to the witness

19    recalling himself that he remembers being at the Reflecting Pool

20    with Mr. Griffin in the video that was previously introduced

21    into evidence.

22         THE COURT:  All right.  So did you want to say

23    anything, Ms. Iyengar?

24         MS. IYENGAR:  Yeah, I don't think this witness's

25    recollection makes the statement not be hearsay.  And

1    furthermore -- well, I guess two points.

2         First of all, I think it's double hearsay because he's

3    talking about a statement -- sorry, the defendant is talking

4    about a statement he heard from someone else.  So I think that's

5    another issue.

6         Second of all, this isn't relevant really to anything,

7    because the defendant's belief about the vice president's

8    whereabouts at any point in time doesn't go to any of the

9    elements of the offense in the information.  So I guess we're

10   objecting on both the hearsay and relevance grounds.

11             THE COURT:  Okay.  Well, if that's true, I don't know

12   why we're arguing about this.  I thought it did matter.

13             MR. SMITH:  Just to be clear for the record --

14             THE COURT:  I think the statement "we began to hear

15   that Mike Pence had already certified the election," I think

16   that is a hearsay statement.  I understand your point about the

17   listener here is --

18             MR. SMITH:  Your Honor, just to be clear --

19             THE COURT:  -- the witness.

20             MR. SMITH:  -- we are not offering it about the affect

21   on the listener.  We are offering Mr. Griffin's statement, not

22   the witness's belief.  Mr. Griffin's statement is coming in

23   because -- through this witness because he filmed this video.

24   This statement is in the video.  It's not the witness's

25   statement.  The statement is from the defendant, and it's not

hearsay, because it's not being offered to prove the truth of
what Mr. Griffin believed.  It's being offered to prove -- to
show his state of mind.

I have a citation for Your Honor if that --

THE COURT:  But state of mind is not then.  You're
trying to tell me that my state of mind back five hours ago was
X.  That's a hearsay statement.

MR. SMITH:  We're not offering it to prove the truth
of when Mr. Griffin believed he thought Pence certified the
election.  We're offering -- excuse me.  We're offering this to
not prove the truth of the connection between Mr. Griffin's
belief and Mister -- the vice president's presence.  We're only
offering this to show that the defendant made the statement and
believed it, that this was his state of mind.

THE COURT:  But it -- okay.

MR. SMITH:  And this is relevant to the issue of
whether he had knowledge that he entered a restricted area,
because restricted area is defined to mean an area in which a
Secret Service protectee is or will temporarily be.

THE COURT:  All right.  So I think I would agree with
you if he was back there and saying oh, the vice president
already certified it.  I don't think the first statement from, I
think it was, video 16 was problematic.  I think this one is.  I
think it's hearsay.  I'm sustaining the objection.

MR. SMITH:  Your Honor, then there's just one more

```
1    evidence rule we would use.  This corroborates the earlier

2    statement.

3               THE COURT:  All right.  I'm sustaining the objection.

4    Let's move on.

5               MR. SMITH:  Okay.

6               BY MR. SMITH:

7    Q.   Mr. Struck, do you remember when you produced this file to

8    the government?

9    A.   It was in January 2021.  Oh, these are the files -- like

10   last week.  I'm sorry.  I'm not sure.  It's hard for me to say

11   which ones.  These, I don't believe so, because the first ones

12   were just from the Capitol, and this one's not.  So --

13   Q.   Okay.  That's fine.  Thank you.

14        So, Mr. Struck, on your walk towards the Capitol, you saw

15   metal barriers in certain places; is that right?

16   A.   Yes, I -- yes.

17   Q.   And so I'm going to bring up what's marked as Government

18   Exhibit 4 and is also -- excuse me, is marked as Defense Exhibit

19   4 and is marked as Government Exhibit 30.  I think you've

20   already seen this clip.

21        So can you see the image here?

22   A.   Yes.

23   Q.   Do you remember when the government showed you this image?

24   A.   Yes.

25   Q.   Okay.  Can you see the metal barriers that are there?
```

1    A.    Yes.

2    Q.    Okay.  Does it look like to you that this is -- can you

3    also see the stone wall in the background there?

4    A.    Yes.

5    Q.    Do you recall the video that the government showed you with

6    Mr. Griffin appearing to climb over that wall?

7    A.    Yes.

8    Q.    Okay.  Now, did you see these barriers, like this metal

9    barrier, in other places that day?

10   A.    Yes.

11   Q.    Okay.  I'm going to see if -- do you remember specifically

12   where that was?

13   A.    Yeah.  They surrounded the president when he was doing his

14   speech.

15   Q.    That's right.  But I'm going to -- do you recall any other

16   areas?

17   A.    No.

18   Q.    All right.  I'm going to show you another image that's

19   marked Government Exhibit -- that's marked Griffin Exhibit 5 and

20   Government Exhibit 25.  I'm going to play this for you.

21        (Video played.)

22   Q.    And I'm going to pause it there.  Do you see any metal

23   barriers there?

24   A.    Yes.

25   Q.    And do you know where that is?

1   A.   Yeah, it's in front of the reflecting pond or towards --

2   Q.   Do you see that monument of a man on a horse there?

3   A.   Yes.

4   Q.   Do you know what monument that is?

5   A.   I do not.

6   Q.   Do you know if that's the Grant Memorial?

7   A.   I believe so.

8   Q.   Okay.  Now, did you see barriers like that in other places

9   as well?  Do you recall?

10  A.   No.  I mean -- no.

11  Q.   All right.  I'm bringing up what's marked as Griffin

12  Exhibit 6, and that's Government Exhibit 26.

13           THE COURT:  Sir, are you looking to admit yours?  I

14  mean, I guess it's a little bit of a moot point since --

15           MR. SMITH:  It is; we believe it's a moot point.  The

16  only reason we marked them is because the government exhibit

17  numbers kept changing.  So we had no certainty of what exhibit

18  numbers the government would use.  So to avoid delay, we --

19           THE COURT:  Okay.  But you're confident these are

20  Government's Exhibits 20, 25, and 26?

21           MR. SMITH:  They've all been authenticated by the

22  witness.  We could move at the end after -- we could move them

23  into evidence individually, or we could do them at the end with

24  the witness after we've gone through.

25           THE COURT:  However you want.

```
 1              MR. SMITH:  Okay.  I think we will do this at the end,
 2     Your Honor.
 3              THE COURT:  Okay.
 4              BY MR. SMITH:
 5     Q.   So can you see the Griffin Exhibit 6 video up here?
 6     A.   Yes.
 7     Q.   Okay.  I'm going to play it for you.
 8          (Video played.)
 9     Q.   I'm going to stop it right there.  Does that look like
10     Mr. Griffin?
11     A.   It does.
12     Q.   And did it look like he just walked through two of those
13     metal barriers you just saw?  I'm going to play that again.
14          (Video played.)
15     A.   Yes.
16     Q.   Okay.
17              THE COURT:  Can you start that from the beginning?
18              MR. SMITH:  Yes.
19          (Video played.)
20              BY MR. SMITH:
21     Q.   Okay.  Now, do you recognize those steps he's walking up
22     right there?
23     A.   Yes.
24     Q.   Is that just right inside the Grant Memorial --
25     A.   Yes.
```

1    Q.   -- we were just looking at?  Okay.  Thank you.

2         I'm going to pull up what's marked Griffin Exhibit 17 and

3    Government Exhibit 15.

4         Mr. Struck, do you recall if there were any other places

5    where those metal-looking barriers were posted that you might

6    have walked on the other side of?

7    A.   No.

8    Q.   Okay.  So in the image that you see in front of you, do you

9    see a metal barrier that's on the right side of the screen?

10   A.   Yes.

11   Q.   Do you know where this is?

12   A.   In front of the Capitol.

13   Q.   Right.  Do you happen to know what street this is?

14   A.   No.

15   Q.   Okay.  I'm going to play this and see if you can recall.

16   A.   Well, I just don't know the street names.

17   Q.   Well, do you see the statue of a man on a horse that's

18   looking at you --

19   A.   Yes.

20   Q.   -- in the perspective?  Is that the same statue that we

21   were looking at before?

22   A.   No.

23   Q.   It's not?

24   A.   I don't think so.  I don't know.

25   Q.   That's fine.  There's another perspective here I'm going to

1   go to.

2       All right.  So the camera has swung around here.  Do you

3   see that building in the background?

4   A.   Yes.

5   Q.   Is that the National Gallery of Art to the east?

6   A.   I don't know.

7         THE COURT:  I will take judicial notice.

8         MR. SMITH:  And Your Honor, we would also ask the

9   Court to take judicial notice that this is Third Street they're

10   crossing right here.

11         THE COURT:  Any objection?

12         MS. IYENGAR:  No, Your Honor.

13         THE COURT:  Without objection.

14         BY MR. SMITH:

15   Q.   I'm going to go back to Griffin Exhibit Number 4, which

16   you've already seen.  Do you remember seeing this image?

17   A.   Yes.

18   Q.   Okay.  Do you see the metal barriers there?

19   A.   Yes.

20   Q.   Do they look -- do they appear to you like they're set up

21   in the same way as the ones we saw earlier?  Do you remember

22   that we saw some metal barriers in front of the Grant

23   Memorial --

24   A.   Sure.

25   Q.   -- or statue?  Does it look like they're kind of set up in

1    the same way there?

2    A.    Yeah.

3    Q.    Okay.  Thank you.  When you saw these barriers, did you and

4    Mr. Griffin ever discuss the Secret Service?

5    A.    No.

6    Q.    When you saw these barriers, did you and Mr. Griffin ever

7    discuss the vice president?

8    A.    No.

9    Q.    Did you and Mr. Griffin ever discuss well, Mike Pence might

10   be inside there, we can't go in there?

11   A.    No.

12   Q.    In fact, Griffin indicated to you that any kind of roping

13   off was about the Biden inauguration; right?

14   A.    Can you, please, repeat that?

15   Q.    So do you recall a time when Mr. Griffin seemed to have

16   said to you that his belief was that the Capitol might have been

17   roped off for the Biden inauguration?

18   A.    Yeah, maybe, yes.

19   Q.    And I think the government showed you its Exhibit Number 64

20   where he said that; right?

21   A.    Yes, I've reviewed all the footage.

22   Q.    I'm going to pull up that moment the government showed you

23   right now where Mr. Griffin talks about the Biden inauguration

24   roping.  It's at 3:34.

25         You recognize this video again?  We looked at it earlier,

1    and the government showed it to you.

2    A.   All right.

3    Q.   Okay.

4         (Video played.)

5    Q.   Okay.  Did you hear Mr. Griffin refer there to what the

6    D.C. Police tells you you can't do?

7    A.   I'm sorry.  Can you play the clip again?

8    Q.   Sure.

9         (Video played.)

10   Q.   Did you hear him say, "Well, when the D.C. Police tells you

11   you can't do this"?

12   A.   Yes.

13   Q.   Didn't you testify earlier that D.C. Police didn't tell

14   anything to Mr. Griffin?

15   A.   He might have been referring to the news that we saw on TV.

16   Q.   But you didn't actually see the D.C. Police tell

17   Mr. Griffin anything?

18   A.   No.

19   Q.   Now, you alluded to this earlier, I believe, Mr. Struck,

20   but you saw a different set of barriers earlier in the day near

21   the Trump rally, didn't you?

22   A.   Yes.

23   Q.   And was there something that indicated that this set of

24   barriers related to the Secret Service to you?

25   A.   No, not necessarily Secret Service, I guess.

1    Q.   Okay.  I'm going to bring up an exhibit that's marked

2    Griffin Exhibit 28.  First, I'm going to ask you to authenticate

3    this.

4              MS. IYENGAR:  Your Honor, I think we're objecting to

5    this.  This was a part of the footage that the Court had

6    excluded the government to be able to play.  These were the new

7    videos that were produced on Wednesday into Thursday.

8              MR. SMITH:  So if Your Honor will recall, the Court

9    excluded three exhibits, not all of the video files that were

10   produced to the defense, period, and the three exhibits the

11   Court excluded do not include this file.

12             THE COURT:  Okay.  I'm overruling the objection.

13             BY MR. SMITH:

14   Q.   So can you see this image?

15   A.   I can.

16   Q.   Okay.  Do you think -- did you film this?

17   A.   Yes, I believe so.

18   Q.   Now, in this first image, do you see the man wearing

19   black -- well, first, let me take a step back.  Strike that.

20        So do you recognize where you are when you filmed this?

21   A.   Yes.

22   Q.   Where is that?

23   A.   I mean, I know it's like the back corner trying to get into

24   the Trump speech.

25   Q.   Trying to get in the Trump speech.  So would you say this

1    is near The Ellipse?

2    A.   Yes.

3    Q.   Do you see the man who is wearing a balaclava mask and he's

4    got his -- he's a law enforcement officer, he's wearing a black

5    glove, and he has his hand on a metal barrier?

6    A.   Yes.

7    Q.   Do you see an indication on his chest that says something?

8    A.   Yes.

9    Q.   Does it say "Secret Service"?

10   A.   It appears to.

11   Q.   Okay.  I'm going to play this.

12        And do you recall, did it appear to you at this time that

13   that Secret Service agent was making decisions as to who may

14   enter and may not enter?

15   A.   Yes.

16        (Video played.)

17   Q.   So the Secret Service agent -- was Mr. Griffin with you at

18   this point?

19   A.   Yes.

20   Q.   So these Secret Service agents were indicating to you and

21   Mr. Griffin whether or not you could enter this area behind

22   these fences; right?

23   A.   Correct.

24   Q.   This is the same day in which you filmed the footage at the

25   metal barriers later; right?

1   A.   Correct.

2   Q.   This is earlier in the day?

3   A.   Correct.

4   Q.   So first you saw a set of fences with these Secret Service

5   agents --

6   A.   Yes.

7   Q.   -- who were deciding whether you could go in and out?

8   A.   Yes.

9   Q.   And then later in the day, you saw those metal barriers;

10   right?

11   A.   I don't remember seeing them that day necessarily, because

12   they weren't closed off.

13   Q.   I meant the metal barriers that were in the videos you saw.

14   A.   Yes, they were in the videos, but not necessarily that I

15   noticed them as we were walking -- nothing was barricaded off.

16   So it didn't feel like a barricade.

17   Q.   I understand.

18   A.   Yeah.

19   Q.   Did you ever see -- I'm going to go back to this.

20        Do you see that agent who has got a neck gaiter and it says

21   "Secret Service" on it?

22   A.   Yes.

23   Q.   Did you see anyone else like that near the askew metal

24   barriers?

25   A.   No.

1  Q.   Okay.  So, Mr. Struck, the government showed you some video

2  clips of Mr. Griffin right outside the Capitol building.  He was

3  next to a set of stairs.

4       Do you remember that?

5  A.   Yes.

6  Q.   Do you recall a moment when Mr. Griffin said to you, "The

7  only way I will go in that building is with a written

8  invitation"?

9  A.   I don't remember him saying that.

10  Q.   You don't remember that?

11       Now, Mr. Struck, did there come a time when Griffin asked

12  you whether you had metadata for some of the video clips that

13  you made that day?

14  A.   Yes.

15  Q.   And was Mr. Griffin asking about a specific moment?

16  A.   Yes.

17  Q.   Do you recall what moment that was?

18  A.   The climbing of the wall.

19  Q.   I'm going to put up what's marked as Government -- excuse

20  me, Griffin Exhibit 7.  There we go.

21       Do you recall that image?

22  A.   Yes.

23  Q.   And is that an image you sent to Mr. Griffin?

24  A.   Yes.

25  Q.   Do you see the top of the image where it says "United

1   States Capitol" and the date and the time?

2   A.   Yes.

3   Q.   What is that time?

4   A.   That's the time when that video clip started recording.

5   Q.   Okay.  So just to be clear, that does not mean that this

6   exact moment where Mr. Griffin is reaching his knee over the

7   wall is the moment -- is 2:31 p.m.?  2:31 p.m. is when this clip

8   contained that image?

9   A.   Exactly.  You would have to back time it to find out what

10  time that was.

11  Q.   I'm going to bring up what's marked as Griffin Exhibit 7.

12          MS. IYENGAR:  Your Honor, I'm sorry.  I don't believe

13  this is -- I know that defense provided us with an exhibit list

14  late last night.  I'm not sure that this was provided as an

15  attachment to that as an exhibit that was going to be used.

16          MR. SMITH:  So the one thing we will note about the

17  first point is the government provided its final exhibit list to

18  us late last night.

19      This is an image that Mr. Struck will authenticate, if

20  given the opportunity.

21          THE COURT:  Okay.  Let's keep going.

22          BY MR. SMITH:

23  Q.   So, Mr. Struck, can you see on the right side where it

24  says -- well, first, take a step back.

25      This film was made in the .mov format; correct?

1    A.    Yes.

2    Q.    And so what kind of device were you using when you were

3    filming?

4    A.    An iPhone.

5    Q.    Okay.  Now, if you look at the info side here --

6    A.    Yes.

7    Q.    -- column, can you see where it says "Apple iPhone 11 Pro

8    Max"?

9    A.    Yes.

10   Q.    Is that your iPhone?

11   A.    It looks like it is, yes.

12   Q.    Okay.  Now, above that, do you see where it says

13   "IMG_9652.mov"?

14   A.    Yes.

15   Q.    Okay.  Do you recognize that file format?

16   A.    Yes.

17   Q.    Did you take -- did you authenticate earlier with the

18   government an image called "IMG.9652"?

19   A.    I did.

20   Q.    Okay.  Can you see a time stamp associated with that?

21   A.    2:31.

22   Q.    Yeah.  Now, look below that.  Do you see that there's a red

23   dot?

24   A.    Yeah.

25   Q.    Isn't it the case that .mov files can have metadata that's

```
1    geographic-based metadata?

2    A.   Yes.

3    Q.   Now, do you see where the red dot is placed next to the

4    Peace Monument there?

5    A.   Yes.

6    Q.   Is that where you filmed this?

7    A.   Yeah, it must be.

8    Q.   Thank you.

9              COURTROOM DEPUTY:  Mr. Smith, that was 8?  You said 7.

10             MR. SMITH:  8.  Thank you.

11        Your Honor, it's now 12:40, and we do have a few more

12   questions for Mr. Struck, but I think this might be an

13   appropriate moment to break for 30 minutes.

14             THE COURT:  Why?  I was planning to go to 1:00 p.m.

15             MR. SMITH:  I would like to speak to my client briefly

16   about something.  I am looking at my clock, and since it's

17   12:40, it seems like this could be a good opportunity to do it.

18             THE COURT:  I'm not ready to take lunch yet.  You can

19   take a moment to talk with your client.

20        (Defense counsel and defendant conferred.)

21             THE COURT:  Mr. Smith.

22             BY MR. SMITH:

23   Q.   Okay.  Mr. Struck, do you recall a time when you were at

24   the Capitol when Mr. Griffin addresses the crowd?

25   A.   Yes.
```

 1    Q.    Do you remember the subject matter of that?

 2    A.    Yes.

 3    Q.    What was that?

 4    A.    It was a prayer.

 5    Q.    It was a prayer.  Now, did Mr. Griffin -- did the crowd

 6    seem riled up by Mr. Griffin's prayer?

 7    A.    They started chanting "pray for Trump."

 8    Q.    Did it seem like they were kind of paying attention to him

 9    and focused?

10    A.    Some of them started to kneel.

11    Q.    I'm going to play for you what's marked as Government --

12    excuse me, Griffin Exhibit 9.

13          (Video played.)

14    Q.    Now, do you recall that moment?

15    A.    Yeah.

16    Q.    So when you're looking at the crowd here, does it look like

17    they're screaming and hollering?

18    A.    No.

19    Q.    Does it look like they've been, what do you want to call

20    it, aggravated or incited?

21    A.    No.

22    Q.    What does it look like to you?

23    A.    It looks like they've been calmed and they're listening to

24    Couy.

25    Q.    So apart from this moment, after or before, did you see

1    any -- Mr. Griffin taking any actions that were appeared to you

2    intended to disrupt the certification?

3    A.   No.

4    Q.   In fact, did there come a time when Mr. Griffin told you

5    the reason he was there was to prefer in legal elections?

6    A.   Yes.

7    Q.   I'm going to bring up what's marked as Griffin Exhibit

8    Number 10 and play this for you.

9         This is -- for the government's benefit, this is also

10   marked Government Exhibit Number 60.

11        (Video played.)

12   Q.   So at this moment, were you filming Mr. Griffin indicating

13   that the reason he's there is to, I guess, rally in support of

14   fair and free elections?

15   A.   Yes.

16   Q.   Did Mr. Griffin also indicate to you that he was there to

17   give -- to ensure that his children have the same opportunities

18   that he has?

19   A.   Yes.

20   Q.   I'm going to bring up what's marked as Griffin Exhibit

21   Number 11, which is also the Government's Exhibit Number 62.

22        (Video played.)

23   Q.   So did you hear Mr. Griffin kind of indicate to you that he

24   wasn't exactly pleased with some parts of what happened?

25   A.   Yes.

1   Q.   He said it's a sad day?

2   A.   Yes.

3   Q.   Mr. Struck, did you see Mr. Griffin destroy anything on

4   January 6?

5   A.   I did not see anything, no.

6   Q.   Did you see him confront law enforcement?

7   A.   No.

8   Q.   Did you see him getting aggressive with anyone?

9   A.   No.

10   Q.   Can you recall any action of his that would have put

11   someone in fear?

12   A.   No.

13   Q.   Any action of his that would make someone think that their

14   property or their possessions might be harmed?

15   A.   No.

16   Q.   You said you were with him the whole time here; right?

17   A.   Correct.

18   Q.   Did anyone approach Mr. Griffin, not just law enforcement,

19   anyone, and say "cool it, buddy," or like "calm down"?

20   A.   No.

21   Q.   Do you believe Mr. Griffin is capable of those kind of

22   things?

23   A.   As far as -- is capable of what?

24   Q.   Of, I'd say --

25          MS. IYENGAR:  Objection, Your Honor, to the question

1    regarding what he's capable of.

2                THE COURT:  On what basis?

3                MS. IYENGAR:  It's not relevant to any of the facts at

4    issue in this case, and his belief of what the defendant could

5    do is not relevant to any of the facts at issue in this case.

6                THE COURT:  Overruled.

7                MR. SMITH:  I can rephrase it anyway.

8                BY MR. SMITH:

9    Q.   Have you ever seen -- in your experience with Mr. Griffin,

10   have you ever seen him grow physically aggressive with another

11   person?

12   A.   I have not.

13   Q.   Would you say that he's generally a kind of even-keeled

14   individual?

15   A.   I would say so, yes.

16   Q.   Did Mr. Griffin ever indicate that he wanted to harm

17   someone inside the Capitol?

18   A.   No.

19   Q.   In fact, you and Mr. Griffin decided not to go inside;

20   right?

21   A.   Yes, we didn't go inside.

22   Q.   And do you remember why?

23   A.   Because we were there to pray, and we prayed, and then we

24   left.

