**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 21-cr-92-TNM |
|  | ) |
|  | ) |
| COUY GRIFFIN, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**SENTENCING MEMORANDUM OF COUY GRIFFIN**

## **Table of Contents**

Introduction .................................................................................................................. 1

Factual background ........................................................................................................ 2

    A.     Griffin's background, family, and character ..................................................... 2

    B.     The misdemeanor conviction and presentence investigation report ............... 3

Argument ....................................................................................................................... 4

    I.     Sentencing procedure ..................................................................................... 4

    II.    The § 3553(a) factors favor a significant downward variance ....................... 4

          A.    The nature and circumstances of the offense and the history
and characteristics of the defendant (§ 3553(a)(1)) ............................ 4

             1.     The typical § 1752 prosecution does not look like
Griffin's ............................................................................... 5

             2.     The Court's judgment in *United States v. Martin* ............... 7

             3.     First-time offender status and atypical conduct ................... 9

             4.     Griffin's remorse ................................................................ 9

          B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6)) ............... 10

          C.    The seriousness of the offense and deterrence (§ 3553(a)(2)) ........... 16

Conclusion ................................................................................................................... 18

**Introduction**

The Court acquitted Griffin of a disorderly conduct charge and found him guilty of knowingly entering an area restricted for the protection of a U.S. Secret Service protectee. Griffin regrets his decision to climb on the inaugural platform. To the extent his presence there contributed to the distress of outnumbered law enforcement officers, he offers them his sincere apology. Though he is of limited means, Griffin would seize an opportunity to offer assistance to injured officers and to contribute to the repair of physical damage to the Capitol. Griffin vows to never again enter a restricted area, at the Capitol or anywhere else.

Griffin asks the Court to bear in mind that he has already incurred serious penalties. Arrested on the mistaken premises that he entered the Capitol Building and intended to bring firearms to Washington, D.C., he was held pretrial in solitary confinement for weeks on a misdemeanor charge. The toilet in his cell had seen better days. Corrections officers snapped pictures of him, apparently destined for social media. Above all, perhaps, private parties have taken this Court's sentencing prerogative into their own hands, filing lawsuits to remove and permanently ban Griffin from office under Section Three of the Fourteenth Amendment. They contend that because this Court found Griffin guilty of unlawfully entering a restricted area he thus engaged in insurrection or rebellion against the United States. Even if that baseless claim does not succeed, the lawsuits themselves will grind through his meager resources. Meanwhile, Wild West-style wanted posters now dot Griffin's hometown in New Mexico. "Cowboys for Trump Founder—January 6 Terrorist." Griffin can hardly appear at the supermarket without encountering some heavy breather threatening violence by way of introduction.

This Court's average sentence for Griffin's misdemeanor offense is two months' probation. In light of the penalties he has already paid, and to avoid unwarranted sentence

1

disparities, Griffin respectfully requests that the Court impose a sentence no higher than that average.

**Factual background**

### A.    Griffin's background, family, employment history, and character

Griffin once rode his horse from San Francisco to Jerusalem.  The journey on horseback took him over a year.  To those who know the New Mexican, this was completely in character. A sentencing memorandum cannot fully capture such a person.

Raised on a cattle ranch in New Mexico, Griffin, now 48, rodeoed for a living until he received a job offer from Disneyland Paris.  For the next five years the City of Light saw the cowboy perform as *le cow-boy* in the Buffalo Bill Wild West Show.  To those skeptics who might object that the gunslinging genuine article surely did not utter a single French *mot*, as Griffin learned to do, it must be recalled that when the legendary bison hunter's original Wild West show performed at the Exposition Universelle in 1889, it drew crowds that rivaled those admiring the Eiffel Tower, simultaneously unveiled nearby.  *The Eiffel Tower during the 1889 Exposition Universelle*, available at: https://www.toureiffel.paris/en/the-monument/universal-exhibition.

After returning from Paris, Griffin occupied the role of pastor for a few years at New Heart Cowboy Church in Alamogordo, New Mexico.  Ultimately, however, his pivot from the Wild West Show would be to a not unrelated field of secular endeavor.  Griffin ran, and sometimes he rode, for political office.  Since January 2019, Griffin has held the office of County Commissioner for Otero County, New Mexico.  In that role he is a fiscal agent for the county, funding different departments.  Griffin's term in office concludes on December 31, 2022. To supplement his minimal officeholder income, Griffin performs stone masonry work on

2

construction projects.  Now divorced, Griffin has a seven-year-old son over whom he and his former spouse share custody.

