**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0092 (TNM)** |
| **v.** | : | |
| | : | |
| **COUY GRIFFIN,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Couy Griffin ("Griffin") to 90 days' incarceration with credit for the 20 days he has already served, one year of supervised release, 60 hours of community service, a $1,000 fine, and $500 restitution.

## I.      Introduction

The defendant, Couy Griffin, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 22, 2022, following a two-day bench trial, this Court found Griffin guilty of one count of 18 U.S.C. § 1752(a)(1): Entering a Restricted Building or Grounds. As explained herein, a sentence of ninety days' imprisonment, with probation to follow, is appropriate in this case because: (1) the defendant entered and remained on the Capitol grounds by climbing over the Olmstead wall, using a metal barricade as a ladder to climb over the wall leading into the Lower West Terrace, climbing over a plywood ramp, and made his way to the inauguration platform; (2) the defendant stood outside a door to an external staircase leading to the inauguration platform and stated, "[w]e will wait until they get this door broken down,"; (3) the defendant remained in the restricted area for over two hours while he observed rioters attempting to break windows; (3) the defendant subsequently stated on two separate occasions that police told him not to enter the restricted area and he violated that order; (4) as an elected official who should have respect for laws that protect the safety of other elected officials, the defendant bragged at an official county commission meeting about violating law enforcement officers' orders to stay out of the restricted area; ; and (5) the defendant has shown a lack of contrition for his conduct following the Court's verdict by posting content on social media mocking the Court's verdict, questioning the Court's judgment, and spreading baseless conspiracy theories about the events of January 6.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that

actually succeeded in halting the Congressional certification combined with the defendant's violation of law enforcement's orders to refrain from entering the restricted area and his lack of remorse, renders a significant jail sentence both necessary and appropriate in this case.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1 Attachment 1 (Statement of Facts). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Couy Griffin's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Couy Griffin and Matthew Struck arrived in Washington, D.C. That evening, Griffin and Struck recorded a video of Griffin standing in front of the Capitol grounds. ECF No. 102, Ex. 63; 3/22/22 Tr. 325. In the background of the video, as depicted below, metal bike racks are clearly visible with signs indicating that the area was restricted.



On January 6, 2021, after attending the former President's rally at the Ellipse, Struck and Griffin walked towards the Capitol building and entered the Capitol grounds at 2:31 p.m. ECF No. 102, Ex. 37-1; 3/22/22 Tr. 326. Griffin climbed over the Olmstead wall, climbed over a second stone wall leading to the Lower West Terrace using a metal barricade as a ladder, and climbed over a plywood ramp to access the entrance to an external staircase. As he stood outside the door to an external staircase leading to the inauguration platform, he stated, "[w]e'll wait until they get this door broken down." ECF No. 102, Ex. 40; 3/22/22 Tr. 327. Griffin then climbed up the stairs leading to the inauguration platform and stated, "I love the smell of napalm in the air." ECF No. 102, Ex. 43; 3/22/22 Tr. 327. This was a reference to Griffin smelling the chemical spray released by law enforcement officers in an effort to control the crowd and move rioters out of the restricted area. 3/22/22 Tr. 327. Griffin subsequently reached the inauguration platform where he recorded another video of himself making accusations regarding election fraud. ECF No. 102, Ex. 44; 3/21/22 Tr. 123. Griffin and Struck remained on the Capitol grounds until approximately 4:48 p.m.

3/22/22 Tr. 327.  During that time, they witnessed rioters discussing attempts to break windows and observed damage to the windows of the Capitol building (ECF No. 102, Ex. 56-1) and observed law enforcement trying to control the crowd while the crowd took officers' ballistic shields, as pictured below (ECF No. 102, Exs. 46-1 and 50-1)





On January 7, 2021, Griffin recorded a video where he stated that he was aware that the Capitol grounds was roped off for the inauguration and that police indicated he could not enter that area. ECF No. 102, Ex. 64; 3/22/22 Tr. 327-328. He further stated, just one day after a violent mob attacked the United States Capitol:

> You want to say that was a mob? You want to say that was violence? No sir. No ma'am. No we could have a 2nd Amendment rally on those same steps that we had that rally yesterday. You know, and if we do, then its gonna be a sad day, because there's gonna be blood running out of that building. But at the end of the day, you mark my word, we will plant our flag on the desk of Nancy Pelosi and Chuck Schumer and Donald J. Trump if it boils down to it.