25   Q.   But didn't -- did you and Mr. Griffin agree that it would

```
1    be inappropriate to go inside?

2    A.   Excuse me?

3    Q.   Did you and Mr. Griffin agree that it would be

4    inappropriate to go inside the building?

5    A.   I don't believe we discussed that.

6    Q.   Okay.  Now, after you left Washington, D.C., where did you

7    go?

8    A.   Roanoke.

9    Q.   Roanoke.  Where did you go after Roanoke?  Did you go

10   somewhere else with Mr. Griffin?

11   A.   Yeah.  We traveled to San Diego.

12   Q.   Why did you do that?

13   A.   To try to contact Ashli Babbitt's family.

14   Q.   And why did you do that?

15   A.   Because we just felt so sad about what had happened, and we

16   just wanted to see if we could offer some comfort.

17   Q.   And is that what you did?  Did you meet her family?

18   A.   We did not.

19             MS. IYENGAR:  I'm sorry.  Objection, Your Honor.

20   Relevance.

21             THE COURT:  Sustained.

22             BY MR. SMITH:

23   Q.   So Mr. Struck, you had a meeting with the FBI, or maybe it

24   was a phone call, in January of 2021; right?

25   A.   Correct.
```

1    Q.    Was it a phone call?

2    A.    It was a phone call.

3    Q.    Okay.  And do you remember telling them that Griffin

4    decided you all would not scale any walls?

5    A.    I don't remember telling them that, but yeah.

6    Q.    Well, do you remember, or do you not remember?

7    A.    I'm sorry.  Can you repeat the question?

8    Q.    So you had this conversation with an FBI agent --

9    A.    Yes.

10   Q.    -- in January of 2021; right?

11   A.    Yes.

12   Q.    And you were talking about what happened on January 6;

13   right?

14   A.    Yes.

15   Q.    And do you remember telling the agent that Mr. Griffin

16   decided that you all would not scale those walls?

17   A.    Correct, yes.

18         MS. IYENGAR:  Objection, Your Honor.  I'm not sure if

19   this is a reference to something in the video footage or a

20   conversation that they had had separately.  But if it's the

21   second part, then it would be hearsay.

22         THE COURT:  This does feel like hearsay.

23         MR. SMITH:  So this is -- and I don't mean this to be

24   pejorative towards you, but this is a little bit of impeachment,

25   because Mr. Struck indicated earlier that he couldn't recall

Griffin saying that they shouldn't go inside, or, you know, I
asked Mr. Struck if he could recall Mr. Griffin indicating they
should not go in the building.

And so what I'm doing is I'm bringing up a 302 document
that shows some of the witness's statements to refresh his
recollection.  I'm not offering them for the truth.

THE COURT:  Okay.  You've got ten minutes --

MR. SMITH:  Thank you.

THE COURT:  -- and then your cross-examination is up.

BY MR. SMITH:

Q.   I'm going to bring up a document that is a recorded -- that
is a memorandum recording some of your interview with the FBI.
Can you look at that document and tell me if this is consistent
with the date on which you spoke with the FBI agent in the
conversation I previously referenced?

A.   Yeah, it appears to be around that time, yeah.

Q.   Okay.  Can you go to the -- do you see the last paragraph
on this page beginning with "closer to the Capitol"?

A.   Uh-huh.

Q.   Okay.  If you keep reading on, down to the next page, first
sentence, it begins, "People around them were scaling additional
walls."

Can you see that?

A.   Yes.

Q.   And then can you see what the next part of the sentence

1    says?

2    A.    Uh-huh, yep.

3    Q.    What does that say?

4    A.    "Couy decided they would not do that."

5    Q.    Does that refresh your recollection about what you might

6    have told the FBI?

7    A.    Yes.

8    Q.    So Couy did indicate you all should not scale the walls

9    outside the Capitol?

10   A.    Correct.

11            COURTROOM DEPUTY:  What exhibit was that?

12            MR. SMITH:  It was just used to refresh the witness's

13   recollection.  It is not being moved into evidence.

14       I think that's everything, Your Honor.

15            THE COURT:  All right.  Ms. Iyengar, any redirect?

16            MS. IYENGAR:  All right.  Your Honor, I guess because

17   Mr. Smith was using these exhibits, just to make things easier,

18   I just ask to move Exhibits 10-1 through 62-1 into evidence as

19   well, if there's no objection to that.

20            MR. SMITH:  No.

21            THE COURT:  Without objection -- so I guess I'm a

22   little confused.  You're asking now for all the dash 1s to get

23   in?

24            MS. IYENGAR:  To be admitted as well, yes.

25            THE COURT:  All right.  Without objection, they're in.

1      (Government Exhibits 10-1 to 62-1 received into evidence.)

2                    FURTHER REDIRECT EXAMINATION

3           BY MS. IYENGAR:

4    Q.   Let me start with some of the questions that were asked on

5    cross-examination.

6    A.   Uh-huh.

7    Q.   So Mr. Smith had asked you about essentially whether the

8    defendant had been trying to, you know, rile anybody up in the

9    crowd when you got onto the inauguration platform.

10          Do you remember that?

11   A.   Yes.

12   Q.   So I just want to play for you what was previously admitted

13   as Exhibit 44.  Let me plug this in.  And I'll actually just

14   play 44-1 so that the Court has the time stamp.

15          And Your Honor, this does have a transcript in the binder

16   as well.  It should be 44-A.

17               THE COURT:  Okay.

18               BY MS. IYENGAR:

19   Q.   And I'm going to play this from 00:00.

20          (Video played.)

21   Q.   And then I also want to play for you Government's Exhibit

22   37-1, which is the time-stamped exhibit.

23          (Video played.)

24   Q.   And I'm pausing it at 1:17.

25          So I also just wanted to talk about something else

1    Mr. Smith had asked you about on cross-examination, which was

2    that your -- you had said something about that your goal when

3    you went onto the Capitol grounds was to find a place to pray;

4    is that right?

5    A.   Correct.

6    Q.   And then you said that you guys -- that Mr. Griffin said

7    his prayer and then you pretty much left; right?

8    A.   Correct.

9    Q.   Okay.  So I just wanted to play a couple of videos for you

10   about that.  So if we can start at 54-1.

11        (Video played.)

12   Q.   Okay.  So I believe this was the same video that you were

13   shown on cross-examination.

14   A.   Yes.

15   Q.   Do you remember that?

16   A.   Yes.

17   Q.   Okay.  And I just paused it at 00:01 in the player.

18        Do you see in the top right-hand corner there's a time

19   stamp up there?

20   A.   Yes.

21   Q.   And it says 3:34:29?

22   A.   Correct.

23   Q.   Okay.  So that was like 3:30, 4:00 p.m.?

24   A.   Okay, yeah.

25   Q.   Okay.  So I want to then go to Government's Exhibit 62-1.

1          (Video played.)

2     Q.   And I'm just going to pause it at 00:00.  And who is that

3     person in the left side of the frame there?

4     A.   That's Couy Griffin.

5     Q.   Okay.  And do you see up at the top right corner there's a

6     time stamp up there?

7     A.   Yes.

8     Q.   And it says 4:48:28?

9     A.   Correct.

10    Q.   So 4:48 p.m. about?

11    A.   Yes.

12    Q.   Okay.  So that is about an hour and 20 minutes after that

13    video we saw with the prayer?

14    A.   Yes.

15    Q.   Okay.  And you can see that the Capitol building is in the

16    background there?

17    A.   Yeah.

18    Q.   So this would have been probably still when you were on the

19    Capitol grounds; is that right?

20    A.   On the grounds, but we had left the Capitol area.

21    Q.   But you're still pretty much right in front of the Capitol?

22    A.   We were in front of the Capitol --

23    Q.   We can see it.

24    A.   -- but not -- yeah.

25              MS. IYENGAR:  I'm sorry.  Just one minute, Your Honor.

1          THE COURT:  Are you almost done with this witness,

2     Ms. Iyengar?

3          MS. IYENGAR:  Yes.  No further questions, Your Honor.

4          THE COURT:  All right.  Sir, you may step down.  Thank

5     you for your testimony here today.

6        Why don't we take a lunch break.  Since I think you all are

7     going to be looking at discovery, I was going to suggest an

8     hour.

9        Ms. Paschall?

10         MS. PASCHALL:  I just wanted to make some

11    representations about what we plan to do with respect to the

12    *Jencks* material.

13         THE COURT:  Okay.

14         MS. PASCHALL:  I've spoken with the general counsel

15    for the United States Secret Service, and we have two planned

16    productions in the documents that we have.  One would address

17    movements of the motorcade.  That would be earlier in the day.

18    We don't believe that's relevant to this time frame.

19         THE COURT:  I agree.

20         MS. PASCHALL:  And the other -- perhaps we can do this

21    not ex parte, with the defense, but outside the hearing of

22    the --

23         THE COURT:  If the parties would approach.

24       (Bench conference.)

25         MS. PASCHALL:  Many of the e-mails indicate the vice

1    president, the vice president's wife, and the vice president's

2    daughter by their Secret Service name.  We didn't want those

3    names to be out there, but we're happy to indicate which e-mails

4    relate to the vice president by just putting a redaction over

5    the code name but then indicating VP, VP wife, VP daughter.

6        Does that work?

7            MR. SMITH:  No objection.

8            THE COURT:  That makes sense.

9            MS. PASCHALL:  All right.  So we will make those

10   reductions over the lunch break.

11           MR. SMITH:  Two points, Judge.  If the next witness is

12   going to be either a Capitol police officer or a Secret Service

13   agent, we're moving for the discovery of the CCV footage before

14   the witness testifies so that we can use it to cross-examine.

15   If we can't get it before then, we can't use the information.

16   So we're moving for it now, and if we can't get it now, we move

17   to strike the Capitol police officer witness.

18           MS. PASCHALL:  The next witness is going to be the

19   Secret Service witness.  I think this is not going to be

20   necessarily relevant, but I also know that the Capitol Police is

21   working on it, and I can give an update to the Court in the next

22   hour.

23           THE COURT:  All right.  Let's see where we are after

24   lunch.

25       (End of bench conference.)

1     (Recess taken from 1:05 p.m. to 2:04 p.m.)

2     (Call to order of the court.)

3          THE COURT:  Mr. Smith, did you want to move in any of

4     those videos from Mr. Struck?

5          MR. SMITH:  Yes, Your Honor.  You anticipated my next

6     question to the Court, which is we would like to move in all the

7     exhibits that were -- I think all of them were authenticated by

8     the government.

9          THE COURT:  Which ones specifically are you seeking to

10    move in?

11         MR. SMITH:  Your Honor, it might be easier if I just

12    take back the evidence list from the deputy and check every one

13    and give it back to the deputy.  Would that work or --

14         THE COURT:  No.  We need to have a record, Mr. Smith,

15    and Ms. Iyengar needs an opportunity to object.

16         MR. SMITH:  If I may, may I approach the deputy and

17    use one of the exhibit lists so that I can communicate with the

18    Court which exhibit I'm referring to?

19    So, Your Honor, Defense Exhibit 1 was Government Exhibit

20    Number 16.  I can't remember if that was one of the exhibits

21    that Ms. Iyengar said the government did not itself move into

22    evidence, but if not, we are moving Defense Exhibit 1 into

23    evidence, which is also government -- which is marked Government

24    Exhibit 16.

25         THE COURT:  All right.  Just go through them.

1          MR. SMITH:  The next one is marked Griffin Exhibit

2     Number 2, which is also Government Exhibit Number 64.  I believe

3     the government moved its 64 into evidence.  So we would just on

4     the side of caution move Griffin Exhibit Number 2 into evidence,

5     which is the same video file that is Government Exhibit Number

6     64.

7          We would move into evidence Griffin Exhibit Number 3, which

8     is a video file labeled IMG_9709.  That was authenticated by the

9     witness as being a film that he made.

10         We would move into evidence Griffin Exhibit Number 4, which

11    is also the same as Government Exhibit Number 30.  We would move

12    into evidence Griffin Exhibit 5, which is the same as Government

13    Exhibit Number 25.  We would move in Griffin Exhibit 6, which is

14    the same as Government Exhibit 26.  We would move in Griffin

15    Exhibit 17, which is the same as Government Exhibit 15.

16         We would move in Griffin Exhibit 4.  I can't remember if I

17    already covered that one.  Yes, I already covered that one.

18         We would move in Griffin Exhibit Number 28, which is the

19    film IMG_9587 that the witness authenticated as his own.

20         We would move into evidence Griffin Exhibit Number 7, which

21    is a screen grab of metadata from a video that the witness

22    authenticated as having taken.

23         We would move in Griffin Exhibit Number 8, which is a

24    screen shot of metadata that the defendant authenticated as his

25    own.

 1          We would move into evidence Griffin Exhibit Number 9, which

 2     is the same as Government Exhibit Number 54.  Griffin moves into

 3     evidence his Exhibit Number 10, which is the same as Government

 4     Exhibit Number 60, and Griffin Exhibit Number 11, which is the

 5     same as Government Exhibit Number 62.

 6               THE COURT:  Okay.  Ms. Iyengar?

 7               MS. IYENGAR:  So, Your Honor, I guess I just have a

 8     question and an objection.  I think Mr. Smith had shown the

 9     Court Defense Exhibit 1-A, and I wanted to make sure he was not

10     seeking to move it in.  That was the transcript of the video.

11               THE COURT:  Are you seeking to move in 1-A?

12               MR. SMITH:  I think it was already moved in during the

13     course of the testimony.

14               THE COURT:  Actually, yes.

15               MS. IYENGAR:  I just wanted to make sure.  And then I

16     guess on Defense Exhibit 3, we had made a hearsay objection to

17     that while it was being played.  So we are objecting to that.

18               THE COURT:  Yes.  I sustained that objection.  So 3

19     will not be admitted.

20          Any other objections, Ms. Iyengar?

21               MS. IYENGAR:  No, Your Honor.

22               THE COURT:  Okay.  So 1, 2, 4, 5, 6, 7, 8, 9, 10, 11,

23     17, and 28 are all admitted.

24          (Defendant Exhibits 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 17, and

25     28 received into evidence.)

1          THE COURT:  All right.  Ms. Iyengar?

2          MR. SMITH:  Judge, I think there are two issues or a

3   few issues we have to address before the next witness.

4          THE COURT:  Okay.

5          MR. SMITH:  So the judge -- the Court ordered the

6   government to produce the *Jencks* material we discussed during

7   lunch.  It wasn't produced.

8          THE COURT:  It looks like it's being given to you

9   right now.

10         MR. SMITH:  Your Honor, you ordered it to be produced

11  during lunch.  It now cannot be used before the witness is about

12  to take the stand.

13         THE COURT:  I said by the end of lunch.  Now you've

14  got it.

15         MR. SMITH:  Judge, the problem is, we have to pay

16  attention to the witness's testimony.  So if we have to review

17  over 30 documents at the same time as paying attention to the

18  witness's testimony, that becomes a problem.  There's only one

19  lawyer on our team.

20         THE COURT:  All right.  Keep going.

21         MR. SMITH:  So there's a problem here.  We need to be

22  able to take notes when the witness is testifying and also

23  review this evidence.

24      And, Judge, there is no reason this couldn't have been

25  produced at the beginning of lunch, just to avoid the waste of

1   time.  This is a sandbag.  It's deliberate.

2           THE COURT:  I disagree.  What's your next issue, sir?

3           MR. SMITH:  The issue is that we can't make effective

4   use of this right now because we have to watch the witness's

5   testimony.

6           THE COURT:  All right.  I will give you a chance

7   before you finish your cross-examination to go through it.  Is

8   that the only thing you wanted to raise?

9           MR. SMITH:  I have not had a chance to review which

10  redactions were lifted.

11      But the other issue is we haven't received word from the

12  government about whether the government will produce the CCV

13  footage that would be used to cross-examine this witness about

14  the presence of the vice president.  The footage is relevant to

15  view because it would allow us to impeach the witness.  So it's

16  *Giglio* material, I believe, within the framework of *Brady* if it

17  allows us to effectively impeach the witness.

18          THE COURT:  All right.  Ms. Paschall, do you want to

19  address that?

20          MS. PASCHALL:  So first, Your Honor, I apologize to

21  Mr. Smith if I didn't make this clear.  We do plan to call the

22  Capitol Police investigator next -- or inspector.  Obviously,

23  this is not his *Jencks* material.  His *Jencks* material has been

24  produced.  And he is not going to be speaking to the location of

25  the vice president.  So I don't think any of that has come to a

1   head at this point.

2       I'm happy to make representations of the strides that we

3   have made, but perhaps we just wait until it comes to a head.

4           THE COURT:  Great.  Let's do that.

5           MR. SMITH:  Your Honor, just one fact.  It's the

6   Capitol Police that's making the decision whether to produce

7   this record, and this is a Capitol Police witness.  So the

8   proposed remedy we were suggesting is striking this witness.

9           THE COURT:  Okay.  I'm not going to deal with that

10  now.

11      Call your witness.

12          MS. PASCHALL:  Thank you, Your Honor.  The government

13  calls Inspector John Erickson.

14      Your Honor, I would ask that the same sensitivity

15  designation that we placed on these materials when we first

16  produced them redacted remain.  So we believe those should still

17  be designated as highly sensitive under the protective order.

18          MR. SMITH:  Your Honor, if they're designated highly

19  sensitive, we can't use them in court.

20          THE COURT:  So I'm granting the government's motion.

21  If there's something you wish to use in court, you can raise it

22  with me first.

23      JOHN ERICKSON, WITNESS FOR THE GOVERNMENT, SWORN

24                DIRECT EXAMINATION

25          BY MS. PASCHALL:

1   Q.   Good afternoon.  In a loud and clear voice, can you,

2   please, state and spell your full name for the record.

3   A.   John Erickson, J-o-h-n E-r-i-c-k-s-o-n.

4   Q.   Where do you work?

5   A.   United States Capitol Police.

6   Q.   And what is your current title with the United States

7   Capitol Police?

8   A.   I'm an inspector.

9   Q.   And what are your duties as an inspector with the United

10  States Capitol Police?

11  A.   I am currently the commander of the Senate Division

12  overseeing uniformed officers assigned to the Senate.

13  Q.   How long have you worked for the Capitol Police?

14  A.   Almost 32 years.

15  Q.   How many levels below the chief of police are you

16  currently?

17  A.   Two.  There's deputy chiefs and assistant chiefs and then a

18  chief.

19  Q.   How long have you been an inspector?

20  A.   Probably about four years.

21  Q.   And before you were an inspector, what was your title?

22  A.   Captain.

23  Q.   And before that?

24  A.   Lieutenant.

25  Q.   And before that?

1    A.   Sergeant.

2    Q.   And before that?

3    A.   Officer.

4    Q.   What are Capitol police officers sworn to do?

5    A.   Protect Congress, its visitors, and the building, the U.S.

6    Capitol.

7    Q.   When Congress is in session, can you approximate how many

8    people work in the Capitol building?

9    A.   There could be maybe 800, 750, 1,000 maybe.

10   Q.   Would that include law enforcement?

11   A.   It includes law enforcement, staff, official business,

12   members of Congress, senators.

13   Q.   Let's talk about the Capitol itself.  Where is the Capitol

14   located?

15   A.   1 First Street Northeast.

16   Q.   Is that in the District of Columbia?

17   A.   It is.

18   Q.   Is the Capitol secured 24 hours a day by Capitol Police?

19   A.   It is.

20   Q.   What type of restrictions exist around the Capitol building

21   and its grounds on a regular basis?

22   A.   On a regular basis, pre-COVID, the grounds were open to the

23   general public to traverse in the grassy areas.  In the improved

24   areas, such as steps, and inside the building are restricted.

25   Q.   Who is allowed access to that restricted

1   inside-of-the-building area?

2   A.   During pre-COVID, it would be official business, visitors

3   for tours.  Since COVID, the building has been closed to any

4   type of tours or general public.

5   Q.   Are there other areas besides the interior of the Capitol

6   building that you would include as restricted generally to the

7   public?

8   A.   Yes.  The terrace level around the west front of the

9   Capitol, the -- all the steps both on the east and the west

10  front are restricted.

11  Q.   And that west terrace area, is that the same area that

12  would include the inauguration stage when that is being put up

13  every four years?

14  A.   That is correct.

15  Q.   On a normal day, what kind of security must someone pass

16  through in order to access those restricted areas?

17  A.   In order to get into the building, you would have to go

18  through magnetometer, and your bags will be put on X-ray machine

19  and screened.

20  Q.   Okay.  And why is that required?

21  A.   Because there's security regulations inside the building as

22  far as firearms and what can and cannot be brought in.

23  Q.   Fair to say that that supports your mission of protecting

24  the building and the members inside of it?

25  A.   It does.

1   Q.   Before January 6, were visitors able to stand on any

2   portion of the Capitol grounds?

3   A.   Before January 6?

4   Q.   Yes.

5   A.   That morning of that day, no.

6   Q.   What about generally in the time frame before January 6?

7   A.   Yes, before January 6 itself, the grounds, the grassy area

8   were open for people to traverse.

9   Q.   And just so that I'm being clear, when we're discussing

10  January 6, are you and I discussing the January 6 that occurred

11  in 2021?

12  A.   That is correct.

13  Q.   Okay.  Are there typically Capitol police officers

14  stationed outside on the grounds of the Capitol?

15  A.   There are.

16  Q.   And why are they there?

17  A.   They offer patrols to make sure -- to enforce laws.

18  Q.   So is it fair to say in your 32 years or almost 32 years

19  with the Capitol Police you have walked the grounds and the

20  building itself many times over?

21  A.   It's fair to say.

22  Q.   So are you intimately familiar with both the building and

23  the grounds that constitute the Capitol complex?

24  A.   I am.

25  Q.   Ms. de Guzman, if you would pull up Government's Exhibit

1    Number 1 to show to the witness.

2         Inspector Erickson, can you see Government's Exhibit Number

3    1 on the screen in front of you?

4    A.   I can.

5    Q.   And what is that?

6    A.   It's the picture of the Capitol building from above.

7    Q.   Okay.  And just to orient ourselves, what do we see on the

8    north side of this photograph?

9    A.   The north end of the building, you will see the roof of the

10   Senate chambers.

11   Q.   And what do we see on the south side of the building?

12   A.   The south side, at the bottom, is the roof of the House of

13   Representatives, the Congress side.

14   Q.   And on the east side of the building, what do we see there?

15   A.   The east side is the plaza.

16   Q.   And on the west side, what do we see there?

17   A.   The west side is the west front of the Capitol.

18   Q.   And in this particular photograph, is there something

19   unique about the west side of that photograph?

20   A.   It's the partial build-out of the inaugural stand.

21   Q.   And that partial build-out of the inaugural stand that

22   you're describing, would that have been present on January 6 of

23   2021?