For all the controversy surrounding him in New Mexico politics, counsel finds Griffin to be earnest, of good cheer in adversity and shrewd.  While he is occasionally prone to impulsive decision-making and crude commentary, experience with him suggests that if given time to reflect, Griffin will correct himself on his own.  One won't catch Griffin performing the Ascot Gavotte but since when have cowboys been known for their polish?

**B.      The misdemeanor conviction and presentence investigation report**

As the Court knows, the government charged Griffin with two misdemeanors: knowingly entering a restricted area without lawful authority, 18 U.S.C. § 1752(a)(1); and engaging in disorderly and disruptive conduct in the restricted area. § 1752(a)(2).

After a bench trial, the Court acquitted Griffin of disorderly conduct and found him guilty of unlawfully entering the restricted area.  3/22/2022 Judgment.

As the presentence investigation report (PSR) indicates, the Guideline for § 1752(a)(1) is U.S.S.G. §2B2.3.  PSR, p. 13.  The base offense level is four, U.S.S.G. §2B2.3(a), and two levels are added because the trespass occurred at a restricted building or grounds.  U.S.S.G. §2B2.3(b)(1)(A)(vii).

The total offense level is thus 6.  PSR, p. 13.  The statutory maximum for this Class A misdemeanor is one year of imprisonment and the Guidelines range is zero to six months.  *Id*. at 23.  Any term of supervised release may not last more than one year.  18 U.S.C. § 3583(b)(3).  Griffin is eligible for up to five years' probation.  18 U.S.C. § 3561(c)(2).  The PSR states that "[i]f probation is imposed, the term shall be at least one year but not more than five years if the offense level is six or greater." PSR, p. 24 (citing U.S.S.G. §5B1.2(a)(1)).  However, as noted

below, this is a Guidelines provision, not a statutory rule, and is therefore merely advisory, not binding on the Court.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661. As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The § 3553(a) factors favor a significant downward variance**

**A.      The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

A number of considerations under § 3553(a)(1) warrant a significant downward variance[1] in Griffin's case: (1) several factors distinguish the typical § 1752 case from Griffin's; (2) after Griffin was found guilty of entering the restricted area despite not entering the Capitol Building,

---

[1] Since Griffin's Guidelines range already includes a sentence of zero months of incarceration (zero to six months), his arguments for a "downward variance" should be read as seeking a sentence of no more than two months' probation.

the Court acquitted a protester of the same charge even though that defendant did enter the building; (3) Griffin's first-time offender status; and (4) Griffin's remorse.

### 1.   The typical § 1752 prosecution does not look like Griffin's

Along a number of levels, Griffin's prosecution was unlike most, or all, § 1752 charges brought before January 6.

First, although the Court denied Griffin's motion-to-dismiss argument that a § 1752 restricted area is one restricted by the U.S. Secret Service by definition, *United States v. Griffin*, 549 F. Supp. 3d 49, 56-58 (D.D.C. 2021), it is nevertheless the case that no prosecution before January 6 had ever involved an area restricted by any other entity.  If the trial testimony of Officer John Erickson of the U.S. Capitol Police and Inspector Lanelle Hawa of the U.S. Secret Service did not conclusively demonstrate that it was the U.S. Capitol Police and not the U.S. Secret Service that set the restricted area on January 6, the testimony from both witnesses nevertheless tended to indicate that it is almost always the case that the Secret Service is the entity that sets restricted areas for its protectees.[2] Inspector Hawa's testimony—and video evidence depicting a distinct USSS-restricted area near the Ellipse on January 6—also showed that, in the ordinary case, the perimeters of such areas are manned by Secret Service agents or at least other law enforcement officers acting at the direction of the Secret Service.  This is a mitigating distinction because in the typical § 1752 case, the intruding defendant has been verbally warned by Secret Service agents, or others acting at their direction, that he is entering a restricted area without permission.  *E.g.*, *United States v. Bursey*, 416 F.3d 301, 304 (4th Cir. 2005) (defendant warned by Secret Service agents that he was unlawfully present in a restricted

---

[2] By "sets restricted areas" Griffin does not refer to the physical labor involved in erecting fencing or barriers but to the decision-making process that determines the size and scope of the restricted area and determines who may enter it.

area).  Here, the Court will recall that Griffin had no interactions with law enforcement before or

after he entered the restricted area; none were posted at the stone wall which demarcated the

legal boundary.  Snow fencing that was also said to demarcate the boundary lay on the ground at

the time Griffin passed near it.