On January 14, 2021, Griffin, who is an elected Otero County commissioner in New Mexico, stated at a recorded county commission meeting that law enforcement stated that the Capitol grounds were "being reserved for Joe Biden and his inauguration. Well, you tell a million Trump supporters that are going down there, pretty soon that crowd pushed through." ECF No. 102, Ex. 78; 3/22/22 Tr. 328. Griffin also stated that he would return to Washington, D.C. for the presidential inauguration and that he intended to bring firearms with him. The January 7 statements

regarding blood running out of the Capitol in conjunction with Griffin's stated intention to return to Washington, D.C. for the inauguration with firearms just days after he participated in a riot at the Capitol building caused law enforcement to act quickly to bring him into custody because of reasonable concerns that he posed a risk to public safety. Following the Court's verdict in this matter, Griffin made statements questioning the validity of the Court's verdict. On March 24, 2022, Griffin posted a message on Twitter stating, "[t]he media has tried to make me look like the biggest loser the last couple days. Truth is I was 1 for 1 with the US Government. The 1 I lost I will appeal. We SHOULD have won a grand slam on both counts. McFaddens PRE written response was pathetic! I wonder who wrote it??":



On April 9, 2022, Griffin posted on Twitter, "[e]xtremely happy for Matthew Martin. Still sit in confusion as to how McFadden handled both cases so differently and found me guilty yet I didn't go inside the Capitol. Selective Prosecution possibly?"



On April 27, 2022, Griffin posted on Twitter that, "Matthew Martin was charged with 'entering into a restricted zone' NOT 'entering into the Capitol'. I didn't even go inside the Capitol and was found guilty yet Martin enters the building and McFadden acquits? Makes absolutely no sense!"



Within the last few weeks, Griffin has also posted several statements on his Twitter page disparaging federal law enforcement officers and spreading false information regarding January 6, including the following posts from May 2022 stating, "[w]here is the investigation into the coordinated and PLANNED SET UP of Jan 6th!! Why doesn't Trump speak up louder on this?!?!" and "[t]he greatest and most concerning corruption is found inside our @FBIWFO @SecretService @CIA @CaptiolPolice. They are the reason @JoeBiden is president and our country is being destroyed. They are the fingertips of the Deep State! Pray for our @US MarshalsHQ.":



In a June 8, 2022, recorded interview on The Mel K Show,[2] Griffin discussed the instant

matter and stated, "I don't think that justice was served." Griffin also commented on United States

Secret Service Inspector Lanelle Hawa's trial testimony, claiming that she did not know where the

restricted area was. He additionally claimed that the FBI and "Team Pelosi" were responsible for

---

[2] A copy of this interview, Government's Exhibit 2 for sentencing, was provided to the Court via USA File Exchange and to counsel for Griffin.

the January 6 attack. He further stated that the rioters on January 6 were instigated by FBI informants in the crowd and asserted that President Biden is not the president.

As the PSR notes, two GiveSendGo.com pages have been created to provide Griffin financial assistance. It appears that neither of these pages were created by Griffin, however, he is receiving the funds raised by these pages. PSR at ¶¶ 106-107. Additionally, although Griffin has court-appointed counsel in this matter, one of the GiveSendGo.com pages has a photograph, shown below, of a check written to an attorney for $5,000, presumably from the proceeds of the GiveSendGo.com page.



As the PSR indicates, each page refers to Griffin's January 6 case and seek to raise money to assist with his legal fees related to his January 6 case. In his June 8, 2022, interview on the Mel K show, Griffin asked the audience listening to the interview to contribute to the GiveSendGo.com account.

## III.   Statutory Penalties

The defendant now faces sentencing on a single count of 18 U.S.C. 1752(a)(1). As noted by the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000.

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Griffin's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 47-56.

The U.S. Probation Office calculated Griffin's criminal history as a category I, which is not disputed. PSR at ¶ 51. Accordingly, the U.S. Probation Office calculated Griffin's total adjusted offense level at 6, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 112.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so

14

under extreme circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Griffin climbed onto the Capitol grounds over the Olmsted Wall, knowing that police officers directed him not to enter that area. After entering the area, he mounted another wall using

a makeshift ramp and then waited for a door to "be broken down" so he could enter the staircase leading up to the inaugural platform. When Griffin stated that he was waiting for the door to be broken down, this was a clear indication that he was aware of the property damage taking place on the Capitol grounds and, instead of leaving, chose to remain on the grounds.

As Griffin walked up the steps towards the inauguration platform, he stated, "I love the smell of napalm in the air," acknowledging that he was aware that law enforcement was using chemical spray due to the conduct of the rioters. Again, Griffin did not turn around and leave the grounds at that point, and instead remained on the inauguration platform. Griffin remained on the Capitol grounds for over two hours while rioters engaged in acts of violence and property damage on the Capitol grounds.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of the Defendant

Griffin's entry into the Capitol grounds is particularly troubling given his position as an elected official. On January 7, 2021, Griffin stated that he was aware that law enforcement officers told him not to enter the restricted area, and that he entered the area in violation of that order. Griffin further stated on January 14, 2021, at an official county commissioner meeting, that he entered the Capitol grounds on January 6 in violation of orders from law enforcement stating that the grounds were restricted. As an elected official, Griffin should be the last person to violate orders from law enforcement officers and should serve as an example to his constituents by complying with those orders. Instead, he not only violated those orders, but bragged about his conduct in the days following January 6.