24   A.   Yes.

25   Q.   Why is that?

A.    Because it was in preparation for the inauguration to take place a couple weeks later.

Q.    Now, on January 6, 2021, was the Capitol building open to the public?

A.    It was not.

Q.    And what about the Capitol grounds?

A.    They were not.

Q.    If we could pull up Government's Exhibit Number 2, please.

      Inspector Erickson, can you see Government's Exhibit Number 2 on the screen in front of you?

A.    I can.

Q.    And do you recognize Government's Exhibit Number 2?

A.    I do.

Q.    Now, I apologize to the Court and defense counsel.  I believe your binders have a red line on the map.

      Inspector Erickson, are you, in fact, red/green color-blind?

A.    I am.

Q.    So when we prepared, did I alter this exhibit to have a yellow line so that you would be able to view it better?

A.    That is correct.

Q.    Okay.  And so is the yellow line that's present on Government's Exhibit Number 2 the restricted area as it was on January 6 of 2021?

A.    That is correct.

1   Q.   Now, on January 6 of 2021, what type of security barriers

2   would have been up to designate the restricted area?

3   A.   They would use bike racks, and snow fence would also be up.

4   Q.   So just for the Court --

5            THE COURT:  Sorry.  Can you say that second part?

6            THE WITNESS:  Bike racks and snow fence.

7            THE COURT:  What's a snow fence?

8            THE WITNESS:  Snow fence is plastic or wooden at times

9   that is put up to also act as restricted areas.

10            THE COURT:  Okay.  Thank you.

11            BY MS. PASCHALL:

12   Q.   Let's talk about the bike racks.  What is a bike rack?

13   A.   A bike rack is a metal piece approximately 6 or 8 feet long

14   that has the ability to attach to each other to designate a

15   certain perimeter or an area to keep people out.

16   Q.   And why is that used by Capitol Police as a security

17   barricade?

18   A.   We use that to help secure areas of the grounds when we

19   have different VIP arrivals or security events that go in place.

20   It helps as an initial pedestrian barrier.

21   Q.   Would it also be accurate to say that on the perimeter of

22   the grounds there are also walls set up, permanent walls?

23   A.   Yes.

24   Q.   You mentioned snow fencing, and the judge inquired a little

25   bit further about that.  On that day, do you remember if there

1   was snow fencing put up at the perimeter, the restricted

2   perimeter of the Capitol grounds?

3   A.   I don't remember the snow fence as far out to the yellow.

4   That's where bike rack was.  But there was snow fence initially

5   further inside that yellow.

6   Q.   That snow fencing would have been located -- when you say

7   further in, do you mean into the lawn area that --

8   A.   The west grassy area further up.

9   Q.   Okay.  Ms. de Guzman, if we could, please, pull up

10  Government's Exhibit Number 3.

11       Inspector Erickson, can you see Government's Exhibit Number

12  3 on your screen there?

13  A.   I do.

14  Q.   And what is that?

15  A.   That is a ground-level picture facing east of the inaugural

16  stand.

17  Q.   Fair to say that we have a glimpse of the west side of the

18  Capitol to include that inaugural stand?

19  A.   That is the west front, yes.

20  Q.   Okay.  And at the very forefront of this picture, at the

21  very bottom there, what do you see?

22  A.   That's green snow fencing, plastic.

23  Q.   And about midway up into that photograph, before we get to

24  the inaugural stage, what do you see there?

25  A.   That's more snow fencing with signs.

```
1   Q.   And are you familiar with what signs would have been placed
2   on that fencing?
3   A.   Yes.
4   Q.   And in fact, on January 6, 2021, were you working as a part
5   of a task force on the security for the inauguration that was
6   set to happen on January 20?
7   A.   I was.
8   Q.   And so were you involved in putting up some of these
9   security barriers?
10  A.   Yes.
11  Q.   Ms. de Guzman, if we could, please, pull up --
12           THE COURT:   Sorry.  Did you say when this was taken,
13  this photo was taken?
14           MS. PASCHALL:   I did not.  Thank you, Your Honor.
15           BY MS. PASCHALL:
16  Q.   Is this a fair and accurate representation of what the west
17  front of the Capitol building would have looked like in the
18  morning hours of January 6 before any of the events of the day
19  began?
20  A.   Yes.
21  Q.   Ms. de Guzman, if we could, please, pull up Exhibit Number
22  4.
23           Inspector Erickson, can you see Government's Exhibit Number
24  4 on your screen?
25  A.   I can.
```

1  Q.   And what is that?

2  A.   It's a restricted access sign that's hanging on the snow

3  fence.

4  Q.   And what does that sign say?

5  A.   "Area Closed by Order of the United States Capitol Police

6  Board."

7  Q.   And is this a sign that throughout your time with the

8  Capitol Police you have used with some regularity?

9  A.   We have, yes.

10  Q.   Ms. de Guzman, if we could, please, pull up Government's

11  Exhibit Number 5.

12       Inspector Erickson, can you see Government's Exhibit Number

13  5 on the screen in front of you?

14  A.   I do.

15  Q.   And do you recognize the area of the Capitol building and

16  grounds where Government's Exhibit Number 5 would have been

17  taken?

18  A.   Yes.  That's the west front face of the Pennsylvania Avenue

19  walkway.

20  Q.   And do we see one of those "Area Closed" signs in this

21  photograph?

22  A.   We do.

23  Q.   And what is that attached to in this photograph?

24  A.   It's attached to bike rack, a metal bike rack that we spoke

25  of earlier.

1          MS. PASCHALL:  At this time, Your Honor, the

2     government would move Exhibits 1, 2, 3, 4, and 5 into evidence.

3          MR. SMITH:  No objection.

4          THE COURT:  Without objection, 1 through 5 are in.

5         (Government Exhibits 1 through 5 received into evidence.)

6          MS. PASCHALL:  Thank you.  You can remove the exhibit.

7          BY MS. PASCHALL:

8    Q.   During your time as a Capitol police officer, would the

9    Capitol Police get notifications if a head of state was going to

10   be visiting the Capitol building and grounds?

11   A.   We do.

12   Q.   Can you explain how that happens?

13   A.   The visiting dignitary of the agency charged with the

14   security of that person would send an e-mail to our Special

15   Events Section, who would then continue to coordinate, reach out

16   and gather all the information, and then send out a special

17   event notice of an arrival.

18   Q.   Let's focus for a minute on the closed circuit TV system

19   that operates at the U.S. Capitol building and grounds.

20        Are you familiar with the CCV cameras operating on the U.S.

21   Capitol building and grounds?

22   A.   I am.

23   Q.   How are you familiar with those CCTV cameras?

24   A.   I -- when I was an officer, I was a dispatcher and worked

25   in the same room where the cameras are kept and monitored.  I've

1    sent out alarm responses that coordinate to the cameras that

2    come up to the locations.

3    Q.    Is it fair to say that you are familiar with the locations

4    of those cameras where they are throughout the building and

5    grounds?

6    A.    I'm pretty confident of that, yes.

7    Q.    Who controls those cameras?

8    A.    The cameras are in fixed positions throughout the different

9    parts of the grounds.  However, there are cameras that have the

10   ability that can pan, and the people that can do that are watch

11   commander's office that can have manual controls over the

12   cameras.

13   Q.    Why does the Capitol Police have cameras on the building

14   and grounds?

15   A.    They assist in the security and monitoring of the grounds

16   and events that occur on the grounds.

17   Q.    Is this closed circuit video system used regularly as a

18   part of Capitol Police's practice in executing their mission in

19   protecting the U.S. Capitol building, grounds, and its members?

20   A.    Yes.

21   Q.    Are those videos regularly kept and maintained by the

22   Capitol Police in its normal course of business?

23   A.    That is correct.

24   Q.    Do those cameras capture audio or just video?

25   A.    Just video.

Q.   Now, in preparation for your testimony here today, did you and I review some of the closed circuit video that was captured on January 6 of 2021?

A.   We did.

Q.   And based on your understanding of the video equipment, the maintenance of those CCTV videos, was the camera equipment working properly on January 6 of 2021?

A.   It was.

Q.   And based on your presence at the U.S. Capitol on January 6, 2021, and your knowledge of the camera systems, do you believe the video footage that we reviewed for this case depicts fair and accurate images of the events that took place at the United States Capitol building and grounds on January 6, 2021?

A.   They do.

Q.   What was your duty assignment on January 6, 2021?

A.   The inaugural task force commander.  So I was charged with planning the security for the inauguration.  So that was my primary responsibility.

Q.   So where were you physically at the beginning of your workday on January 6, 2021?

A.   Government Printing Office, North Capitol and G Street.

Q.   Fair to say you were not on the Capitol building complex at the beginning of your workday on January 6, 2021?

A.   That's correct.

1   Q.   Did you ultimately come to the Capitol building on
2   January 6, 2021?
3   A.   I did.
4   Q.   Do you know approximately what time?
5   A.   Maybe around -- maybe 1:30-ish, somewhere around there.
6   Q.   And why did you go there?
7   A.   Because I had heard over our radio that there were people
8   climbing the walls and the inaugural stand and breaching the
9   building.
10  Q.   What did you do when you arrived at the Capitol?
11  A.   I just monitored my radio and tried to listen to where
12  there were areas needing most assistance, and I would respond to
13  that area and do what I could.
14  Q.   Did your monitoring of the radio on that day take you to a
15  location that we have called the Senate wing door?
16  A.   That is correct.
17  Q.   What about the area that we call the crypt?
18  A.   I was in the crypt also, yes.
19  Q.   And what about the area that we have previously discussed,
20  the Lower West Terrace where the inaugural stage was being
21  built?
22  A.   I was at the Lower West Terrace door also.
23  Q.   When we talk about the Lower West Terrace door, can you
24  describe for the Court where that is in relation to the
25  inauguration stage?

```
 1              MR. SMITH:  Your Honor, objection.  This has nothing
 2      to do with Mr. Griffin's --
 3              COURT REPORTER:  Microphone, Counsel.
 4              MR. SMITH:  This is general testimony about the day.
 5              THE COURT:  I will overrule any objection.
 6         I know where it is.  Let's keep going.
 7              MS. PASCHALL:  Okay.
 8              BY MS. PASCHALL:
 9      Q.   Did you ultimately help to clear the Lower West Terrace of
10      the U.S. Capitol grounds?
11      A.   I did.
12      Q.   And why was it important for the Capitol Police to clear
13      the Lower West Terrace?
14      A.   Because there was destruction going on, and people were
15      still trying to breach through the Lower West Terrace door.  So
16      we tried to push people back off of the Capitol grounds.
17      Q.   Were you ultimately successful?
18      A.   Yes.
19      Q.   How?
20      A.   We met up at the Lower West Terrace door, the Capitol
21      Police Civil Disturbance Unit, Metropolitan Police Civil
22      Disturbance Unit, Virginia State Tactical Teams, and as we were
23      pushing back on the -- through the door to push people back, the
24      tactical teams would deploy flash bangs, which is a loud
25      shuddering feeling to disorient people.  That allowed us to make
```

1    progress by pushing people further back.

2        We were grabbing weapons from the people, sticks, poles,

3    bats, and pulling them back away from us and just kept pushing

4    down onto the inaugural stand, and eventually down the stand,

5    through the Lower West Terrace, and then through the grass back

6    to First Street.

7    Q.   Were you also deploying some sort of chemical irritants as

8    well?

9    A.   The tactical teams were, yes.

10   Q.   Sorry.  You personally were not --

11   A.   Yes.

12   Q.   -- but the Capitol Police and partners, were you deploying

13   chemical irritants?

14   A.   Yes.

15   Q.   Ms. de Guzman, if we could, please, pull up Government's

16   Exhibit Number 73.

17       Inspector Erickson, can you see Government's Exhibit Number

18   73 on your screen there?

19   A.   Yes.

20   Q.   Is this a video compilation that you and I viewed together

21   in preparation for your testimony here today?

22   A.   It is.

23   Q.   And are the videos viewed here captured on January 6 of

24   2021?

25   A.   Yes.

1          MS. PASCHALL:  At this time, Your Honor, the

2     government would move to admit Exhibit 73, this compilation

3     video of U.S. Capitol Police footage.

4          THE COURT:  Do you object?

5          MR. SMITH:  We already had, but I think Your Honor

6     ruled.

7          THE COURT:  I agree.  Over objection, I will allow it

8     to be played.

9        (Government Exhibit 73 received into evidence.)

10         BY MS. PASCHALL:

11    Q.   Ms. de Guzman, if you could, please, start the video.

12       (Video played.)

13    Q.   If you could stop the video, please.

14         Inspector Erickson, what are we looking at in this still

15    shot at 00:20?

16    A.   This is the bottom of Pennsylvania Avenue walkway that we

17    talked about earlier.  That's actually on First Street itself

18    proper at Peace Circle, Northwest, First Street.

19    Q.   And can you see right in the middle of that video there

20    right before the steps?

21    A.   I do.

22    Q.   What do you see there?

23    A.   Bike rack.

24    Q.   What else is on those bike racks?

25    A.   The "Area Closed" signs that we referred to earlier.

1    Q.   Now, directly to the bottom left of the screen there, do

2    you see a wall?

3    A.   I do.

4    Q.   And is that a permanent barricade on the Capitol building

5    and grounds?

6    A.   They are permanent concrete walls.  It's a part of the

7    infrastructure of the grounds.

8    Q.   What direction are we facing at this point in time?

9    A.   Facing east.

10   Q.   Ms. de Guzman, can you play the video.

11        (Video played.)

12   Q.   Ms. de Guzman, you can stop the video.

13        Do you know which direction we are facing at this point in

14   time?

15   A.   Facing west, Pennsylvania Avenue.

16   Q.   And what is the time stamp in the upper left corner here?

17   A.   12:57 p.m.

18   Q.   You can push play on the video at 00:51.

19        (Video played.)

20        And if we could stop the video here.

21        Okay.  We've stopped at 1:11.  What are we seeing here?

22   A.   That is a view from the top of the building of the front of

23   the inaugural stand and the Lower West Terrace in the west front

24   of the Capitol.

25   Q.   Okay.  If we could push play.

1    (Video played.)

2    Q.   And if we could stop for a second.

3         We've stopped at 1:19.  Up at the very top of the screen, a

4    little less than an inch down, what do you see there?

5    A.   It's more snow fence with signs on it, the "Area Closed"

6    signs.

7    Q.   If we could start again at 1:19.

8         (Video played.)

9    Q.   And if we could stop the video.

10        We've stopped at 1:53.  What are we seeing at this point of

11   the video?

12   A.   That is on the east front.  You're viewing the rotunda or

13   center steps from the back of the plaza.  You're facing west.

14   Q.   And in kind of the middle upper left of this photograph, do

15   you see vehicles there?

16   A.   I do.

17   Q.   And do you know which vehicles those are?

18   A.   The black Suburbans leaving is the motorcade for the Vice

19   President of the United States.

20   Q.   And do you see in the very middle of the photograph a line

21   of people?

22   A.   Yes.

23   Q.   Is that one of the perimeters that we discussed earlier on

24   the east front of the Capitol?

25   A.   That's the east front perimeter with the bike rack.

1   Q.   Okay.  If we could start the video again, please.

2        (Video played.)

3   Q.   If we could stop the video.

4        Okay.  I've stopped the video at 2:32.  What are we looking

5   at at this point?

6   A.   Those are the center rotunda steps of the Capitol on the

7   east front.

8   Q.   If we could start the video again.

9        (Video played.)

10  Q.   And if we could stop the video.

11       We've stopped at 2:59.  What are we looking at here?

12  A.   That is the -- it would be a shot from the north side.

13  That's down at the bottom of the inaugural platform.

14  Q.   So that white structure that we're seeing in the background

15  right behind the tree, is that a part of the inaugural platform?

16  A.   It is.

17  Q.   If we could start the video again at 2:59.

18       (Video played.)

19  Q.   Can we stop the video.

20       We've stopped at 3:56.  There's now an overlay on top of

21  the video.  What is this?

22  A.   That's an overhead view of the first floor of the Capitol

23  building with the crypt being in the center.

24  Q.   If we could play the video at 3:56.

25       (Video played.)

1    Q.    If we could stop the video.

2          We've stopped at 4:09.  Where are we here?

3    A.    That is inside the first floor facing the Senate wing

4    doors.  That's on the east side of the Capitol.

5    Q.    Is this the Senate wing door you mentioned earlier was a

6    part of the path that you traversed on January 6, 2021,

7    responding to different calls?

8    A.    It was, yep.

9    Q.    Start again at 4:09.

10         (Video played.)

11   Q.    If we could stop the video, please.

12         At 4:59, what have we just seen happen here?

13   A.    We've just seen somebody throw a 2-by-4 through the window

14   and then continue to smash the glass and climb through the

15   window.

16   Q.    What is the time stamp in the upper left-hand corner,

17   please?

18   A.    2:13 p.m.

19   Q.    If we could start the video again.

20         (Video played.)

21   Q.    And if we could stop the video.

22         We've stopped at 5:53.  What are we looking at here?

23   A.    That is a view from the Lower West Terrace of the Capitol.

24   Q.    And do you see depicted here some of those bike racks that

25   you've been discussing before for security?

1    A.    Yep.  They're separating the crowd of people with the

2    police officers.

3    Q.    What is the time stamp in the upper left-hand corner,

4    please?

5    A.    It is 2:14 p.m.

6    Q.    Okay.  If we could start the video again.

7         (Video played.)

8    Q.    And if we could stop the video.

9         We've stopped at 6:05.  Were you able to see in that clip

10   what appears to be a white smoke going over the crowd there?

11   A.    Yes.

12   Q.    Do you know what that might have been?

13   A.    That would have been possibly smoke from a flash bang or a

14   chemical grenade thrown.

15   Q.    We can start the video again at 6:05.

16        (Video played.)

17   Q.    If we could stop the video.

18             THE COURT:  So these interior shots really don't feel

19   relevant, Ms. Paschall.  Let's keep going.

20             MS. PASCHALL:  Okay.  We can keep playing the video.

21        (Video played.)

22             MR. SMITH:  Judge, we would object that the Court just

23   instructed the government to move on, and now we're playing the

24   same.

25        (Video played.)

```
1              THE COURT:  Do you know how many -- can we skip to
2      where we're outside again?
3              MS. PASCHALL:  Sure.  We will actually stop the video
4      here at 7:57.
5              BY MS. PASCHALL:
6      Q.   Do you know what door we're looking at here, Inspector
7      Erickson?
8      A.   Yes.  That's the Senate door, east front, adjoining the
9      carriage entrance.  The right and left side is going into the
10     door.
11     Q.   Now, Ms. de Guzman, I'm going to ask you to do something
12     that I don't have an exact time stamp, and I apologize.  If we
13     could pull ahead to time stamp 2:29, which I think is going to
14     be -- why don't you try around 10 minutes.  If we could go back.
15     Yes, that's perfect.  We can stop the video there.
16          Okay.  We've stopped the video at 11:49.  Do you recognize
17     where we are at this point, time stamp 2:29?
18     A.   Yeah.  That's the Capitol Visitor Center and the Capitol
19     building proper.
20     Q.   And is the Capitol Visitor Center connected to the Capitol
21     building itself?
22     A.   It is.
23     Q.   And how is it connected?
24     A.   Through tunnels.  It's an open floor plan.  You leave the
25     Capitol, and escalators take you down into the Capitol Visitor
```

1    Center.

2    Q.    All right.  If we can play from 11:49.

3          (Video played.)

4    Q.    If the Court will permit one more interior video, I believe

5    the next video will be exterior.

6          (Video played.)

7    Q.    If we could stop the video at 12:45.

8          What are we seeing here?

9    A.    That's the Lower West Terrace of the Capitol, the base of

10   the inaugural platform.

11   Q.    And if you could tell us the time stamp in the upper left

12   corner, please.

13   A.    2:33 p.m.

14   Q.    Ms. de Guzman, if you could assist in pulling ahead to

15   approximately 3:00 p.m.  I think it's going to be maybe three or

16   four minutes.  All right.  If we could stop the video here.

17         We've stopped at 18:03.  What are we viewing here?

18   A.    That is a view facing west out of the Lower West Terrace

19   door.

20   Q.    And what is directly beyond that archway that we're seeing

21   there in the background?

22   A.    When you go through the archway, you walk down onto the

23   inaugural platform.

24   Q.    And what is the time stamp in the upper left corner,

25   please.

1    A.    3:00 p.m.

2    Q.    And now if we could pull ahead, Ms. de Guzman, to 3:39, I

3    think it will be a short jump.  Well, stop here actually.

4          It stops at 19:40.  What are we viewing at this point?

5    A.    Still the Lower West Terrace door.  It looks like police

6    have gone through the door.  They're now on the steps leading

7    through the archway pushing people back.

8    Q.    Is it fair to say that this group of officers that we see

9    in this video were ultimately able to re-establish a line at the

10   mouth of that archway there on the Lower West Terrace?

11   A.    That's correct.

12   Q.    If we could push play again, Ms. de Guzman.

13         (Video played.)

14   Q.    Okay.  If you could stop the video.

15         At 20:30, Inspector Erickson, do you see yourself in this

16   video?

17   A.    I do.

18   Q.    Where are you?

19   A.    To the left of the screen, you will see the -- I have a

20   black mask on with the gold leaves on the brim of my hat.

21   Q.    And where are you located at this point in time?

22   A.    That is the Senate wing door.

23   Q.    And what is the time stamp, please?

24   A.    3:39 p.m.

25   Q.    If we could push play again at 20:30.

1        (Video played.)

2   Q.   And if we could stop the video.

3        We've stopped the video at 20:53.  What are we looking at

4   here?

5   A.   That is a view on the north side of the Upper West Terrace

6   facing south.

7   Q.   And if we look all the way in the far background, all the

8   way to the right of the photograph, what are we seeing over

9   there?

10  A.   That's the bleacher part of the inaugural platform.

11  Q.   All right.  Thank you, Ms. de Guzman.  If you could take

12  down Government's Exhibit Number 73 and bring up Government's

13  Exhibit Number 74.

14       All right.  Inspector Erickson, do you see Government's

15  Exhibit Number 74 on your screen?

16  A.   I do.

17  Q.   And what is this?

18  A.   It is a shot from the roof of the inaugural platform of the

19  Lower West Terrace in the west front of the Capitol.

20  Q.   Okay.  Now, in our internal camera time at 00:00, what is

21  the time stamp in the upper left corner, please?

22  A.   It is 12:30 p.m.

23  Q.   Okay.  And do you see in this photograph what you've

24  previously identified as some of the snow fencing with the signs

25  from the Capitol Police on them?

1    A.    Yes.

2    Q.    And are those all presently erect as they should have been

3    to barricade this area?

4    A.    Yes, that is correct.

5    Q.    Okay.  Ms. de Guzman, if you could, please, move forward to

6    28:27 on our internal time.  That's perfect.

7          (Video played.)

8    Q.    Now, we're playing the video at 28:15 internal time.  What

9    has happened since the beginning of this video?