Second, by the time Griffin entered the restricted area, the sole USSS protectee at issue—

the vice president—had been removed to an underground bunker.  To Griffin's knowledge, there

had never been a § 1752 prosecution before January 6 where the defendant and protectee were

said to have occupied the same "building or grounds,"  § 1752(c)(1)(B), even though the latter

remained underground in a "sensitive location" to which members of the public had no access

and the former stood in an outdoor public space, hundreds of feet above.  Because the function of

§ 1752 is to prevent members of the public from coming too close to a protectee, this distinction

is mitigating.  Griffin came nowhere near the vice president.  Nor could Griffin's entry into the

restricted area have caused the vice president's departure from the Capitol, thanks to Griffin's

arrival on the scene after 2:30 p.m.

Third, the typical § 1752 prosecution involves a defendant who enters the restricted area

*because the protectee is there*.  Before January 6, the statute had not been used as an all-purpose

federal trespass law to punish the act of entering a restricted area even where it is unmotivated by

anything to do with the protectee.  Consider *Bursey* again.  Bursey wanted to protest the Iraq war

in the area where President Bush would be, because President Bush would be there.  *Bursey*, 416

F.3d at 305.  The president was the defendant's intended audience.  Here, by contrast, some

evidence suggested that Griffin was under the impression that the USSS protectee was no longer

present at the Capitol by the time he arrived there.  No evidence, in any case, indicated that

Griffin's purpose in being in the area was driven by the protectee's presence specifically.  This

distinction is mitigating, as a defendant who enters a restricted area in order to be closer to, say,

the president poses a far more serious security problem than the defendant who enters that area

for some reason other than the protectee's incidental presence.

Fourth, the typical § 1752 restricted area does not attempt to preclude access to a First

Amendment public forum.  Here, by contrast, the West Front of the U.S. Capitol, where Griffin

led a prayer, is a public forum.  *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.

Supp. 575 (D.D.C. 1972) (three-judge panel) *sum. aff'd* 409 U.S. 972 (1972).  Thus, Griffin had

a right to "assemble in the Capitol Grounds." *Id.* at 583.  Griffin also had the right to make

speeches that have "the intent, effect, or propensity to attract a crowd or onlookers." *Lederman v.*

*United States*, 291 F.3d 36, 39 (D.C. Cir. 2002).

### 2.      The court's judgment in *United States v. Martin*

About a week after Griffin's trial, the Court presided over the trial in *United States v.*

*Martin*, 21-cr-394 (D.D.C. 2021).  Like Griffin, Martin was charged with entry into a restricted

area and disorderly conduct there under § 1752(a).  However, unlike Griffin, Martin entered the

Capitol Building.  Martin was acquitted of all charges.  *Martin*, 4/6/22 Judgment of Acquittal.

Griffin understands that Martin testified at trial that his interactions with law enforcement

inside the Capitol Building led him to believe that he was lawfully authorized to enter the

building and that the Court found Martin's testimony credible even if it did not agree that,

objectively, the officers in question authorized Martin's entrance.  Griffin did not offer similar

testimony in his trial.

At the same time, the government's position is that the restricted area on January 6

extended well beyond the Capitol Building itself, encompassing much of the Capitol Grounds.

In order for Martin to enter the building, he had to pass through the restricted area grounds, just

as Griffin did, before he interacted with law enforcement inside.  Here, it is important to recall the categories of evidence the Court cited in concluding that the government established, beyond a reasonable doubt, that Griffin knew the outdoor area he entered was restricted.  This included images depicting "the various barriers on the west front of the lawn [which] were clearly visible, including snow fencing with signs saying that the area was closed." 3/22/22 Tr., pp. 325-26.  The Court found that the appearance of the snow fencing put Griffin on notice, together with evidence suggesting that Griffin "smelled OC spray" in the area, climbed over a stone wall, and scaled an emergency exit staircase onto the inaugural platform.  *Id.* at 334.  Perhaps unlike the defendant in *Martin*, Griffin made two statements following January 6 "admitting that the area had been cordoned off and that police were telling people to stay away." *Id.* at 335.  (That said, no evidence showed that Griffin in fact observed law enforcement officers telling people to stay away.  To the contrary, the only testimony on this subject from government witness Matt Struck was that Griffin had no interactions with law enforcement the entire day of January 6.).

Nevertheless, it is difficult to see how any protester could have reached the point of entering the Capitol on the west side of the building on January 6 without encountering many of the general red flags cited by the Court such as snow fencing (even downed fencing), barriers, and the smell of OC spray.

Griffin does not suggest that the defendant in *Martin* is guilty.  Instead, his point is that the distinction between guilt and innocence in these cases appears to be a subtle rather than egregious one.  In most January 6 cases, the act of entering the building is considered more serious than protest outside it, which is why the overwhelming majority of those charged did enter the building.  This too is a significant mitigating factor.