Moreover, Griffin not only did not take responsibility for his conduct, he also mocked the Court's verdict in this case in March and April, insinuating that the Court's findings of fact and verdict were written by someone else and calling the Court "pathetic." As an elected official, Griffin should promote confidence in the judicial system instead of sowing doubt in the validity of the Court's decision. Griffin has also made multiple public statements as recently as May 2022 undermining the authority of federal law enforcement officials and insinuating that the attack on January 6 was a set up.

Due to Griffin's status as an elected official and his flagrant disrespect for law enforcement, as demonstrated by his conduct on January 6, Griffin's conduct presents a very real need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

Griffin has shown a particular contempt for the law both in his actions on January 6, and his conduct since the conclusion of his trial. He bragged about violating law enforcement orders to stay out of the restricted area both in a Facebook video and at a public county commission meeting where he was acting in his capacity as an elected official. After the Court issued its verdict in this matter, Griffin chose, on multiple occasions, to cast doubt on the Court's decision. Griffin also disparaged federal law enforcement officers for investigating the events of January 6. While Griffin has a First Amendment right to make these statements, the Court should consider them when determining its sentence as they speak directly to his acceptance of the Court's verdict.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing

> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a

manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society. Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing).

 The gravity of these offenses demands deterrence. This was not a protest. *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

 *Specific Deterrence*

 Griffin's conduct on January 6 and since that day indicates that incarceration is the only

way to ensure deterrence for his behavior. Griffin openly violated the orders of law enforcement

officers not to approach the restricted area and remained there for over two hours while property

damage and violence were going on around him. Following his conduct on January 6, Griffin

publicly stated law enforcement officers instructed him not to enter the restricted area and that he

acted in contravention of those orders. Griffin, as recently as May 2022, has mocked and sought to undermine the validity of the Court's verdict, and made derogatory statements regarding the role of federal law enforcement in investigating the January 6 attack, which indicates an utter lack of remorse for his actions.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the government invites

---

[4] Attached to this  sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. This table is Government's Exhibit 1 for sentencing.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and  *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Courts in other January 6 cases have imposed sentences of incarceration in cases where defendants ignored law enforcement commands. *See United States v. Tryon,* 21-cr-420 (RBW)

(sentenced to 50 days jail time, when defendant observed other rioters break a window and celebrated his actions in his post-arrest interview); *United States v. Paul Von Bernewitz*, 21-cr-307 (CRC)(sentenced to 30 days incarceration, when defendant was an early breacher of the West Front, observed others breaking windows, and heard police deploying flash bangs and tear gas). Courts in other January 6 cases have also imposed sentences of incarceration to individuals who abused a position of public trust, as Griffin did in this case. *See United States v. Scavo*, 21-cr-254 (RCL) (sentenced to 60 days of jail time, when defendant had ties to local politics, gave a TV interview and witnessed violence at the East Rotunda door); *United States v. Pham*, 21-cr-109 (TJK) (sentenced to 45 days of jail time, when defendant was an active duty police officer who minimized his conduct). Courts have also imposed sentences of incarceration in part due to prolific social media use by defendants to undercut the Court's rulings and minimize their role in the January 6 attack, as Griffin did. *United States v. Jenna Ryan*, 21-cr-50 (CRC)(sentenced to 60 days jail time, when defendant had large social media presence, gave TV interviews, showed significant lack of remorse and disrespect for judicial system); *United States v. Meteer*, 21-cr-630 (CJN) (sentenced to 60 days incarceration, when defendant had substantial lack of remorse, demonstrated through statements on Facebook and in three television interviews, including one year after the riot).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[6]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual

---

[6] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Applying these principles to this case leads to the conclusion that Griffin should be required to pay $500 in restitution.  His offense of conviction, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii).  As described in detail above, Griffin's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees.  A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Rubenacker should be responsible

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

is $500.  That is the same amount that defendants convicted of misdemeanor offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664."  18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d).  Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.  18 U.S.C. § 3664(h).  Here, Griffin should be directed to pay $500 as an approximate estimate of the losses for which he is responsible.

## VII.    Fine

Griffin's conviction under Section 1752 subjects him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b)(5).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."  *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.  As the PSR notes, as of May 3, 2022, over $50,000 had been raised for Griffin's benefit in online campaigns claiming that he is a victim of political

persecution.  *See* PSR ¶¶ 106-07.  Griffin should not be able to "capitalize" on his participation in the Capitol siege in this way.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Couy Griffin to 90 days' incarceration, one year of supervised release, a $1,000 fine, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:   /s/  *Janani Iyengar*
JANANI IYENGAR
NY Bar No. 5225990
KIMBERLY PASCHALL
D.C. Bar No. 1015665
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, NW
Washington, D.C.
Office: 202-252-7760
Janani.iyengar@usdoj.gov