10   A.    People have knocked over or stepped over the snow fence

11   restricted area and then climbed up over another restricted area

12   with the wall to the Lower West Terrace, and they're now

13   climbing up the other restricted bike rack to the lower terrace.

14   Q.    Fair to say you've just described several barricades that

15   were present on the west front before this time stamp at

16   12:58 p.m. on January 6, 2021?

17   A.    That is correct.

18   Q.    All right.  Ms. de Guzman, if we could, please, move

19   forward on our internal time stamp to 2:27:48.  That's perfect.

20         (Video played.)

21   Q.    And we've started Government's Exhibit 74 at 2:27:35.  What

22   are we viewing by this point in time?

23   A.    That's the Lower West Terrace and the inaugural stand and

24   the west front completely covered with people.

25   Q.    And what is the time stamp in the upper left-hand corner,

1    please?

2    A.    2:57 p.m.

3    Q.    And if we could stop the video briefly, do you see directly

4    in the center of the -- well, center top of where we've stopped

5    something that has been erected in the middle of the grounds

6    there?

7    A.    Yes.

8    Q.    What is that?

9    A.    That is the inaugural camera that is used on the day of the

10   inauguration to film the event.

11   Q.    I'm going to try and draw your eye down from that tower

12   towards what we can additionally see as some white -- it looks

13   like the outer lip of the inauguration stage.

14        Do you see that?

15   A.    I do.

16   Q.    And where we see some of the lip of the inauguration stage

17   there, do you also see what appears to be a white flag with

18   something green in the middle of it off to the just right of

19   center there?

20   A.    I do see the white flag, yes.

21   Q.    Ms. de Guzman, if we could, please, move forward in time to

22   internal 2:33.  We will start it again, and if we could stop

23   briefly.

24        (Video played.)

25   Q.    We've stopped here at internal time 2:33:02.  Do you see

1    what appears to be some white smoke over the Lower West Terrace

2    there?

3    A.    I do.

4    Q.    Do you see the time stamp in the upper left-hand corner?

5    A.    Yes, 3:03 p.m.

6    Q.    Do you believe at that point in time that the teams that

7    were trying to clear the Lower West Terrace would have been

8    using some of the chemical irritants that we've previously

9    described?

10   A.    Yes, that could come from that area, yes.

11   Q.    And some of the flash bangs we've previously described?

12   A.    That is correct.

13   Q.    Now, Ms. de Guzman, if we could, please, move forward to

14   internal 2:44:35.

15         (Video played.)

16   Q.    And if we could stop there.

17         We stopped at internal time 2:43:37.  Were you still able

18   to see that white flag that we described earlier with the tree

19   on it in a similar location off to the right there?

20   A.    Vaguely.  Sitting next to the American flag there?

21   Q.    Maybe we should play it a few more seconds.

22         (Video played.)

23   Q.    Can you describe where you see that?

24   A.    It looks like something similar to that is towards the

25   middle right of the screen next to an American flag blowing,

1   like a tree on the white flag.

2   Q.   What is the time stamp in the upper left corner, please?

3   A.   3:13 p.m.

4   Q.   Okay.  Ms. de Guzman, if we could, please, pull up

5   Government's Exhibit 75.

6        Inspector Erickson, do you see Government's Exhibit 75 on

7   your screen?

8   A.   I do.

9   Q.   Do you recognize this?

10  A.   I do.  That's the Senate pass desk.  It's the vice

11  president end of the Senate lobby of the Senate wing.

12  Q.   If we could -- well, first I will direct your attention to

13  the upper left-hand corner time stamp.  What is that, please?

14  A.   2:25 p.m.

15  Q.   Okay.  If we could play that video.

16       (Video played.)

17  Q.   And if we could stop the video at 00:30.

18       What have we just witnessed here?

19  A.   That was the evacuation of the Vice President of the United

20  States from the Senate floor, specifically a ceremonial office.

21            MS. PASCHALL:  I apologize I did not do this earlier,

22  Your Honor.  If we could move into evidence Exhibit 74 and 75.

23            MR. SMITH:  No objection.

24            THE COURT:  Without objection, 74 and 75 are in.

25       (Government Exhibits 74 and 75 received into evidence.)

```
 1                BY MS. PASCHALL:

 2      Q.   How long did it ultimately take to clear everyone from the

 3      Capitol building and grounds on January 6, 2021?

 4      A.   Multiple hours.  I could not say.  I think finally the

 5      people from the -- it was getting dark when the National Guard

 6      showed up some time after 5:30 or 6:00.

 7      Q.   5:30 or 6:00, you said?

 8      A.   P.m., yes.

 9      Q.   Okay.  I'm now going to play for you some exhibits that are

10      already in evidence and ask you to describe some of the

11      locations that we see here.

12           If we could, please, pull up, Ms. de Guzman, Government's

13      Exhibit 63.

14                THE COURT:  I think I know where this is.  I'm really

15      familiar with the area.  I worked on Capitol Hill.

16                MS. PASCHALL:  Can I ask a single question?

17                THE COURT:  Okay.

18                BY MS. PASCHALL:

19      Q.   Inspector Erickson -- if we could pull this video ahead

20      maybe a minute or so, Ms. de Guzman, and push play for a second.

21           (Video played.)

22      Q.   And if we could stop the video there.

23           Inspector Erickson, are you able to see on to the west lawn

24      through the trees back there?

25      A.   I can, yes.
```

1    Q.   What are you able to see?

2    A.   To the right-hand side, I could see the bike rack heading

3    down through the Reflecting Pool, through the trees.  You can

4    still see glimpses of the snow fence with the signs affixed to

5    it, "Area Closed."

6    Q.   Okay.  We can take down Exhibit 63 and pull up Exhibit 33.

7    Oh, 33-1 was fine.

8         (Video played.)

9    Q.   And we can stop the video.

10        Okay.  We've stopped at 00:23.  Inspector Erickson, do you

11   know approximately where this video may have been taken?

12   A.   Yes.  That's the Olmstead wall, and it is on the north end

13   of the Capitol west front, borders the sidewalk and 1st Street

14   near Peace Circle.

15   Q.   If we could continue to play at 23 seconds.

16             THE COURT:  If I could ask a question.  So you're

17   saying this was the restricted area; is that correct?

18             THE WITNESS:  This is the wall leading into the

19   restricted area.

20             THE COURT:  So everyone on this side is not in the

21   restricted area; everyone on the far side is in the restricted

22   area?

23             THE WITNESS:  For the bike rack, yes.

24             THE COURT:  Well, I don't see a bike rack.  Am I

25   missing that?

1        THE WITNESS:  If you move down the wall.  So the bike

2   rack is put together along with the wall, the retaining wall as

3   a barrier.  So if you would go to the left of that back when we

4   were showing the bike rack and the signs on the Peace Circle

5   walkway, that's where this leads to, and that's where the bike

6   rack will meet this wall.

7        THE COURT:  Right.  So it looked to me like at this

8   point there's no bike rack.  You had bike racks like at the

9   entrances to the area; is that correct?

10        THE WITNESS:  That's correct.

11        THE COURT:  Okay.  No signs or anything on this wall,

12   though?

13        THE WITNESS:  Correct.

14        THE COURT:  Okay.  Thank you.

15        BY MS. PASCHALL:

16   Q.   If we could continue to play at 00:25.

17        (Video played.)

18   Q.   If we could stop the video.

19        We've stopped at 1:05.  We're looking at the ground here.

20   What do you see on the ground here?

21   A.   That's the snow fence.

22   Q.   Is that that green kind of mesh-looking material that we

23   see on the ground there?

24   A.   That is correct.

25   Q.   And was that constructed as a part of the barricade to wall

1    off the restricted areas?

2    A.   It was a part of the -- yes, it's another layer of area of

3    restricted.  You can see part of the sign tore up on the

4    floor -- or on the ground underneath them.

5    Q.   Okay.  Ms. de Guzman, if we could, please, pull up

6    Government's Exhibit 34.  Actually, if we want to do 34-1, that

7    might be easier.

8         (Video played.)

9    Q.   Can you stop the video, please.

10        We stopped the video at 00:16.  Did you just hear a noise

11   played in this video, Government's Exhibit 34-1?

12   A.   I heard, yeah, multiple noise, bands, music, drums.

13   Q.   Did you -- well, let's pull it back to about 11 seconds.

14        (Video played.)

15   Q.   Did you hear two noises in succession right there?

16   A.   I did.  I didn't recognize them.

17   Q.   Okay.  If we could -- actually, if we could, please,

18   continue to play Government's Exhibit 34.

19        (Video played.)

20   Q.   If we could stop at 00:26.

21        Looking ahead to the Lower West Terrace, can you see some

22   of that white smoke that we've been describing earlier?

23   A.   Yes.

24   Q.   If we could, please, pull up Government's Exhibit 37-1.

25        (Video played.)

1    Q.   If we could stop the video.

2         We've stopped at 00:39.  What do we see kind of in the

3    midline of this video here?

4    A.   There's the mid retaining wall from the west front that

5    leads to the Lower West Terrace and some bike rack.

6    Q.   And if we could start the video again at 00:49.

7         (Video played.)

8    Q.   If we can stop the video.

9         We've stopped at 1:02.  Kind of down in the lower right

10   area here, do you see some more of that snow fencing we've been

11   discussing?

12   A.   Yes.  It's down on the ground.

13   Q.   And finally, if we could pull up Government's Exhibit

14   Number 42, please.

15            THE COURT:  Sorry.  Can you put that back up for a

16   moment, please.  Is there a name for that wall?

17            THE WITNESS:  Pardon me?

18            THE COURT:  That wall that they were just climbing

19   over there.

20            THE WITNESS:  I'm sorry.  A name?

21            THE COURT:  Do you know the name of that wall, or is

22   there a --

23            THE WITNESS:  We call it the Lower West Terrace wall.

24            THE COURT:  Okay.  And so that's going from the big --

25            THE WITNESS:  Center panel grassy area to the Lower

1    West Terrace improved area, yes.

2              THE COURT:  Okay.  Thanks.  What exhibit is this?

3              MS. PASCHALL:  That is 37-1, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              BY MS. PASCHALL:

6    Q.   If we could pull up 42-1, please.

7         (Video played.)

8    Q.   And if we could stop that video.

9         Okay.  We've stopped the video at 00:04.  Do you know what

10   we're looking at here?

11   A.   I do.

12   Q.   What is that?

13   A.   It's one of the doors built for evacuation purposes on the

14   inaugural platform on the west front.

15             MS. PASCHALL:  Thank you, Inspector.  Those are all my

16   questions.

17             THE COURT:  All right.  Mr. Smith?

18                       CROSS-EXAMINATION

19             BY MR. SMITH:

20   Q.   Good afternoon, Officer.

21   A.   Good afternoon.

22   Q.   I'm representing Couy Griffin.  I will ask you a few

23   questions about your testimony.  Okay?

24   A.   Certainly.

25   Q.   Officer, you testified that you've been with the United

1    States Capitol Police for over 30 years; is that right?

2    A.   Yes, sir.

3    Q.   And I think you testified that you're familiar with all of

4    the locations inside the Capitol building?  Would you say

5    that's --

6    A.   Many of them, yes.

7    Q.   You referenced in your testimony the vice president's

8    office.

9    A.   Yes.

10   Q.   Do you recall saying that?  Do you recall referring to the

11   vice president's office inside the Capitol?

12   A.   Yes.

13   Q.   Are you familiar with the location of that office?

14   A.   I am.

15   Q.   Is that an office that the vice president has permanently?

16   Is that only his office?

17   A.   Yes.

18   Q.   No other members of Congress use that office; is that

19   right?

20             MS. PASCHALL:  Objection.

21             THE WITNESS:  Not that I know of.

22             MS. PASCHALL:  Relevance.

23             THE COURT:  Let's get to it.  I know where it is.

24             BY MR. SMITH:

25   Q.   So does the vice president control that office in his

1    capacity as the President of the Senate?

2    A.    That -- I would say it's his office.  It's assigned to him

3    as the President of the Senate, yes.

4    Q.    Are you familiar with how often the vice president appears

5    at the Capitol?

6    A.    I don't know the exact number, but I do know he comes down

7    often, or back then him or currently her.

8    Q.    So if I understood you correctly, you say that the vice

9    president comes to the Capitol often?

10   A.    If we had to put a number on it, I don't know, maybe --

11   much of it -- he can come up on his own.  Much of it is done in

12   anticipation of Senate votes that he's interested in.  He would

13   come down to preside as President of the Senate.

14   Q.    So he will preside as the President of the Senate and vice

15   president to break ties in the Senate, for example?

16   A.    Sometimes, yes.

17   Q.    But sometimes he will use his office for other reasons

18   besides breaking ties; is that right?

19   A.    That, I could not speak to really.

20   Q.    The vice president was present at the Capitol to preside

21   over the joint session on January 6; correct?

22   A.    I believe so.

23   Q.    So the vice president was at the Capitol working; correct?

24   A.    I would think so.

25   Q.    Has the vice president, in your experience, ever appeared

1    at the Capitol when he's not working?

2                 MS. PASCHALL:  Objection, Your Honor; relevance.

3                 MR. SMITH:  It's relevant, Your Honor.

4                 THE COURT:  Overruled.

5                 THE WITNESS:  I think you would have to speak to the

6    Secret Service and the capacity on how he regulates whether he's

7    working or not working.

8                 BY MR. SMITH:

9    Q.   Thank you.  We will, Officer.  But the question is whether

10   you have ever personally in your capacity as an officer with a

11   great many years under your belt at the Capitol, have you ever

12   seen a vice president come to the Capitol for a reason other

13   than work?

14   A.   No.

15   Q.   So you testified that there were permanent restrictions

16   around the Capitol building on January 6; correct?

17   A.   Yes, sir.

18   Q.   And one of those permanent restrictions was the stone wall

19   that you just looked at; is that right?

20   A.   That wall is a part of the ornamental that was built, part

21   of the grounds when the building was built.

22   Q.   And this might seem like a silly question, but that wall is

23   always there, regardless of who is inside; correct?

24   A.   That is correct.

25   Q.   Now, do you recall that you referenced some snow fencing?

1    Is that right?

2    A.    Yes, sir.

3    Q.    And the snow fencing was placed around the west front of

4    the Capitol in anticipation of the inauguration; is that right?

5    A.    That's correct.

6    Q.    So is it accurate to say that the snow fencing was designed

7    to protect the infrastructure at the Capitol for the

8    inauguration?

9    A.    Leading up to it, so while they're building it, the

10   security of it, to keep people away.

11   Q.    So the security function was to protect the infrastructure

12   for the inauguration?

13   A.    Correct.

14   Q.    Now, you also referenced another kind of temporary security

15   barrier that was there on January 6, and that's metal, I think

16   you called them, bike racks; is that right?

17   A.    Yeah, that's correct.

18   Q.    Okay.  And does the U.S. Capitol Police place those bike

19   racks around the Capitol on occasions in which a Secret Service

20   protectee is not present?

21   A.    We do.

22   Q.    Do you do it often?

23   A.    It all depends on what the event is taking place.

24   Q.    And so is it fair to say that the metal barriers that were

25   placed around the Capitol on January 6 were there like for the

1    same reason that the snow fencing was there?

2    A.    No.  We would not have deployed the bike rack for the State

3    of the Union -- or not State of the Union, but the inauguration

4    or for the inaugural platform at that time.

5    Q.    So what was the distinction that prompted the U.S. Capitol

6    Police to place the bike barriers, the bike racks on January 6?

7    A.    We had that demonstration that was planned further down the

8    Mall.

9    Q.    And so who -- what was the function of the bike racks?

10    A.    Was to keep people out, kind of deter people around that

11    area, keep the area inside secure from people coming in.

12    Q.    And was that to protect members of Congress?

13    A.    That was to keep people outside of the grounds, to stop

14    them from coming around inside the area.

15    Q.    And this again might seem like a silly question to you, but

16    the U.S. Capitol Police wants to keep those people from entering

17    because its mission is to protect members of Congress; is that

18    right?

19    A.    And any visitors, people working, or the building itself,

20    yes.

21    Q.    Okay.  So you testified that only authorized people are

22    allowed to enter the Capitol building at certain times; is that

23    right?

24    A.    That's correct.

25    Q.    And that authorization rule, when is that in force?

1   A.   All the time.

2   Q.   All the time?

3   A.   So the building's open.  If you're staff, you have a staff

4   ID.  If you're official business in the building, a visitor,

5   people would come down and clear you and bring you in.

6   Q.   So is it fair to say that that policy of authorization is

7   in place even when Secret Service protectees are not present?

8   Is that right?

9   A.   That is correct.

10  Q.   And it's the U.S. Capitol Police that decides who is given

11  authorization to enter; is that right?

12  A.   On a normal basis, daily basis, when the Secret Service

13  does not have a protectee up there, yes.

14  Q.   So when the Secret Service has a protectee up there, what

15  is the process for authorization?

16  A.   Well, they always -- we would keep them informed on the

17  events we have going on during the day.  So it's to share

18  information with your law enforcement partners.

19  Q.   So the information about who may be authorized is shared

20  with the Secret Service, but which entity decides who may come

21  in?  Is it the Capitol Police?

22  A.   Well, it depends.  If you're visiting a member on the

23  Senate, then the senator's office working through the Senate

24  Sergeant at Arms office would then give clearance, and the staff

25  would come down and let our officers know.  All we do is the

1    screening part.

2    Q.   So let's say on January 6 there was a person who wanted to

3    come inside to talk to a congressman.  All right?

4    A.   Uh-huh.

5    Q.   And they wanted to speak to a congressman, not a Secret

6    Service member.  That would have to be authorized by the Capitol

7    Police; correct?

8    A.   No.  If a person came up and wanted to speak to a member of

9    Congress, especially on January 6, they would have to go to the

10   member of Congress's office building and have a prior

11   appointment because the buildings were closed to the public.

12   Q.   Thank you.  What I'm trying to say is that supposing this

13   individual did not go to the proper member of Congress's office,

14   then it would be according to U.S. Capitol Police policy that

15   that person could not lawfully enter; is that right?

16            MS. PASCHALL:  Objection, Your Honor, as to relevance.

17            THE COURT:  Overruled.

18            THE WITNESS:  At the time the restrictions were that

19   the buildings were closed because of COVID.  And that's by order

20   of the Speaker of the House and the attending physician.

21            BY MR. SMITH:

22   Q.   So would you say that there's a difference in lawful

23   authorization to enter the building, depending on who the person

24   wants to see?

25   A.   I think it more depends on the business that you might have

1  at hand.

2  Q.   So supposing the business is to speak to a congressperson,

3  would you agree that lawful authorization in that case is

4  different than authorization in the case when a person wants to

5  come into the Capitol to speak to a Secret Service protectee?

6          MS. PASCHALL:  Objection; leading, Your Honor.

7          THE COURT:  Overruled.

8          BY MR. SMITH:

9  Q.   Because we were interrupted, let me put it again.  And I

10  kind of garbled the question.  So I will try to put it more

11  simply.

12      Would you say there are two different kinds of lawful

13  authorization to enter the Capitol, depending on what the

14  business is of the person who wants to enter?  Is that fair to

15  say?

16  A.   No.  If you want to enter the Capitol, you would reach out

17  to whoever has an office there, "I would like to schedule a

18  visit to speak on" whatever.

19      They would then come down and meet you at the entrance

20  under the current status, and they would say this person's

21  authorized.  We would screen them.  They would escort them in

22  the building, to their office for their meeting.

23      If the Secret Service protectee had someone come to visit

24  them, we would coordinate through our partners at the Secret

25  Service.

Q.   Okay.  So if I understand you correctly, if a person wants
to visit -- their business is to visit a member of Congress
inside the Capitol, they have to go to the member of Congress's
office?

MS. PASCHALL:  Objection.

MR. SMITH:  Judge, this is now getting to the point
where we can't ask questions.

THE COURT:  I understand what -- go ahead.

THE WITNESS:  They would have to reach out.  They
couldn't go to the office to see them because the buildings were
closed.  So they would have to call the office ahead of time,
set up the appointment, and then meet -- whatever entrance, the
staff person from that member of Congress's office would have to
come down to meet them.

BY MR. SMITH:

Q.   And by contrast, if an individual wants to visit with a
member of -- a Secret Service protectee in the Capitol, there's
a different process where the United States Capitol Police has
to coordinate with the Secret Service; is that right?

A.   We would not allow authorization for someone to speak to
one of their protectees unless we coordinated with our partners.

Q.   But that's not true in the case where a person merely wants
to visit with a member of Congress?  The United States Capitol
Police would not coordinate with the Secret Service regarding a
visitor's visit to just a member of Congress; is that right?

1    A.    I'm not charged with the protection of the vice president.

2    Q.    That is correct.  My question is whether an individual who

3    would like to enter the Capitol but does not seek any audience

4    with a Secret Service protectee, in that case the United States

5    Capitol Police does not coordinate with the Secret Service; is

6    that correct?

7    A.    If they don't want to see a Secret Service protectee?

8    Q.    Correct.

9    A.    Correct.

10   Q.    Thank you.  So I'm going to bring your attention back to

11   the bike racks that you were -- mentioned before.  The

12   government showed you some images of those bike racks.  I'm

13   going to bring up Government's Exhibit Number 15.

14         Now, I think I recall you saying that you can see better

15   with yellow, is that right, than red?

16   A.    Different shades of red and green, that's correct.

17   Q.    All right.  I'm going to try a shade of red.  If you can't

18   see it, you let me know.  Okay?  So I'm circling.

19   A.    Yep.

20   Q.    Now, is that a bike rack?

21   A.    It is.

22   Q.    Is that the kind of bike rack you were referring to in your

23   testimony?

24   A.    That is correct.

25   Q.    Okay.  That's all.  We're done with that one.

1       I'm going to be bringing up Government's Exhibit Number 25.

2   Can you see that image?

3   A.   I can.

4       (Video played.)

5   Q.   Now, I'm going to draw a circle over some objects on the

6   screen again.  Do you see those metal stands?

7            THE COURT:  This is all outside the restricted area?

8            MR. SMITH:  This is.

9            BY MR. SMITH:

10  Q.   Are those bike racks?

11  A.   Yes.

12  Q.   Those are the same bike racks that are blocking the

13  restricted area; is that right?

14  A.   No.

15  Q.   They're different bike racks?

16  A.   They're bike racks, but there are signs on there that don't

17  say "Area Closed."

18  Q.   Okay.  I'm going to bring up now -- this has already been

19  admitted into evidence as Griffin Exhibit Number 4.  Now, do you

20  see the bike racks on that screen?

21  A.   I do.

22  Q.   Do they look like the bike racks we were looking at in the

23  last image?

24  A.   Yes.

25  Q.   Is there any difference that you see there?

1    A.   Not significant.

2    Q.   Do you see any insignificant differences?

3         THE COURT:  So these still aren't -- those do not

4    demarcate the restricted area?