### 3.    First-time offender status and atypical conduct

The fact that Griffin is a first-time offender, and that the offense conduct is atypical for

him, is an appropriate basis for a downward variance.  *United States v. Huckins*, 529 F.3d 1312,

1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month

range to below the calculated Guidelines range was reasonable and permissibly took into account

the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143

(10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement

from recommended Guidelines range of 65-78 months imprisonment supported by district

court's finding of several factors including that defendant had no felony criminal record and his

offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009)

(affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Griffin's lack of criminal history does not

mean that it is inappropriate for the Court to vary downward on the same basis.  *See United*

*States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to

enter sentencing variances based on factors already taken into account by the Advisory

Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a

sentencing] variance.").

### 4.    Griffin's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward

variance.  And district courts may vary downward based on remorse even where the acceptance

of responsibility adjustment under U.S.S.G. §3E1.1 does not apply because the defendant

exercised his right to trial.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

9

As explained above, Griffin deeply regrets his decision to climb on the inaugural platform and enter the restricted area.  To the extent his presence there contributed to the distress of outnumbered law enforcement officers, he offers them his sincere apology.  Though he is of limited means, Griffin would seize an opportunity to offer assistance to injured officers and to contribute to the repair of physical damage to the Capitol.  Griffin will personally demonstrate remorse at sentencing in his allocution.

**B.     Avoiding unwarranted sentence disparities (§ 3553(a)(6))**

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

Among thousands of January 6 protesters, Griffin appears to be the only one charged under § 1752 who neither entered the Capitol Building nor committed a felony offense outside it.  Moreover, before January 6 the government had never used § 1752 to prosecute protesters like Griffin at the Capitol even when U.S. Secret Service protectees were present.  The Court has already indicated these factors may be "relevant at sentencing" in the context of avoiding unwarranted sentence disparities.  *Griffin*, 549 F. Supp. 3d at 59.

The Court was surely right.  Before comparing Griffin's case to those of other convicted January 6 protesters, it is well to begin with thousands of similarly situated people who were never charged at all, on January 6 and in prior episodes of protest at the Capitol.  As the government's response to Griffin's selective protection motion showed, it is undisputed that on January 6 Griffin was surrounded by hundreds of protesters who have not been charged under § 1752 or with any other crime.  The government could not identify any principled basis for distinguishing Griffin's actions from those of the others in the context of § 1752.  ECF No. 71

(not identifying any reason why Griffin entered the restricted area but not the protesters surrounding him who stretch to the horizon in photographs of the scene).  If it is essential to avoid unwarranted sentence disparities "among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), it is surely no less important to reduce the punishment of one who is found guilty of conduct which hundreds of people committed without facing charges much less punishment.

The Court must also avoid sentence disparities between January 6 cases and prior episodes of unruly protest at the Capitol.  Just one example, which Griffin previously raised with the Court, are the "numerous uncharged protestors who broke through USCP barricades to occupy the Capitol steps on the eve of Justice Kavanaugh's Senate confirmation vote." *Griffin*, 549 F. Supp. 3d at 59 (citing *Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote*, Roll Call, Oct. 6, 2019, https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/).  Just as on January 6, a USSS protectee—the vice president—was "temporarily visiting," § 1752(c)(1)(B), during the Kavanaugh protesters' breach.  *Kavanaugh is sworn in after close confirmation vote in Senate*, N.Y. Times, Oct. 6, 2019, available at: https://www.nytimes.com/2018/10/06/us/politics/brett-kavanaugh-supreme-court.html.  Not one of these protesters was charged under § 1752.  To the extent they were charged with anything, it was pursuant to the district's "post and forfeit" procedure, whereby the protester pays a fine between $25-$100, after which the case is dropped. *Know your rights: Demonstrations in D.C.*, ACLU, available at: https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc.  A sentence of greater than two months' probation would create unwarranted sentence disparities with the Kavanaugh protesters.

Then there are the sentences of convicted January 6 protesters. Considering just this Court's sentences alone, a sentence of longer than two months' probation would create unwarranted disparities. For this Court has given that sentence, or at least some probationary sentence, to many defendants who, unlike Griffin, entered the Capitol Building:

- *United States v. Jenny Cudd*, 21-cr-68 (D.D.C. 2021) (two months' probation for § 1752 conviction);

- *United States v. Damielle Doyle*, 21-cr-324 (D.D.C. 2021) (two months' probation for disorderly conduct and entry);

- *United States v. Andrew Ericson*, 21-cr-506 (D.D.C. 2021) (24 months' probation for parading in the Capitol Building);

- *United States v. Rachel Pert*, 21-cr-139 (D.D.C. 2021) (24 months' probation for parading in the Capitol Building);

- *United States v. Eliel Rosa*, 21-cr-68 (D.D.C. 2021) (12 months' probation for parading in the Capitol Building);

- *United States v. Dana Joe Winn*, 21-cr-139 (D.D.C. 2021) (12 months' probation for parading in the Capitol Building);

- *United States v. William Blauser*, 21-cr-386 (D.D.C. 2021) (a non-incarceration sentence for parading in the Capitol Building);

- *United States v. Sean Cordon*, 21-cr-269 (2 months' probation for parading in the Capitol Building).