5         THE WITNESS:  Correct.

6         BY MR. SMITH:

7    Q.   When the judge asked you whether those do not demarcate the

8    restricted area, were you referring, Officer, to the barriers in

9    the image that's marked Griffin Exhibit Number 4?

10   A.   The bike racks there are not the restricted area.

11   Q.   Thank you.  I'm going to pull up Government's Exhibit 33.

12   You're able to see the wall right there that was referenced in

13   the government's testimony earlier; right?

14   A.   Yes, sir.

15   Q.   And you're testifying that this is not the restricted area

16   boundary?

17        THE COURT:  No --

18        THE WITNESS:  No, that wall is.

19        THE COURT:  Yeah, it's the Olmstead wall.

20        BY MR. SMITH:

21   Q.   Officer, I believe that you drew a distinction in your

22   testimony between green fencing and the stone wall; is that

23   right?

24   A.   Well, the green fencing I said was also a part of the --

25   another layer of -- like the bike rack that adds to the

1    restricted area to keep people out.

2    Q.    The stone wall was not placed on January 6 as a restricted

3    area; is that right?

4    A.    Correct.

5    Q.    The snow fencing was the restricted area line; is that

6    right?

7    A.    But we connect the snow fencing and use the wall itself as

8    a part of the barrier, yes.

9    Q.    So the wall was used as a means of propping up what was the

10   demarcation line which is the snow fencing; is that right?

11   A.    The bike racks is the start of it because it connects to

12   the wall and then to the snow fence.

13   Q.    So a couple of minutes ago, we said that -- remember when

14   we saw those fences on First Street -- those bike racks, excuse

15   me?

16   A.    Yep.

17   Q.    And you said that's not the restricted area?

18   A.    That's because you're how far back to Union Square where

19   that part wasn't.  This is where it's going to start.

20   Q.    Okay.  I think you might not have seen the last image.  So

21   I'm going to bring that back up.  This was Griffin's Exhibit

22   Number 4.

23         Do you remember when we saw these fences?

24   A.    Yes.

25   Q.    Excuse me, bike racks?

1    A.    Uh-huh.

2    Q.    Do you know what street that is?

3    A.    That's First Street.

4    Q.    That's First Street?

5    A.    Yes.

6    Q.    And you testified that those are not the restricted area

7    barriers?

8    A.    No.  Where the picture you just showed after, if you follow

9    to the left on your screen, that's where that part of the wall

10   is, and it connects to the bike rack.

11   Q.    So can you see -- so I'm going to draw a circle around the

12   bike rack right here, this bike rack that's within a -- the red

13   circle.  Is that a part of the restricted area line?

14   A.    I do not believe so.

15   Q.    You don't believe so, okay.  I'm going to take this down

16   and go back to the exhibit we were just at, which is Government

17   Exhibit Number 33.

18         Do you know, Officer, where this is?

19   A.    It's not up on the screen.

20         Here we go.  I do know where that is, yes.

21   Q.    Now, is this not the wall that we could see in the last

22   video we were just looking at?

23   A.    I don't believe that is that wall.

24   Q.    Okay.  So I'm going to go back again --

25   A.    It's not that exact part of the wall.  It is the wall we

1    were looking at to the left.

2    Q.    It's a couple feet down?

3    A.    Probably 50 to 60 feet down, yes.

4    Q.    Okay.  So this wall that we're looking at here is always at

5    the Capitol; right?

6    A.    Yes, sir.

7    Q.    And so it was not placed as a post or a barrier for

8    January 6; is that right?  It was not placed --

9    A.    We connected our bike rack to the left.  It was not placed

10   as that, yes.

11   Q.    So let's -- I'm going to get to the -- excuse me.

12         You said bike rack.  Which bike rack are you referring to?

13   A.    Well, earlier, when I was questioned by counsel, my

14   counsel, they showed Pennsylvania Avenue walkway with bike rack.

15   If you go to that walkway, that bike rack meets where this wall

16   ends.

17   Q.    I understand that.  But I am -- what I'm trying to do is

18   focus on the parts of the street that I'm showing you in these

19   videos.  All right?

20         So I think you testified a couple minutes ago that the bike

21   racks we saw on First Avenue were not a part of the restricted

22   area.  Is that right?

23   A.    Yes.

24   Q.    And you've also testified that the stone wall was not

25   placed as a barrier line --

```
 1    A.   Correct.

 2    Q.   -- for January 6; correct?

 3    A.   Correct.

 4    Q.   But the next part is, the stone wall was used to prop up

 5    snow fencing; is that right?

 6    A.   No.  The snow fence was further inside.  So if you look to

 7    the opposite side of this wall, that's where the snow fence was

 8    inside of.

 9    Q.   So can you see this image here that's on the other side of

10    the stone wall?

11    A.   Yes.  So now you're on the grass, the west front side,

12    correct.

13    Q.   Are you able to point in this image where the snow fencing

14    was?

15    A.   It's hard to see it when -- the one image we saw when they

16    were climbing over the wall, they were stepping on some of the

17    snow fence.  I think you just passed some of it.

18    Q.   Right now?

19    A.   Yeah, that was one layer, and further up was another.

20    Q.   Can you see how the snow fence is rolled up there kind of

21    like a rug?

22    A.   Yes.

23    Q.   Why does it look like that?

24    A.   I believe that when you knock down snow fence that's put up

25    temporarily, it goes to an automatic roll.  So part of it is
```

1    rolling.

2    Q.   Do you see a sign on that fence?

3    A.   It looks to me like it's been torn off, because if you look

4    to the bottom, just my opinion, it's a zip tie that is tied to

5    the top of the fence, that white thing sticking up.

6    Q.   You think there might have been a "Do Not Enter" sign on it

7    before it was ripped down?

8    A.   Possibly so.

9    Q.   Why would it be there?

10   A.   Because that was a part of the security fencing put up for

11   the inaugural platform for State of the Union.

12   Q.   I keep asking really silly questions because it's too

13   simple for you.  This is much more basic.

14        Why would the "Do Not Enter" sign be on the snow fence?

15   A.   Well, we put it on the snow fence so people can see what

16   the fence is there for.

17   Q.   So they know -- so you put it up there so people know

18   they're not supposed to enter; is that right?

19   A.   Correct.

20   Q.   But you're saying that in this image, when the defendant's

21   walking over the wall, it's not there; is that right?

22   A.   It is not there.  You can't see it.

23   Q.   So you would agree that the sign indicating that one is not

24   supposed to enter is not there; is that right?

25   A.   Uh-huh.

1   Q.   So a person wouldn't know whether this was snow fencing

2   that was --

3   A.   Probably not, but they should know not to climb over the

4   wall.

5   Q.   Well, that might be, Officer, but the wall was not placed

6   for January 6; is that right?

7   A.   Correct.

8   Q.   Officer, you testified about the Capitol Visitor Center?

9   A.   Yes.

10  Q.   And specifically where it's located; right?

11  A.   Yes, sir.

12  Q.   I'm going to bring up Government's Exhibit Number 73, and

13  I'm going to go to 11:18.

14       Can you see that image?  Do you remember seeing this in the

15  government's --

16  A.   Yes, sir.

17  Q.   Where is this again?

18  A.   This is in the CVC in the Capitol area, in one of the

19  lobbies.

20  Q.   And where is the Capitol Visitor Center?

21  A.   It's underneath parts of the Capitol.

22  Q.   Is it all underground?

23  A.   It is.

24  Q.   The Capitol Visitor Center is a different building than the

25  Capitol building?

1    A.    It is not.

2    Q.    It's the same building?

3    A.    Yes.

4          MR. SMITH:  So, Judge, at this point we are going to

5    introduce a party admission which has been filed in this case.

6    I'm going to publish it.  It's a declaration that the government

7    filed by an agent of the government at its behest in its

8    capacity as a -- to offer a sworn statement which says that the

9    Capitol building is different than the Capitol Visitor Center.

10         If you look at the third paragraph, it says -- the last

11   line, it says, "The Capitol complex is a term that we use to

12   include the Capitol building and the Capitol Visitor Center."

13   They're different buildings.

14         We are introducing it under F.R.E. 801(a)(2)(C) and

15   801(a)(2)(D).  That's an admission made by a person who the

16   party authorized to make this statement or a statement made by

17   the party's agent within the scope of his employment.

18         THE COURT:  So the United States Capitol Police is not

19   a party to this.

20         MR. SMITH:  Is not a party to?

21         THE COURT:  This case.

22         MR. SMITH:  Oh, it's made by a party's agent.  So this

23   is 801(a)(2)(D).  If the government's attorney, the U.S.

24   Attorney's Office, goes to an agent of the government and asks

25   it to make a statement within the scope of his employment,

1    that's a party admission.

2            THE COURT:  Ms. Paschall?

3            MS. PASCHALL:  So first, setting aside the party

4    admission, I don't think it's proper if he's attempting to

5    impeach this witness with this information.  This is not this

6    witness's statement.

7            MR. SMITH:  It's not a --

8            MS. PASCHALL:  If he is planning to admit this as a

9    party admission, we agree with Your Honor.  The Capitol Police

10   is not a party to the case.  This was filed by the Capitol

11   Police under the United States Attorney's Office's filing

12   powers, so to the extent that that's correct.

13        I also don't read that to be in conflict with what this

14   witness is testifying to, and he can't impeach this witness with

15   someone else's statement.  He can enter it into evidence if he

16   wishes as a party opponent statement.  I tend to agree with Your

17   Honor that that isn't appropriate under these circumstances.

18   But he can't use it to impeach this witness who has probably

19   never seen this statement before and certainly didn't author

20   this statement.

21           MR. SMITH:  So, Your Honor, we're not using it to

22   impeach.  As I indicated when I first brought the exhibit up,

23   we're introducing it as a party admission because the statement

24   was, quote, made by the party's agent or employee on a matter

25   within the scope of the relationship and while it existed.  It

was also a statement made by a person whom the party authorized

to make the statement on the subject.

So the person who makes the statement is not the party.

It's the person who makes the statement is authorized by the

party to make the statement or was the party's agent or employee

on a matter within the scope of the relationship.

So this is a statement that fits within those exceptions,

and what this shows is -- the statement is, "The Capitol complex

is a term that we use to include the Capitol building and the

Capitol Visitor Center."

So we're moving that into evidence as Exhibit Number --

Defense Exhibit Number 14.

THE COURT:  All right.  I sustain the objection.  I

don't think the United States Capitol Police are a party or an

agent of the party to this case.  The United States Capitol

Police is an entirely different branch of government from the

Department of Justice.

Please move on, sir.

BY MR. SMITH:

Q.   So this image that you can see is a part of the Capitol

Visitor Center; right?

A.   Yes, sir.

Q.   Where is -- is there a loading dock in the visitor center?

A.   There is.

Q.   There is?  Where is it in relation to this?

1   A.   Maybe underneath -- possibly underneath the Senate plaza,

2   the Senate east front wing.

3   Q.   So I'm going to go back in this video here.

4        So there are some people trying to get in this door here

5   that's shutting.  What is the door shutting to?

6   A.   Pardon me?

7   Q.   Where is the area on our side of the door, if you're

8   looking at this image?

9   A.   That's coming from the crypt of the Capitol.

10  Q.   Those protestors in the image are heading from the crypt

11  towards what?

12  A.   Towards the CVC.

13  Q.   Towards the CVC.  And once they've entered the CVC, if they

14  entered under this door, how would they get to the loading dock,

15  or could they get to the loading dock?

16  A.   They could.

17  Q.   Are there -- how does one walk from here to the loading

18  dock?

19  A.   You would go down the staircase.  You could go to the left.

20  You could walk down around.  There's hallways that lead to the

21  loading dock.

22  Q.   Is there any security there?

23  A.   Yes.

24  Q.   What kind of security?

25  A.   Police officers.

1    Q.   And where do they -- they're posted on various --

2    A.   Different areas around the building.

3    Q.   Well, if a protestor here wanted to get from here down to

4    the loading dock, he would have to encounter U.S. Capitol police

5    officers?

6    A.   Along the way probably, yes.

7    Q.   At various points or --

8    A.   Probably at maybe one point, not counting the loading dock.

9    Q.   Is there a locked door?  Is there some kind of door that

10   separates these things?

11   A.   There's not a locked door.  There's a swinging door.

12   Q.   There's a swinging door?

13   A.   Yeah.

14   Q.   Was that manned on January 6?

15   A.   Yes.

16   Q.   So at the beginning of your testimony with the government,

17   you were referring to the areas that are restricted at the

18   Capitol by the Capitol Police; correct?

19   A.   Yes, sir.

20   Q.   What's the legal authority by which the U.S. Capitol Police

21   restrict those areas?

22   A.   Through the Capitol Police Board.

23   Q.   Through the Capitol Police Board.  And do you know if

24   there's a statute or is there some --

25   A.   I believe there is.  I don't have that offhand.

Q.   Does that -- do you know whether that statute pertains to
the Capitol Police?

A.   It does.

Q.   It does?  Thank you.  So when the U.S. Capitol Police
restrict this area that we've been describing today in the
testimony, it's through that Capitol Police Board authority; is
that right?

A.   That's correct.

Q.   Are you aware of any other legal authority that would allow
them to do that?  By "them," I mean the U.S. Capitol Police.

A.   Just by the authority to enforce the laws.  We don't need
the Capitol Police Board to do that, if something is happening,
an emergency of some sort.

Q.   What laws are you referring to?

A.   The laws of the District of Columbia, federal laws.

Q.   Are you referring to anything else?

A.   Pardon me?

Q.   Are you referring to any other law you're enforcing when
you restrict the area?

A.   No, sir.

Q.   So in your long experience with the Capitol Police, you've
seen a lot of protestors arrested at the Capitol; is that fair
to say?

A.   Yes, sir.

Q.   And protestors are not always charged with an offense if

1   they enter a restricted area; is that right?

2           MS. PASCHALL:  Objection, Your Honor; relevance.

3           MR. SMITH:  I'm getting there, Your Honor.

4           MS. PASCHALL:  Or to this witness's knowledge of who

5   gets charged by the U.S. Attorney's Office.

6           THE COURT:  I'm going to overrule the objection, but

7   let's get there quickly, sir, because I think she's right that

8   this doesn't feel relevant.

9           THE WITNESS:  Can you repeat that?

10          BY MR. SMITH:

11  Q.   This is another kind of silly question to you, but

12  sometimes when the U.S. Capitol Police arrest protestors at the

13  Capitol, they're not booked and charged; is that right?

14  A.   If they're arrested by us?  Yes.

15  Q.   Well, sometimes they're encouraged to leave but not

16  arrested?  I guess that's how I should have put it.

17  A.   That is true.

18  Q.   And when they're arrested, what is the crime?

19  A.   It depends on what they're doing at that time.

20          MS. PASCHALL:  Objection, Your Honor.

21          THE COURT:  Sustained.

22          MR. SMITH:  Your Honor, may I follow up on what the

23  witness just said?

24          THE COURT:  No.

25          BY MR. SMITH:

1    Q.   In your experience, are you familiar with Capitol

2    protestors being arrested relating to the -- in connection with

3    the Secret Service?

4              MS. PASCHALL:  Objection.

5              THE WITNESS:  That, I don't know.  I apologize, but

6    that's vague.  Is there a situation?

7              BY MR. SMITH:

8    Q.   You're right, Officer.  I want to clarify this.

9         You're familiar, like you said, with protestors being

10   arrested at the Capitol where they shouldn't be; right?

11   A.   Yes, sir.

12   Q.   And when they're arrested, why are they arrested?

13             MS. PASCHALL:  Objection.

14             THE COURT:  Sustained.

15             BY MR. SMITH:

16   Q.   This is just the last couple of exhibits, and then it's

17   over.  I'm bringing up Government Exhibit Number 37, which I

18   think the judge referenced at the end of your direct.  Okay.

19        (Video played.)

20   Q.   Do you remember seeing this video on direct, Officer?  I'm

21   going to fast forward through it a little bit, but basically,

22   you've got -- let's see where it happens here.

23        You've got a little wall here, and there's a grate.  Do you

24   see that bike rack there?

25   A.   Yes, sir.

1    Q.   At this point we are inside of the snow fencing; is that

2    right?

3    A.   That is correct, sir.

4    Q.   So the line that was separating inside the restricted area,

5    outside, we've already crossed that; right?

6    A.   Multiple times, yes, sir.

7    Q.   Well, we were referring to the snow fence that's right near

8    the stone wall?

9    A.   No.  There's snow fence further up.

10   Q.   When you say further up --

11   A.   So probably about 30 yards behind the people in this

12   picture, there's another row of snow fence.

13   Q.   I understand exactly what you're saying, Officer.  What I'm

14   trying to say inarticulately is assume you are the person --

15   remember that video we showed where people are walking over the

16   stone wall, climbing over it?

17   A.   Yeah.

18   Q.   They didn't come from the other side of the west front

19   where the snow fencing was lined up originally; right?

20   A.   Correct.

21   Q.   They came from the other direction, over the stone wall

22   near the Peace Monument and then entered the lawn.

23        Do you remember that?

24   A.   That is correct.

25   Q.   So in order to do that, they don't cross the snow fencing

1    that was lined up on the front side of the west lawn?

2    A.   It doesn't matter where you entered over that wall that you

3    showed here, you still would have to go through snow fence that

4    was set up.

5    Q.   So you're referring to the snow fencing that was on the

6    ground, though; correct?

7    A.   No, sir.  The snow fence that was on the ground was right

8    down near that wall.

9    Q.   But at the moment we watched the video, the snow fencing

10   was on the ground?

11   A.   Correct.

12   Q.   I understand your position is that at one point there was

13   snow fencing there, and it extended around this part of the west

14   front.

15   A.   Uh-huh.

16   Q.   But I'm saying that in the video we watched and -- the

17   individuals crossing over the stone wall did not need to cross

18   snow fencing that was up?

19   A.   Correct, but there were two rows of snow fencing, one

20   closest to the wall and on further up to this wall where they're

21   at.  This is a separate wall.

22   Q.   Okay.  And where were you shown a second snow fencing wall

23   that was up?

24   A.   Well, if you -- there's an overview video that, I think, we

25   showed earlier on that.  Right at the walkways where you come

1    in, there was some snow fence put up.

2    Q.    The walkway?  Where are you referring to?

3    A.    I'm sorry.  The Peace Circle, and then there's Garfield

4    Circle over on the southern end.  When you go up these walkways,

5    there's snow fence there.

6    Q.    Do you remember that really long montage exhibit that the

7    government was walking you through with showing different parts

8    of the Capitol?

9    A.    Yes.

10   Q.    That's what you're referring to; correct?

11   A.    Yes.

12   Q.    You're not referring to the video that we watched where a

13   person climbs over the stone wall; right?

14   A.    Correct.

15   Q.    Okay.  So now, you see -- in this video right here, you see

16   the barrier that's propped up there on the wall?

17   A.    The ladder, yes.

18   Q.    That barrier right there is not a restricted -- that's not

19   restricting an area, is it?

20   A.    Well, that's because they took the bike rack apart and then

21   made it a ladder to climb over the restricted area.

22   Q.    Agreed, Officer, but what I'm saying is that when walking

23   up this barrier, you are not crossing a restricted area line at

24   that time, are you?

25   A.    Yeah, you already crossed over two.

Q.   We crossed over it in the video we saw where a person
climbs over the stone wall; is that right?

A.   No, but there's some further up.  I apologize if I'm not
explaining that.

Q.   So, Officer, remember how you were shown lots of different
images from a montage of places around the Capitol, and you were
pointing out places where there was snow fencing?

A.   Yes.

Q.   I'm referring to a different video which you just saw where
someone is climbing over a stone wall and the fencing was down.

     Do you remember that one?

A.   Yes, sir.

Q.   So now we're looking at this -- having moved on from that
point, we're looking at this barrier here propped up on the
wall.  This is not a restricted area line right here, is it?

A.   You're in the restricted area already, but yes.

Q.   But crossing this particular wall is not the restricted
area line?  They were there before, you were saying?

A.   Correct.  You're inside the restricted area at this point.

Q.   You're inside, but this movement -- do you see this person
who is wearing a tan --

          THE COURT:  Mr. Smith, got it.  Let's move on.

          MR. SMITH:  Okay.

          BY MR. SMITH:

Q.   And then I think in Government Exhibit 36, which I'm going

to bring up here -- Officer, while I'm looking for this, do you

recall that there was another tan-looking ramp that people were

walking up in an image that was shown to you?  Not the metal

barrier that's propped up like this, but there's also kind of a

tan-looking ramp walking up.

A.   Yes, vaguely.

Q.   Right.  Is that a restricted area line?

A.   So the tan ramp, if I am not mistaken, is a part of the

inaugural stand.  We built handicap ramps that are ADA

accessible for reasons.  And I only say that because all that

was painted tan.  So if it was a tan ramp, it was built for the

construction in ADA inside the restricted area.

Q.   Now, you've been shown images where you have this group of

people inside this restricted area once they've crossed that

green fencing; right?  When they move from that area to the area

on the platform, is that a different restricted area?

A.    It's all restricted area, but there was another row of bike

fence that they climbed over to get there.

Q.   You're referring to the bike fence that was turned

sideways?

A.   No.  It could have been, but there's pieces spread across

the whole Lower West Terrace.  So that could have been two

pieces that were at the bottom of the walkway.

Q.   What I'm trying to -- again, my question is really simple,

but once you're in this restricted area, there aren't circles

1    within circles that are different restricted areas?  There's

2    only one restricted area; is that right?

3    A.    Correct, but multiple layers of bike rack or snow fence

4    along the way.

5    Q.    Now, is there a different restricted area inside the

6    building?

7              MS. PASCHALL:  Objection, Your Honor.

8              THE COURT:  Overruled.

9              THE WITNESS:  A restricted area is a restricted area,

10   yes.

11             BY MR. SMITH:

12   Q.    So let's say one of these protestors is standing on the

13   inaugural building but his friend goes inside the building and

14   he stays out on the inaugural platform.

15        Is that a different restriction -- violation of a

16   restricted area, to enter the building itself?

17   A.    Well, the building's closed to the public on January 6, so

18   yes.

19   Q.    Would you say that that's a different restricted area?

20   A.    Well, one is -- they're both restricted areas.  One's

21   inside the building, and one's on top of the inaugural stand.

22   Q.    So if a person crosses from outside the building inside the

23   building, they're not entering a different restricted area?

24   They were already in it?

25   A.    It's already restricted.

1    Q.    It's the same?  It's all the same?

2    A.    Well, the building's closed to the public.  So they closed

3    the west front for construction and demonstration reasons.

4    Q.    So it was restricted in a way that the outside was not?

5    A.    No, the outside was restricted, too.

6    Q.    It was restricted, too, but it was a different kind of

7    restriction.  There was a restriction for the building.

8    A.    I don't know different kinds of restrictions.  Restrictions

9    are restrictions.

10    Q.    Restrictions are restrictions --

11          THE COURT:  Mr. Smith, come on.  I think you're asking

12    him for legal conclusions here.