But the January 6 sentences imposed by other judges in this district also suggest that a sentence of incarceration would create unwarranted sentence disparities. Many of the following

defendants engaged in conduct inside the Capitol Building far more serious than Griffin's

outside it:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading |

13

| | | | |
|---|---|---|---|
| | | | offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |

14

| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| --- | --- | --- | --- |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is |

| | | | our house" under selfie photograph. |
|---|---|---|---|
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

A sentence of no more than two months' probation would avoid creating unwarranted sentence disparities with all the aforementioned defendants.

**C.    The seriousness of the offense and deterrence (§ 3553(a)(2))**

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The penalties Griffin has already incurred as a result of this case are more than sufficient to deter him from ever again entering a restricted area.  Griffin was arrested on January 17, 2021. When his detention hearing was ultimately held on February 1, a Magistrate Judge detained him

16

pretrial.  Since Griffin was not charged with a felony offense and the government did not appear to make any risk of flight or witness obstruction argument, it was not clear on what statutory basis the detention order rested.  18 U.S.C. § 3142(f)(1), (2).  In any case, the Magistrate Judge appeared to base the decision in part on Griffin's comments concerning China's possible influence over the 2020 presidential election.  These remarks, the Magistrate Judge found, showed that Griffin was a danger to society.  From January 17 to February 5, Griffin was mostly held in solitary confinement in the D.C. Jail.  The toilet in his cell was broken.  Corrections officers snapped pictures of Griffin in his cell, presumably for use in social media.  The experience was a brutal one for Griffin.

The media attention brought on by this case has imposed additional penalties.  For the past year, Griffin has regularly received death threats from people calling him a terrorist and white supremacist.  He is frequently accosted in public by angry citizens who threaten violence.

Then there are the public interest law firms.  In the middle of Griffin's trial, a group of lawyers announced a *quo warranto* lawsuit against Griffin in New Mexico. See *Lawsuit Filed to Remove Couy Griffin From Office,* CREW, Mar. 21, 2022 ("CREW Press Release"), available at: https://www.citizensforethics.org/legal-action/lawsuits/lawsuit-filed-to-remove-couy-griffin-from-office/. The lawsuit was filed by a 501(c)(3) organization called Citizens for Responsibility and Ethics in Washington (CREW).  It alleges that, under Section Three of the Fourteenth Amendment to the United States Constitution, known as the Disqualification Clause, a provision created for and unused since the Civil War, the courts must reverse a local election held over 160 years later in which Griffin prevailed.  That provision provides:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial

officer of any State, to support the Constitution of the United States, shall have engaged
in insurrection or rebellion against the same, or given aid or comfort to the enemies
thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3.

The 501(c)(3) organization contends that by walking on the U.S. Capitol steps on January
6, Griffin committed an act akin to an armed conflict that consumed 2% of the country's
population, which would amount to six million Americans today, i.e., Griffin committed
insurrection or rebel against the U.S. Constitution.  Griffin somehow did this, they say, even
though the government could not produce evidence beyond a reasonable doubt that he engaged
in disorderly conduct on January 6.   Even if this disqualification effort fails, it will have
seriously drained Griffin's limited resources as he fights to maintain his office and gainful
employment.

All of these developments are serious penalties for a misdemeanor conviction and serve
as potent specific and general deterrence.  The shame Griffin has experienced is itself a
guarantee of deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y.
2008) (specific deterrence satisfied by "intense shame created by the convictions); *United States
v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.)
(same).

**Conclusion**

For all the foregoing reasons, Griffin respectfully requests a sentence no greater than two
months' probation.

Dated: June 9, 2022                          Respectfully submitted,

                                             */s/ David B. Smith*
                                             David B. Smith (D.C. Bar No. 403068)
                                             108 N. Alfred St.
                                             Alexandria, VA 22314

18

Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Aaron Mostofsky*

## Certificate of Service

I hereby certify that on the 9th day of June, 2022, I filed the foregoing submission with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

Graciela Lindberg
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Aaron Mostofsky*

19