13          BY MR. SMITH:

14    Q.    Officer, we were referring to the loading dock in the

15    Capitol Visitor Center.  Are you aware of any protestors

16    breaching that area?

17    A.    I'm not aware.

18    Q.    Are you -- would you be aware if it had happened?

19    A.    I would hear it over the radio possibly if that

20    transmission went out.

21    Q.    Why do you think the protestors didn't go into that area?

22    A.    I don't know.

23          MR. SMITH:  I think that's everything, Judge.

24          THE COURT:  Thank you, Mr. Smith.

25          Ms. Paschall, redirect?

```
 1                        REDIRECT EXAMINATION
 2            BY MS. PASCHALL:
 3   Q.   Ms. de Guzman, can you, please, pull up Exhibit Number 2.
 4        Inspector, can you see Government's Exhibit Number 2 on
 5   your screen?
 6   A.   Yes, I do.
 7   Q.   Just to be abundantly clear, is the Capitol building inside
 8   of the restricted area that you've already testified to inside
 9   of the yellow border on Government Exhibit Number 2?
10   A.   Yes.
11   Q.   Can we, please, pull up Government's Exhibit Number 3.
12        Can you see Government's Exhibit Number 3 on your screen,
13   Inspector?
14   A.   Yes, ma'am.
15   Q.   Remember when we talked about the green snow fencing in the
16   very forefront of this photograph?
17   A.   Yes.
18   Q.   Are you all the way at the restricted perimeter here, or
19   are you already inside the restricted perimeter when that green
20   snow fencing in Exhibit Number 3 exists?
21   A.   So the stuff at the bottom, the green snow fence, you are
22   inside the restricted perimeter.  The snow fence further up, you
23   are still inside the restricted perimeter.
24            THE COURT:  The Olmstead wall is the restricted -- the
25   boundary?
```

1        THE WITNESS:  The Olmstead wall is just to the bottom

2   of this picture here, on the other side.  I couldn't tell you

3   how many feet.

4        THE COURT:  That's the boundary?

5        THE WITNESS:  Yes, sir.

6        BY MS. PASCHALL:

7   Q.  Could we, please, pull up Government Exhibit 73 and play

8   from 00:00.

9        (Video played.)

10  Q.  If we stop the video here, 00:19, is this the Peace Circle

11  we've been talking about?

12  A.  Yes.

13  Q.  Is this the bike rack that you've been referring to, that

14  if you moved it down from the Olmstead wall it would be blocking

15  your path?

16  A.  That is correct.

17  Q.  Where is the Olmstead wall in relation to where we are at

18  00:19 in Government's Exhibit 73?

19  A.  If you look to the right of your screen, you can see it

20  starts at each end of where the walkway ends.

21  Q.  And fair to say we're on sort of the northwest side of the

22  restricted area perimeter?  Is that correct?

23  A.  That is correct.

24  Q.  You can pull down that exhibit.  Thank you, Ms. de Guzman.

25        We've talked about the mission of the Capitol Police is to

1    keep safe the members, the building, and the visitors who come

2    to the U.S. Capitol building and grounds; is that accurate?

3    A.   Yes.

4    Q.   Is the vice president considered somebody who visits the

5    U.S. Capitol building and grounds?

6    A.   Yes.

7    Q.   Was he visiting on January 6 of 2021?

8    A.   Yes.

9    Q.   Would it have been a part of the Capitol Police's mission

10   on January 6, 2021, to keep the vice president safe?

11   A.   Yes.

12            MS. PASCHALL:  No more questions, Your Honor.

13            THE COURT:  Thank you.

14       All right.  Why don't we take a five-minute break.

15       Inspector, I appreciate your testimony here today.  You're

16   free to go.

17            THE WITNESS:  Thank you, sir.

18       (Recess taken from 4:01 p.m. to 4:12 p.m.)

19            MS. PASCHALL:  Your Honor, I do have an update for the

20   Court and for counsel about the video.

21       Tad DiBiase has gotten the dispensation necessary from the

22   Capitol Board to disclose it.  He is downloading those videos

23   now.  We expect them to be here at the court in short order.

24       That's the update.

25            THE COURT:  All right.  Let's go ahead and call your

1    next witness, please.

2           MS. PASCHALL:  I think at this time, Your Honor, we

3    maybe want to deal with stipulations and agreed-upon exhibits.

4    So I will let Ms. Iyengar.

5           MS. IYENGAR:  Your Honor, at this time the government

6    would like to play Government's Exhibit 78 for the Court.  I

7    believe Mr. Smith had indicated there was some sort of an

8    objection.  We had reached a stipulation, which I believe was

9    Government's Exhibit 100, about the authenticity of the video.

10   I'm not sure what the nature of the objection is.

11          THE COURT:  Okay.  Mr. Smith?

12          MR. SMITH:  Your Honor, we don't know what 78 is

13   because the government has changed its exhibit numbers so many

14   times.  So if the government begins to play it, perhaps I can --

15          THE COURT:  It's the county special meeting of

16   January 14.

17          MR. SMITH:  Oh, no objection.

18          THE COURT:  Without objection, you may play 78.

19      Do you not have this sheet?  Did you all give Mr. Smith a

20   copy?

21          MS. IYENGAR:  I provided a copy of that to Mr. Smith,

22   yes.

23          THE COURT:  Their sheet actually is pretty detailed,

24   sir.

25          (Video played.)

1          MS. IYENGAR:  Sorry, Your Honor.  There is a

2     transcript of Exhibit 78.  It should be 78-A in the trial

3     binder.

4          (Video played.)

5               THE COURT:  Ms. Iyengar, this is about 20 minutes?

6               MS. IYENGAR:  Yes.

7               THE COURT:  Why don't I just read this transcript?  Is

8     there any reason why that wouldn't just work?

9               MS. IYENGAR:  That is, I guess, fine with the

10    government if that's the Court's preference.

11              MR. SMITH:  No objection.

12              THE COURT:  Yeah, I think we can keep moving.  If

13    there's something you want me to see, I'm willing to see it.

14    Otherwise, it just feels like a better use of all of our time.

15              MS. IYENGAR:  Your Honor, there may be a part that we

16    want to direct the Court's attention to.

17              THE COURT:  Great.  Let's do that.

18              MS. IYENGAR:  We're going to start playing it at 2:00

19    on the player time stamp.

20              THE COURT:  Okay.

21         (Video played.)

22              MS. IYENGAR:  We just stopped it at 3:17.

23              THE COURT:  Okay.

24              MS. IYENGAR:  And I think there's just one more video,

25    and this is Exhibit 72 that we wanted to play, which was the

1    montage of the official proceeding.  I believe the Court already

2    ruled on -- well, is waiting to rule on the admissibility upon

3    seeing the montage.  So we will play that for the Court now.

4            THE COURT:  How long is this?

5            MS. IYENGAR:  I believe this is about ten minutes.

6            MR. SMITH:  Your Honor, we would object just now on

7    the basis that we're not going to have time to --

8            COURT REPORTER:  Come to the microphone, Counsel.

9            MR. SMITH:  Your Honor, it's now 4:20, and the

10   government has placed its Secret Service witness last.  There

11   are discovery issues we have to resolve before the witness can

12   testify, and the government is proposing to play a ten-minute

13   video about the electoral clause and the 12th Amendment.

14           THE COURT:  I understand.

15       You may go ahead.

16       (Video played.)

17           THE COURT:  All right.  That was 72?

18           MS. IYENGAR:  Yes.

19           THE COURT:  Over objection, I'm admitting it.

20       (Government Exhibit 72 received into evidence.)

21           MS. PASCHALL:  I think all that remains for us to move

22   in without a witness is Exhibit 70, which is the -- two

23   exhibits, Exhibits 102 and 103, which are the congressional

24   records which are interspersed throughout the government's last

25   exhibit.

THE COURT:  All right.  Any objection, Mr. Smith?

MR. SMITH:  No, objection.

THE COURT:  Without objection, 102 and 103 are in.

(Government Exhibits 102 and 103 received into evidence.)

MS. IYENGAR:  And Your Honor, I believe that concludes everything that we can take care of today before the CCTV footage is turned over, assuming that the Court does not want us to call the witness before the footage is turned over.

THE COURT:  No, I do want you to call your witness.

MS. IYENGAR:  Oh, we can do that, then.

MR. SMITH:  Your Honor, we would object to not having access to the footage during the testimony.

THE COURT:  I understand.

MR. SMITH:  Your Honor, can we have a conference for one moment to discuss a few of these issues?

THE COURT:  Okay.  Parties approach.

(Bench conference.)

MR. SMITH:  So this is the sensitive materials that the government produced over the weekend, the *Jencks* material for the next witness, and it indicates that the vice president was in the loading dock.  It says CVC.  I think it means the Capitol Visitor Center.

And we're going to be making an argument, a couple of arguments that this is not the Capitol building or grounds, but not just for the reasons in our papers but because restricted

1    areas are above ground and this witness is likely going to be

2    testifying that restricted areas move when the protectee moves.

3         So we need to use this to cross-examine the witness.  We

4    want to lift the sensitivity designation.

5              THE COURT:  Do you know, is he going to be --

6              MR. SMITH:  She.

7              THE COURT:  -- that the vice president was in the

8    loading dock?

9              MS. IYENGAR:  Yes.

10             MR. SMITH:  Oh, she's going to testify that he was

11   there?

12             MS. IYENGAR:  My understanding of the Court's order

13   was that the Court was allowing the defense to get into the vice

14   president's exact location.  And so we were assuming that that

15   was going to be gotten into on cross-examination.

16             MR. SMITH:  So I think, Your Honor, if she says no and

17   I didn't move to lift this, then --

18             THE COURT:  We'll deal with it then.

19             MR. SMITH:  Okay.

20        (End of bench conference.)

21             MS. IYENGAR:  The government calls Lanelle Hawa to the

22   stand.

23          LANELLE HAWA, WITNESS FOR THE GOVERNMENT, SWORN

24             THE COURT:  Good afternoon, ma'am.

25             THE WITNESS:  Good afternoon.

                          DIRECT EXAMINATION

1

2            BY MS. IYENGAR:

3    Q.   If you could state and spell your name for the court

4    reporter, please.

5    A.   Sure.  It's Lanelle, L-a-n-e-l-l-e, R., last name Hawa,

6    H-a-w-a.

7    Q.   Okay.  Where are you currently employed?

8    A.   With the United States Secret Service.

9    Q.   And in what capacity?

10   A.   I'm an inspector.

11   Q.   Okay.  And how long have you been with the Secret Service?

12   A.   A little over 23 years.

13   Q.   What is your current assignment with them?

14   A.   I'm an inspector.

15   Q.   I'm sorry.  Which division or unit are you assigned to?

16   A.   With the Inspection Division.

17   Q.   I'm sorry.  Say that one more time.

18   A.   With the Inspection Division.

19   Q.   And how long have you been with that unit?

20   A.   I went over to the Inspection Division in September of

21   2021.

22   Q.   Okay.  So prior to going over to the Inspection Division,

23   what unit were you assigned to?

24   A.   I was assigned to the Liaison Division.

25   Q.   And how long were you with the Liaison Division?

A.    I went over to the Liaison Division in December of 2019.

Q.    Okay.  So is it fair to say you were with the Liaison

Division on January 6, 2021?

A.    Yes.

Q.    Okay.  And what exactly does the Liaison Division do?

A.    We coordinate visits to the U.S. Capitol with any of our

protectees, you know, president, vice president, heads of state,

or anyone who is designated as a protectee by the United States

Secret Service.  So we coordinate with the Capitol Police,

Senate or House Sergeant at Arms, and coordinate, facilitate

access onto the complex, off the complex, and then throughout

the complex, the Capitol complex.

Q.    And just to be clear, when you say "protectee," you mean a

person that receives Secret Service protection; is that right?

A.    Correct.

Q.    So prior to January 6, 2021, had you ever coordinated

visits by the vice president to the Capitol building?

A.    Yes.

Q.    Okay.  And approximately how many times would you say you

did that?

A.    Oh, goodness.  Several.

Q.    Okay.  So I'm going to direct your attention now to

January 6, 2021.  What were you assigned to do that day?

A.    I was assigned to -- as the liaison agent, the site agent

for Vice President Pence.

1   Q.   Okay.  And I'm a fast talker.  So I think you're just

2   feeding off of me.  But if you could just slow down just a

3   little bit --

4   A.   Sure.

5   Q.   -- I think it will help our court reporter out.

6        And I think this is probably clear, but was Vice President

7   Pence at that time protected by the Secret Service?

8   A.   Yes.

9   Q.   Okay.  Why was Vice President Pence visiting the Capitol on

10  January 6, 2021?

11  A.   He was coming up for the Joint Session of Congress.  They

12  were gathering for the Electoral College vote.

13  Q.   Okay.  Prior to January 6, did you notify anyone, including

14  any law enforcement partners, that the vice president would be

15  at the Capitol on that day?

16  A.   I'm sorry.  Can you repeat the question?

17  Q.   Sure.  Prior to January 6, 2021, did you notify anyone,

18  including any law enforcement partners, of the vice president's

19  visit on January 6?

20  A.   Yes.

21  Q.   And how did you make that notification?

22  A.   Via e-mail, through a notification form that we utilize, I

23  notified the U.S. Capitol Police.

24           MS. IYENGAR:  Okay.  And I guess I will just ask

25  whether there's any objection to Government's Exhibit 6 before

1  we put it up on the screen.

2          THE COURT:  Why don't you just go ahead and put it up.

3          MR. SMITH:  No objection.

4          THE COURT:  All right.  Without objection, 6 is in.

5      (Government Exhibit 6 received into evidence.)

6          MS. IYENGAR:  Okay.  Perfect.

7          BY MS. IYENGAR:

8  Q.   And Inspector, I'm not sure if you can see that on your

9  screen.

10 A.   Yeah.

11 Q.   Okay.  Great.  You said that you made the notification

12 through e-mail; correct?

13 A.   Correct.

14 Q.   Is this the same e-mail that you sent to make that

15 notification?

16 A.   Yes.

17 Q.   Okay.  And if we can actually just go down to page 2 of

18 this exhibit.  So on page 2 of this exhibit, it looks like

19 there's sort of a schedule down here at the bottom of the page.

20     Do you see that?

21 A.   Yes.

22 Q.   Can you just explain for us what that schedule was about

23 and what the purpose was in providing that schedule?

24 A.    Sure.  It's just a notification that let's the Capitol

25 Police know that this is the location where we anticipated the

1    motorcade, the vice president's motorcade arriving and then

2    where we anticipate the vice president moving about the Capitol

3    complex once he arrives.  And again, usually we'll put on there

4    where we anticipate the vice president departing the complex.

5    Q.   Okay.  All right.  And we can take Exhibit 6 down.  Thank

6    you.

7         So moving on to January 6, then, do you know if the U.S.

8    Capitol building or the surrounding grounds was restricted in

9    any way for visitor entry on that day?

10   A.   It was.

11   Q.   And if you could pull up Exhibit 2, do you see a copy of

12   Exhibit 2 in front of you?

13   A.   Yes.

14   Q.   And is that a map of the restricted perimeter from

15   January 6, 2021?

16   A.   Yes.  The yellow line?

17   Q.   Yes, the yellow line.

18   A.   Yes.

19   Q.   And can you just explain in terms of the buildings that are

20   within that restricted perimeter, which buildings are included

21   within the perimeter?

22   A.   The main Capitol building, the visitor center.  There's a

23   loading dock within there as well.

24   Q.   Okay.  And the Capitol building, visitor center, and the

25   loading dock, those were all restricted to visitor -- any sort

1    of visitor entry; is that correct?

2    A.   Correct.

3    Q.   Okay.  And the visitor center and the loading dock, are

4    those above ground or below ground?

5    A.   Below ground.

6    Q.   Okay.  And they were still restricted to visitor entry;

7    correct?

8    A.   Correct.

9    Q.   Okay.  Why was there a restriction in place on January 6

10   for visitor entry onto both the Capitol grounds as well as the

11   building, visitor center, and the loading dock?

12   A.   Multiple reasons.  One, there was a build-out of the

13   inaugural stand on the west side; because of the certification

14   of the Electoral College votes on January 6; and there was,

15   obviously, COVID restrictions as well.

16            THE COURT:  Sorry.  Could you say that last part?

17            THE WITNESS:  There was COVID restrictions.

18            THE COURT:  COVID?

19            THE WITNESS:  COVID.

20            BY MS. IYENGAR:

21   Q.   And I'm sorry if I missed this.  Were any of the reasons

22   for the restriction Vice President Pence's visit?

23   A.   He was a part of the Electoral College, the certification.

24   Q.   I see.  So moving on to the actual timeline of events that

25   day, on January 6, at what time approximately that morning or

1    afternoon did you first see Vice President Pence?

2    A.    Approximately 12:30.

3    Q.    Okay.  And was the vice president by himself or with other

4    family members?

5    A.    He was with other family members.

6    Q.    Can you tell us who was with him?

7    A.    Sure.  His wife, Mrs. Pence, and his daughter, Charlotte.

8    Q.    Okay.  And do they both receive Secret Service protection

9    as well?

10   A.    Yes, they do.

11   Q.    Okay.  Where did you first meet him when you met him that

12   day?

13   A.    I met the motorcade at the base of the stairs of the Senate

14   carriage.

15   Q.    Okay.  Is that within the Capitol building or somewhere

16   else?

17   A.    The main Capitol building.

18   Q.    Okay.  After you met his motorcade, where did you go with

19   Vice President Pence?

20   A.    We proceeded to his ceremonial office on the second floor

21   of the Senate building.

22   Q.    Okay.  And that's still within the Capitol building?

23   A.    Correct.

24   Q.    Okay.  Did there come a time that he left that office?

25   A.    Yes.

1    Q.   And where did he go at that point?

2    A.   The Senate chamber.

3    Q.   Okay.  And about what time was that?

4    A.   Oh, gosh.  A little before 1:00.

5    Q.   Okay.  What was the reason he was going over to the Senate

6    chamber at that point?

7    A.   For ceremonial purposes, to walk over with the senators, to

8    proceed over to the House side for the election -- for the

9    certification of the Electoral College votes.

10   Q.   Okay.  So he first goes to the Senate chamber; correct?

11   A.   Correct.

12   Q.   That's what you just testified to?

13   A.   Yes.

14   Q.   And then there comes a time that he goes to the House side;

15   is that right?

16   A.   Correct.

17   Q.   Okay.  Did there come a time that he went from the House

18   side back over to the Senate chamber?

19   A.   Yes.

20   Q.   Okay.  At the point that he leaves from the House chamber

21   back to the Senate chamber, were you personally aware of

22   anything that -- anything that was taking place outside on the

23   Capitol grounds?

24   A.   Yes.

25   Q.   And tell me about that.

1   A.   We were getting notifications that there were some security

2   breaches on the west lawn.

3   Q.   Okay.  And explain what you mean by "security breaches."

4   A.   That there was groups of individuals who had broken through

5   the fencing on the -- again, on the west side.

6   Q.   Okay.  And what, if any, action did you take, did you or

7   any of -- any of the other members of the Secret Service take

8   based on that information that you were receiving?

9   A.   Just gathering the information at that time.

10   Q.   Okay.  So after the vice president moved over to the Senate

11   chamber, did he stay in the Senate chamber, or did there come a

12   time that he left?

13   A.   He was in the Senate chamber, and there came a point where

14   he moved to his office in the Senate area.

15   Q.   Okay.  And that's the same office we were talking about

16   earlier; is that right?

17   A.   Yes.

18   Q.   Why did he return back to his office from the Senate

19   chamber?

20   A.   Because there was continued breaches on the west side.

21   Q.   Okay.  And when you say "continued breaches," of what?

22   A.   Security breaches.  So there was a large group of

23   individuals who were breaking through the snow fencing and the

24   bike rack, and they were coming up on the inaugural stage.

25   Q.   I guess, why did he have to leave the Senate chamber to go

1    back to his office just because people were outside the building

2    breaking through the snow fencing?

3    A.    It was becoming a security concern.

4    Q.    Okay.  And tell me about that.  Why was that a security

5    concern for you?

6    A.    Well, we had individuals, unknown individuals who were

7    breaking through a security barrier of a site where we had

8    protectees.  So it becomes a security issue when they are

9    surrounding a secured site, and then it becomes an issue when

10   they are potentially taking away options for our routes out.

11   Q.    Okay.  And tell me about taking away options for the routes

12   out.  How are people outside the building taking away options

13   for you to exit?

14   A.    At some point the individuals were also breaching the east

15   side.

16   Q.    Okay.  And why was that significant?

17   A.    Well, that's where our motorcade was.

18   Q.    Okay.  All right.  So the vice president goes over to

19   his -- the ceremonial office; correct?

20   A.    Correct.

21   Q.    And then does there come a time that he leaves the

22   ceremonial office?

23   A.    Yes.

24   Q.    So I actually want to show you Government's Exhibit 75,

25   which is a video.

1           (Video played.)

2    Q.   If we can just pause it real quick.  Sorry.  Thank you for

3    being very quick on that.

4         So we're just looking at the first frame in Government's

5    Exhibit 75.  You can see in the top left corner here the time

6    stamp says Wednesday, January 6, 2021, at 2:25:49 p.m.

7         Do you see that?

8    A.   Yes.

9    Q.   Do you see -- before we kind of move on through the video,

10   do you see yourself in this frame at all?

11   A.   Yes.

12   Q.   Can you just point yourself out and tell the Court what

13   you're wearing?

14   A.   Yes.  I'm at the -- on the foyer of the stairs in a blue

15   top and black suit.

16   Q.   Okay.  And we can continue -- and just to sort of orient

17   the Court, where exactly is this?

18   A.   That is the member staircase, and it's just outside the

19   Senate chamber and the vice president ceremonial office.

20   Q.   And what we're about to watch, is this the evacuation from

21   the ceremonial office that we were just talking about?

22   A.   Correct.

23   Q.   Okay.  So we can go ahead and continue to play the video.

24           (Video played.)

25   Q.   If we want to just pause it right here, is the vice

1    president in this frame here?

2    A.   Yes.

3    Q.   Can you just point out, I guess, what he looks like and

4    what he's wearing?  I know everybody seems to be wearing the

5    same thing.

6    A.   Sure.  He is, I guess I would say, in front of the

7    gentleman who has got his wrist up, and he's wearing a dark

8    suit, and you can see his white collar and gray hair.

9    Q.   All right.  And so after -- and we can actually just play

10   this all the way to the end.

11        (Video played.)

12   Q.   All right.  I think it's starting to replay.  We can go

13   ahead and take it down.  Thank you so much.

14        So after kind of that video ends and the vice president

15   goes down that staircase, where do you go with him?

16   A.   We took him to a secure location.

17   Q.   Okay.  And where was that secure location that he was taken

18   to?

19   A.   Underground.

20   Q.   Okay.  Can you be a little bit more specific than that?

21   A.   It was in the loading dock.

22   Q.   Okay.  And where was that loading dock like approximately

23   located, I guess?

24   A.   It's located, I guess, underneath the Capitol building,

25   sort of under the plaza on the Senate side.

1    Q.   Okay.  Is it fair -- I guess -- and if we can just pull up

2    Exhibit 2 again.  Sorry to make you go back and forth.

3        Just looking at Exhibit 2, is the loading dock that you

4    took the vice president to within that yellow line in Exhibit 2?

5    A.   Yes.

6    Q.   Okay.  And I think we were talking about a loading dock

7    earlier in your testimony, about whether it was restricted or

8    not, and you indicated that the loading dock you were talking

9    about was restricted; right?

10   A.   Correct.

11   Q.   Is that the same loading dock that the vice president was

12   taken to?

13   A.   Yes.

14   Q.   Okay. All right.  And approximately how long did he remain

15   in that loading dock location for?

16   A.   Several hours, so approximately four or five hours.

17   Q.   Okay.  Did there come a time that -- well, I guess let me

18   back up for a second.

19       After the vice president went to the loading dock area, do

20   you know what happened with the Electoral College certification

21   process?  Was it still going on?  Had it been stopped?  Or

22   something else?

23   A.   While we were in the loading dock?

24   Q.   Yes.

25   A.   It had been stopped.

Q.   Okay.

THE COURT:  Ms. Iyengar, do you have a time stamp on
the video of the vice president leaving the ceremonial --

MS. IYENGAR:  Yes.  I believe it was 2 -- sorry.  I
think it starts at 2:26, but let me just confirm that.  2:25:49.

THE COURT:  Thank you.

BY MS. IYENGAR:

Q.   And why was the certification of the Electoral College
stopped at the point that the vice president sort of left out of
the ceremonial office?

A.   It was stopped for multiple reasons.  It was stopped
because there was breaches on the House of Representatives side
by individuals who had breached the House of Representatives,
and then there was breaches happening also on the Senate side of
the Capitol building.

Q.   Okay.  Was -- I guess, was it stopped at all in relation to
any of the individuals you had talked about earlier who were
outside of the Capitol building?

A.   Yes.

Q.   And tell me about that.

A.   Approximately 2:00, I want to say, the Capitol went into
lockdown, which means everything has to stop, and the doors
lock, and people aren't allowed in.  It's a security issue,
obviously, that's causing concern so that they have to stop any
official actions that are taking place and make sure everybody's

safe.

Q.   Okay.  And when the building went into lockdown at 2:00,
was that due to individuals who had breached the security
perimeter inside the building or outside the building?

A.   I believe it was -- I believe it might have been both, but
I can't recall for sure.

Q.   That's fine.  If you're not sure, you're not sure.  That's
totally fine.

     Okay.  Did there come a time that the vice president
returned back to the Senate chamber?

A.   Yes.

Q.   On the evening of January 6?

A.   Yes.

Q.   Okay.  And why did he return back?

A.   For the continuation of the certification of the Electoral
College votes.

Q.   Okay.  Did you remain with the vice president between the
time that he evacuated out of the ceremonial office to the time
that he returned back to the Senate chamber that evening?

A.   Yes, I did.

Q.   Okay.  And I don't think I asked you this:  About what time
does he return back to the Senate chamber?

A.   I want to say it was approximately 7:00.

Q.   Okay.  And in that interim period between when he leaves
the ceremonial office to when he returns back to the Senate

```
 1    chamber, was there ever a time that he was outside of the
 2    restricted perimeter that we see in Government's Exhibit 2?
 3    A.   No.
 4              MS. IYENGAR:  Your Honor, if I can have just one
 5    moment.
 6         (Government counsel conferred.)
 7              MS. IYENGAR:  No further questions for this witness,
 8    Your Honor.
 9              THE COURT:  Thank you, Ms. Iyengar.
10         Mr. Smith?
11                            CROSS-EXAMINATION
12              BY MR. SMITH:
13    Q.   Good afternoon.
14    A.   Good afternoon.
15    Q.   I'm representing the defendant.
16         Ms. Hawa, you said that you've been employed by the Secret
17    Service for over 20 years; is that correct?
18    A.   23, over 23 years.
19    Q.   23 years?
20    A.   Yes, sir.
21    Q.   And that's -- is that about four presidencies, would you
22    say?
23    A.   I'm not sure.
24    Q.   Maybe, you know, Bill Clinton, George Bush, Barack Obama,
25    Donald Trump, all of those presidencies that you've been
```

1    involved with the Secret --

2    A.    Yes.

3    Q.    And your time with the Secret Service includes liaison work

4    with vice presidents, too; is that right?

5    A.    Yes.

6    Q.    You've been working with vice presidents' security details

7    for a long time?

8    A.    Yes.

9    Q.    Ms. Hawa, the vice president has an office at the Capitol;

10   correct?

11   A.    Correct.

12   Q.    It's called the vice president's room?

13   A.    That's not what I refer to -- I just know it as the

14   ceremonial office.

15   Q.    Ceremonial office.  And does the vice president often visit

16   his office at the Capitol?

17   A.    Which vice president?

18   Q.    Any vice president.

19   A.    I mean, I guess it would depend which one you're referring

20   to.

21   Q.    How about Vice President Mike Pence?

22   A.    Does he often?

23   Q.    Did.  I guess it would be past tense now.

24   A.    My recollection is since I was assigned up there, he was

25   there maybe a handful of times.

```
 1    Q.    So what are the reasons the vice president visits that
 2    office at the Capitol?
 3    A.    He would go for official business.
 4    Q.    Do you know what kind of business that is?
 5    A.    No.
 6    Q.    Does he break ties in the Senate when there's a vote in the
 7    Senate, the vice president?
 8    A.    Yes.  He's the President of the Senate.
 9    Q.    And does he attend other votes, even if he's not breaking a
10    tie?
11    A.    I can't speak to that.
12    Q.    Did Vice President Pence break about 12 ties during his
13    term in office in the Senate?
14    A.    I couldn't speak to that.  I couldn't give you an exact
15    number.
16    Q.    So when the vice president traveled to the Capitol that
17    day, he was on official business; is that right?
18    A.    Yes.
19    Q.    The official business was that he was presiding over the
20    joint session that was counting electoral certificates; is that
21    right?
22    A.    Correct.
23    Q.    He was working that day; is that fair to say?
24    A.    That's my understanding.
25    Q.    Now, are you familiar with when vice presidents travel to
```

1    places outside of either the vice president's residence or the

2    Capitol?

3    A.   Can you be more specific?

4    Q.   So when the vice president leaves Washington, D.C., he

5    leaves his home, his official residence, and he's not traveling

6    to the Capitol but he travels outside of Washington, D.C., are

7    you familiar with the process by which his security is

8    maintained?

9    A.   To some degree, I guess, to some degree.  I was never

10   assigned to the vice president's detail.

11   Q.   Are you familiar with the process by which the Secret

12   Service sets restricted areas, security perimeters for the vice

13   president when he goes to other places?

14   A.   Yes.

15   Q.   Is that the same process as the one when the vice president

16   visits the Capitol?

17   A.   I think the processes vary.

18   Q.   Sorry.  Could you repeat that?  I think there was some

19   interference with --

20   A.   I said the processes can vary.

21   Q.   The processes can vary?

22   A.   Sure.

23   Q.   And when you say "vary," do you mean varying between when

24   the vice president's at the Capitol and when he is, for example,

25   attending a rally in Florida?

```
1    A.   Sure, based on the site, it can vary.

2    Q.   And would -- when the vice president goes to the Capitol

3    building, he is working there; correct?  For example, on

4    January 6, he was working there?

5    A.   Yes.

6    Q.   If the vice president is traveling to a rally in Florida,

7    for example, he's not working in his constitutional capacity as

8    the President of the Senate, is he?

9    A.   I can't answer that.

10   Q.   Well, if the vice president is attending a social function

11   in Florida, is he working?

12   A.   A social function?

13             MS. IYENGAR:  Objection, Your Honor.  I'm not sure

14   what relevance this has.

15             THE COURT:  Yeah, sustained.

16             BY MR. SMITH:

17   Q.   Ms. Hawa, the Secret Service has the legal authority to set

18   perimeters around the vice president that forbid people from

19   entering; is that right?

20   A.   Correct.

21   Q.   What is that authority?

22   A.   18 U.S.C. 1752.

23   Q.   And who determines what the security perimeter is?

24   A.   The agents -- it depends -- again, it would depend on the

25   site.  We work with our counterparts, and depending on where
```

1    that site is and what that site is --

2    Q.   Generally speaking -- I think you were referring to

3    different types of agents within the Secret Service, but I was

4    asking a broader question.

5         Is it the Secret Service that determines what a security

6    perimeter is?

7    A.   Yes.

8    Q.   Does any other body decide?

9    A.   Can you be more specific with your question?

10   Q.   So for example, let's say the vice president's traveling

11   again to Florida and he's doing a rally and there needs to be a

12   perimeter there.

13        It's the Secret Service that decides what the perimeter is;

14   is that right?

15   A.   Correct.

16             MS. IYENGAR:  Objection, Your Honor.  This is not

17   relevant to this proceeding.

18             THE COURT:  Overruled.

19             BY MR. SMITH:

20   Q.   So the Secret Service is the entity that is making the

21   decision about where that perimeter should be; is that right?

22        Now, let me clarify that.

23   A.   Yeah, clarify that for me.

24   Q.   I'm not saying that -- I'm not asking you if the Secret

25   Service goes around lifting barriers and putting posts up.  I'm

1   not asking you that.

2       I'm asking, is the Secret Service the one that decides

3   where the area should be?

4   A.   Yes.

5   Q.   And have you ever encountered a situation where some other

6   law enforcement agency takes upon itself to determine what that

7   should be on its own?

8   A.   No, I have not come to that situation.

9   Q.   You haven't in 23 years?

10  A.   Have I come into -- have I come into a situation where

11  another law enforcement agency has determined --

12  Q.   Yeah.

13  A.   -- what our security barrier is going to be?

14  Q.   Right.

15  A.   No.

16  Q.   So on January 6, there were Secret Service agents manning

17  barriers near the Capitol; right?

18  A.   Manning barriers?

19  Q.   Right.  There were Secret Service agents on January 6 along

20  the National Mall who were patrolling a security perimeter; is

21  that right?

22  A.   No, that's not correct.

23  Q.   It's not?  Now, I'm referring to the entire National Mall

24  that day.

25  A.   What's the question, then?  You're referring to the entire

1   Mall?

2   Q.   Yeah.  So wasn't there a place where the Secret Service did

3   set a restricted area on January 6 in Washington, D.C.?

4           MS. IYENGAR:  Objection, Your Honor.  I'm not sure

5   what relevance security perimeters outside of the Capitol area

6   have to --

7           MR. SMITH:  I didn't say it was outside the Capitol.

8           THE COURT:  Please don't talk over her.

9       The objection is overruled.

10          BY MR. SMITH:

11  Q.   So are you familiar with the restricted areas that were set

12  up in and around the Capitol and the National Mall on January 6?

13  A.   Yes, I'm familiar with the areas that were set up around

14  the Capitol on January 6.

15  Q.   Okay.  I'm going to put up something that's been admitted

16  into evidence.  It's Defense Exhibit 28.

17      Ms. Hawa, are you familiar with the president's rally at

18  The Ellipse on January 6?

19  A.   Yes.

20  Q.   That was -- was the president visiting The Ellipse?

21  A.   I wasn't involved in that site.

22  Q.   Oh, are you familiar with the procedures by which the

23  president would be protected by the Secret Service?

24  A.   Yes.

25  Q.   So in this image right here, do you recognize this place

1    that we're looking at here?

2    A.    It appears to be down by The Ellipse.

3    Q.    Right.  And do you see what these agents are wearing?

4    A.    Yes.

5    Q.    Are these Secret Service agents?

6    A.    They could be agents or officers.

7    Q.    Working with the Secret Service?

8    A.    It appears to be.

9    Q.    And what would they be doing here?

10   A.    I imagine they were --

11             MS. IYENGAR:  Objection, Your Honor.

12             THE COURT:  Overruled.

13             THE WITNESS:  I imagine they were probably a part of

14   the rally, but again, I wasn't there.  So I wasn't familiar with

15   the security setup that day.

16             BY MR. SMITH:

17   Q.    I'm asking a more general question.

18   A.    Okay.

19   Q.    Having worked with the Secret Service for 23 years, why are

20   these Secret Service agents -- you see one of them has his arm

21   on a barrier, and -- I will play the clip for you.

22         (Video played.)

23   Q.    Does it look to you that these people, the Secret Service

24   is deciding who can enter this area?

25   A.    Yes.

Q.   And in order to enter a Secret Service area, you need the
authorization of the Secret Service; is that right?

A.   Well, no.  You don't need to have a Secret Service agent or
officer at that location, but there might be an agreed-upon
permissions to get in.

Q.   Ultimately, it's the Secret Service that is making the
decision of who can come into the gate, the restricted area, and
who cannot; is that right?

A.   Correct.

Q.   And if someone were to walk in without getting a Secret
Service agent's approval, that would be prohibited; right?

         MS. IYENGAR:  Your Honor, I'm objecting.  I'm sorry to
keep raising this, but --

         MR. SMITH:  Judge, this is --

         MS. IYENGAR:  -- this issue has been litigated before
about the Secret Service in tandem with Capitol Police setting
the restricted area.

         MR. SMITH:  Judge --

         MS. IYENGAR:  This line of questioning is not relevant
to any of the facts at issue in this case.

         MR. SMITH:  Judge, our response is it also goes to
knowledge, and it's an offer of proof.

         THE COURT:  Okay.  I'm going to overrule the
objection, but I understand your point.  Let's keep moving.

         MR. SMITH:  Okay.

1           BY MR. SMITH:

2    Q.    So in your experience at the Secret Service, this is how a

3    person who would enter a restricted area would obtain authority;

4    is that right?

5    A.    What is "this"?  When you say "this," what do you mean?

6    Q.    By interacting with Secret Service agents that are manning

7    a perimeter.

8    A.    Not necessarily.  It doesn't always have to be Secret

9    Service agents or officers manning a perimeter.

10   Q.    Not manning the perimeter, but deciding who can come in and

11   out; is that right?

12   A.    Yeah, Secret Service will provide or agree upon the

13   credentials that are needed to access our secure perimeter.

14   Q.    And let's say -- you were referring to other law

15   enforcement agents that might be securing a perimeter; right?

16   A.    Sure.

17   Q.    But let's say someone wanted to enter the restricted area

18   where the president is.  Can any individual law enforcement

19   officer with state or local authority say that someone can come

20   in on their own?

21   A.    On their own?

22   Q.    Yes.

23   A.    No.

24   Q.    And why is that?

25   A.    There would have been a discussion with the Secret Service.

Q.   So ultimately, it's the Secret Service that's the --

A.   Correct.

Q.   Now, if there's an area that's restricted where someone other than the Secret Service is deciding who can come in and out, is that a restricted area under the authority that you mentioned?

A.   At a Secret Service designated site?

Q.   If there's an area that's surrounded by fencing and the rule is that any law enforcement officer can determine who can come in and out, is that a 1752 restricted area?

        MS. IYENGAR:  Objection.  That asks for a legal conclusion.

        THE COURT:  Sustained.

        BY MR. SMITH:

Q.   Have you ever seen, in your experience in the 23 years at the Secret Service, a restricted area for the Secret Service where a law enforcement officer who is not at the Secret Service can determine on their own who can enter and exit?

A.   At a Secret Service designated site?

Q.   Correct.

A.   No, I have not.

Q.   The Secret Service didn't set the restricted area outside the Capitol; right?  That was the Capitol Police?

A.   Physically set it up?

Q.   No, decide where the line goes.

1    A.   They had set -- they --

2    Q.   Just tell me.  Just say it.

3    A.   They determined --

4            MS. IYENGAR:  Objection, Your Honor.

5            THE WITNESS:  They determined where the perimeter was

6    going to be based on a long-standing relationship that we have

7    with the Capitol Police.  It was known to us that that is where

8    the perimeter typically is for events like this.

9            BY MR. SMITH:

10   Q.   It was known to you, but the Secret Service did not set it?

11   The Capitol Police?

12   A.   I was not involved in those discussions.

13   Q.   In your 23 years of experience, have you seen another law

14   enforcement agency set a restricted area for Secret Service

15   protectees?

16           MS. IYENGAR:  I object again, Your Honor.  This again

17   goes back to the issue that we already litigated and does not go

18   to the defendant's knowledge.

19           THE COURT:  Okay.  So I'm going to sustain it.  It's

20   been asked and answered.

21           BY MR. SMITH:

22   Q.   Now, you told the government that you were familiar with

23   the size of the restricted area around the Capitol, the metes

24   and bounds of the restricted area; is that right?

25   A.   Yes.

1   Q.   I'm bringing up what's been marked as Government -- or

2   excuse me, Griffin Exhibit 17.  Can you see that image?

3   A.   Yes.

4   Q.   Do you see where I'm circling that in red?

5   A.   Yes.

6   Q.   That's a part of the restricted area; right?

7   A.   It's hard to tell, but --

8   Q.   What does it look like to you?

9   A.   It looks to me like that might be Third Street, but I can't

10  tell from this angle.

11  Q.   You're not sure?

12  A.   I'm not sure from this angle.

13  Q.   Okay.  I'm bringing up what's been marked as Griffin

14  Exhibit Number 5.

15       (Video played.)

16  Q.   Can you see the barriers I'm circling right here?

17  A.   Yes.

18  Q.   Is that a part of the restricted area?

19  A.   It does not appear to be.

20  Q.   Why?

21  A.   Well, it looks like it's broken up a bit.

22  Q.   Let's say it hadn't -- okay.  So some protestors moved it.

23  Before they moved it, is it a part of the restricted area?

24  A.   Yes, I believe those statues were -- should have been

25  surrounded by bike rack.

1    Q.   Thank you.  I'm bringing up what's marked Griffin Exhibit

2    Number 4.  Now, do you recognize this street?

3    A.   Yes.  Again --

4    Q.   Do you know what street that is?

5    A.   -- that looks like Third Street.

6    Q.   That's Third Street?

7    A.   Yes; it looks like Third Street to me, yes.

8    Q.   Okay.  So I'm going to circle some of these barriers right

9    here, these two.

10   A.   Okay.

11   Q.   Do you know, are those a part of the -- is that the

12   restricted area line?

13   A.   Again, it looks like it's been moved.

14   Q.   Okay.  Let's say it hadn't.  I'm asking you, before

15   protestors moved those barriers, was that the restricted area

16   line?

17   A.   It should have been.

18   Q.   It should have been?

19   A.   Yeah.

20   Q.   Okay.  And I'm bringing up what's marked as Government

21   Exhibit -- Griffin Exhibit 18.  I'm just going to play this clip

22   for you, and you tell me -- and I will ask you a question after.

23   Okay?

24        (Video played.)

25   Q.   Okay.  So do you see these people climbing over this wall?

1   A.   Yes.

2   Q.   Would you say that's the restricted area line?

3   A.   I'm not familiar with where that wall is exactly, but -- so

4   I can't answer that question.

5   Q.   So when a vice president, for example, is traveling to

6   another state and there's a security perimeter that's set up,

7   how does the Secret Service normally indicate where the

8   perimeter is?

9   A.   Ask the question again.

10   Q.   So let's say the vice president is visiting someplace

11   outside of Washington, D.C., and he needs a security perimeter

12   around where he is.

13        How does the Secret Service normally indicate where the

14   perimeter is?

15   A.   There's various ways.  I mean, we could designate it by

16   roads.  We could designate it in the air.  We could designate

17   it, you know, with barriers.  We could designate it with

18   vehicles, checkpoints.

19   Q.   Well, people have to -- people who are outside the area

20   have to be made aware that there's a restricted area; is that

21   right?

22   A.   Sure; sure.

23   Q.   And how are they normally made aware?

24   A.   By notifications or by restricted signs.

25   Q.   What do the restricted signs look like?

1    A.   It depends.  It could be local law enforcement that's

2    assisting us.  It could be signs that we put up at checkpoints.

3    So it would depend.

4    Q.   Well, what is the information that has to be made aware to

5    people outside of it?

6    A.   That it's a restricted area.

7    Q.   That it's a restricted area.

8    A.   Or they could be verbally told it's a restricted area.

9    Q.   Okay.  Either one of those would suffice?

10   A.   Sure.

11   Q.   What if there isn't a sign and there's no verbal warning?

12   A.   Then I guess they would eventually -- they would come upon

13   somebody, perhaps, that would be able to tell them that it's a

14   restricted area.

15   Q.   And who would do that?

16   A.   It would depend.  Again, it could be local law enforcement

17   or an agent or an officer.

18   Q.   So the person who enters the area when there's no sign and

19   it is the restricted area, they would be made aware of it if

20   someone tells them it's a restricted area?

21        MS. IYENGAR:  Objection, Your Honor.  This is all

22   speculation.

23        THE COURT:  Sustained.

24        BY MR. SMITH:

25   Q.   The Secret Service should know what its own restricted

1   areas are; right?

2   A.   Yes.

3   Q.   And if an agent, for example, were not to know what the

4   restricted area was, it's probably not a restricted area; right?

5   A.   I don't think that's true.

6          MS. IYENGAR:  Objection.  I think this is calling --

7          BY MR. SMITH:

8   Q.   If even the agent --

9          MS. IYENGAR:  I'm sorry.

10          BY MR. SMITH:

11   Q.   If the Secret --

12          THE COURT:  Sir, we have an objection pending.

13      Ms. Iyengar?

14          MS. IYENGAR:  I've actually lost my train of thought.

15   I think the question was calling for the witness to draw a legal

16   conclusion about whether this is a restricted area for 1752

17   purposes.

18          MR. SMITH:  Your Honor, that's not what I'm asking.

19          THE COURT:  Okay.  Well, I think you were.  So I'm

20   sustaining the objection.  Do you have a question that's not

21   calling for a legal conclusion?

22          BY MR. SMITH:

23   Q.   Okay.  In your experience, have you ever encountered a

24   Secret Service restricted area where the agents don't know what

25   is restricted and what isn't?

1    A.   I think we do have some restricted areas that are covered

2    by certain teams that not every agent involved in the advance

3    may be fully familiar with.

4    Q.   That's fair.  You were a part of the liaison team; right?

5    A.   Correct.

6    Q.   And so you should be made aware of where restricted areas

7    are that day; right?

8    A.   Yes.

9    Q.   So my question is, an agent that is a part of the team in

10   the restricted area needs to know where the restricted area is;

11   right?

12   A.   Yes.

13   Q.   Because if the agent didn't know where the restricted area

14   was, it's not a security perimeter; right?

15        MS. IYENGAR:  Objection, Your Honor.  I think that's

16   also calling for a legal conclusion.

17        THE COURT:  Sustained.

18        BY MR. SMITH:

19   Q.   Ms. Hawa, in your experience, have you encountered

20   individuals who have gone into a restricted area that didn't

21   know it?

22        MS. IYENGAR:  Objection.  What's the relevance of

23   this?  There's no time frame --

24        MR. SMITH:  Your Honor, this is getting vexatious with

25   the government's objections, which are made without --

1          THE COURT:  I disagree, but I'm overruling the

2    objection.

3          THE WITNESS:  Can you ask the question again?

4          BY MR. SMITH:

5    Q.   In your experience with protecting Secret Service

6    protectees and when they're within a restricted area, have you

7    encountered situations where individuals who do not have lawful

8    authority enter the restricted area unknowingly?

9    A.   Unknowingly?  Not that I can recall.

10   Q.   So you've never seen the circumstance where a person walks

11   into the area and they didn't know the president or the vice

12   president was in it?

13   A.   No.  Typically, in my situations where I've encountered it,

14   we typically will talk to the people before they get into the

15   secure area.

16   Q.   And you would tell them that the president or the vice

17   president is there; right?

18   A.   Not always telling them why they can't come into the

19   restricted area.  We don't usually say it's because the vice

20   president or the president is there, no.

21   Q.   Do you identify yourselves?

22   A.   I always identify myself.

23   Q.   Why do you identify yourself?

24   A.   Because it's something I choose to do.

25   Q.   Well, no, no.  What's -- you identify yourself to the

1    individual who wants to come in by telling them you're a Secret

2    Service agent; right?

3    A.   I would either say Secret Service or law enforcement.

4    Q.   So you said that the Capitol Police on January 6 set the

5    restricted area and informed the Secret Service of that; right?

6    A.   I did not say that.

7    Q.   What did you say?

8    A.   I didn't say anything to that degree.  You and I were

9    having -- you mentioned it, and I said that we have a

10   long-standing relationship with them.

11   Q.   So are you testifying that when the Capitol Police set the

12   restricted area on January 6 they did not inform the Secret

13   Service?

14   A.   That's not what I said.

15   Q.   Did they inform the Secret Service of the restricted area

16   they set?

17   A.   I believe they did, but I can't specifically recall the

18   conversations that would have been had.

19   Q.   What is your belief based on?

20   A.   That I would have seen -- one, that I would have seen it,

21   and that I would have seen the perimeter being set up prior to

22   January 6, because it would have gone up earlier for the

23   inaugural stand and then being built upon.  And then I probably

24   would have had conversations.

25   Q.   Well, when you say you probably, are you saying -- you

1    testified you would have seen it.  What do you mean by "it"?

2    A.    I would have seen fencing go up.

3    Q.    When would you have seen that?

4    A.    Probably, based -- with the inaugural stand being built,

5    that probably would have gone up a couple months before January.

6    Q.    Based on the inaugural stand, you said?

7    A.    The inaugural stand being built, the inaugural stage.

8    Q.    So you're saying the restricted area concerns the vice

9    president's -- or the president's future presence at the

10   inaugural stage?  Is that what you're saying?

11   A.    No.  I'm saying that was a part of the secure perimeter.

12   That was included in the entire security perimeter.  So part of

13   that went up earlier.

14   Q.    You're not personally familiar with any conversations

15   between the Capitol Police and the Secret Service about setting

16   the restricted area; right?

17   A.    Not that I can recall.

18   Q.    Do you know someone at your agency who is familiar?

19   A.    Not that I can recall.

20   Q.    So you were a member of the liaison team at the Capitol

21   with the vice president, and you do not know whether the Capitol

22   Police spoke to the Secret Service about setting a restricted

23   area?

24   A.    I can't speak to that, no.

25   Q.    You don't know?  You were a member of the liaison team.

1   A.   Correct.

2   Q.   So how did you ensure that the security perimeter was

3   correct?

4   A.   Because it's a long-standing relationship that we have with

5   them.  So we know that there are certain boundaries that will be

6   established during certain events.  It's an agreed-upon standard

7   boundary.

8   Q.   And you're familiar with those boundaries?

9   A.   Yes.

10   Q.   Like the ones we just saw?

11   A.   Yes.

12   Q.   So you were shown a video clip of the vice president

13   leaving the Capitol building.  You were in that video clip.

14        Do you remember that one?

15   A.   I was not shown a video of him leaving the Capitol

16   building.

17   Q.   Walking down a flight of stairs?

18   A.   Right.  He's not leaving the Capitol building.

19   Q.   Did you testify about where he was going?

20   A.   I said he was leaving his ceremonial office.

21   Q.   I'm bringing up Government's Exhibit 75.  Do you remember

22   watching this video?

23   A.   Yes.

24   Q.   And you testified that Mike Pence was leaving at this

25   point; correct?

1   A.   I said he was leaving his ceremonial office.

2   Q.   Leaving the ceremonial office?

3   A.   Yes.

4   Q.   And he was heading towards the loading dock; right?

5   A.   Yes.

6   Q.   How long did it take him to get to the loading dock?

7   A.   A few minutes.

8   Q.   Two minutes.  25 plus 3 is 28; right?

9        So Mister -- Vice President Pence leaves the Senate

10   chamber, his ceremonial office at this point, and you testified

11   that it was because of the encroaching presence of protestors;

12   is that right?

13   A.   I didn't use the word "protestors."  I believe I said there

14   was individuals breaching the grounds, individuals breaching the

15   grounds and the actual building, the structure.

16   Q.   And so it was -- so if this is 2:25, it was protestors who

17   had arrived before that point who prompted individuals -- who

18   prompted the vice president to leave towards the loading dock;

19   right?

20   A.   Yes.

21   Q.   It wasn't individuals who arrived -- who were approaching

22   the Capitol after 2:25, was it?

23   A.   They were continuing to approach.  It was a continuing,

24   ongoing --

25   Q.   I understand.  But the decision to move down towards the

1    loading dock was made before 2:25, right, not after?

2    A.   Correct.

3    Q.   When the vice president arrived in the loading dock, he

4    remained there, you testified, until he returned to the Senate

5    chamber later that evening; correct?

6    A.   Correct.

7    Q.   And do you believe that the security detail performed

8    adequately that evening with the vice president?

9              MS. IYENGAR:  Objection; relevance.

10             THE COURT:  Sustained.

11             BY MR. SMITH:

12   Q.   Do you believe that proper policy was followed in bringing

13   the vice president to the secure location?

14             MS. IYENGAR:  Objection.

15             THE COURT:  Sustained.

16             BY MR. SMITH:

17   Q.   Would the vice president have remained where he was if he

18   was insecure in the secure location?

19   A.   I don't understand the question.

20   Q.   You called this place a secure location, right, that the

21   vice president was led to?  Is that right?

22   A.   That he was taken to?

23   Q.   Yes.

24   A.   Okay.  So we took him to a secure location.

25   Q.   Right.  What does that mean, secure location?

1    A.    Where we felt he was more secure than the location in which

2    he was previously.

3    Q.    Did anyone, while you were with him, any individuals who

4    were protesting approach the secure location?

5    A.    No.

6    Q.    Is that because it was secured with Capitol Police and

7    locked doors?

8    A.    It was secured with Capitol Police and Secret Service, and

9    it was a little further removed from the location where we came

10   from.

11   Q.    The vice president made the decision not to leave; right?

12   The vice president himself decided not to leave?

13   A.    I can't answer that.

14   Q.    Are you familiar, in your 23 years of service with the

15   Secret Service, with restricted areas that extend from the

16   surface to below-ground places?

17   A.    Meaning what?

18   Q.    So let's say a vice president is traveling to Florida again

19   and attending a rally and there's a security perimeter that

20   rings the rally stage.  Okay?

21        Would that security perimeter apply to a tunnel underneath

22   the earth?

23        MS. IYENGAR:  Objection.  This is, first of all,

24   speculative, and again, I think it's going towards a legal

25   conclusion.

1          THE COURT:  Sustained.  You have five minutes,

2     Mr. Smith.

3          BY MR. SMITH:

4     Q.   Are you familiar in your experience with underground

5     restricted areas?

6          MS. IYENGAR:  Objection.  This is going towards a

7     legal conclusion.

8          MR. SMITH:  Your Honor, this goes directly to an

9     element of the offense.

10          THE COURT:  I will overrule the objection.

11          THE WITNESS:  Can you ask the question again?

12          BY MR. SMITH:

13     Q.   Are you familiar in your experience with a restricted area

14     that exists below ground?

15     A.   I don't think we have a category for restricted areas that

16     exist below ground.

17     Q.   Yeah, have you seen that before?

18     A.   Sure.

19     Q.   When?

20     A.   Like we've used parking garages and underground areas as

21     restricted areas before.

22     Q.   When was that?

23     A.   Oh, I don't -- it's been at numerous sites.

24     Q.   Can you give one example?

25          MS. IYENGAR:  Objection, Your Honor.  I think this

1   gets into the categories that the Court prohibited

2   cross-examination on.

3           THE COURT:  I agree.  I'm sustaining it.

4           BY MR. SMITH:

5   Q.   The place where Mike Pence was taken is not the same place

6   as where he left; is that right?

7   A.   The place that he was taken on the 6th --

8   Q.   The secure location is a different place than the Senate

9   chamber; is that right?

10  A.   Yes.

11  Q.   Okay.  When the vice president is moved out of a secure

12  location, is a new security perimeter formed of Secret Service

13  agents?

14          MS. IYENGAR:  Objection, Your Honor.  I think this

15  again is getting into those categories --

16          MR. SMITH:  Judge --

17          MS. IYENGAR:  -- that were precluded.

18          MR. SMITH:  Judge, she's just objecting to every

19  question without a basis.

20          THE COURT:  I don't agree with that.

21      I will overrule the objection.

22          THE WITNESS:  Can you ask the question again?

23          BY MR. SMITH:

24  Q.   Let me explain what I'm trying to ask.  So again, the vice

25  president travels to a rally.  There's a security perimeter

around the stage.  But the vice president has to leave because
either he gets an emergency call, he has to leave the area.

      The security detail will go with him; is that right?

A.   Correct.

Q.   Is there no more restricted -- let's say he leaves the
restricted area.  Does a new restricted area form where the vice
president goes?

                MS. IYENGAR:  Objection, Your Honor.  This is again --

                MR. SMITH:  Your Honor, the witness was prepared to
answer, and the government will not allow the questions to be
asked.

                MS. IYENGAR:  I'm sorry, Your Honor.  First of all, I
don't appreciate the way Mr. Smith is speaking to me.  I think
we just need to take the temperature down.

      Second of all, this is purely speculative about an issue
that's not in this case, and this is not proper testimony here.

                MR. SMITH:  The issue in the case is whether there's a
restricted area that the defendant entered.  It is appropriate
to ask the witness whether the area Mr. Griffin entered is a
restricted area.

                THE COURT:  So she's testified that he was in that
restricted area for the next four to five hours.  I don't
understand -- I mean, we're not talking about him leaving the
restricted area so there would be a new one.

                MR. SMITH:  The question is whether he's in the

```
 1    restricted area.  But there's another question, which is, when

 2    the vice president leaves the place where the restricted area

 3    exists, does it move with him?

 4            THE COURT:  Okay.  So you haven't shown --

 5            MR. SMITH:  The record --

 6            THE COURT:  Sir, do not talk over me.  Do not talk

 7    over other people.

 8        You haven't shown that he ever left the restricted area.

 9    I'm sustaining the objection.  And you have two minutes.

10            BY MR. SMITH:

11    Q.  I asked to speak with you before today; is that right?

12    A.  I'm sorry?

13    Q.  I asked to conduct an interview with you.  Do you know

14    that?

15    A.  I do believe it was mentioned to me, yes.

16    Q.  Did you want to conduct an interview?

17    A.  No.

18    Q.  I don't blame you.  That's all.

19            THE COURT:  All right.  Thank you, Mr. Smith.

20        Ms. Iyengar, brief redirect?

21                       REDIRECT EXAMINATION

22            BY MS. IYENGAR:

23    Q.  So I just wanted to clear up a few things that were asked

24    on cross-examination.

25        So you were asked about whether, I guess, Secret Service or
```

1     the Capitol Police set up the security perimeter on January 6.

2         Do you remember that?

3     A.    Yes.

4     Q.    And you had mentioned that there's a long-standing

5     relationship between Secret Service and Capitol Police with

6     respect to a Secret Service protectee's visit to the Capitol

7     building.

8         Can you just explain what you mean by that?

9     A.    Sure.  That we're pretty familiar with what their protocols

10    are when there's events at the Capitol and on the Capitol

11    grounds.  We're familiar with their protocols.  We usually will,

12    you know -- it's clear to us or it will be determined that on

13    certain days of events the access that will be allowed, so that

14    discussions like that are had.  Meaning, in particular, that

15    day, we knew there were going to be no visitors because it

16    wasn't allowed.  Or we will know that only certain passes or

17    only certain access will be granted.

18        So we trust that those protocols are being followed by the

19    U.S. Capitol police officers, and we're familiar with perimeters

20    that are set up for, like I mentioned, purposes of the inaugural

21    stage or perimeters being set up when there's a major event.

22    Q.    Okay.  And I guess just going back to that e-mail that we

23    had talked about on direct examination that you sent on

24    January 5th, what was the purpose of that e-mail, sending that

25    to Capitol Police?

A.    To let them know that we had a -- it's called a head of

state notification, to let them know that we had a protectee

coming.  Normally, when it's a head of state, that would

indicate it's either the president, the vice president, or a

foreign dignitary that's a head of state, and that there are

certain protocols that fall into place when that's occurring.

Q.    Okay.  So is it fair to say this was not a situation where

like a local police department just took it on themselves to

determine what the security perimeter was?  This was something

that you had done in conjunction with Capitol Police; is that

fair to say?

A.    Correct.

Q.    Okay.  Now, we talked, I think, on direct examination and

on cross about who physically set up the security perimeter on

January 6.

      Was that something Secret Service did, or that was

something that Capitol Police did?

A.    Capitol Police.

Q.    Okay.  So would somebody from Capitol Police probably have

a better understanding of exactly where the barriers were set up

that day?

A.    Yes.

Q.    And which signs were posted where?

A.    Yes.

Q.    Okay.  You were asked about the video of Vice President

1   Pence evacuating out of the ceremonial office.

2       Do you remember that?

3   A.   Yes.

4   Q.   And you were asked about whether he was evacuated due to

5   people who had breached the perimeter prior to 2:25 p.m.

6       Do you remember that?

7   A.   Yes.

8   Q.   Okay.  People who breached the security perimeter outside

9   the Capitol building after 2:25 p.m., was there, you know -- was

10  there any reason that they sort of posed any problem to the vice

11  president's security after 2:25 p.m.?  Does that make sense?

12  A.   Yes.  It was an ongoing concern.

13  Q.   Okay.  And explain what you mean by that.

14  A.   We were monitoring what was happening and occurring on the

15  Capitol grounds that day.

16  Q.   Okay.

17  A.   The breaches that were occurring, where they were

18  occurring, numbers of individuals who were breaching.

19  Q.   So if people continued to -- is it fair to say that if

20  people continued to breach the security perimeter after

21  2:25 p.m., that still posed a security risk to the vice

22  president?

23  A.   Absolutely.

24  Q.   And I did just want to show you actually one video, and

25  this is Government's Exhibit 76, I believe.  If we could just

1    pause that real quick, and I will read the time stamp out in the

2    top left corner.  It's Wednesday, January 6, 2021, at

3    1:58:41 p.m.  I'm sorry to make you pause again.

4        Can you just explain what this area is that we're looking

5    at here?

6    A.   Yes.  That's the east side of the main Capitol building.

7    Q.   Okay.

8    A.   And that's the plaza area.

9    Q.   Okay.  And I can kind of see that there's like a line that

10   people don't seem to be moving past here.

11       Do you know why that is?

12   A.   There's a bike rack set up in the plaza.

13   Q.   Okay.  A bike rack indicating that people were not allowed

14   to move past that area; is that right?

15   A.   Correct.

16   Q.   And if we can go ahead and play the video.

17       (Video played.)

18   Q.   If we could pause it real quick.  Thank you.

19       So we see kind of in the background of the video there's

20   some black SUVs pulling out.  Do you know what that was about?

21   A.   That's the vice president's motorcade.

22   Q.   Okay.  And why was it -- why were they pulling out at that

23   point?

24   A.   We were having discussions.  The motorcade agents had let

25   us know that there was starting to be a presence of numerous

1   individuals on the plaza, and obviously, we knew that there was

2   also numerous individuals who had breached the west side of the

3   plaza.

4        And we made a determination that it was best that we move

5   the motorcade off of the plaza before it was -- we put ourselves

6   in a position where we couldn't move the motorcade off of the

7   plaza.

8   Q.   And when you say put yourselves in a position where you

9   couldn't move the motorcade, what do you mean by that?

10  A.   Meaning that we didn't want there to be -- the reason the

11  bike rack is there is because there are motorcades on that

12  plaza, to include ours and the leadership from the Capitol, from

13  the House of Representatives and the Senate.  So it's there for

14  purposes of a security perimeter to keep the motorcades secure.

15       And we didn't want to risk individuals breaching those --

16  as you can see, I think, on the right side of the video screen,

17  you can see where they actually do start to breach and get onto

18  the plaza.  So we needed to move the cars off so we didn't have

19  a situation where we would be unable to move the cars off the

20  plaza if we were choosing to leave.

21  Q.   Okay.  And why do people, sort of outside in a setting like

22  this, coming up to a motorcade, why does that present any sort

23  of security concern for, I guess, people inside a car?

24  A.   Why is it a concern if individuals come up on a motorcade?

25  Q.   Yeah.

1    A.   Well, it's a safety concern.  There's multiple reasons.

2    But we don't -- it's a security concern to us, because we don't

3    ever want anybody being so close that they could touch or put

4    anything on the vehicles.

5    Q.   Okay.  And if we can just go ahead and play this all the

6    way to the end.

7        (Video played.)

8    Q.   Okay.  If we can quickly pause it.  Thank you so much.

9        So these individuals -- I think you had mentioned before

10   people were starting to breach.  So these individuals that we

11   see walking kind of in the middle of the screen here -- just for

12   the record, this is at 00:55 in the player and 1:59:36 in the

13   video time stamp.

14       These individuals in the middle here, are those the people

15   you were talking about breaching?

16   A.   Well, both.  We had individuals in the middle here, and

17   then there are individuals on the right side, which is -- the

18   structure on the right side is the Senate side of the main

19   structure.

20       So we were -- again, there was conversations.  The agents

21   in the motorcade were letting us know that it was getting heavy

22   with individuals out on the plaza, and we needed to make a

23   decision as to what we were going to do with the vehicles.

24            MS. IYENGAR:  Okay.  All right.  Thank you, Your

25   Honor.  No further questions.

```
 1            THE COURT:  Can counsel approach for a moment.
 2        (Bench conference.)
 3            THE COURT:  All right.  So the government is resting;
 4    is that right?
 5            MS. IYENGAR:  I think that's correct, Your Honor.
 6            THE COURT:  It looks like you provided Mr. Smith a
 7    video?
 8            MS. PASCHALL:  I did.
 9            THE COURT:  Do you have a sense of how long that is?
10            MS. PASCHALL:  So it's five hours, but I can probably
11    point him to relevant time periods of entrance and exit with
12    time stamps.  That would shorten the viewing.
13            THE COURT:  That would be great.
14        So I think what I'm going to suggest is that we adjourn for
15    today.  Do you know, does your client intend to testify?
16            MR. SMITH:  He is not going to testify, but we have
17    a -- we would like to review the evidence, but we think this
18    would be a good opportunity -- we have a written Rule 29 motion.
19    It doesn't cover all the issues.  So maybe we could file it with
20    the Court today, and that would give the government an
21    opportunity to respond, and then we can do the argument
22    tomorrow, if this witness is going to continue into the next day
23    anyway.
24            THE COURT:  So do you intend to put on any witnesses?
25            MR. SMITH:  No, no witnesses.
```

1          THE COURT:  You are welcome to file whatever you want.

2   I think what I will ask you to do is have Inspector Hawa come

3   back tomorrow.  If you wish to reopen your cross, I will allow

4   you to, but you're going to give me a proffer of what in the

5   video necessitates it.  I am kind of doubting there is going to

6   be anything, but if you find anything.

7        And Ms. Paschall, please give Mr. Smith the --

8          MR. SMITH:  And then tomorrow we would have closing

9   argument?

10          THE COURT:  Correct.

11          MS. IYENGAR:  Should I tell her to be back at 9:00 or

12   9:30?

13          THE COURT:  I think 9:30 would be good.

14       (End of bench conference.)

15          THE COURT:  All right.  So Inspector Hawa, I

16   appreciate your appearance here today.  I'm going to ask you to

17   return for 9:30 tomorrow.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.  Thank you.

20        And does the government rest?

21          MS. IYENGAR:  Yes, we do, Your Honor.

22          THE COURT:  All right.  So let's reconvene at 9:30

23   tomorrow, and we will have closing arguments, if nothing else.

24       Ms. Iyengar, anything else we should be discussing today?

25          MS. IYENGAR:  No, Your Honor.

1          THE COURT:  All right.  Mr. Smith?

2          MR. SMITH:  No, Your Honor.  We would just like to

3    indicate we're making a motion under Rule 29 for a judgment of

4    acquittal, and we're filing it.  We have a written filing which

5    we can just hand to the Court.

6          THE COURT:  That would be great.  File something on

7    ECF, but if you can give something to me, I will take a look at

8    it.  You've got another copy, I take it?

9          MR. SMITH:  Yes.

10          THE COURT:  Ms. Iyengar, did you want to move in 76?

11          MS. IYENGAR:  Yes, Your Honor.  Thank you.

12          THE COURT:  Mr. Smith, any objection?

13          MR. SMITH:  76 was what?

14          THE COURT:  That was the motorcade we just saw.

15          MR. SMITH:  No objection.

16       (Government Exhibit 76 received into evidence.)

17          THE COURT:  Mr. Smith, did you want to move in your

18    Number 18, the last thing you showed?

19          MR. SMITH:  Your Honor, may I have just a moment?

20          THE COURT:  You may.  Ms. Chaclan, as usual, is on

21    this much better than I.

22          MR. SMITH:  Yes, Your Honor, we would like to move in

23    18, which is also Government Exhibit 13.

24          THE COURT:  Any objection, Ms. Iyengar?

25          MS. IYENGAR:  No, Your Honor.

1           THE COURT:  Without any objection, Defense 13 is

2      received.

3           (Defendant Exhibit 13 received into evidence.)

4           THE COURT:  All right.  With that, we are in recess

5      until 9:30 tomorrow.

6           I will just ask you not to discuss your testimony between

7      now and tomorrow morning when you return.

8           THE WITNESS:  Yes, Your Honor.

9           (Proceedings adjourned at 5:45 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.


/s/ Sara A. Wick_____          March 30, 2022_____
SIGNATURE OF COURT REPORTER          DATE